## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| HATICE CENGIZ, | ) | |
| | ) | |
| AND | ) | |
| | ) | |
| DEMOCRACY FOR THE ARAB | ) | |
| WORLD NOW, INC., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CASE NUMBER: |
| | ) | |
| MOHAMMED BIN SALMAN, | ) | |
| Al Yamamah Palace, | ) | JURY TRIAL DEMANDED |
| Riyadh 12911, Saudi Arabia, | ) | |
| and | ) | |
| Al Auja Palace, | ) | |
| Wadi Hanifah, | ) | |
| Riyadh 13731, Saudi Arabia, | ) | |
| | ) | |
| MAHER ABDULAZIZ M. MUTREB, | ) | |
| al-Ha'ir Prison, | ) | |
| Al Hair, Riyadh 14765, Saudi Arabia, | ) | |
| | ) | |
| SAUD AL-QAHTANI, | ) | |
| Saudi Arabian Ministry of Interior | ) | |
| King Fahad Rd., | ) | |
| Al Olaya, Riyadh 11543, Saudi Arabia, | ) | |
| and | ) | |
| Al Yamamah Palace, | ) | |
| Riyadh 12911, Saudi Arabia, | ) | |
| | ) | |
| AHMED AL-ASSIRI (A/K/A AHMAD AL-ASIRI, | ) | |
| AHMED AL-ASIRI, AHMAD MOHAMMAD | ) | |
| ASIRI), | ) | |
| Saudi Arabian Ministry of Interior | ) | |
| King Fahad Rd., | ) | |
| Al Olaya, Riyadh 11543, Saudi Arabia, | ) | |
| | ) | |
| SALAH MUHAMMAD A. TUBAIGY (A/K/A | ) | |
| SALAH MUHAMMED TUBAIGY, SALAH | ) | |
| MOHAMMED TUBAIGY), | ) | |
| al-Ha'ir Prison, | ) | |
| Al Hair, Riyadh 14765, Saudi Arabia, | ) | |
| | ) | |

MOHAMMAD AL-OTAIBI,                          )
Saudi Arabian Ministry of Interior            )
King Fahad Rd.,                              )
Al Olaya, Riyadh 11543, Saudi Arabia,         )
                                             )
MOHAMED ALQUARI,                             )
Saudi Arabian Ministry of Interior            )
King Fahad Rd.,                              )
Al Olaya, Riyadh 11543, Saudi Arabia,         )
                                             )
MANSOUR OTHMAN M. ABAHUSSAIN,                )
al-Ha'ir Prison,                             )
Al Hair, Riyadh 14765, Saudi Arabia,          )
        and                                  )
Saudi Arabian Ministry of Interior            )
King Fahad Rd.,                              )
Al Olaya, Riyadh 11543, Saudi Arabia,         )
                                             )
NAIF HASSAN S. ALARIFI (A/K/A NAIF           )
HASAN ALARIFI),                              )
al-Ha'ir Prison,                             )
Al Hair, Riyadh 14765, Saudi Arabia,          )
        and                                  )
Saudi Arabian Ministry of Interior            )
King Fahad Rd.,                              )
Al Olaya, Riyadh 11543, Saudi Arabia,         )
                                             )
FAHAD SHABIB A. ALBALAWI,                    )
al-Ha'ir Prison,                             )
Al Hair, Riyadh 14765, Saudi Arabia,          )
                                             )
MOHAMMAD SAAD H. ALZAHRANI (A/K/A            )
MOHAMED SAAD H. ALZAHRANI,                   )
MOHAMMED ALZAHRANI),                         )
al-Ha'ir Prison,                             )
Al Hair, Riyadh 14765, Saudi Arabia,          )
        and                                  )
Saudi Arabian Ministry of Interior            )
King Fahad Rd.,                              )
Al Olaya, Riyadh 11543, Saudi Arabia,         )
                                             )
THAAR GHALEB T. ALHARBI,                     )
al-Ha'ir Prison,                             )
Al Hair, Riyadh 14765, Saudi Arabia,          )
        and                                  )
Saudi Arabian Ministry of Interior            )

2

King Fahad Rd,                                         )
Al Olaya, Riyadh 11543, Saudi Arabia,                  )
                                                       )
ABDULAZIZ MOHAMMED ALHAWSAWI,                          )
al-Ha'ir Prison,                                       )
Al Hair, Riyadh 14765, Saudi Arabia,                   )
        and                                            )
Saudi Arabian Ministry of Interior                     )
King Fahad Rd.,                                        )
Al Olaya, Riyadh 11543, Saudi Arabia,                  )
                                                       )
MUSTAFA MOHAMMED ALMADANI,                             )
al-Ha'ir Prison,                                       )
Al Hair, Riyadh 14765, Saudi Arabia,                   )
        and                                            )
Saudi Arabian Ministry of Interior                     )
King Fahad Rd.,                                        )
Al Olaya, Riyadh 11543, Saudi Arabia,                  )
                                                       )
BADR LAFI M. ALOTAIBI,                                 )
al-Ha'ir Prison,                                       )
Al Hair, Riyadh 14765, Saudi Arabia,                   )
        and                                            )
Saudi Arabian Ministry of Interior                     )
King Fahad Rd.,                                        )
Al Olaya, Riyadh 11543, Saudi Arabia,                  )
                                                       )
SAIF SAAD Q. ALQAHTANI,                                )
al-Ha'ir Prison,                                       )
Al Hair, Riyadh 14765, Saudi Arabia,                   )
        and                                            )
Saudi Arabian Ministry of Interior                     )
King Fahad Rd.,                                        )
Al Olaya, Riyadh 11543, Saudi Arabia,                  )
                                                       )
WALEED ABDULLAH M. ALSHEHRI (A/K/A                     )
WALEED ABDULLAH M. ALSEHRI),                           )
al-Ha'ir Prison,                                       )
Al Hair, Riyadh 14765, Saudi Arabia,                   )
        and                                            )
Saudi Arabian Ministry of Interior                     )
King Fahad Rd.,                                        )
Al Olaya, Riyadh 11543, Saudi Arabia,                  )
                                                       )
TURKI MUSHARRAF M. ALSEHRI (A/K/A                      )
TURKI MUSERREF M. ALSHEHRI, TURKI                      )

3

MUSERREF ALSEHRI, TURKI                     )
MUSHARRAF M. ALSHEHRI),                     )
al-Ha'ir Prison,                            )
Al Hair, Riyadh 14765, Saudi Arabia,        )
    and                 )
Saudi Arabian Ministry of Interior          )
King Fahad Rd.,                             )
Al Olaya, Riyadh 11543, Saudi Arabia,       )
                                            )
KHALID ALOTAIBI (A/K/A KHALID               )
    AEDH G. ALTAIBI),     )
al-Ha'ir Prison,                            )
Al Hair, Riyadh 14765, Saudi Arabia,        )
    and                 )
Saudi Arabian Ministry of Interior          )
King Fahad Rd.,                             )
Al Olaya, Riyadh 11543, Saudi Arabia,       )
                                            )
AHMAD ABDULAZIZ AL-JUNABI,                  )
al-Ha'ir Prison,                            )
Al Hair, Riyadh 14765, Saudi Arabia,        )
    and                 )
Saudi Arabian Ministry of Interior          )
King Fahad Rd.,                             )
Al Olaya, Riyadh 11543, Saudi Arabia,       )
                                            )
KHALED YAHYA AL-ZAHRANI,                    )
al-Ha'ir Prison,                            )
Al Hair, Riyadh 14765, Saudi Arabia,        )
    and                 )
Saudi Arabian Ministry of Interior          )
King Fahad Rd.,                             )
Al Olaya, Riyadh 11543, Saudi Arabia,       )
                                            )
AHMED ABDULLAH MUZAINI,                     )
Saudi Arabian Ministry of Interior          )
King Fahad Rd.,                             )
Al Olaya, Riyadh 11543, Saudi Arabia,       )
                                            )
ABDULRAHMAN MOHAMED ALQUARNI,               )
Saudi Arabian Ministry of Interior          )
King Fahad Rd,                              )
Al Olaya, Riyadh 11543, Saudi Arabia,       )
                                            )
ABDULAZIZ SULEIMAN AL-GUMIZI (A/K/A         )
ABDUALAZIZ SULEIMAN AL-GUMIZI),             )

Saudi Arabian Ministry of Interior    )
King Fahad Rd.    )
Al Olaya, Riyadh 11543, Saudi Arabia,    )
    )
EKREM SULTAN,    )
Saudi Arabian Ministry of Interior    )
King Fahad Rd.    )
Al Olaya, Riyadh 11543, Saudi Arabia,    )
    )
JOHN DOES 1-4,    )
    )
    Defendants.    )

## COMPLAINT

COME NOW, Plaintiffs Hatice Cengiz and Democracy for the Arab World Now, Inc. ("DAWN"), through undersigned counsel, to seek a judgment against Defendants for claims arising under both federal law and the laws of the District of Columbia as a result of the Defendants' murder of Jamal Khashoggi.

1.    On October 2, 2018, Defendants, acting in a conspiracy and with premeditation, kidnapped, bound, drugged, tortured, and assassinated U.S.-resident journalist and democracy advocate Jamal Khashoggi inside the Saudi Consulate in Istanbul, Turkey, then dismembered his body, while Plaintiff Cengiz waited for him outside for more than 12 hours. Mr. Khashoggi's remains have never been located nor returned. This brutal and brazen crime was the culmination of weeks of planning and conspiratorial actions taken collectively by Defendants and their co-conspirators.

2.    The ruthless torture and murder of Mr. Khashoggi shocked the conscience of people throughout the world. The objective of the murder was clear – to halt Mr. Khashoggi's advocacy in the United States, principally as the Executive Director of Plaintiff DAWN, for democratic reform in the Arab world. The murder was carried out pursuant to a directive of Defendant Mohammed bin Salman, the Crown Prince of Saudi Arabia. Defendants saw Mr. Khashoggi's

actions in the United States as an existential threat to their pecuniary and other interests and, accordingly, conspired to commit the heinous acts that are the subject of this suit.

3.      The plan to permanently silence Mr. Khashoggi by murdering him was put in motion no later than the summer of 2018 after Defendant Mohammed bin Salman, other Defendants, and their co-conspirators discovered Mr. Khashoggi's plans to utilize DAWN as a platform to espouse democratic reform and promote human rights. The Defendants learned, after hacking mobile telephone(s) of Mr. Khashoggi's associate(s), that Mr. Khashoggi had created and headed DAWN, and Defendants were deeply concerned that Mr. Khashoggi's activities through DAWN in the United States, including his calls for democracy and observance of human rights in the Kingdom of Saudi Arabia (the "Kingdom" or "Saudi Arabia"), would undermine Defendants' pecuniary and political interests. Accordingly, Defendants resolved to put an end to Mr. Khashoggi's efforts by any means necessary.

4.      When Mr. Khashoggi approached the Saudi Embassy in Washington, D.C., to acquire documents necessary to confirm civilly his marriage to Plaintiff Cengiz, Defendants manufactured an opportunity to murder him. Specifically, as part of the conspiracy to kill Mr. Khashoggi, Saudi Embassy officials informed Mr. Khashoggi that the documents were not available at the Embassy in Washington. The Embassy officials further informed Mr. Khashoggi that he would have to obtain these essential documents in the Saudi Consulate in Istanbul, Turkey. Thus, while Mr. Khashoggi was in the United States, members of the Saudi Embassy, who were also in the United States, lured Mr. Khashoggi to the Saudi Consulate in Turkey under a ruse that Turkey was the sole place he could obtain the documents he sought. This fatal misdirection took place in the United States and was part of the overall conspiracy intended to have a direct impact

on Mr. Khashoggi's political activities in the United States. Defendants and their co-conspirators orchestrated these actions with the intention of murdering Mr. Khashoggi.

5.      Plaintiffs, Hatice Cengiz and DAWN, come before this Court to seek to hold Defendants accountable for their actions and to obtain redress for the damage Defendants have caused. The sole venue where such accountability and redress can effectively be obtained is here in the United States.

## PARTIES

6.      Plaintiff Hatice Cengiz is the widow of Jamal Khashoggi. Plaintiff Cengiz and Mr. Khashoggi were married in an Islamic ceremony on September 16, 2018. At the time of his murder, they were seeking to civilly confirm their marriage. Plaintiff Cengiz accompanied Mr. Khashoggi to the Saudi Consulate in Istanbul as he sought the documents needed for this purpose. She waited deep into the night outside the Consulate, but he was never seen again.

7.      Plaintiff DAWN is a 501(c)(4) Delaware corporation with a principal place of business in Washington, D.C. Mr. Khashoggi was the Executive Director of DAWN at the time of his murder. Defendants were aware of and deeply concerned with Mr. Khashoggi's involvement with DAWN and his use of the platform to promote democratic reform in the Arab world.

8.      Defendant Mohammed bin Salman ("MBS") is the Crown Prince of the Kingdom of Saudi Arabia. Defendant MBS ordered the murder of Mr. Khashoggi.  Numerous individuals directly involved in the torture and murder of Mr. Khashoggi were part of MBS' inner circle.  MBS is neither head of the Saudi state nor head of its government.  Rather, he is the son of King Salman bin Abdulaziz Al Saud.  King Salman is the head of state of the Kingdom and, because he serves as the Prime Minister of Saudi Arabia, is also the head of the Kingdom's government.

9.      Defendant Maher Abdulaziz M. Mutreb is a citizen of Saudi Arabia. At the time of Mr. Khashoggi's torture and murder, Defendant Mutreb was an intelligence officer and worked

with MBS's advisor Saud Al-Qahtani. Defendant Mutreb was assigned to the Royal Protective force of MBS and served as MBS' designee to lead the team that completed the torture and murder. He has long been a close advisor to MBS. Defendant Mutreb was operationally in charge during the planning and execution of the murder of Mr. Khashoggi.

10.     Defendant Saud Al-Qahtani is a citizen of Saudi Arabia who, until on or about October 19, 2018,[1] served as a trusted adviser to MBS and was considered his "enforcer."[2]  From his position running media operations within the royal court, Al-Qahtani flooded social media with propaganda, monitored critics using espionage, and orchestrated an online effort to attack and seek to discredit critics, including Mr. Khashoggi.[3]  He acted as a co-conspirator in the murder of Jamal Khashoggi and called into the killing of Mr. Khashoggi, reportedly, via Skype.[4]

---

[1] In places throughout the Complaint, Plaintiffs identify some but not all of the publicly available sources for certain averments made.  These sources are for the Court's convenience.  However, these citations to publicly accessible sources are not and should not be construed as the sole sources and bases for Plaintiffs' contentions as set forth herein. *See* Kevin Sullivan, Loveday Morris, & Tamer El-Ghobashy, *Saudi Arabia Fires 5 Top Officials, Arrests 18 Saudis, Saying Khashoggi was Killed in Fight at Consulate*, Reuters (Oct. 19, 2018), https://www. washingtonpost.com/news/world/wp/2018/10/19/saudi-government-acknowledges-journalist-jamal-khashaoggi-died-while-in-that-countrys-consulate-in-istanbul/.    Al-Qahtani appears to continue to serve as an advisor to MBS, despite Al-Qahtani's dismissal from the Royal Court.  *See* U.N. Human Rights Council, *Annex to the Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions: Investigation into the Unlawful Death of Mr. Jamal Khashoggi*, ¶ 147 n.100, U.N. Doc. A/HRC/41/CRP.1 (June 19, 2019) (hereinafter "SR Report").
[2] *See* Tamer El-Ghobashy, *Khashoggi Mystery Fixes Spotlight on Saudi Official Described as Crown Prince's Strategist, Enforcer*, Wash. Post (Oct. 12, 2018), https://www.washingtonpost. com/world/khashoggi-mystery-fixes-spotlight-on-saudi-official-described-as-crown-princes-strat egist-enforcer/2018/10/12/df5b523a-cd8f-11e8-ad0a-0e01efba3cc1_story.html.
[3] Katie Benner, Mark Mazzetti, Ben Hubbard, & Mike Isaac, *Saudis' Image Makers: A Troll Army and a Twitter Insider*, N.Y. Times (Oct. 20, 2018), https://www.nytimes.com/2018/10/20/us/ politics/saudi-image-campaign-twitter.html; Associated Press, *American Prosecutors: Saudis Recruited Twitter Workers to Spy on Users*, Politico (Nov. 6, 2019), https://www.politico.com/ news/2019/11/06/saudi-arabia-twitter-spies-067024.
[4] *How the Man Behind Khashoggi Murder Ran the Killing Via Skype*, Reuters (Oct. 22, 2018), https://www.reuters.com/article/us-saudi-khashoggi-adviser-insight/how-the-man-behindkhasho ggi-murder-ran-the-killing-via-skype-idUSKCN1MW2HA.

11.    Defendant Ahmed al-Assiri (a/k/a Ahmed Al-Asiri, Ahmad Al-Asiri, Ahmad Mohammad Asiri) is a citizen of Saudi Arabia who served until on or about October 19, 2018 as Deputy Director of the Saudi General Intelligence Presidency and was a Saudi Major General.[5] On information and belief, at the behest of Defendant MBS, Defendant Assiri planned and organized the team in Riyadh that ultimately travelled to Turkey to murder Jamal Khashoggi.

12.    Defendant Salah Mohammed A. Tubaigy (a/k/a Salah Muhammed Tubaigy, Salah Mohammed Tubaigy) is a citizen of Saudi Arabia, a forensic scientist, and an expert on autopsies who was employed as a forensic doctor with the Ministry of the Interior and as Director of the Saudi Scientific Council of Forensics.[6] Defendant Tubaigy acted as a co-conspirator in the murder of Jamal Khashoggi. After Mr. Khashoggi was killed, Tubaigy dismembered Mr. Khashoggi's body and placed pieces of Mr. Khashoggi's body in plastic bags.

13.    Defendant Mohammad al-Otaibi is a citizen of Saudi Arabia and former Saudi Consul General in Istanbul who acted as a co-conspirator in the murder of Jamal Khashoggi. Defendant al-Otaibi led the logistics efforts at the Saudi Consulate in preparation for the arrival of the rapid intervention team that carried out the murder of Mr. Khashoggi. He was contacted by Defendant Mutreb to lead the logistics efforts in preparation for the arrival of the rapid intervention team that carried out the torture and murder of Mr. Khashoggi. On October 17, press reports circulated that Defendant al-Otaibi had been fired from his post. The actions he took as part of the conspiracy to murder Mr. Khashoggi were not within the scope of his consular activities.

---

[5] *See Who is Ahmed al-Asiri, the Sacked Saudi Intelligence Official?*, Al Jazeera News (Oct. 20, 2018), https://www.aljazeera.com/news/2018/10/ahmed-al-asiri-sacked-saudi-intelligence-chief-181019235211120.html.
[6] *See 'I'm Suffocating': Khashoggi's Last Words, Says Turkish Reporter*, Al Jazeera News (Nov. 11 2018), https://www.aljazeera.com/news/2018/11/suffocating-khashoggi-words-turkish-report er-181111085534099.html; SR Report ¶ 87 Table A.

14.     Defendant Mohamed Alquari—on information and belief, the individual identified as "SA" by Agnes Callamard, the United Nations Special Rapporteur on extrajudicial, summary, or arbitrary executions, in the report on her investigation into the unlawful killing of Mr. Khashoggi[7]—is a citizen of Saudi Arabia who served at the Saudi Consulate in Istanbul and acted as a co-conspirator in the murder of Jamal Khashoggi. Among other things, he relayed videos and images of Mr. Khashoggi's initial visit to the Saudi Consulate in Istanbul to other Saudi officials and he communicated with Defendant Mutreb on September 28, 2018 to advise that Mr. Khashoggi would return to the consulate on October 2, 2018.  Defendant Alquari ominously asserted in that call that Mr. Khashoggi was "one of the people sought."

15.     Defendant Mansour Othman M. Abahussain is a citizen of Saudi Arabia who acted as a co-conspirator in the torture and murder of Jamal Khashoggi.  He was part of the intelligence component of the rapid intervention team and participated directly in the murder of Mr. Khashoggi in the Saudi Consulate on October 2, 2018.

16.     Defendant Naif Hassan S. Alarifi (a/k/a Naif Hasan Alarifi) is a citizen of Saudi Arabia who acted as a co-conspirator in the murder of Jamal Khashoggi.  He was a first lieutenant of external intelligence and worked directly in MBS' office.  He was part of the rapid intervention team and participated directly in the murder of Mr. Khashoggi in the Saudi Consulate on October 2, 2018.

---

[7] U.N. Special Rapporteur Callamard initiated an inquiry in January 2019 into the unlawful killing of Mr. Khashoggi under the terms of her mandate. *See* U. N. Human Rights Council, *Independent Human Rights Expert to Visit Turkey to Launch International Inquiry into Khashoggi Case* (Jan. 25, 2019), https://www.ohchr.org/en/NewsEvents/Pages/DisplayNews. aspx?NewsID=24113&LangID=E . U.N. Special Rapporteur Callamard produced a report of her findings, dated June 19, 2019, for the 41st Session of the U.N. Human Rights Council.  *See* SR Report, *supra* note 1.

17.     Defendant Fahad Shabib A. Albalawi is a citizen of Saudi Arabia who acted as a co-conspirator in the murder of Jamal Khashoggi.  Defendant Albalawi is a member of the Saudi Royal Guard who, upon information and belief, traveled with Defendant MBS to the United States and accompanied Defendant MBS on a March 14, 2017 visit at the White House with U.S. President Donald Trump.  Defendant Albalawi was present in the Saudi Consulate in Istanbul and personally and directly took part in Mr. Khashoggi's murder.

18.     Defendant Mohammad Saad H. Alzahrani (a/k/a Mohamed Saad H. Alzahrani a/k/a Mohammed Alzahrani) is a citizen of Saudi Arabia and an Intelligence Officer who acted as a co-conspirator in the murder of Jamal Khashoggi.  He was present in the Saudi Consulate in Istanbul and, on information and belief, personally took part in Mr. Khashoggi's murder.

19.     Defendant Thaar Ghaleb T. Alharbi is a citizen of Saudi Arabia and a lieutenant in the Saudi forces who acted as a co-conspirator in the murder of Jamal Khashoggi.  He was part of the rapid intervention team, was present in the Saudi Consulate in Istanbul, and, on information and belief, personally took part in Mr. Khashoggi's murder.

20.     Defendant Abdulaziz Mohammed Alhawsawi is a citizen of Saudi Arabia and a former member of the Saudi royal protective guard who acted as a co-conspirator in the murder of Jamal Khashoggi. He was a member of Defendant MBS' personal security team. He was part of the rapid intervention team, was present in the Saudi Consulate in Istanbul, and, on information and belief, personally took part in Mr. Khashoggi's torture and murder.

21.     Defendant Mustafa Mohammed Almadani is a citizen of Saudi Arabia who acted as a co-conspirator in the torture and murder of Jamal Khashoggi. He was part of the rapid intervention team, was present in the Saudi Consulate in Istanbul, and, on information and belief, personally took part in Mr. Khashoggi's murder. After the murder, he donned Mr. Khashoggi's

clothes and visited tourist sites in a failed effort to deceive the world into believing Mr. Khashoggi had left the Consulate.

22.    Defendant Badr Lafi M. Alotaibi is a citizen of Saudi Arabia who acted as a co-conspirator in the murder of Jamal Khashoggi. He held the position of Major and was involved in External Intelligence in Saudi Arabia.  He was part of the rapid intervention team, was present in the Saudi Consulate in Istanbul, and, on information and belief, personally took part in Mr. Khashoggi's murder.

23.    Defendant Saif Saad Q. Alqahtani is a citizen of Saudi Arabia who acted as a co-conspirator in the murder of Jamal Khashoggi. He was a close advisor to and worked in the private office of Defendant MBS and was part of the rapid intervention team.  He was present in the Saudi Consulate in Istanbul and, on information and belief, personally took part in Mr. Khashoggi's murder. He accompanied Defendant Almadani, disguised as Mr. Khashoggi, in visiting tourist sites in a failed effort to cover up the murder of Mr. Khashoggi.

24.    Defendant Waleed Abdullah M. Alshehri (a/k/a Waleed Abdullah M. Alsehri) is a citizen of Saudi Arabia who acted as a co-conspirator in the murder of Jamal Khashoggi. Defendant MBS personally elevated Mr. Alshehri to the position of Major in the Saudi Royal Guard. Defendant Alshehri was part of the rapid intervention team, was present in the Saudi Consulate in Istanbul, and personally took part in Mr. Khashoggi's murder.

25.    Defendant Turki Musharraf M. Alsehri (a/k/a Turki Muserref M. Alshehri, Turki Musharraf M. Alshehri, Turki Muserref Alsehri) is a citizen of Saudi Arabia who acted as a co-conspirator in the murder of Jamal Khashoggi.  He was at the time an intelligence officer and part of the rapid intervention team.  He was present in the Saudi Consulate in Istanbul and, on information and belief, personally took part in Mr. Khashoggi's murder.

12

26.     Defendant Khalid Alotaibi (a/k/a Khalid Aedh G. Altaibi) is a citizen of Saudi Arabia who acted as a co-conspirator in the murder of Jamal Khashoggi. He was part of the Saudi Royal Guard and accompanied Defendant MBS during his visit to the United States in 2017.  He was part of the rapid intervention team, was present in the Saudi Consulate in Istanbul, and, on information and belief, personally took part in Mr. Khashoggi's murder.

27.     Defendant Ahmed Abdulaziz al-Jonabi is a citizen of Saudi Arabia and a chemist who acted as a co-conspirator in the murder of Jamal Khashoggi. He was personally involved in the cleanup of the Consulate after the murder and personally destroyed evidence of Mr. Khashoggi's murder.

28.     Defendant Khaled Yahya al-Zahrani is a citizen of Saudi Arabia and a toxicologist who acted as a co-conspirator in the murder of Mr. Khashoggi. He aided in the cleanup of the Consulate after the murder and personally destroyed evidence of the murder of Mr. Khashoggi.

29.     Defendant Ahmed Abdullah Muzaini is a citizen of Saudi Arabia and the Saudi Military Attaché assigned to the Saudi Consulate in Istanbul, Turkey. Defendant Muzaini was also the Saudi intelligence agency's Station Chief in Istanbul.[8]  He acted as a co-conspirator in the murder of Jamal Khashoggi. He sent a coded message to Riyadh on September 28, 2018 informing Defendants of Mr. Khashoggi's visit to the Consulate.[9]  He was involved in enticing Mr. Khashoggi to return to the Consulate on the day he was tortured and murdered.[10]  The actions he

---

[8] *Saudi Arabia Sentences 5 Suspects to 20 Years in Prison Over Khashoggi Murder*, Daily Sabah (Sept. 7, 2020), https://www.dailysabah.com/world/mid-east/saudi-arabia-sentences-5-suspects-to-20-years-in-prison-over-khashoggi-murder.
[9] *Id.*
[10] *Saudi Military Attaché Helped Asiri Plan, Execute Khashoggi Murder*, Middle East Monitor (Oct. 24, 2018), https://www.middleeastmonitor.com/20181024-saudi-military-attache-helped-asiri-plan-execute-khashoggi-murder/.

took as part of this conspiracy to murder Mr. Khashoggi were not within the scope of his consular activities.

30.     Defendant Abdulrahman Mohamed Alquarni is a citizen of Saudi Arabia who acted as a co-conspirator in the murder of Jamal Khashoggi. He was working at the Consulate in Istanbul at the time of the murder and was involved in making logistical arrangements for the rapid intervention team. On September 28, 2018, he advised Riyadh that Mr. Khashoggi had arrived at the Consulate in Istanbul.  The actions he took as part of this conspiracy to murder Mr. Khashoggi were not within the scope of his consular activities.

31.     Defendant Ekrem Sultan is a citizen of Saudi Arabia and an official at the Saudi Consulate in Istanbul who acted as a co-conspirator in the torture and murder of Jamal Khashoggi. He was an employee at the Consulate who communicated with Mr. Khashoggi on both September 28, 2018 and October 2, 2018.  He was directly involved in ensuring Mr. Khashoggi would return to the Consulate so that he could be tortured and murdered.  The actions he took as part of this conspiracy to murder Mr. Khashoggi were not within the scope of his consular activities.

32.     Defendant Abdulaziz Suleiman Al-Gumizi (a/k/a Abdualaziz Suleiman Al-Gumizi) is a citizen of Saudi Arabia who acted as a co-conspirator in the murder of Jamal Khashoggi.  Mr. Al-Gumizi served as a Saudi consular official and participated in the rapid intervention team.  His actions such as scouting out locations in the Belgrade Forest as potential places to dispose of Mr. Khashoggi's remains were not within the scope of his consular activities.

33.     Defendant John Doe 1[11] is a Saudi consular security official who handled logistics of the murder of Mr. Khashoggi.  Specifically, he took part in ensuring that regular non-Saudi consulate workers did not come to the office on October 2, 2018 so as to minimize witnesses.  He

---

[11] Defendant John Doe 1 is referred to as "AA" in the SR Report.

14

is a citizen of Saudi Arabia who acted as co-conspirator in the murder of Jamal Khashoggi. The actions he took as part of the conspiracy to murder Mr. Khashoggi were not within the scope of his consular activities.

34.     Defendants John Does 2 and 3[12] are Saudi consular security attaches who traveled to Riyadh for planning and training and participated in the rapid intervention team.  They are citizens of Saudi Arabia who acted as co-conspirators in the murder of Jamal Khashoggi. The actions they took as part of the conspiracy to murder Mr. Khashoggi were not within the scope of their consular activities.

35.     Defendant John Doe 4[13] is a driver for the Saudi consulate who tested whether the Mercedes-Benz Vito van that would carry Mr. Khashoggi's remains would fit into the consular residence's indoor parking garage.  He conducted this test in the very early morning of October 2, 2018. He understood that his actions were part of a plan to murder Mr. Khashoggi and, as a result, his actions as part of the conspiracy to murder Mr. Khashoggi were not within the scope of his consular activities.

## JURISDICTION AND VENUE

36.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the action arises under the Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note) and the Alien Tort Statute, 28 U.S.C. § 1350. The Court additionally has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.

---

[12] Defendants John Does 2 and 3 are referred to as "YK" and "AAA" in the SR Report.
[13] Defendant John Doe 4 has been identified in media reports as "S.K."

37.     This Court has supplemental jurisdiction over Plaintiffs' state law claims based on 28 U.S.C. § 1367.

38.     The exercise of subject matter jurisdiction over this claim pursuant to the Alien Tort Statute is proper because the claim touches and concerns the United States.  As detailed further below, significant portions of the conduct that is the subject of this complaint occurred inside the United States.  For example, Defendants ensured that Mr. Khashoggi could not obtain a certificate of marriage eligibility from the Saudi Arabian Embassy in Washington, D.C. and advised him he must obtain the certificate in Istanbul, Turkey, for the purpose of forcing him to leave the United States and obtain the certificate in the location where Defendants ultimately murdered him. Defendant MBS also instructed the Saudi Ambassador to the United States, who was in the United States, to assure Mr. Khashoggi that it would be safe for Mr. Khashoggi to retrieve the document he needed at the Saudi Consulate in Istanbul.  The Ambassador did so, setting in motion the chain of events that led to Mr. Khashoggi's murder in the Consulate in Istanbul.  Defendants' actions were also purposefully aimed at the United States, as Mr. Khashoggi was a U.S.-resident journalist and human rights advocate. Defendants murdered him to silence said political activities in the United States. Defendants acted with the intent to lure Mr. Khashoggi outside of the United States and murder him.

39.     The exercise of personal jurisdiction is appropriate under Fed. R. Civ. Proc. 4(k)(2) because this claim arises under the Alien Tort Statute and Torture Victim Protection Act, the Defendants are beyond the jurisdiction of any state's courts of general jurisdiction, and exercising jurisdiction is consistent with the Constitution and United States law.

40.     This suit arises out of and relates to Defendants' contacts with the United States. Key steps in Defendants' conspiracy to lure Mr. Khashoggi to his death in Istanbul occurred inside

of the United States: the Defendants ensured that the Saudi Embassy in Washington, D.C. would not provide Mr. Khashoggi with a necessary document so that he would be forced to seek the document in Istanbul, and the Defendants arranged for the U.S.-based Saudi Ambassador to communicate to Mr. Khashoggi—falsely—that Mr. Khashoggi would be safe while retrieving the document in Istanbul.  These actions laid the groundwork for Mr. Khashoggi's murder.  The Defendants' U.S. contacts thus were key to achieving the extrajudicial killing at the center of this suit.

41.     Furthermore, the Defendants' actions were directed and aimed at the United States in critical respects.  Mr. Khashoggi was a U.S. resident and widely-respected journalist and advocate who had become the Executive Director of Plaintiff DAWN, which is incorporated in the United States with its principal offices in Washington, D.C. On information and belief, each Defendant was aware of Mr. Khashoggi's U.S. ties and brutally killed Mr. Khashoggi to silence him and prevent him from continuing in the United States his advocacy for democracy in the Arab world.

42.     Mr. Khashoggi's assassination is a tragedy with worldwide ramifications to be sure, but personal jurisdiction over Defendants in this forum is appropriate both because significant aspects of Defendants' wrongful conduct took place in the United States and because Defendants undertook wrongful conduct in the United States, the intended and actual effect of which, was to silence Mr. Khashoggi's political advocacy in the United States – advocacy that was especially threatening to Defendants precisely because it occurred *in the United States* and so touched Defendants' economic and political interests there.

43.     This court also has pendent personal jurisdiction over Defendants with regard to Plaintiffs' common law claims, including for intentional infliction of emotional distress, loss of

consortium, loss of society, and tortious interference of contract, because these claims share a common nucleus of operative fact with Plaintiffs' federal claims.

44.     Venue is proper in this Court pursuant to the rules of pendent venue and 28 U.S.C. § 1391(b)(2) because a substantial part of the events constituting the conspiracy leading to Mr. Khashoggi's murder occurred in this judicial district.  Alternatively, venue is proper pursuant to 28 U.S.C. § 1391(b)(3) because there is no district in which this action may otherwise be brought and because Defendants are subject to the Court's personal jurisdiction with regard to this action.

## FACTS

A.  The Life of Jamal Khashoggi and Defendants' Persistent Opposition to his Advocacy

45.     Jamal Khashoggi was born on or about January 22, 1958, in Medina, Kingdom of Saudi Arabia.

46.     Mr. Khashoggi was a well-respected, high-profile, and outspoken journalist employed at times by the Kingdom of Saudi Arabia and a variety of media outlets over the course of his career. He was known as one of the most prominent Arab journalists of his generation.[14] Mr. Khashoggi was steadfastly committed to promoting, expanding, and advocating for democratization and greater human rights observance in the Arab world.

47.     Mr. Khashoggi's work, advocacy, and efforts to promote democracy and objective journalism in the Arab world often met harsh opposition from officials and political leaders of the region, as well as their supporters.

48.     For example, Mr. Khashoggi was twice removed from the position of editor-in-chief of a daily Saudi newspaper based in Riyadh called *Al Watan*. In 2003, Mr. Khashoggi was

---

[14] *Obituary: Jamal Khashoggi was a 'Good Man and a Fine Journalist'*, Al Jazeera (Oct. 20, 2018),   https://www.aljazeera.com/news/2018/10/profile-jamal-khashoggi-saudi-writer-missing-turkey-181007184026645.html.

fired less than two months after being hired as editor-in-chief after he published articles critical of the Kingdom's religious conservative elite.[15] And in 2010, after having been rehired as editor-in-chief in 2007, Mr. Khashoggi was forced to resign after publishing an opinion piece critical of Salafist extremism.[16]

49.     In 2014, Mr. Khashoggi served as the general manager for a satellite channel called *Al Arab*, owned by Saudi Prince Waleed bin Talal bin Abdulaziz and headquartered in Manama, Bahrain. But after being on the air for less than 11 hours, the Kingdom of Bahrain shut down the channel because Mr. Khashoggi aired an interview with a Shia politician from the Bahrain opposition party.[17]

50.     Significantly, in 2016, Saudi officials banned Mr. Khashoggi from writing in newspapers, appearing on television, and speaking at conferences after Mr. Khashoggi made statements critical of then-United States President-Elect Donald Trump during a presentation at a

---

[15] *See, e.g.*, Bill Law, *I Know Jamal Khashoggi Personally and I Fear for His Safety*, Al Jazeera (Oct. 4, 2018), https://www.aljazeera.com/indepth/opinion/fear-jamal-khashoggi-181004080147 143.html.

[16] *See, e.g.*, David Ignatius, *Jamal Khashoggi Chose to Tell the Truth. It's Part of the Reason He's Beloved*, Wash. Post (Oct. 7, 2018), https://www.washingtonpost.com/opinions/global-opinions/ jamal-khashoggi-chose-to-tell-the-truth-its-part-of-the-reason-hes-beloved/2018/10/07/4847f1d6 -ca70-11e8-a3e6-44daa3d35ede_story.html?utm_.term=.cb5cd83cc653.

[17] *See, e.g.*, *Bahrain Suspends Newly Launched Alarab News Channel*, Al Jazeera (Feb. 9, 2015), https://www.aljazeera.com/news/middleeast/2015/02/bahrain-suspends-newly-launched-alarab-news-channel-150209155209829.html; *Jamal Khashoggi disappears after visiting Saudi Consulate in Istanbul*, NBC (Oct. 3, 2018), https://www.nbcnews.com/news/world/jamal-khashoggi-disappears-after-visiting-saudi-consulate-istanbul-n916126. In 2017, Talal was one of the members of the royal family detained for months at the Ritz Carlton in Saudi Arabia on corruption charges. According to some reports, Talal was beaten and stripped of most of his wealth. *See* Tina Nguyen, *'Everything's Fine': Saudi Billionare Says Imprisonment, Torture Rumors Just a 'Misunderstanding,'* Vanity Fair (Jan. 29, 2018), https://www.vanityfair.com/news/2018/01/saudi-prince-alwaleed-bin-talal-says-imprisonment-was-misunderstandig.

Washington, D.C.-based think-tank on November 10, 2016.[18] That is, Saudi officials banned Mr. Khashoggi from speaking publically because of comments he made that were critical of the then-United States President-elect during a speech which took place in the capitol city of the United States. Furthermore, after Mr. Khashoggi warned on Twitter that Saudis should be wary of Trump, Defendant al-Qahtani informed him that he was "not allowed to tweet, not allowed to write, not allowed to talk" and added "You can't do anything anymore—you're done."[19]

51.     In late 2016, Saudi officials ordered Khashoggi to stop his postings on Twitter.[20]

B.  Mr. Khashoggi's Self-Imposed Exile and His Leading Role in DAWN

52.     Having lost his freedom to write, speak, and publish freely, Mr. Khashoggi made the decision, at great personal costs, to leave the Kingdom and his family for a self-imposed exile in the United States. In light of his unwavering conviction for justice and for advancing democracy in the Arab world, Mr. Khashoggi took his voice to the place he knew to be the center of the international political universe: Washington, D.C.

53.     In Washington, D.C., Mr. Khashoggi developed strong ties to think tanks, journalists, and academics. He was a guest speaker at respected institutions such as the Brookings Institution and the Washington Institute for Near East Policy.[21] Khashoggi was seen as a source

---

[18] *See, e.g.*, *Saudi Journalist Banned from Media After Criticizing Trump*, Middle East Eye (Dec. 4, 2016), https://www.middleeasteye.net/news/saudi-journalist-banned-media-after-criticising-trump.

[19] Souad Mekhennet & Greg Miller, *Jamal Khashoggi's Final Months as an Exile in the Long Shadow of Saudi Arabia*, Wash. Post (Dec. 22, 2018), https://www.washingtonpost.com/world/national-security/jamal-khashoggis-final-months-anexile-in-the-long-shadow-of-saudi-arabia/2018/12/21/d6fc68c2-0476-11e9-b6a9-0aa5c2fcc9e4_story.html.

[20] *See, e.g.*, Jamal Khashoggi, Opinion, *Saudi Arabia Wasn't Always this Repressive. Now It's Unbearable*, Wash. Post (Sept. 18, 2017), https://www.washingtonpost.com/news/global-opinions/wp/2017/09/18/saudi-arabia-wasnt-always-this-repressive-now-its-unbearable/?utm_term=.34b49d63a87e.

[21] *See* Transcript at 2, *Investigating the Khashoggi Murder: Insights from U.N. Special Rapporteur Agnes Callamard*, Brookings Inst. (July 2, 2019), https://www.brookings.edu/wpcontent/uploads/

of information on Saudi Arabia; in one case, a former FBI agent working on behalf of the families

of victims of the terrorist attacks on September 11, 2001 contacted Khashoggi.[22]

54.      In September 2017, Mr. Khashoggi began writing a column in the *Washington Post*,

headquartered in Washington, D.C., about Middle Eastern affairs, including the media and civil

society crackdowns initiated by Defendant MBS with aid from various other Defendants. In his

writings, Mr. Khashoggi often challenged the Kingdom and the ruling royal family, the House of

Saud, to implement civil society reforms.[23]

55.      In the words of U.N. Special Rapporteur Callamard, Mr. Khashoggi was "a U.S.

resident, a[] . . . journalist for the *Washington Post*, therefore in many ways a symbol for a very

deep seated value in the U.S."[24]

56.      In his final, posthumously published column for the *Washington Post*, Mr.

Khashoggi called for "a platform for Arab voices … the creation of an independent international

forum, isolated from the influence of nationalist governments spreading hate through

propaganda."[25]

57.      Mr. Khashoggi's activities in the United States did not go unnoticed.  In October

2017, Mr. Khashoggi received a call from Riyadh.  MBS's loyal lieutenant, Defendant Saud al-

---

2019/06/fp_20190702_callamard_khashoggi_transcript.pdf ("Jamal Khashoggi was known to many people in Washington -- he was in this building many times -- and known to many people both here and abroad"); Jamal Khashoggi et al., *A New President and the Middle East*, Wash. Inst. (Nov. 15, 2016), https://www.washingtoninstitute.org/policy-analysis/view/a-new-president-and-the-middle-east.

[22] Souad Mekhennet & Greg Miller, *Jamal Khashoggi's Final Months as an Exile*, *supra* note 19.

[23] *See, e.g., Saudi Arabia Wasn't Always this Repressive. Now It's Unbearable*, *supra* note 20.

[24] Transcript at 9, *supra* note 21.

[25] Jamal Khashoggi, Opinion, *Jamal Khashoggi: What the Arab World Needs Most Is Free Expression*, Wash. Post (Oct. 17, 2018), https://www.washingtonpost.com/opinions/global-opinions/jamal-khashoggi-what-the-arab-world-needs-most-is-free-expression/2018/10/17/adfc8 c44-d21d-11e8-8c22-fa2ef74bd6d6_story.html?utm_term=.3ab34ebc6dfc.

Qahtani, called to inform Khashoggi that public comments regarding Saudi reforms had pleased MBS, and Defendant al-Qahtani urged Khashoggi to "keep writing and boasting" about MBS' achievements.  The purpose of the call was clear: to remind Khashoggi that Defendant MBS was closely monitoring his writings.[26]  Khashoggi responded by challenging Defendant al-Qahtani about activists he knew who had been imprisoned in the Kingdom.  A friend who was present later recalled that even as Khashoggi bravely challenged Defendant al-Qahtani, he "saw how Jamal's hand was shaking while holding the phone."[27]

58.    The personal costs of Mr. Khashoggi's work – including his calls for reform – were quick and severe. He was forcibly alienated from his first wife and four children who remained behind in Saudi Arabia. As a result of his work, Saudi officials placed a travel ban on his oldest son, preventing Mr. Khashoggi's son from fulfilling the responsibilities of his employment as a banker and causing great personal anguish to Mr. Khashoggi. Then, in November 2017, Mr. Khashoggi's first wife divorced him under pressure from Kingdom authorities. The efforts of Saudi officials to intimidate and isolate Mr. Khashoggi convinced him that any chance of returning to his old life in the Kingdom was foreclosed. In response, Mr. Khashoggi focused his attention on establishing a new life outside of the Kingdom and, specifically, in the United States.

59.    In late 2017, Mr. Khashoggi began planning to take a lead role in Plaintiff DAWN, with the intention of utilizing DAWN as a platform from which to advocate for democracy and to promote human rights in the Arab world.  Between November 2017 and spring 2018, Mr. Khashoggi met with the other co-founders of DAWN on a weekly basis to discuss the new organization.

---

[26] Souad Mekhennet & Greg Miller, *Jamal Khashoggi's Final Months as an Exile*, *supra* note 19.
[27] *Id.*

60.     Mr. Khashoggi pressed the other co-founders of Plaintiff DAWN to include the "N" at the end of the name of DAWN – standing for the word "Now" and emphasizing the urgency of the organization's mission.

61.     In January 2018, Plaintiff DAWN was incorporated in the state of Delaware as a nonprofit organization under I.R.C. Section 501(c)(4).

62.     In May 2018, Mr. Khashoggi directed that Plaintiff DAWN rent four office suites (4034-4037) at 2200 Pennsylvania Avenue, NW, to host DAWN staff.

63.     On or about June 1, 2018, Mr. Khashoggi executed an agreement with Plaintiff DAWN to serve as the organization's Executive Director. The agreement provided that Mr. Khashoggi's employment would begin on June 1, 2018 and was not limited by a fixed temporal term.

64.     Among other things, the agreement states that "DAWN is in the business of research and advocacy," that Mr. Khashoggi had "skills and experience useful in the business of DAWN," and that, under the agreement, Mr. Khashoggi was required to "use his best efforts to enhance and promote DAWN's business."

65.     Plaintiff DAWN recognized and retained Mr. Khashoggi as he was uniquely capable of furthering the organization's research and advocacy through his lifetime of experience and extensive network within and outside governments in the Arab world.  His extraordinary abilities were invaluable and irreplaceable.

66.     Mr. Khashoggi was an active voice on social media, amassing approximately two million Twitter followers prior to his murder.[28]

---

[28] SR Report ¶ 59.

C. Defendants' Targeting of Mr. Khashoggi

67.     Mr. Khashoggi was well aware of the potential dangers of his work but persevered nonetheless. In the months leading up to his murder, Mr. Khashoggi shared with those close to him the anxiety that he endured and the possibly dire consequences of continuing in his work. He took precautions in an effort to ensure his safety.  For example, he would not travel on airlines that he believed the Kingdom could exert influence over for fear his flight would be rerouted to Saudi Arabia and he would be arrested, imprisoned, and otherwise harmed. Mr. Khashoggi repeatedly told friends and colleagues that he feared for his safety and that he was certain he would be arrested if he returned to Saudi Arabia.[29]

68.     As support for his trepidation, Mr. Khashoggi noted examples of intimidation against and abuse of Saudi citizens critical of the Kingdom's regime, both within the Kingdom and beyond. Mr. Khashoggi specifically referenced the arrest of scholars within the Kingdom and the pressure placed on other dissenters to speak favorably of the Kingdom under threat of imprisonment.[30]

69.     Since at least 2017, Defendant MBS, aided and abetted by other Defendants, as well as his brother, then Saudi Ambassador to the United States, Khaled bin Salman—who at Defendant MBS's direction urged Khashoggi to go to the Saudi Consulate in Istanbul and assured him it would be safe to do so[31]—has conspired to silence many critics and has waged a clandestine campaign to silence dissenters.   These efforts have included the surveillance, kidnapping,

---

[29] *See, e.g.*, SR Report ¶ 66.
[30] *See, e.g.*, SR Report ¶ 66.
[31] *See, e.g.*, Shane Harris et al., *CIA Concludes Saudi Crown Prince Ordered Jamal Khashoggi's Assassination*, Wash. Post (Nov. 16, 2018), https://www.washingtonpost.com/world/national-security/cia-concludes-saudi-crown-prince-ordered-jamal-khashoggis-assassination/2018/11/16/98c89fe6-e9b2-11e8-a939-9469f1166f9d_story.html

detention, torture, and forcible repatriation of clerics, intellectuals, and activists deemed to be dissenters – inside the Kingdom but increasingly over the years abroad as well.[32]  Since Defendant MBS was elevated to Crown Prince in 2017, Saudi security forces have detained dozens of individuals, including about a dozen women's rights activists who campaigned for lifting the Kingdom's ban on driving by women.[33]  Some of these women were frequently interrogated and faced beatings, electric shocks, waterboarding, and threats of rape and murder.[34]  Saudi authorities also detained renowned Saudi economist and businessman Essam al-Zamel in September 2017 as part of a wave of arrests.[35]  Over two hundred Saudi princes, ministers, and tycoons were put under house arrest at the Ritz Carlton during a crackdown conducted on the pretext of an "anti-corruption" sweep.[36]

70.     As part of this concerted crackdown, Defendant al-Qahtani has worked to crush dissenters online.  Al-Qahtani has more than a million Twitter followers and is known as "Lord of the Flies" for the swarms of social media operatives he has directed to attack Defendants MBS's perceived adversaries.[37]  These operatives "hunt[ed] on Twitter for voices and conversations to

---

[32] *See, e.g.*, Mark Mazzetti and Ben Hubbard, *It Wasn't Just Khashoggi: A Saudi Prince's Brutal Drive to Crush Dissent*, N.Y. Times (Mar. 17, 2019), https://www.nytimes.com/2019/03/17/world/middleeast/khashoggi-crown-prince-saudi.html.

[33] *Id.*

[34] *Id.*

[35] Nadine Dahan, *Essam al-Zamil: The Saudi Economist Punished for Speaking Truth to Power*, Middle East Eye (Oct. 12, 2018), https://www.middleeasteye.net/news/essam-al-zamil-saudi-economist-punished-speaking-truth-power.

[36] *How the Man Behind Khashoggi Murder Ran the Killing Via Skype*, *supra* note 4.

[37] Souad Mekhennet & Greg Miller, *Jamal Khashoggi's Final Months as an Exile*, *supra* note 19. In June 2017, for instance, al-Qahtani orchestrated online attacks against Qatar by urging Saudis to tweet the names of anyone sympathetic to Qatar using the Arabic phrase for "Black List."  *How the Man Behind Khashoggi Murder Ran the Killing Via Skype*, *supra* note 4.

silence."[38] And Mr. Khashoggi was their frequent target; waking up each morning to renewed attacks from these operatives took a toll on his mental health.[39]

71.     As summarized by U.N. Special Rapporteur Callamard, from 2017 to 2018 "the United Nations and human rights organisations had reported a deterioration of the human rights situation in Saudi Arabia, characterized by arbitrary detention, imprisonment, unfair trial, the use of torture, and enforced disappearances. The Kingdom also imprisoned princes and businessmen in the Riyadh Ritz-Carlton on accusations of corruption. There is further, evidence of a programme of abduction of princes and princesses, living abroad. U.N. Special Rapporteur Callamard was informed of the abduction of Sultan Ben Turki Al-Saoud, Turki Ben Bandar Al-Saoud, Saoud Ben Saif Al-Nasr, and Tarek Obaid. The most brazen of the acts attributed to the Kingdom of Saudi Arabia took place in November 2017 when Saudi Arabia detained and placed under house arrest Lebanese Prime Minister Saad Hariri, forcing him to resign on public television."[40]

72.     "At a bare minimum," U.N. Special Rapporteur Callamard found, Defendant MBS "condoned this behavior and allowed the repetition and escalation of these crimes" and "took no action to prevent or punish those responsible."[41] U.N. Special Rapporteur Callamard further found that this crackdown on dissidents and political opponents could not have occurred without Defendant MBS's "agreement or acquiescence" and that he played an "essential role" in allowing the campaign to occur.[42]

73.     In the context of this widespread crackdown on dissidents, Mr. Khashoggi's concerns regarding his safety turned out to be well-founded. Due primarily to his activities in the

---

[38] Katie Benner et al., *Saudi's Image Makers: A Troll Army and a Twitter Insider*, *supra* note 3.
[39] *Id.*
[40] SR Report ¶ 378 (footnotes omitted).
[41] *Id.* ¶ 257.
[42] *Id.*

United States and specifically his advocacy work at DAWN, Defendants targeted Mr. Khashoggi and sought to put an end to his ability to carry out his work on behalf of DAWN and to otherwise silence his criticism and pro-democracy activities. Indeed, Defendant Alquari specifically referenced that Mr. Khashoggi was one of the individuals who had been targeted by Defendant MBS by stating that it was known that he was "one of the people sought."[43]

74.     Defendants would not have had difficulty learning of Mr. Khashoggi's involvement in DAWN because Mr. Khashoggi openly discussed his activities with many members of the community. More specifically and importantly still, Defendants also learned of Mr. Khashoggi's activities with DAWN by hacking the phone of his friend and colleague Omar Abdulaziz.

75.     Since the beginning of his self-imposed exile in the United States, Mr. Khashoggi was in frequent contact with Mr. Abdulaziz, a Saudi political activist who had been living in Montreal, Canada since 2009.

76.     Mr. Abdulaziz has been subject to efforts of Saudi officials to lure him to Saudi Arabia.  In May of 2018, Saudi officials contacted Mr. Abdulaziz, and two representatives of the Saudi Royal Court travelled to meet with him in Canada.  The Saudi emissaries claimed to be working on orders from Defendants MBS and promised him safety if he returned with them to Saudi Arabia. Mr. Abdulaziz refused their requests, in part, on the advice of Mr. Khashoggi. Specifically, the Saudi representatives repeatedly pushed Mr. Abdulaziz to meet with them at the Saudi Embassy in Canada. Mr. Abdulaziz conferred with Mr. Khashoggi, who specifically told him not to go to a Saudi Embassy and only to meet the representatives in public.

77.     Primarily through the WhatsApp mobile application, Mr. Khashoggi and Mr. Abdulaziz carried on extensive discussions about human rights issues and the need for democratic

---

[43] *Id.* ¶ 78.

reform in the Kingdom.  They also discussed various projects to strengthen human rights in their homeland.  In one of his messages, Mr. Khashoggi stated of Defendant MBS: "Arrests are unjustified and do not serve [MBS] (logic says), but tyranny has no logic, but he loves force, oppression and needs to show them off. He is like a beast 'pac man' - the more victims he eats, the more he wants. I will not be surprised that the oppression will reach even those who are cheering him, then others and others and so on. God knows."[44]

78.     In these communications, Mr. Khashoggi and Mr. Abdulaziz often discussed Mr. Khashoggi's use of his position with Plaintiff DAWN as a platform to bring democracy and greater human rights observance throughout the Arab world, and especially in the Kingdom. These exchanges were normally in Arabic. A text exchange on March 3, 2018 was typical. Mr. Khashoggi initiated the conversation by informing Mr. Abdulaziz that he was working with Arab colleagues on setting up an organization called Democracy for the Arab World Now. He further advised that he needed a design for a website for DAWN and asked Mr. Abdulaziz for assistance. Mr. Abdulaziz replied that he would arrange a meeting with a designer and committed to helping with social media.

79.     In June of 2018, on information and belief, an operator working on behalf of Defendants infected Mr. Abdulaziz's cell phone with Pegasus spyware. The Pegasus spyware allowed Defendants to access Mr. Abdulaziz's contacts, photos, text messages, online chat logs, emails, personal files, and otherwise encrypted apps such as WhatsApp. The software also allowed Defendants to use the microphone and camera on Mr. Abdulaziz's mobile phone to spy on his affairs.

---

[44] Nina Dos Santos & Michael Kaplan, *Jamal Khashoggi's Private WhatsApp Messages May Offer New Clues to Killing*, CNN.com (Dec. 4, 2018), https://www.cnn.com/2018/12/02/middleeast/jamal-khashoggi-whatsapp-messages-intl/index.html.

80.     Though Defendants may well have known earlier of Mr. Khashoggi's activities through DAWN, there is no question that after hacking Mr. Abdulaziz's mobile phone, Defendants were aware or became aware of Mr. Khashoggi's contractual relationship with DAWN and his intent to use it as a platform to advocate for human rights and democratic reform in the Kingdom. Mr. Khashoggi's efforts with DAWN were perceived by Defendants as contrary to their pecuniary and other interests and posed an existential threat to Defendant MBS' plans to secure power as an autocrat. Defendants thereafter resolved to stop Mr. Khashoggi from carrying out his work on behalf of DAWN, redoubled their efforts to abduct Mr. Khashoggi, and actively sought a suitable opportunity to permanently silence him.

81.     Defendants made ongoing efforts to lure Mr. Khashoggi back to the Kingdom.[45] For example, in 2017 or the beginning of 2018, Defendant al-Qahtani contacted Mr. Khashoggi, offering him a job and requesting that Khashoggi return to the Kingdom. Likewise, upon information and belief, former Saudi Ambassador Khalid bin Salman repeatedly conveyed the message to Mr. Khashoggi that he was not in any trouble and should return to Riyadh.

82.     Upon information and belief, also in late 2017 or early 2018, Mr. Khashoggi's passport went missing from his home in Virginia. After Mr. Khashoggi and one of his colleagues searched his house and were unable to locate it, Mr. Khashoggi was forced to go to the Saudi Embassy in Washington, D.C. to obtain a replacement. At the Embassy, Mr. Khashoggi was met by then Ambassador Khalid bin Salman, who inquired about Mr. Khashoggi's work for the Washington Post, asked whether Mr. Khashoggi had considered accepting an earlier offer to run a think tank on behalf of the Saudi Government, and informed Mr. Khashoggi that $5 million had been allocated for the project. Mr. Khashoggi also asked about the status of his son's travel ban,

---

[45] *See, e.g.*, SR Report ¶ 67.

and Khalid bin Salman assured Mr. Khashoggi that he would look into it. Shortly after this encounter, Mr. Khashoggi found his passport in his home, causing him to suspect that agents of the Defendants had removed his passport from his home.

83.    Prior to Mr. Khashoggi's kidnapping and murder, the United States government reportedly intercepted communications from Saudi officials discussing a plan to lure Mr. Khashoggi back to the Kingdom.[46]

84.    These efforts repeatedly failed to induce Mr. Khashoggi to return to the Kingdom because he was certain that he could not do so safely. Mr. Khashoggi explained to friends and loved ones that these ruses were nothing more than attempts to bring him back to the Kingdom so as to jail, kill, or otherwise silence him.

85.    According to the CIA's findings, two months prior to Khashoggi's murder, Defendant MBS said that if he could not lure Khashoggi back to Saudi Arabia on his own, "We could possibly lure him outside Saudi Arabia and make arrangements."[47]  The agency found that evidence established that Defendant MBS had ordered Khashoggi's murder.[48]

D.    Mr. Khashoggi and Plaintiff Cengiz Decide to Marry and the Defendants Lure Mr. Khashoggi to Istanbul

86.    Mr. Khashoggi's love of Plaintiff Cengiz and his plans to start a life with her presented the Defendants with the opportunity they had awaited.

---

[46] *See, e.g.*, Elise Labott, Kevin Liptak, & Gul Tuysuz, *Saudis Discussed Plan to Lure Jamal Khashoggi to Saudi Arabia, US Intercepts Show*, CNN (Oct. 11, 2018), https://www.cnn.com/2018/10/11/politics/khashoggi-us-intelligence-saudi-plan-to-lure-journalist/index.html.
[47] Bradley Hope & Justin Scheck, *The Rise of Mohammed bin Salman, in 10 Steps – from $50 Million Parties to the Murder of Jamal Khashoggi*, Times (Aug. 29, 2020), https://www.thetimes.co.uk/article/the-rise-of-mohammed-bin-salman-in-10-steps-from-50-million-parties-to-the-murder-of-jamal-khashoggi-gt3tmmh8s.
[48] Shane Harris *et al.*, *CIA Concludes Saudi Crown Prince Ordered Jamal Khashoggi's Assassination*, *supra* note 31.

87.     On May 6, 2018, Mr. Khashoggi met Plaintiff Cengiz at the *Al Sharq* conference in Istanbul. Plaintiff Cengiz conducted an interview with Mr. Khashoggi during the *Al Sharq* conference.  Mr. Khashoggi and Plaintiff Cengiz remained in contact when he returned to the United States.

88.     On or about July 10, 2018, Mr. Khashoggi travelled to Istanbul where he again saw Plaintiff Cengiz and the couple began their courtship in earnest. Following his departure on July 18, 2018, they remained in contact.  They communicated multiple times nearly every day through WhatsApp, voice calls, and FaceTime messaging.

89.     On or about July 27, 2018, Mr. Khashoggi flew overnight to Istanbul and remained until on or about August 4, 2018. During this trip, Mr. Khashoggi and Plaintiff Cengiz decided they would marry and began their engagement. They also began discussing logistics of their marriage, including the documents that would be needed to confirm their civil marriage under Turkish law.  Plaintiff Cengiz was familiar with the Turkish marriage process from work she had performed as an interpreter for other foreign nationals, as confirmed by online research she performed, and she identified that Mr. Khashoggi required a certification from his home country that he was not already married. Accordingly, before his return to the United States, on or about August 5, 2018, Plaintiff Cengiz told Mr. Khashoggi that Turkey would require a certificate of marriage eligibility from the Kingdom to recognize a civil marriage.

90.     In August of 2018, Mr. Khashoggi contacted the Embassy of the Kingdom of Saudi Arabia in Washington, D.C. to obtain the certificate of marriage eligibility. This is a service routinely provided by the Embassy, indeed the website of the Embassy clearly lists that among the services provided to Saudi nationals is "carrying out the steps required for . . . Saudi citizens

wishing to marry . . . foreigners."[49] However, recognizing an opportunity to abduct Mr. Khashoggi, Defendants, working through officials at the Embassy, instructed Mr. Khashoggi that he would have to apply for the document at the Saudi Consulate in Istanbul.  These instructions were a ruse to lure Mr. Khashoggi to a location where Defendants could carry out an operation to kidnap, torture and murder him.

91.     While in the United States, Mr. Khashoggi made a phone call to then Saudi Ambassador Khalid bin Salman, the Saudi Ambassador to the United States and brother to Defendant MBS.  Mr. Khashoggi sought assurances that it would be safe for him to visit the Saudi Consulate in Istanbul. Khalid bin Salman was in Washington, D.C. during the call and – in a continuing effort to entice Mr. Khashoggi to Istanbul under false pretenses – reiterated that Mr. Khashoggi should go to the Saudi Consulate in Istanbul to retrieve the documents.  Khalid bin Salman gave Mr. Khashoggi assurances that it would be safe to do so.  Reports indicate that Khalid Bin Salman made these assurances at the direction of his brother, Defendant MBS.[50]

92.     On or about September 9, 2018, Mr. Khashoggi returned to Istanbul and met with Plaintiff Cengiz's family – first with her father and subsequently with her father and brother – to finalize the conditions of their marriage.

93.     Plaintiff Cengiz's family finalized the arrangements of the marriage, which was conditioned on the couple marrying civilly in addition to a traditional Islamic marriage and on Mr. Khashoggi's agreement to purchase an apartment in Istanbul to serve as a home for the couple. Mr. Khashoggi purchased an apartment on September 25, 2018, for 1,252,000.00 Turkish Lira

---

[49] *Saudi Nationals*, The Embassy of the Kingdom of Saudi Arabia, https://www.saudiembassy.net/saudi-nationals (last visited Sept. 29, 2020) (last visited Sept. 21, 2020) (quotation professionally translated from the original Arabic language website).
[50] Shane Harris *et al.*, *CIA Concludes Saudi Crown Prince Ordered Jamal Khashoggi's Assassination*, *supra* note 31.

(approximately $218,000.00 USD). The apartment was located in the town of Merkezefendi, county of Zeytinburnu, in the city of Istanbul, registered at map section 494, block 2948, parcel 48. The couple planned and agreed to hold title to the apartment jointly following the legal confirmation of their marriage.

94.     Another condition of the marriage was that Mr. Khashoggi would provide Plaintiff Cengiz a stipend on a regular basis, which he began immediately.

95.     Mr. Khashoggi and Plaintiff Cengiz agreed that after they married they would principally reside in the United States and return to their flat in Turkey over some summers. Mr. Khashoggi firmly believed that in order to be an effective voice for change that it was essential he be based in Washington, D.C. as he knew it to be the center of the political world. He communicated this to Plaintiff Cengiz on many occasions.

96.     On several occasions, Mr. Khashoggi sent funds to Plaintiff Cengiz to financially support her. Mr. Khashoggi and Plaintiff Cengiz also agreed that Mr. Khashoggi would regularly provide funds to Plaintiff Cengiz so that she could continue her studies and learn English while they resided in the United States.

97.     Mr. Khashoggi and Plaintiff Cengiz shared an extraordinarily close relationship and spent almost all their time together when he was in Istanbul, and they spoke multiple times per day for hours when in separate places.

98.     Mr. Khashoggi and Plaintiff Cengiz were married in the Islamic tradition on September 16, 2018. Shortly after this ceremony, Mr. Khashoggi and Plaintiff Cengiz hosted an intimate celebration of their marriage in Istanbul with a few close friends. But in order to confirm the marriage civilly in Turkey, as a foreign national, Mr. Khashoggi was required to obtain a certificate of marriage eligibility from his home country—the Kingdom of Saudi Arabia.

E.   Defendants Torture and Murder Jamal Khashoggi

99.     Having been denied his certificate of marriage eligibility by the Embassy of the Kingdom of Saudi Arabia in Washington, D.C., Mr. Khashoggi, accompanied by Plaintiff Cengiz, went to the Fatih marriage bureau in central Istanbul on the morning of September 28, 2018, to determine whether there was a way for them to confirm their marriage without the Saudi certificate of marriage eligibility. The marriage bureau confirmed the certificate would be necessary and refused to grant the civil confirmation of their marriage.

100.    Despite his wariness, on that same day, Mr. Khashoggi and Plaintiff Cengiz went to the Saudi Consulate in Istanbul unannounced. Prior to entering the Consulate alone, Mr. Khashoggi left his mobile phones with Plaintiff Cengiz because he knew that the Consulate would require him to leave them with Consulate officials and Mr. Khashoggi was uncomfortable placing his phones in the custody of Consulate officials.

101.    Mr. Khashoggi entered the Consulate at 11:50 a.m. and spent approximately forty-five minutes inside. At first, the Saudi officials in the Consulate were surprised to see him, but treated him cordially and sat to have tea with him. Defendant Sultan spoke with Mr. Khashoggi and told him that the certificate would take time to prepare. Mr. Khashoggi informed Defendant Sultan that he had to leave for a flight to London but would be returning on October 2, 2018. Defendant Sultan told Mr. Khashoggi that the certificate would be available when he returned.

102.    Within hours, Mr. Khashoggi's appearance at the Consulate and his scheduled return on October 2, 2018, were communicated to certain Defendants in Riyadh. At 2:22 P.M. on September 28, Defendant Alquari, a security official stationed at the Consulate, spoke to Defendant Maher Abdulaziz Mutreb, who said he had informed "the communications office"— presumably referring to the department directed by Defendant Saud al-Qahtani—about the

information given to him.[51]  Defendant Alquari responded, "I conveyed the videos and images. Can you make sure that it's closed?"[52]  In a second conversation between these two men, at 2:27 p.m. on September 28, 2018, Defendant Mutreb asked Defendant Alquari to confirm whether Mr. Khashoggi would indeed be returning to the Consulate on October 2, 2018.[53]  Defendant Alquari, referencing that Mr. Khashoggi had been targeted by the Kingdom, responded, "Yes, we were all shocked. . . .  There isn't anything official but it's known that he is one of the people sought."[54]

103.   Later that day, at 7:08 p.m. and 8:04 p.m., the Kingdom's Consul General to Istanbul, Defendant Mohammed al-Otaibi, had two separate discussions, the former with Defendant John Doe 1, and the latter with Defendant Alquarni, wherein the Defendants discussed that individuals were needed to travel urgently to Riyadh to make preparations to carry out a secret "security-related" assignment.[55]

104.   On September 29, Defendant Muzaini –the Military Attaché assigned to the Saudi Consulate in Istanbul and reputed Saudi Intelligence Station Chief – traveled to Riyadh where Defendant Assiri delivered his orders and mission plan for the murder.  Likewise, Defendants John Doe 2 and 3, both security officials from the Consulate in Istanbul, traveled to the Kingdom to take part in preparations to kidnap, torture, and kill Mr. Khashoggi upon his return to the Consulate on October 2, 2018.

105.   In an apparent attempt to hide the purpose of the officials' trip to Riyadh, Defendants traveling from Istanbul to Riyadh were instructed by Defendant al-Otaibi to purchase

---

[51] *See* SR Report ¶ 78.
[52] *Id.*
[53] *Id.*
[54] *Id.*
[55] *See, e.g.*, *id.* ¶¶ 79–80.

flights for their entire families, even though the top secret nature of the assignment had been made clear and he had previously directed that the travelers not inform others of the trip's purpose.

106.    Defendants Muzaini and John Doe 2 and 3 returned to Istanbul from Riyadh on a commercial flight on October 1, 2018, at approximately 5:30 p.m. local time. They were accompanied by Defendants Alarifi, Alzahrani, and Abahussain. At approximately 7:00 p.m., Defendants Alarifi, Alzahrani, and Abahussain went to the Consulate and stayed there for several hours, assessing the suitability of the location for the planned abduction, torture and murder of Mr. Khashoggi the following day.

107.    That same evening, Defendants Muzaini, and Al-Gumizi drove to the Belgrade Forest, located approximately twenty kilometers from Istanbul, in search of a suitable place to deposit Mr. Khashoggi's remains the following day. Defendant Abuhussain contacted the owner of a farmhouse in Yalova, a city on the coast of the Sea of Marmara, inquiring for the same purpose.

108.    On October 1, 2018, in another apparent attempt to conceal their unlawful plans, the Consul General, Defendant al-Otaibi, and Defendant Alquarni contacted an Istanbul-based tourism company to book several hotel rooms through a travel agent with a "sea-view" and proximity to the Consulate, for the use of Defendants traveling to Istanbul to take part in the kidnapping, torture and murder of Mr. Khashoggi.

109.    On October 1, 2018 at 9:48 p.m., Defendants who were Saudi Consulate Officials, including Defendant Alquarni and Defendant John Doe 1, had a conversation that was recorded. Defendant John Doe 1 said: "A commission from Saudi Arabia will come tomorrow, [they have]

something [to] do [in] the consulate." To which, Defendant Alquarni asked if "it" would happen on the first floor.[56]

110.    In the early morning of October 2, 2018, Defendants Albalawi, Alharbi, Almadani, Badr Alotaibi, Turki Alsehri, Waleed Alshehri, Alqahtani, Mutreb, and Tubaigy arrived in Istanbul to carry out the abduction, torture, and killing of Mr. Khashoggi at the Saudi Consulate in Istanbul, in willful violation of the laws of the United States, Turkey, and international law.

111.    Two defendants had unique and vital purposes in effecting the killing of Mr. Khashoggi and its attempted cover up. Defendant Tubaigy, a forensic doctor and professor of criminal evidence, was a last-minute addition to the group, and was responsible for expertly dismembering and disposing of Mr. Khashoggi's body following his torture and murder. Defendant Almadani was brought along to serve as a body double for Plaintiff Khashoggi so that Defendants could mask Khashoggi's disappearance after his murder. Defendant Almadani brought a fake beard to use for this purpose.

112.    In preparation for removing Mr. Khashoggi's body from the Consulate, at 1:38 a.m. on October 2, 2018, Defendant John Doe 4 drove a Mercedes-Benz Vito van to the consular residence's indoor parking garage to ensure it would fit during the operation to kidnap, torture and kill Mr. Khashoggi.

113.    In the early morning hours of October 2, 2018, Mr. Khashoggi returned to Istanbul on a flight from London. Mr. Khashoggi met Plaintiff Cengiz at their recently-purchased apartment. Mr. Khashoggi had given Plaintiff Cengiz 20,000 Turkish Lira (about $3,500 USD) to

---

[56] *See, e.g.*, Abdurrahman Şimşek & Nazif Karaman,, *Saudi Hit Squad's Gruesome Conversations During Khashoggi's Murder Revealed*, Daily Sabah (Sept. 9, 2019), https://www.dailysabah.com/investigations/2019/09/09saudi-hit-squads-gruesome-conversations-during-khashoggis-murder-revealed.

buy furnishings for the home and they planned to finish furnishing the apartment together in the coming days.

114. Hours later, Mr. Khashoggi called Defendant Sultan at the Saudi Consulate to ensure the certificate was ready. Defendant Sultan confirmed that it was and told Mr. Khashoggi that he could come pick it up. Mr. Khashoggi and Plaintiff Cengiz took a taxi to the Consulate, arriving around 1:00 p.m.

115. The Consul General, Defendant al-Otaibi, reportedly ordered non-Saudi staff at the Consulate to either not report for work on October 2nd or to leave the Consulate at noon. Others were told to remain in their offices. Likewise, the staff at the Consul General's residence were told not to enter or leave the Residence, under the guise that there were to be expected repairs.[57]

116. Between approximately 10:00 a.m. and 11:00 a.m., in preparation for Mr. Khashoggi's arrival at the Consulate, Defendants Abahussain, Alarifi, Alhawsawi, and Khalid Alotaibi went to the Consul General's Residence, while Defendants Alzahrani, Mutreb, Waleed Alshehri, Albalawi, Badr Alotaibi, Tubaigy, Almadani, Alharbi, Alqahtani, and Turki Alsehri went to the Consulate.[58]

117. At 1:02 p.m., in a recording captured by Turkish Intelligence, Defendant Mutreb and Defendant Tubaigy had a macabre discussion inside the Consulate prior to Defendant Khashoggi's arrival. The pair coldly discussed the logistics of how the Defendants would remove Mr. Khashoggi's dismembered body parts from the Consulate. Defendant Tubaigy expressed his view that dismembering Mr. Khashoggi would not be difficult and stated summarily, "[j]oints will

---

[57] *See* SR Report ¶ 78.
[58] *Id.* ¶ 90 & Table B.

be separated. It is not a problem. The body is heavy. First time I cut on the ground. If we take plastic bags and cut it into pieces, it will be finished. We will wrap each of them."[59]

118.   At the end of their conversation, exhibiting clear premeditation, Defendant Mutreb asked whether the "sacrificial animal" had arrived. Minutes later, the pair were informed that Mr. Khashoggi had indeed arrived.[60]

119.   On October 2, 2018, at approximately 1:15 p.m., Mr. Khashoggi entered the Saudi Consulate in Istanbul as Plaintiff Cengiz waited outside. Once again, he left his mobile phones with Plaintiff Cengiz for safekeeping.[61]

120.   Upon his arrival at the Consulate, Mr. Khashoggi was met by a number of the Defendants. These Defendants included Defendant Sultan. The Defendants invited him to the Consul General's office on the second floor.[62]

121.   The Defendants' initial conversation with Mr. Khashoggi centered on whether Mr. Khashoggi intended to return to the Kingdom.[63]

122.   When Mr. Khashoggi replied by saying that he wished to return in the future, he was told that there was an order to bring him back to the Kingdom immediately.[64]

123.   Several Defendants present at the Consulate then confronted Mr. Khashoggi in or around the Consul General's office.

---

[59] *Id.* ¶ 91.
[60] *Id.*
[61] *Id.* ¶ 92.
[62] *See id.* ¶ 94.
[63] *Id.* ¶ 94.
[64] *Id.*

124.    In a recording captured by Turkish Intelligence, Defendant Mutreb can be heard demanding that Mr. Khashoggi send a message to his son, to which Mr. Khashoggi responded "What should I say? See you soon? I can't say kidnapping."[65]

125.    Then, Defendant Mutreb is heard stating, "Cut it short," and "Take off your jacket." At that point, Mr. Khashoggi responded with incredulity, "How could this happen in an embassy?"[66]

126.    At 1:33 p.m., after refusing to write a message to his son, and after apparently observing a towel, Mr. Khashoggi stated, "[T]here is a towel here. Are you going to give me drugs?"[67] These were likely Jamal Khashoggi's last words.

127.    Following this exchange, a struggle began and quickly intensified. Mr. Khashoggi attempted to flee the group and was seized upon and, after torturing him, Defendants present murdered Mr. Khashoggi.

128.    Through recordings capturing Mr. Khashoggi's murder, sounds of the struggle can be heard along with the following horrifying statements: "Did he sleep?" "He raises his head;" "Keep pushing;" and "Push here; don't remove your hand; push it."[68] Sounds of movement, heavy panting, and plastic sheets can also clearly be heard.[69]

129.    A Turkish Intelligence assessment of the recording of the murder identified the sound of a saw at 1:39 p.m.[70]

---

[65] *Id.*
[66] *Id.*
[67] *Id.*
[68] *Id.* at ¶ 95.
[69] *Id.* at ¶ 96.
[70] *Id.*

130.    In the hours after the killing and dismemberment took place, Defendant Maher Abdulaziz Mutreb contacted Bader al-Asaker, the head of Defendant MBS's office in Riyadh, on at least four occasions.[71] Defendant Mutreb also called an accomplice in the United States.[72]

131.    Also during this time, Defendant Al-Qahtani called into the torture session via a visual media call. At one point he demanded that his co-Defendants "Bring me the head of the dog."[73]

132.    Thereafter, Mr. Khashoggi's body was dismembered and disposed of by Defendant Tubaigy with the help of the other Defendants.  Mr. Khashoggi was beheaded and his fingers were severed.[74]

133.    According to news reports, Defendant Tubaigy listened to music while dismembering the body and advised other Defendants to do the same.[75]

134.    After the murder, in an attempt to cover up the heinous crime, Defendant Almadani, wearing Khashoggi's clothes and accompanied by Defendant Alqahtani, walked out of the Consulate through a rear entrance and openly walked around tourist areas far from the Consulate to serve as a decoy.[76]

---

[71] *See* Hannah Lucinda Smith, *Saudi Hit Squad Leader 'Called Crown Prince's Office' After Khashoggi Death*, Times (Oct. 23, 2018), https://www.thetimes.co.uk/article/hit-squad-leadercalled-office-of-crown-prince-fpkgspbs0/; *Khashoggi Case: All Previous Updates*, Al Jazeera (Nov. 22, 2018), https://www.aljazeera.com/news/2018/11/22/khashoggi-case-all-previous-updates/.

[72] *Khashoggi Case: All Previous Updates*, AL JAZEERA, *supra* note 71.

[73] *How the Man Behind Khashoggi Murder Ran the Killing Via Skype*, *supra* note 4.

[74] David D. Kirkpatrick & Carlotta Gall, *Audio Offers Gruesome Details of Jamal Khashoggi Killing, Turkish Official Says*, N.Y. Times (Oct. 17, 2018), https://www.nytimes.com/2018/10/17/world/europe/turkey-saudi-khashoggi-dismember.html.

[75] David Hearst, *Jamal Khashoggi's Killing Took Seven Minutes, Turkish Source Tells MEE*, Middle East Eye (Dec. 10, 2018), https://www.middleeasteye.net/news/jamal-khashoggis-killing-took-seven-minutes-turkish-source-tells-mee.

[76] SR Report ¶ 98.

135.    A few hours after Mr. Khashoggi first entered the Consulate, a consular van and another vehicle were seen leaving the Consulate and arriving minutes later at the Consul-General's residence.  A Mercedes-Benz Vito van with the diplomatic plate 34 CC 1865 left the Consulate and entered the premises of the Consul-General's residence about 200 meters away at 3:09 p.m.[77] Video leaked to the Turkish media shows certain Defendants carrying large bags at the Consul-General's residence, which, upon information and belief, contained the remains of Mr. Khashoggi.[78]

136.    During all this time, Plaintiff Cengiz was left waiting outside, becoming increasingly anguished and enduring unimaginable distress. At 4:41 p.m., Plaintiff Cengiz phoned Khashoggi's emergency contact, Yasin Aktai, who alerted the authorities.

137.    At 4:30 p.m., Plaintiff Cengiz called Turan Kislasci and he traveled to the Consulate. After his arrival, Plaintiff Cengiz and Mr. Kislasci approached two Consular officials who were exiting the Consulate and asked about Mr. Khashoggi's whereabouts.  The officials stated that Mr. Khashoggi was not inside and had departed the Consulate.  Mr. Kislasci informed the officials that Mr. Khashoggi could not have exited through the same door that he entered from because Plaintiff Cengiz has been waiting outside that entrance since Mr. Khashoggi entered and had not seen him return.  The officials then questioned why Plaintiff Cengiz and Mr. Kislasci remained waiting at the Consulate and told them to go home to wait for Mr. Khashoggi there.

---

[77] *See Turkish Police Search Van That Allegedly Carried Khashoggi's Body*, Daily News (Oct. 19, 2018),   https://www.hurriyetdailynews.com/turkish-police-search-van-that-allegedly-carried-kha shoggis-body-138046.  The van remained at the Consul-General's for three days, after which it was taken to a car wash.  *See* Evan Ratliff, *The Story of Jamal Khashoggi's Murder and How the World Looked the Other Way*, Insider (Oct. 1, 2019), https://www.insider.com/the-murder-of-jamal-khashoggi-2019-10.

[78] *See Video Shows Bags Believed to Contain Khashoggi's Remains: Report*, Al Jazeera (Dec. 31, 2018), https://www.aljazeera.com/news/2018/12/video-shows-bags-believed-khashoggi-remains-report-181230215116612.html.

Meanwhile, Mr. Khashoggi's killers were fleeing the country, returning to Saudi Arabia on private and commercial flights out of Istanbul.

138.     Plaintiff Cengiz remained outside the Consulate until approximately 2:00 a.m. on October 3, 2018 in a desperate and tormented state.

F.   The Aftermath and Attempted Cover-up by Defendants

139.     Mr. Khashoggi's disappearance sparked worldwide outrage.[79]

140.     For over seventeen days, Defendants embarked on a misinformation campaign that was both devious and hopelessly inept. Initially, Defendants outright denied that any harm had come to Mr. Khashoggi and denied any knowledge of his whereabouts. On October 5, Defendant MBS lied and insisted in an interview with Bloomberg that Mr. Khashoggi had left the consulate. Defendants and other Saudis restricted access to the Consulate and Residence while a cleaning crew led by Defendants Abdulaziz al-Junabi and Defendant Yahya al-Zahrani operated,[80] then offered limited access to the media and local Turkish officials seeking to examine the premises for signs of Mr. Khashoggi.

141.     Following the departure of Mr. Khashoggi's assassins, Turkish police conducted a retroactive review of the luggage they took through the airport x-ray machines while leaving the country.  The retroactive review showed that the following was loaded onto a private jet: five radio

---

[79] *See, e.g.*, Peter Bergen, *The Global Fallout from the Khashoggi Murder is Bad News for the Saudis*, CNN (Nov. 1, 2018), https://www.cnn.com/2018/10/31/opinions/global-fallout-from-kha shoggi-murder-is-bad-news-for-the-saudis-bergen/index.html; Michael Burke, *DC Think Tank Declines Saudi Money Amid Khashoggi Controversy*, Hill (Oct. 15, 2018), https://thehill.com/ policy/international/411545-washington-think-tank-declines-saudi-money-amid-khashoggi-controversy.

[80] *See, e.g.*, Orhan Coskun, *Saudis Sent 'Clean-Up' Team to Turkey after Khashoggi Killing, Official Says*, Reuters (Nov. 5, 2018), https://www.reuters.com/article/us-saudi-khashoggi-turkey/ saudis-sent-clean-up-team-to-turkey-after-khashoggi-killing-official-says-idUSKCN1NA0OS.

handsets and compatible intercom devices, two syringes, two electroshock devices, a signal blocking device, and a scalpel.

142.    To prevent access to evidence of the murder, on October 6, 2018, Defendants encrypted the hard drives that contained the records of CCTV cameras at the police checkpoint outside the Saudi Consulate.[81]  However, Turkish authorities had obtained the footage prior to the Saudi effort to hide the video evidence.[82]

143.    During a guided media tour of the Consulate on Saturday, October 6, 2018, the Consul General, Defendant al-Otaibi, mocked the disappearance by opening cabinets and cupboards to prove that Mr. Khashoggi was not inside.[83]  Defendant Al-Otaibi said, "If those who say he was kidnapped are focusing on his being in the mission, these are just rumors that have no proof."[84]

144.    Nearly two weeks after Mr. Khashoggi's murder, and after Defendants Abdulaziz al-Junabi and Yahya al-Zahrani completed their task of destroying evidence of Mr. Khashoggi's murder,[85] Turkish authorities were finally permitted to search the Consulate. However, by this point, a cleaning crew had cleaned up the scene of the murder and destroyed evidence of Mr. Khashoggi's torture and murder.

---

[81] *See Saudis Tampered with CCTV Cameras after Khashoggi Murder: Report*, Al Jazeera (Nov. 6, 2018), https://www.aljazeera.com/news/2018/11/saudis-tampered-cctv-cameras-khashoggi-murder-report-181106081248140.html.
[82] *Id.*
[83] Dominic Evans, *Saudi Arabia Opens Up Consulate after Journalist Vanishes*, Reuters (Oct. 6, 2018), https://www.reuters.com/article/us-saudi-politics-dissident-consulate/saudi-arabia-opens-up-consulate-after-journalist-vanishes-idUSKCN1MG0RC.
[84] *Id.*
[85] *See, e.g.*, Orhan Coskun, *Saudi's Sent 'Clean-Up' Team to Turkey after Khashoggi Killing, Official Says*, Reuters, *supra* note 80.

145.    Fourteen days after Mr. Khashoggi's disappearance, the nearby residence of the Consul General was searched by Turkish authorities for clues to Mr. Khashoggi's disappearance and remains. Mr. Khashoggi's remains have not been found to this day, adding to the distress of Plaintiff Cengiz and other friends and family.

146.    Defendants and the Kingdom denied Mr. Khashoggi's death until October 18, 2018, when the Kingdom's chief prosecutor appeared on state television and admitted that Mr. Khashoggi had been killed in the Consulate—purportedly after a fistfight.[86] Following this admission, King Salman dismissed several senior military and intelligence officials.[87] On October 20, 2018 the Saudi Ministry of Foreign Affairs issued a statement reiterating that narrative, alleging that the fistfight broke out after Mr. Khashoggi refused attempts to convince him to return to the Kingdom.[88]

147.    On October 21, 2018, in an interview with Fox News, Saudi Foreign Minister Adel al Jubeir stated that Mr. Khashoggi's death was the result of a rogue operation wherein individuals exceeded their authorities and responsibilities and then attempted to conceal their mistakes.[89]

148.    On October 25, 2018, changing its narrative for the third time within a week, the Saudi Office of the Attorney General stated that the attack on Mr. Khashoggi was a planned, pre-meditated murder.[90]

149.    On January 25, 2019, the U.N. Human Rights Council announced that U.N. Special Rapporteur Callamard would initiate a human rights inquiry into the unlawful death of Mr.

---

[86] *See generally* SR Report ¶¶ 129–146.
[87] *See id.* ¶ 147.
[88] *See id.* ¶ 146.
[89] *See id.* ¶ 151.
[90] *Id.* ¶ 162.

Khashoggi and report her findings to the 41st session of the U.N. Human Rights Council that June. U.N. Special Rapporteur Callamard's report concluded that "Mr. Khashoggi's killing constituted an extrajudicial killing" and violated the Vienna Convention on Consular Relations and that the circumstances of Mr. Khashoggi's killing "may constitute an act of torture."[91]

150.    U.N. Special Rapporteur Callamard found that Defendant MBS was aware of the destruction of evidence following Khashoggi's murder.[92] U.N. Special Rapporteur Callamard further reported that "every expert consulted finds it inconceivable that an operation of this scale could be implemented without the Crown Prince [MBS] being aware, at a minimum, that some sort of mission of a criminal nature, directed at Mr. Khashoggi, was being launched."[93]

151.    U.N. Special Rapporteur Callamard concluded that Mr. Khashoggi's killing "constitutes an international crime over which States should claim universal jurisdiction" and that the killing "is a violation of a jus cogen norm."[94]

152.    The U.S. Central Intelligence Service concluded, with high degree of confidence and on the basis of multiple sources of intelligence, that Defendant MBS ordered Mr. Khashoggi's assassination.[95]

153.    On November 15, 2018, the U.S. Department of the Treasury's Office of Foreign Assets Control sanctioned seventeen individuals for their roles in Khashoggi's killing—an unusual

---

[91] *Id.* ¶¶ 1-3.
[92] *Id.* ¶ 259.
[93] *Id.* ¶ 257.
[94] *Id.* ¶ 21.
[95] Shane Harris *et al.*, *CIA Concludes Saudi Crown Prince Ordered Jamal Khashoggi's Assassination*, *supra* note 31.

step given that the United States rarely sanctions Saudi nationals.[96]  According to a Department of Treasury press release, the Office of Foreign Assets Control imposed the sanctions pursuant to an Executive Order that builds upon an act targeting "perpetrators of serious human rights abuse."[97]

154.    The sanctioned individuals included Defendants al-Qahtani, Mutreb, Tubaigy, Alarifi, Alzahrani, Abahussain, Alotaibi, Alhawsawi, Waleed Alshehri, Turki Alsehri, Alharbi, Albalawi, Alotaibi, Almadani, and Alqahtani.[98] The Office stated that Defendant al-Qahtani "was part of the planning and execution of the operation that led to the killing of Mr. Khashoggi" and that his subordinate, Defendant Mutreb, "coordinated and executed" the operation.[99]  The office further stated that at least fourteen other Saudi government officials, the remaining Defendants noted above, participated in the operation.[100]

155.    Treasury Secretary Steven Mnuchin announced that all of the sanctioned Saudi officials "were involved in the abhorrent killing of Jamal Khashoggi" and that "[t]hese individuals who targeted and brutally killed a journalist who resided and worked in the United States must face consequences for their actions."[101]

156.    The European Union has repeatedly called for the perpetrators of Khashoggi's killing to be brought to justice and specifically issued a joint motion for a resolution in October

---

[96] Patricia Zengerle & Stephen Kalin, *U.S. Imposes Sanctions for Khashoggi Killing, Saudis Seek Death Penalty*, Reuters (Nov. 15, 2018), https://www.reuters.com/article/us-saudi-khashoggi/u-s-imposes-sanctions-for-khashoggi-killing-saudis-seek-death-penalty-idUSKCN1NK2VB.
[97] Press Release, U.S. Dep't Treasury, *Treasury Sanctions 17 Individuals for Their Roles in the Killing of Jamal Khashoggi* (Nov. 15, 2018), https://home.treasury.gov/news/press-releases/sm547.
[98] *Id.*
[99] *Id.*
[100] *Id.*
[101] *Id.*

2018 condemning Mr. Khashoggi's murder and seeking to have those responsible held accountable.[102]

    G.  <u>Plaintiffs' Harms and Exploration of Remedies in Turkey</u>

    157.    As a result of Mr. Khashoggi's death, Plaintiff Cengiz has suffered and will continue to suffer severe mental anguish and the loss of Mr. Khashoggi's society. Plaintiff Cengiz was forced to endure pain outside the Saudi Consulate as she waited for Mr. Khashoggi, imagining the worst when he failed to emerge, only to have her worst fears confirmed in the days that followed. She has since suffered continual mental anguish in the almost two years since his death. She received professional mental health counseling, was prescribed medicine to help cope with the tragedy, and continues to have difficulty sleeping as a result of Mr. Khashoggi's murder. In addition to her grief and distress over the loss of her husband, the worldwide attention has forced Plaintiff Cengiz to live under 24-hour security and she was even forced to leave Turkey for several months until this scrutiny subsided.  She also continually questions her safety and avoids meeting new people.

    158.    As a result of the sudden and deliberate killing of its Executive Director, Plaintiff DAWN suffered significant pecuniary damages as it was unable to reap the benefit of its contract with Mr. Khashoggi to promote DAWN and its activities.

    159.    Plaintiff DAWN's official public launch was delayed by approximately two years due to Mr. Khashoggi's killing.

---

[102] *See* Reuters, *West Urges S. Arabia to Release Women Activists, Prosecute Khashoggi Killers*, Nat'l Post (Sept. 15, 2020), https://nationalpost.com/pmn/news-pmn/crime-pmn/west-urges-s-arabia-to-release-women-activists-prosecute-khashoggi-killers; Joint Motion for a Resolution on the Killing of Jamal Khashoggi in the Saudi consulate in Istanbul, Eur. Parl. Doc. 2018/2885 (RSP) (2018).

160.    Plaintiffs have retained counsel in Turkey to explore whether there are available, adequate remedies through a civil action in Turkey. Counsel have informed Plaintiffs that it would be futile to bring an action in a civil court in Turkey and that even if an action could be brought in Turkey, the remedies would prove woefully inadequate.

161.    Moreover, Plaintiffs have been informed by seasoned Turkish counsel that in Turkey where, as here, there is an ongoing criminal prosecution,[103] the settled practice of the Turkish Court of Appeals compels the civil courts to cease their proceedings until the determination of the material facts by the criminal courts.  As a result, civil courts in Turkey will stay proceedings indefinitely until the conclusion of related criminal proceedings.  This settled practice drew criticism from the European Court of Human Rights (ECHR) in *Akseki v. Turkey*, in which the ECHR found that a Turkish court failed to show the required diligence in resolving a civil claim when that claim was rescheduled until the conclusion of criminal proceedings.[104] The ECHR concluded that the five-year delay for completion of proceedings at one level of the Turkish court system was unreasonable.[105] Plaintiffs would confront the same untenable delays were they to seek redress in Turkey, as there is presently an ongoing Turkish prosecution in absentia related to Mr. Khashoggi's murder. This prosecution will not come to a close in the foreseeable future.

162.    A fair trial would likewise be unavailable in Saudi Arabia.  The State Department has explained that the judiciary in Saudi Arabia is not an independent entity and instead is

---

[103] *See* Matthew S. Schwartz, *Khashoggi Murder Trial Begins In Turkey*, NPR (July 3, 2020), https://www.npr.org/2020/07/03/887116557/khashoggi-murder-trial-begins-in-turkey (noting that the trial has been adjourned until November 24, 2020).

[104] *Akseki v. Turkey*, App. No. 19509/07, ¶¶ 21-24 (Mar. 6, 2012), https://hudoc.echr.coe.int/eng# {%22display%22:[2],%22languageisocode%22:[%22ENG%22],%22docname%22:[%22Akseki %22],%22itemid%22:[%22001-109320%22]}.

[105] *Id.* ¶ 24.

"required to coordinate [its] decisions with executive authorities, with the king and crown prince as arbiters."[106]  The State Department has also noted that "[i]n some cases the government did not carry out judicially ordered compensation for unlawful detentions in a timely manner."[107]  Moreover, according to the Kingdom itself, "[a]t the top of the legal system is the King, who acts as the final court of appeal."[108]  As King Salman is the ultimate appellate tribunal, it is inconceivable that he would permit fair proceedings against his favored son, Defendant MBS.  On September 7, 2020, the Riyadh Criminal Court commuted death sentences for some of those accused of killing Khashoggi; U.N. human rights investigator Agnes Callamard said the prosecutor's verdict was "'a parody of justice' that spared 'high-level' plotters."[109]

### FIRST CLAIM FOR RELIEF
*(Extrajudicial Killing under the Alien Tort Statute, 28 U.S.C. § 1350)*

163.    Plaintiff Cengiz, in her individual capacity, realleges and incorporates the allegations stated in the preceding paragraphs as if fully set forth herein.

164.    The Alien Tort Statute grants district courts "original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.

165.    Plaintiff Cengiz is an alien entitled to bring suit pursuant to 28 U.S.C. § 1350.  *See* 8 U.S.C. § 1101(a)(3) (defining "alien"). Plaintiff Cengiz is a native citizen of Turkey and currently resides in Istanbul.

---

[106] U.S. Dep't of State, *2017 Country Reports on Human Rights Practices: Saudi Arabia*, https://www.state.gov/reports/2017-country-reports-on-human-rights-practices/saudi-arabia/.
[107] U.S. Dep't of State, *Human Rights Reports, Custom Report Excerpts: Saudi Arabia*, https://www.state.gov/report/custom/52251d12be/ (last visited Sept. 29, 2020).
[108] *Legal and Judicial Structure*, The Embassy of the Kingdom of Saudi Arabia, https://www.saudiembassy.net/legal-and-judicial-structure-0 (last visited Sept. 21, 2020), attached as Exhibit A.
[109] *EU Parliament Urges Arms Embargo on Saudi Arabia*, Al Jazeera (Sept. 17, 2020), https://www.aljazeera.com/news/2020/09/17/eu-parliament-urges-arms-embargo-on-saudi-arabia/.

166.    Plaintiff Cengiz married Mr. Khashoggi according to the traditions of Islam on September 16, 2018. Plaintiff Cengiz was also financially dependent on Mr. Khashoggi. Mr. Khashoggi had agreed to provide Plaintiff Cengiz with a regular stipend as a condition of their marriage and sent Plaintiff Cengiz funds on several occasions during their relationship. Had Mr. Khashoggi not been murdered, the couple would have jointly held title to an apartment Mr. Khashoggi purchased for the couple.

167.    Mr. Khashoggi's killing was not authorized by any court or judgment and violated international law. Mr. Khashoggi's killing constituted an extrajudicial killing. This extrajudicial killing constitutes a "tort . . . committed in violation of the law of nations or a treaty of the United States" under the Alien Tort Statute, 28 U.S.C. § 1350, in that it violated customary international law prohibiting extrajudicial killings and persecution as reflected, expressed, defined, and codified in customary international law, multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

168.    Defendants directed actions in the United States that coerced decedent Jamal Khashoggi to enter the Saudi Consulate in Istanbul.  There, he was intentionally and deliberately tortured and killed by Defendants acting under actual or apparent authority, or color of law, of a foreign nation and/or under the command of, in conspiracy with, or as the agents of Defendants acting under actual or apparent authority, or color of law, of a foreign nation.

169.    The killing of Jamal Khashoggi had a substantial and specific focus on the United States. Decedent Jamal Khashoggi, after being lured by Defendants to Turkey, was kidnapped, tortured, and killed as the intended result of an unlawful conspiracy that was planned, ordered, and implemented by Defendants. The key discussions that resulted in luring Mr. Khashoggi to Turkey occurred when both Mr. Khashoggi and his interlocutors were in the United States and occurred

at the behest of Defendants. Defendants' conspiracy was formulated for the purpose of silencing Mr. Khashoggi and preventing him from continuing his efforts in the United States as a voice for democratization in the Middle East, principally as the Executive Director of Plaintiff DAWN. The conspiracy was also designed to deter others who might speak out against the Defendants generally and MBS specifically, including individuals in the United States. The Defendants' wrongful actions also directly harmed Plaintiff DAWN, which is incorporated in the United States, and Plaintiff Cengiz, who had intended to reside principally in the United States after her marriage to Mr. Khashoggi.

170.    Defendants' actions caused Mr. Khashoggi to suffer severe physical and mental pain and suffering before his death.

171.    The extrajudicial killing of her husband caused Plaintiff Cengiz to experience severe mental pain and suffering; loss of guidance, companionship, and society; loss of consortium; and loss of solatium. As a direct and proximate consequence of the intentional acts of the Defendants, as above set forth, and the injuries thereby inflicted, Plaintiff Cengiz has suffered significant damages in an amount to be determined at trial.

172.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, and malicious, and should be punished by an award of punitive damages in an amount to be determined at trial.

173.    Adequate and available remedies for Mr. Khashoggi's killing do not exist in Turkey or the Kingdom.

## SECOND CLAIM FOR RELIEF
*(Extrajudicial Killing under the Torture Victim Protection Act, 28 U.S.C. § 1350 note)*

174.    Plaintiff Cengiz, in her individual capacity, realleges and incorporates the allegations stated in the preceding paragraphs as if fully set forth herein.

175.    The Torture Victim Protection Act subjects any individual "who, under actual or apparent authority, or under color of law, of any foreign nation" has "subject[ed] an individual to extrajudicial killing" to liability to "any person who may be a claimant in an action for wrongful death." Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note). Decedent Jamal Khashoggi was abducted and killed as the intended result of an unlawful conspiracy that was planned, ordered, and implemented by Defendants. This conspiracy was formulated for the purpose of silencing and preventing Mr. Khashoggi from continuing his efforts in the United States as a voice for democratization in the Middle East, principally as the Executive Director of Plaintiff DAWN. The conspiracy was also designed to deter others who might speak out against the Kingdom, including individuals throughout the United States.

176.    Acting pursuant to that plan, Defendants, acting under actual or apparent authority or under color of law of a foreign nation, intentionally and deliberately killed Mr. Khashoggi. Defendant MBS ordered Mr. Khashoggi's murder.

177.    Mr. Khashoggi's killing was deliberate, not authorized by any court or judgment, and unlawful under the laws of the United States, Turkey, and international law. Mr. Khashoggi's killing constituted an extrajudicial killing as defined by the Torture Victim Protection Act, 28 U.S.C. § 1350 note.

178.    Mr. Khashoggi suffered severe physical and mental pain and suffering before his death.

179.    Plaintiff Cengiz, Mr. Khashoggi's widow, has standing to bring suit under the Torture Victim Protection Act because Plaintiff Cengiz may be a claimant in an action for Mr. Khashoggi's wrongful death.

180.     Plaintiff Cengiz was financially dependent on Mr. Khashoggi.

181.     The extrajudicial killing of her husband caused Plaintiff Cengiz to experience severe mental pain and suffering; loss of guidance, companionship, and society; loss of consortium; and loss of solatium. As a direct and proximate consequence of the intentional acts of the Defendants, as above set forth, and the injuries thereby inflicted, Plaintiff Cengiz has suffered significant damages in an amount to be determined at trial.

182.     Defendants' acts and omissions were deliberate, willful, intentional, wanton, and malicious, and should be punished by an award of punitive damages in an amount to be determined at trial.

183.     Adequate and available remedies for Mr. Khashoggi's killing do not exist in Turkey or the Kingdom.

### THIRD CLAIM FOR RELIEF
*(Tortious Interference of Contract)*

184.     Plaintiff DAWN realleges, and incorporates by reference all previous paragraphs of this Complaint as though fully set forth herein.

185.     Plaintiff DAWN executed a valid employment contract with Mr. Khashoggi on June 1, 2018, which set forth the terms by which Mr. Khashoggi would serve as the Executive Director of Plaintiff DAWN.

186.     Defendants were aware of the contractual arrangements between DAWN and Mr. Khashoggi. Through cell phone communications, Mr. Khashoggi openly and often discussed with his friend, Omar Abdulaziz and others, Mr. Khashoggi's contracted role to serve as the Executive Director of DAWN, and his plans to use DAWN as a platform to bring democracy and greater human rights observance in, *inter alia,* the Kingdom. Defendants perceived these plans as antagonistic to their pecuniary, political and other interests.

187.    Defendants and their agents hacked Mr. Abdulaziz's smartphone and were thereby able to access and spy on Mr. Khashoggi's conversations with Mr. Abdulaziz, in which Mr. Khashoggi discussed his contract and employment with Plaintiff DAWN.

188.    On information and belief, Defendants had actual knowledge of DAWN's contractual relationship with Mr. Khashoggi by, *inter alia,* hacking Mr. Abdulaziz's cell phone.

189.    Defendants then intentionally and tortiously interfered with DAWN's business relations with Mr. Khashoggi by unlawfully, and without justification, abducting, torturing, and killing Mr. Khashoggi in the Saudi Consulate in Istanbul, to prevent Mr. Khashoggi from fulfilling his contractual role as Executive Director of Plaintiff DAWN and from advocating for greater human rights observance and democratic reforms in, *inter alia*, the Kingdom.

190.    As a direct and proximate consequence of the intentional acts of the Defendants, as above set forth, and the injuries thereby inflicted, Plaintiff DAWN has been significantly damaged. DAWN has been unable to benefit from the tremendous network and reputation of Mr. Khashoggi to raise resources and advance DAWN's political objectives. DAWN's official public launch was delayed by approximately two years due to Mr. Khashoggi's killing. The amount of damages shall be determined at trial.

191.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, and malicious, and should be punished by an award of punitive damages in an amount to be determined at trial.

## FOURTH CLAIM FOR RELIEF
*(Wrongful Death)*

192.    Plaintiff Cengiz, in her individual capacity, realleges and incorporates the allegations stated in the preceding paragraphs as if fully set forth herein.

193.    In violation of the laws of the United States, Turkey, and international law, Defendants wrongfully and intentionally abducted and killed Mr. Khashoggi in the Saudi Consulate in Istanbul, Turkey.

194.    Plaintiff Cengiz is Mr. Khashoggi's widow, having married Mr. Khashoggi according to the traditions of Islam on September 16, 2018.  Plaintiff Cengiz was also financially dependent on Mr. Khashoggi as understood under Turkish law.  Mr. Khashoggi sent Plaintiff Cengiz funds on several occasions during their relationship and had agreed to provide Plaintiff Cengiz with a regular stipend as a condition of their marriage.  Mr. Khashoggi had purchased an apartment for the couple to share in Istanbul, and, had Mr. Khashoggi not been murdered, the couple had planned and agreed to hold title to the apartment jointly.

195.    As a direct and proximate consequence of the intentional killing of Mr. Khashoggi by Defendants, Plaintiff Cengiz has suffered damages due to mental pain and anguish; loss of guidance, companionship, and society; loss of consortium; loss of solatium; and the loss of future support and services on which she is dependent, in an amount to be determined at trial.

196.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, and malicious, and should be punished by an award of punitive damages in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF
*(Intentional Infliction of Emotional Distress, Including Solatium)*

197.    Plaintiff Cengiz, in her individual capacity, realleges and incorporates the allegations stated in the preceding paragraphs as if fully set forth herein.

198.    Plaintiff Cengiz is Mr. Khashoggi's widow, having married Mr. Khashoggi according to the traditions of Islam on September 16, 2018.  Mr. Khashoggi and Plaintiff Cengiz

shared an extraordinarily close relationship and spent almost all their time together when he was in Istanbul, and they spoke multiple times per day for hours when in separate places.

199.    Plaintiff Cengiz was also financially dependent on Mr. Khashoggi as understood under Turkish law.  Mr. Khashoggi sent Plaintiff Cengiz funds on several occasions during their relationship and had agreed to provide Plaintiff Cengiz with a regular stipend as a condition of their marriage.  Mr. Khashoggi had purchased an apartment for the couple to share in Istanbul, and, had Mr. Khashoggi not been murdered, the couple had planned and agreed to hold title to the apartment jointly.

200.    Defendants lured Mr. Khashoggi from his home in the United States to the Saudi Consulate in Istanbul so that they could intentionally, and without justification, abduct and kill Mr. Khashoggi.

201.    Defendants' actions in abducting and killing Mr. Khashoggi exceeded all possible limits of human decency, were extreme and outrageous, and intolerable in civilized society.

202.    Defendants' violent actions were intended to intimidate, coerce, and emotionally impact others who knew and loved Mr. Khashoggi, and who shared his passion for advocating for democracy and human rights promotion in the Middle East, in particular Plaintiff Cengiz.

203.    Plaintiff Cengiz was present and waiting outside the Saudi Consulate in Istanbul while Defendants abducted and killed her husband.

204.    As a direct and proximate consequence of the intentional acts of the Defendants as above set forth and the injuries thereby inflicted, Plaintiff Cengiz suffered severe emotional distress which will continue for the rest of her life; loss of guidance, companionship, and society; loss of consortium; and loss of solatium. She has thereby suffered damages in an amount to be determined at trial.

205.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, and malicious, and should be punished by an award of punitive damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### *(Loss of Consortium)*

206.    Plaintiff Cengiz, in her individual capacity, realleges and incorporates the allegations stated in the preceding paragraphs as if fully set forth herein.

207.    Plaintiff Cengiz is Mr. Khashoggi's widow, having married Mr. Khashoggi according to the traditions of Islam on September 16, 2018.  Mr. Khashoggi and Plaintiff Cengiz shared an extraordinarily close relationship and spent almost all their time together when he was in Istanbul, and they spoke multiple times per day for hours when in separate places.

208.    Plaintiff Cengiz was also financially dependent on Mr. Khashoggi as understood under Turkish law. Mr. Khashoggi sent Plaintiff Cengiz funds on several occasions during their relationship and had agreed to provide Plaintiff Cengiz with a regular stipend as a condition of their marriage. Mr. Khashoggi had purchased an apartment for the couple to share in Istanbul, and, had Mr. Khashoggi not been murdered, the couple had planned and agreed to hold title to the apartment jointly.

209.    Defendants lured Mr. Khashoggi from his home in the United States to the Saudi Consulate in Istanbul so that they could intentionally, and without justification, abduct and kill Mr. Khashoggi.

210.    The Defendants' intentional and wrongful actions in abducting and killing Mr. Khashoggi deprived Plaintiff Cengiz of the benefits of her marital relationship with Mr. Khashoggi.

211.    As a direct and proximate consequence of the intentional acts of the Defendants as above set forth, Plaintiff Cengiz suffered the debilitating loss of love, companionship, comfort, society, solace, intimacy, services, moral support and affection that she previously enjoyed with Mr. Khashoggi, and she has thereby sustained damages in an amount to be determined at trial.

212.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, and malicious, and should be punished by an award of punitive damages in an amount to be determined at trial.

## SEVENTH CLAIM FOR RELIEF
*(Loss of Society)*

213.    Plaintiff Cengiz, in her individual capacity, realleges and incorporates the allegations stated in the preceding paragraphs as if fully set forth herein.

214.    Plaintiff Cengiz is Mr. Khashoggi's widow, having married Mr. Khashoggi according to the traditions of Islam on September 16, 2018.  Mr. Khashoggi and Plaintiff Cengiz shared an extraordinarily close relationship and spent almost all their time together when he was in Istanbul, and they spoke multiple times per day for hours when in separate places.

215.    Plaintiff Cengiz was also financially dependent on Mr. Khashoggi as understood under Turkish law. Mr. Khashoggi sent Plaintiff Cengiz funds on several occasions during their relationship and had agreed to provide Plaintiff Cengiz with a regular stipend as a condition of their marriage. Mr. Khashoggi had purchased an apartment for the couple to share in Istanbul, and, had Mr. Khashoggi not been murdered, the couple had planned and agreed to hold title to the apartment jointly.

216.    The Defendants' intentional and wrongful actions in abducting and killing Mr. Khashoggi caused Plaintiff Cengiz to suffer the loss of society of Mr. Khashoggi.

217.    As a direct and proximate consequence of the intentional acts of the Defendants as above set forth, Plaintiff Cengiz suffered the loss of love, companionship, comfort, solace, intimacy, moral support and affection that she previously enjoyed with Mr. Khashoggi, and she has thereby sustained damages in an amount to be determined at trial.

218.    Defendants' acts and omissions were deliberate, willful, intentional, wanton, and malicious, and should be punished by an award of punitive damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

1.    Award Plaintiffs compensatory damages to be determined at trial;

2.    Award Plaintiffs punitive damages to be determined at trial;

3.    Award Plaintiffs the costs and associated liabilities of this action, including reasonable attorneys' fees; and

4.    Grant such other and additional relief as the Court deems just and proper.

DATED this 20th day of October, 2020.

Respectfully submitted,

*/s/* Keith M. Harper
Keith M. Harper (D.C. Bar No. 451956)
Charles W. Galbraith (D.C. Bar No. 1028083)
Robert Harmala (D.C. Bar No. 451955)
Julian SpearChief-Morris (D.C. Bar No. 1618979)
JENNER & BLOCK LLP
1099 New York Avenue, Suite 900
Washington, D.C.  20001
Telephone:  (202) 639-6045

Faisal Gill (D.C. Bar No. 497312)
GILL LAW FIRM
1155 F Street NW, Suite 1050
Washington D.C.  20005
Telephone:  (202) 570-8223

*Counsel for Plaintiffs,*
*Hatice Cengiz and*
*Democracy for the Arab World Now, Inc.*