# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HATICE CENGIZ, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:20-cv-03009 (JDB) |
| MOHAMMED BIN SALMAN, *et al.*, | |
| *Defendants*. | |

## DEFENDANT MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD'S MOTION TO DISMISS

Michael K. Kellogg (DC 372049)
Gregory G. Rapawy (DC 493973)
Andrew C. Shen (DC 500071)
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Attorneys for Defendant*
*Mohammed bin Salman bin Abdulaziz Al Saud*

June 4, 2021

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ iv

INTRODUCTION ............................................................................................................... 1

SUMMARY OF RELEVANT ALLEGATIONS ................................................................ 4

SUMMARY OF SUPPORTING FACTUAL DECLARATIONS ...................................... 6

STANDARD OF REVIEW ................................................................................................ 7

ARGUMENT ...................................................................................................................... 8

I.      This Court Lacks Personal Jurisdiction over the Crown Prince ........................... 8

        A.      Plaintiffs Fail To Show Personal Jurisdiction over the Crown
                Prince Based on Khashoggi's Alleged Interactions with Saudi
                Embassy Officials .................................................................................... 9

                1.      Plaintiffs' Allegations That Embassy Officials Conspired
                        To Deny Khashoggi a Certificate Do Not Support
                        Jurisdiction .................................................................................. 9

                        a.      Plaintiffs' Conspiracy Allegations Are Legally
                                Insufficient ..................................................................... 10

                        b.      The Evidence Contradicts Plaintiffs' Allegations .......... 11

                2.      Plaintiffs' Allegations That Prince Khalid Gave Khashoggi
                        Assurances About His Safety Do Not Support Jurisdiction ...... 12

                        a.      Plaintiffs' Allegation That Prince Khalid Acted at
                                the Crown Prince's Direction Is Legally Insufficient ...... 12

                        b.      The Evidence Shows That Prince Khalid Neither
                                Gave the Alleged Assurances nor Received
                                Direction To Do So ........................................................ 13

        B.      Plaintiffs Fail To Show Personal Jurisdiction over the Crown
                Prince Based on Khashoggi's Own Contacts with the United States ...... 14

                1.      Allegedly Causing Harm to a U.S. Resident on Foreign Soil
                        Is Not a Jurisdictional Contact with the United States .............. 14

                2.      Plaintiffs Fail To Allege That Defendants' Conduct Was
                        Aimed at the United States or That the Brunt of the Harm
                        Was Felt Here .............................................................................. 15

i

C.      Exercising Jurisdiction over the Crown Prince Would Offend
        Notions of Fair Play and Substantial Justice.........................................17

D.      Plaintiffs Fail To Show Pendent Personal Jurisdiction over
        Plaintiffs' Non-Statutory Claims Against the Crown Prince................................19

II.     Plaintiffs' Claims Are Barred by Foreign Official Immunity, by the Act of
        State Doctrine, and for Failure To Join an Indispensable Party .......................20

A.      The Crown Prince Is Entitled to Head-of-State Immunity ...................................20

B.      The Act of State Doctrine Bars Plaintiffs' Claims.................................................23

C.      Saudi Arabia Is an Indispensable Party That Cannot Be Joined
        Because It Is Immune from Suit ...........................................................................28

        1.      Saudi Arabia Is a Required Party Under Rule 19(a)................................28

        2.      Saudi Arabia Is Immune from Suit .........................................................31

        3.      Because Saudi Arabia Cannot Be Joined, This Case Should
                Be Dismissed ...........................................................................................32

III.    Cengiz Is Not the Appropriate Plaintiff and Fails To State a Claim Under
        the TVPA ...........................................................................................................34

A.      Cengiz Is Not an Appropriate Plaintiff Under the TVPA.....................................34

        1.      Cengiz Is Not Khashoggi's "Legal Representative"................................35

        2.      Cengiz Is Not a "Person Who May Be a Claimant in an
                Action for Wrongful Death" ....................................................................37

                a.      Cengiz Is Not a "Person Who May Be a Claimant in
                        an Action for Wrongful Death" in Any Relevant
                        Jurisdiction..................................................................................38

                        i.      Cengiz May Not "Be a Claimant in an
                                Action for Wrongful Death" Under
                                Virginia Law ..............................................................39

                        ii.     Cengiz May Not "Be a Claimant in an
                                Action for Wrongful Death" Under
                                Saudi Law ..................................................................39

                        iii.    Cengiz May Not "Be a Claimant in an
                                Action for Wrongful Death" Under
                                D.C. Law.....................................................................39

|  |  | iv. | Cengiz May Not "Be a Claimant in an Action for Wrongful Death" Under Turkish Law | 40 |

|  | b. | Should the Court Find a True Conflict, It Should Apply the Laws of Virginia, of Saudi Arabia, or of D.C. | 41 |

| B. | Cengiz Has Not Exhausted Adequate and Available Remedies in Turkey | 44 |

| IV. | Cengiz Fails To Establish Jurisdiction Under the Alien Tort Statute | 46 |

| A. | Cengiz Is Not an Appropriate Plaintiff To Bring Suit | 47 |

| B. | Cengiz's Claims Are Impermissibly Extraterritorial | 47 |

| V. | Plaintiffs Have Failed To State Any Non-Federal Claims | 50 |

| A. | DAWN Fails To State a Claim for Tortious Interference with Contract | 51 |

| B. | Cengiz Fails To State a Claim for Wrongful Death | 55 |

| C. | Cengiz Fails To State Any Additional Common Law Claims | 56 |

|  | 1. | Cengiz Fails To State a Claim for Intentional Infliction of Emotional Distress | 57 |

|  | 2. | Cengiz Fails To State a Claim for Loss of Consortium or Loss of Society | 59 |

| CONCLUSION | 60 |

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

Page

CASES

*A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454 (D.C. Cir. 1995) ................ 36, 56

*Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184 (5th Cir. 2017) ......................................... 48

*Aircrash Disaster Near Roselawn, Ind. on Oct. 31, 1994, In re*, 948 F. Supp. 747
(N.D. Ill. 1996) ............................................................................................................................. 42

*Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592 (1982) ......................... 30

*Ali v. Carnegie Inst. of Washington*, 306 F.R.D. 20 (D.D.C. 2014), *aff'd*,
684 F. App'x 985 (Fed. Cir. 2017) ......................................................................................... 32-33

*Aluminum Warehousing Antitrust Litig., In re*, 90 F. Supp. 3d 219
(S.D.N.Y. 2015) ............................................................................................................................ 11

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140 (2d Cir. 2011) ....................................... 13

*APA Assessment Fee Litig., In re*, 766 F.3d 39 (D.C. Cir. 2014) ......................... 38, 40, 50-51, 55

*Asahi Metal Indus. Co. v. Superior Ct. of California*, 480 U.S. 102 (1987) ........................... 18, 19

\*   *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ................................................................................ 7, 53

*Atkins v. Fischer*, 232 F.R.D. 116 (D.D.C. 2005) ........................................................................ 14

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ................................................. 23, 24

*Beanal v. Freeport-McMoRan, Inc.*, 969 F. Supp. 362 (E.D. La. 1997), *aff'd*,
197 F.3d 161 (5th Cir. 1999) ...................................................................................................... 47

*Becker v. Wells Fargo Bank NA, Inc.*, 2014 WL 3891933 (E.D. Cal. Aug. 7, 2014),
*report and recommendation adopted*, 2014 WL 12773790 (E.D. Cal. Sept.
9, 2014), *aff'd*, 672 F. App'x 660 (9th Cir. 2016) ..................................................................... 58

*Bell v. Ivory*, 966 F. Supp. 23 (D.D.C. 1997), *aff'd*, 1998 WL 388499
(D.C. Cir. May 13, 1998) ............................................................................................................ 54

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................... 7

*Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493 (D.C. Cir. 1995) .............................. 54

*Bertuglia v. City of New York*, 839 F. Supp. 2d 703 (S.D.N.Y. 2012) ......................................... 13

---

[*] Authorities principally relied upon are marked with an asterisk.

*Blantz v. California Dep't of Corr. & Rehab.*, 727 F.3d 917 (9th Cir. 2013) ..............................13

*Boles v. Greeneville Hous. Auth.*, 468 F.2d 476 (6th Cir. 1972) ...................................................28

*Boniface v. Viliena*, 338 F. Supp. 3d 50 (D. Mass. 2018)...............................................................45

*Bowen v. Pan Am. World Airways, Inc.*, 474 F. Supp. 563 (S.D.N.Y. 1979) .........................51-52

*Briggs v. Walker*, 171 U.S. 466 (1898)..........................................................................................35

*Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1773 (2017)...........................9

*Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985) .................................................................14

*Calder v. Jones*, 465 U.S. 783 (1984) ......................................................................................15, 16

*Carruth v. Bentley*, 942 F.3d 1047 (11th Cir. 2019)......................................................................12

*Ciarrocchi v. James Kane Co.*, 116 F. Supp. 848 (D.D.C. 1953)...................................................57

* *Cole, Raywid & Braverman v. Quadrangle Dev. Corp.*, 444 A.2d 969 (D.C. 1982).........51, 52, 57

*Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005), *aff'd*,
    503 F.3d 974 (9th Cir. 2007) ..................................................................................................45

*Crowley v. North Am. Telecomms. Ass'n*, 691 A.2d 1169 (D.C. 1997)..........................................60

*Curry v. Giant Food Co. of D.C.*, 522 A.2d 1283 (D.C. 1987) ......................................................59

*D'Addario v. Geller*, 264 F. Supp. 2d 367 (E.D. Va. 2003) ..........................................................19

*D'Onofrio v. SFX Sports Grp., Inc.*, 534 F. Supp. 2d 86 (D.D.C. 2008)........................................10

*Daimler AG v. Bauman*, 571 U.S. 117 (2014) ...........................................................................9, 18

*Dammarell v. Islamic Republic of Iran*, 2005 WL 756090 (D.D.C. Mar. 29, 2005),
    *recon. granted in part*, 370 F. Supp. 2d 218 (D.D.C. 2005).................................38, 42, 43

*Danziger v. Ford Motor Co.*, 402 F. Supp. 2d 236 (D.D.C. 2005)................................................38

*de Csepel v. Republic of Hungary*, --- F. Supp. 3d ---, 2020 WL 2343405
    (D.D.C. May 11, 2020), *interlocutory appeal pending*, No. 20-7047
    (D.C. Cir.) ................................................................................................................................34

*Dean v. Walker*, 876 F. Supp. 2d 10 (D.D.C. 2012)......................................................................52

*District of Columbia v. Coleman*, 667 A.2d 811 (D.C. 1995) ...........................................38, 43, 51

*District of Columbia v. Murphy*, 314 U.S. 441 (1941) ..................................................................39

*Doe v. Exxon Mobil Corp.*:

> 393 F. Supp. 2d 20 (D.D.C. 2005) ("*Exxon I*"), *appeal dismissed*,
> 473 F.3d 345 (D.C. Cir. 2007) ..................................................................45

> 654 F.3d 11 (D.C. Cir. 2011) ("*Exxon II*"), *vacated*, 527 F. App'x 7
> (D.C. Cir. 2013) ..............................................................................48, 49

> 527 F. App'x 7 (D.C. Cir. 2013) ...............................................................49

> 2015 WL 5042118 (D.D.C. July 6, 2015) ("*Exxon III*") ...........................49, 50

*Doe 1 v. Buratai*, 792 F. App'x 6 (D.C. Cir. 2019) .......................................15

*Estate of Alvarez v. Johns Hopkins Univ.*, 275 F. Supp. 3d 670 (D. Md. 2017) .........................47

*Estate of Domingo v. Marcos*, 1983 WL 482332 (W.D. Wash. July 14, 1983) .........................20

*Estate of Klieman v. Palestinian Auth.*:

> 923 F.3d 1115 (D.C. Cir. 2019), *cert. granted, vacated, and remanded*,
> 140 S. Ct. 2713 (2020) ......................................................................15, 17

> 140 S. Ct. 2713 (2020) .............................................................................17

*First Chicago Int'l v. United Exchange Co.*, 836 F.2d 1375 (D.C. Cir. 1988) ......................10, 12

*Fisher v. Great Socialist People's Libyan Arab Jamahiriya*, 541 F. Supp. 2d 46
(D.D.C. 2008) ..............................................................................37, 38

*Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021) ..................................9

*Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*,
582 F.3d 393 (2d Cir. 2009).......................................................................23

*Futrell v. Department of Labor Fed. Credit Union*, 816 A.2d 793 (D.C. 2003) ..........................57

*GEICO v. Fetisoff*, 958 F.2d 1137 (D.C. Cir. 1992)......................................................38

*Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407 (D.D.C. 1988).........................................54

*Gilbert v. Washington Metro. Area Trans. Auth.*, 1991 WL 221158
(D.D.C. Oct. 9, 1991)..........................................................................59-60

*Harbury v. Hayden*, 444 F. Supp. 2d 19 (D.D.C. 2006), *aff'd*, 522 F.3d 413
(D.C. Cir. 2008) ................................................................................44-45

*Haskins v. Midwest Air Traffic Control Serv., Inc.*, 2016 WL 3653531
(N.D. Ill. July 8, 2016)..........................................................................42

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ....................................9

*Hitaffer v. Argonne Co.*, 183 F.2d 811 (D.C. Cir. 1950) ...............................................................60

*Hood ex rel. Mississippi v. City of Memphis*, 570 F.3d 625 (5th Cir. 2009) ...............................28

\* *Hourani v. Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015)....................................................24, 25, 26, 27

*IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95 (D.D.C. 2018)............................................18

*International Shoe Co. v. Washington*, 326 U.S. 310 (1945) .........................................................9

*Investment Tech. Grp., Inc. Sec. Litig., In re*, 251 F. Supp. 3d 596
      (S.D.N.Y. 2017) .......................................................................................................................14

*Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27 (D.D.C. 2001), *aff'd sub
      nom. Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003) ..........................59

*Jerez v. Republic of Cuba*, 775 F.3d 419 (D.C. Cir. 2014)...........................................................31

*Jones v. Kirchner*, 835 F.3d 74 (D.C. Cir. 2016)..........................................................................56

*Jones v. Pledger*, 363 F.2d 986 (D.C. Cir. 1966) .........................................................................51

*Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549 (D.C. Cir. 1993)............................................57

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997) .................10

*Kaplan v. Central Bank of Islamic Republic of Iran*, 896 F.3d 501
      (D.C. Cir. 2018) .......................................................................................................................49

*Kareem v. Haspel*, 986 F.3d 859 (D.C. Cir. 2021) ...................................................................53-54

*Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984) ...............................................................14

*Kescoli v. Babbitt*, 101 F.3d 1304 (9th Cir. 1996)........................................................................28

\* *Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*,
      43 F.3d 1491 (D.C. Cir. 1995)...........................................................................................31, 33

*Kilroy v. Windsor*, 1978 U.S. Dist. LEXIS 20419 (N.D. Ohio, Dec. 7, 1978) ............................20

\* *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013) ...............................46, 47, 48, 49, 50

*Kline v. Kaneko*, 535 N.Y.S.2d 303 (Sup. Ct., N.Y. Cty., 1988), *aff'd sub nom.
      Kline v. Cordero De La Madrid*, 154 A.D.2d 959 (N.Y. App. Div. 1989)........................20

*Lannan Found. v. Gingold*, 300 F. Supp. 3d 1 (D.D.C. 2017) ......................................................52

\*   *Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 156
      (2020) ...................................................................................................................20

     *Libya v. Miski*, 889 F. Supp. 2d 144 (D.D.C. 2012) ...........................................54

\*   *Livnat v. Palestinian Auth.*:

           82 F. Supp. 3d 19 (D.D.C. 2015), *aff'd*, 851 F.3d 45 (D.C. Cir. 2017) .........................27

           851 F.3d 45 (D.C. Cir. 2017) ...............................................................9, 15, 16, 17

     *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8 (D.D.C. 1995)......................................38

     *Marshall v. Allison*, 908 F. Supp. 2d 186 (D.D.C. 2012), *aff'd*, 554 F. App'x 20
      (D.C. Cir. 2014) ...................................................................................................54

     *Marsoun v. United States*, 525 F. Supp. 2d 206 (D.D.C. 2007) ....................................7

     *Mastafa v. Chevron Corp.*, 770 F.3d 170 (2d Cir. 2014)...........................................48

     *McConnell v. McConnell*, 99 F. Supp. 493 (D.D.C. 1951)...................................36, 37

     *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066 (D.C. Cir. 2012) .....................23, 26

     *McLaughlin v. McPhail*, 707 F.2d 800 (4th Cir. 1983) .........................................10

     *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264 (11th Cir. 2002) .................................7

     *Miango v. Democratic Republic of Congo*, 288 F. Supp. 3d 117 (D.D.C. 2018),
      *vacated*, 2019 WL 2191806 (D.D.C. Jan. 19, 2019) & 2020 WL 3498586
      (D.D.C. June 29, 2020), *appeal pending*, No. 20-5244 (D.C. Cir.)...................................60

     *Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990) .............................................41, 43

     *Mitchell v. Yates*, 402 F. Supp. 2d 222 (D.D.C. 2005) .........................................50

     *Muchow v. Lindblad*, 435 N.W.2d 918 (N.D. 1989) ...........................................59

     *Mutual Life Ins. Co. v. Armstrong*, 117 U.S. 591 (1886)...........................................36

     *Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005) ........................................7, 17, 18

     *Nanko Shipping, USA v. Alcoa, Inc.*, 107 F. Supp. 3d 174 (D.D.C. 2015),
      *rev'd and remanded*, 850 F.3d 461 (D.C. Cir. 2017).........................................54

     *Nnaka v. Federal Republic of Nigeria*, 238 F. Supp. 3d 17 (D.D.C. 2017), *aff'd*,
      756 F. App'x 16 (D.C. Cir. 2019).............................................................26, 27

     *Nyambal v. AlliedBarton Sec. Servs., LLC*, 153 F. Supp. 3d 309 (D.D.C. 2016).........................54

*Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1 (D.C. Cir. 1977) ...................................19

*Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096 (D.D.C. Mar. 19, 2019) ............................11

*Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84 (D.D.C. 2017), *vacated in part*,
    285 F. Supp. 3d 240 (D.D.C. 2018) ..................................49

*Olin Corp. v. Fisons PLC*, 47 F. Supp. 2d 151 (D. Mass. 1999) ...................................19

*Owens v. Republic of Sudan*, 864 F.3d 751 (D.C. Cir. 2017), *vacated in part
    sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020) ..........................37

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981) ........................................45

*Pitt v. District of Columbia*, 491 F.3d 494 (D.C. Cir. 2007) ........................................55

*Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90 (D.C. Cir. 1986) .............. 45-46

*Reeves v. Eli Lilly & Co.*, 368 F. Supp. 2d 11 (D.D.C. 2005) ........................................56

\*  *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008) ...............................28, 29, 30, 32, 33

*Republic of Sudan v. Owens*, 194 A.3d 38 (D.C. 2018) ........................................57, 58

*Rhodes v. Rhodes*, 96 F.2d 715 (D.C. Cir. 1938) ........................................37

*RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090 (2016) ................................47, 48

*Rojas Mamani v. Sanchez Berzain*, 636 F. Supp. 2d 1326 (S.D. Fla. 2009) ...........................45

*Runyon v. District of Columbia*, 463 F.2d 1319 (D.C. Cir. 1972) ................................41

*Rush v. Savchuk,* 444 U.S. 320 (1980) ........................................10

\*  *Samantar v. Yousuf*, 560 U.S. 305 (2010) ........................................20

*Saudi Arabia v. Nelson*, 507 U.S. 349 (1993) ........................................31

*Scott v. United States*, 416 F. Supp. 2d 116 (D.D.C. 2006) ........................................45

*Sea-Land Servs., Inc. v. Gaudet*, 414 U.S. 573 (1974) ........................................60

*Shafer v. Children's Hosp. Soc'y of Los Angeles*, 265 F.2d 107 (D.C. Cir. 1959) ...................36

*Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016 (D.C. Cir. 2020) ........................15

*Sieverding v. American Bar Ass'n*, 439 F. Supp. 2d 111 (D.D.C. 2006) ........................7

*Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190 (D.D.C. 2014) ........................................20

*Smither & Co. v. Coles*, 242 F.2d 220 (D.C. Cir. 1957) ....................................................60

*Sosa v. Alvarez-Machain*, 542 U.S. 692 (2004) ..........................................................46, 48

*Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904 (D.C. Cir. 2018) ........................48

*Stager v. Schneider*, 494 A.2d 1307 (D.C. 1985) ........................................................59

*Strother v. District of Columbia*, 372 A.2d 1291 (D.C. 1977) ..........................................40

*Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560 (2012) ..............................................35

*Taylor v. Albert Einstein Med. Ctr.*, 750 A.2d 650 (Pa. 2000) ..........................................58

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300
   (2d Cir. 1981) ............................................................................................23

\* *TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1 (D.D.C. 2013), *aff'd*,
   2015 WL 3653187 (D.C. Cir. June 9, 2015) ...............................................30, 31, 32, 33

*Torres v. Southern Peru Copper Corp.*, 113 F.3d 540 (5th Cir. 1997) ...................................30

*Two Shields v. Wilkinson*, 790 F.3d 791 (8th Cir. 2015) ................................................28

*United States v. Botefuhr*, 309 F.3d 1263 (10th Cir. 2002) ............................................19

*United States v. Dancy*, 510 F.2d 779 (D.C. Cir. 1975) ................................................36

*United States v. Philip Morris Inc.*, 116 F. Supp. 2d 116 (D.D.C. 2000) ................................7

*W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400
   (1990) ....................................................................................................24

\* *Walden v. Fiore*, 571 U.S. 277 (2014) ..........................................8, 9, 14, 15, 16, 17

*Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801 (E.D. Va. 2007) ........................................13

*Warth v. Seldin*, 422 U.S. 490 (1975) ..................................................................47

*WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129 (2018) ....................................48

*Wichita & Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765 (D.C. Cir. 1986) ......................33

*Williams v. District of Columbia*, 9 A.3d 484 (D.C. 2010) ............................................57

*Wilson v. Whittaker*, 154 S.E.2d 124 (Va. 1967) ......................................................42

*Wood ex rel. United States v. American Inst. in Taiwan*, 286 F.3d 526
   (D.C. Cir. 2002) ..........................................................................................27

x

*Woodley*, *In re*, 777 S.E.2d 560 (Va. 2015)........................................................................39, 42

*Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995)..................................................47

*Young v. Firemen's Ins. Co. of Washington, D.C.*, 463 A.2d 675 (D.C. 1983).............................36

*Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012) ................................................20, 21

*Zaidi v. United States Sent'g Comm'n*, 115 F. Supp. 3d 80 (D.D.C. 2015) ..................................7


INTERNATIONAL CASES

*Apex Global Mgmt. Ltd. v. Fi Call Ltd.*, [2013] EWHC 587 (Ch) ..........................................22, 23

*Application for Arrest Warrant Against General Shaul Mofaz* (Bow St. Mag. Ct.
    Feb. 12, 2004) (Eng.) (Pratt, Dist. J.), *reprinted in Current Developments:*
    *Public International Law*, 53 Int'l & Comp. L.Q. 769 (July 2004)....................................23

*Baker v. Bolton*, 1 Camp. 493, 170 Eng. Rep. 1033 (1808) ..............................................51

*Prosecutor v. Perišić*, Case No. IT-04-81-T, Judgement (Feb. 28, 2013),
    https://www.icty.org/x/cases/perisic/acjug/en/130228_judgement.pdf............................49

*Re Bo Xilai* (Bow St. Mag. Ct. Nov. 8, 2005) (Eng.) (Workman, Sr. Dist. J.),
    *available at Weixum v. Xilai*, No. 1:04-cv-00649-RJL, ECF No. 16-7
    (D.D.C. July 24, 2006)..............................................................................23


TREATIES, STATUTES, AND RULES

Vienna Convention on Consular Relations, done Apr. 24, 1963, 21 U.S.T. 77,
    T.I.A.S. No. 6820, 596 U.N.T.S. 261 ..............................................................26, 27

Vienna Convention on Diplomatic Relations, done Apr. 18, 1961, 23 U.S.T. 3227,
    T.I.A.S. No. 7502, 500 U.N.T.S. 95 ...................................................................27

* Alien Tort Statute, 28 U.S.C. § 1350 .........................................................*passim*

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891
    (codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611) ..........................28, 31, 37

    28 U.S.C. § 1605(a)(5)....................................................................................31

    28 U.S.C. § 1605A........................................................................................31, 58

    28 U.S.C. § 1605B(b) ....................................................................................31

Promoting Security and Justice for Victims of Terrorism Act of 2019, Pub. L. No. 116-94, div. J, tit. IX, § 903, 133 Stat. 3082 ...................................................17

    133 Stat. 3082-85 ...........................................................................................17

\* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992), *reprinted in* 28 U.S.C. § 1350 note ............................................................ *passim*

    § 2(a), 106 Stat. 73 ................................................................................34, 35

    § 2(a)(2), 106 Stat. 73 .........................................................................34, 47

    § 2(b), 106 Stat. 73 ..............................................................................34, 44

28 U.S.C. § 1367(c)(3) ........................................................................................50

Wrongful Death Act, D.C. Code § 16-2701 *et seq.*:

    D.C. Code § 16-2701 .................................................................................52

    D.C. Code § 16-2702 ...........................................................40, 52, 56, 57

Va. Code:

    § 8.01-50(C) ...............................................................................................39

    § 8.01-53(A)(i)-(iv) ...................................................................................42

    § 8.01-53(A)(v) ..........................................................................................42

State Immunity Act 1978, c. 33 (U.K.) ...............................................................23

Fed. R. Civ. P.:

    Rule 4(k)(2) .............................................................................9, 11, 17, 19

    Rule 12(b)(1) ..............................................................................................49

    Rule 12(b)(2) ................................................................................................1

    Rule 19 .......................................................................................................28

    Rule 19(a) ...................................................................................................28

    Rule 19(a)(1)(B)(i) .....................................................................................28

    Rule 19(b) .............................................................................................28, 33

    Rule 19(b)(1) ..............................................................................................33

    Rule 19(b)(2) ..............................................................................................33

Rule 19(b)(3) ..................................................................................................33

Rule 19(b)(4) ..................................................................................................33

Fed. R. Evid. 201(b)(2) ..........................................................................................36

LEGISLATIVE MATERIALS

H.R. Rep. No. 102-367, pt. 1 (1991), *reprinted in* 1992 U.S.C.C.A.N. 84 ..................................37

S. Rep. No. 102-249 (1991) ......................................................................................35


ADMINISTRATIVE MATERIALS

Brief for the United States as Amicus Curiae Supporting Petitioners, *Nestlé USA,
   Inc. v. Doe I*, Nos. 19-416 & 19-453 (U.S. Sept. 8, 2020), 2020 WL
   5498509 ..................................................................................................48

Central Intelligence Agency, *The World Factbook:  Saudi Arabia*,
   https://www.cia.gov/the-world-factbook/countries/saudi-arabia/
   (last visited May 25, 2021) ............................................................................22

Readout, *Secretary Pompeo's Call with Saudi Crown Prince Mohammed bin
   Salman Al Saud*, Office of the Spokesperson, U.S. Dep't of State (Mar. 25,
   2020), https://2017-2021.state.gov/secretary-pompeos-call-with-saudi-
   crown-prince-mohammed-bin-salman-al-saud-4/index.html ..........................................22

*Remarks by President Trump and Crown Prince Mohammad Bin Salman of the
   Kingdom of Saudi Arabia Before Working Breakfast | Osaka, Japan*,
   The White House (June 28, 2019), https://trumpwhitehouse.archives.gov/
   briefings-statements/remarks-president-trump-crown-prince-mohammad-
   bin-salman-kingdom-saudi-arabia-working-breakfast-osaka-japan/ ................................22

*Remarks With Saudi Arabian Crown Prince Mohammed bin Salman al-Saud*, U.S.
   Dep't of State (July 12, 2017), https://2017-2021.state.gov/remarks-with-
   saudi-arabian-crown-prince-mohammed-bin-salman-al-saud/index.html ........................22


OTHER MATERIALS

Basic Law of Governance, https://www.saudiembassy.net/basic-law-governance ......................21

Hatice Cengiz, *We Have Been Deprived of Jamal Khashoggi's Voice.  But His
   Silence Says It All*, Wash. Post (Oct. 1, 2020) ....................................................4

Shane Harris et al., *CIA Concludes Saudi Crown Prince Ordered Jamal
    Khashoggi's Assassination*, Wash. Post (Nov. 16, 2018),
    https://wapo.st/3cfZ9r8 ................................................................................13, 50

Spencer S. Hsu, *Saudi crown prince girds for legal battle in a changing
    Washington over human rights allegations*, Wash. Post (Nov. 2, 2020),
    https://www.washingtonpost.com/local/legal-issues/saudi-crown-prince-
    lawsuits/2020/11/02/ca23820a-1a06-11eb-aeec-b93bcc29a01b_story.html ....................29

Interview with Hatice Cengiz,
    https://www.youtube.com/watch?v=F_byDEAZLEc ..........................................................4

Mark Mazzetti & Ben Hubbard, *It Wasn't Just Khashoggi:  A Prince's Brutal
    Drive to Crush Dissent*, N.Y. Times (Mar. 17, 2019),
    https://www.nytimes.com/2019/03/17/world/middleeast/khashoggi-crown-
    prince-saudi.html ...................................................................................................16

Press Release, *Readout of PM's Call with Mohammed bin Salman:  2 September
    2020*, Prime Minister's Office, 10 Downing Street (Sept. 2, 2020),
    https://www.gov.uk/government/news/readout-of-pms-call-with-
    mohammed-bin-salman-2-september-2020 ......................................................22

William Prosser, *Handbook of the Law of Torts* (4th ed. 1971) ....................................55

Restatement (Second) of Conflict of Laws (1971) .....................................37, 43, 44, 55

Restatement (Second) of Torts (1965) ...........................................................57, 58, 59

Royal Order A/226, issued 1440/06/18 AH (02/23/2019 AD) ....................................21

Royal Order A/229, issued 1440/06/18 AH (02/23/2019 AD) ....................................21

Royal Order A/292, issued 1436/04/03 AH (07/21/2017 AD) ....................................22

Royal Order A/313, issued 1438/11/01 AH (07/24/2017 AD) ....................................21

Royal Order A/352, issued 1441/05/18 AH (01/13/2020 AD) ....................................21

*Saudi Crown Prince Mohammed bin Salman Arrives in Pakistan*, Al Jazeera
    (Feb. 17, 2019), https://www.aljazeera.com/news/2019/02/saudi-crown-
    prince-mohammed-bin-salman-arrives-pakistan-190217061720354.html......................22

Matthew S. Schwartz, *Khashoggi Murder Trial Begins In Turkey*, NPR (July 3,
    2020), https://www.npr.org/2020/07/03/887116557/khashoggi-murder-
    trial-begins-in-turkey ...........................................................................................46

*Transcript:  ABC News' George Stephanopoulous Interviews President Joe
    Biden*, ABC News (Mar. 17, 2021), https://abcnews.go.com/Politics/
    transcript-abc-news-george-stephanopoulos-interviews-president-

joe/story?id=76509669 ................................................................................................22

Kim Willsher, *French President and Saudi Crown Prince Vow Partnerships
on Syria and Economic Issues*, L.A. Times (Apr. 10, 2018),
https://www.latimes.com/world/europe/la-fg-france-saudi-arabia-
20180410-story.html ...........................................................................................22

Lewis S. Yelin, *Head of State Immunity as Sole Executive Lawmaking*,
44 Vand. J. Transnat'l L. 911 (2011) ...............................................................20

## INTRODUCTION

On October 2, 2018, Saudi citizen Jamal Khashoggi was murdered in a consular facility of the Kingdom of Saudi Arabia ("Saudi Arabia") in Istanbul, Turkey.  Saudi Arabia has since convicted in its own courts eight individuals for crimes associated with Khashoggi's killing.  A parallel criminal proceeding is ongoing in Turkey.

Plaintiffs are Hatice Cengiz, Khashoggi's fiancée at the time of his death, and Democracy in the Arab World Now, Inc. ("DAWN"), an advocacy organization Khashoggi founded before his death.  Relying on newspaper articles and anonymous leaks, they accuse His Royal Highness Mohammed bin Salman bin Abdulaziz Al Saud, the Crown Prince of Saudi Arabia ("the Crown Prince" or "Prince Mohammed bin Salman"), of having ordered Khashoggi's killing.

The Crown Prince denies those accusations, but they are not in any event properly before this Court.  Fundamental constraints on the Court's jurisdiction, as well as procedural and substantive defects in the Complaint, require dismissal.  The Crown Prince is outside this Court's jurisdiction as a matter of due process and also immune from suit.  Cengiz, as Khashoggi's fiancée, is not the appropriate plaintiff to bring claims for his wrongful death.  Neither she nor DAWN has cognizable legal claims of any kind.  This Court's inquiry should end with the determination that this case is not properly before it.

I.    This Court lacks personal jurisdiction over the Crown Prince.  The Complaint alleges a killing in Turkey, directed from Saudi Arabia.  It lacks concrete allegations that the Crown Prince had any relevant contacts with the United States.  Although Plaintiffs allege a plot to lure Khashoggi to the Consulate in Istanbul by denying him a marriage-eligibility certificate in Washington, D.C., their allegations that the Crown Prince personally directed any such conduct are conclusory.  Sworn declarations, which this Court may consider under Rule 12(b)(2), also contradict Plaintiffs' claims.  The Embassy's records do not show the contacts Plaintiffs allege,

Saudi Arabia's former Ambassador never spoke with Khashoggi on the matter, and – contrary to Plaintiffs' assertions – the Embassy could not have given Khashoggi the certificate he needed.

II.     Rules that protect the foreign relations of the United States from interference by private litigants also bar this action.  The Crown Prince is immune from suit in U.S. courts as the son and designated successor of His Majesty King Salman bin Abdulaziz Al Saud ("King Salman").  In addition, Plaintiffs' allegations that Saudi Arabia's Crown Prince, former Ambassador, and Embassy officials were involved in a murder plot directly attack the legitimacy of official acts of the Saudi Arabian government and implicate Saudi Arabia's core sovereign interests.  This Court should decline to adjudicate those allegations both under the act of state doctrine and because Saudi Arabia is a necessary but absent party that cannot be joined.

III.    Cengiz fails to state a claim under the Torture Victim Protection Act of 1991 ("TVPA").  Only a decedent's legal representative or a potential claimant in a wrongful-death action can bring a TVPA claim.  Cengiz's alleged Islamic marriage to Khashoggi occurred in Turkey, and Turkey does not recognize religious marriages without civil confirmation.  Accordingly, she was never his wife and cannot sue for his wrongful death.  That right belongs to Khashoggi's children, who a Saudi probate court recognized as his heirs.  Cengiz also admits that she has not exhausted her remedies in Turkey, the jurisdiction where Khashoggi's death occurred, and fails to show it would be futile to do so.

IV.    Cengiz fails to allege jurisdiction or state a claim under the Alien Tort Statute ("ATS").  She is not an appropriate plaintiff to sue under the ATS for an extrajudicial killing because the ATS's requirements mirror those of the TVPA, which she does not meet.  Also, the ATS does not apply outside the United States.  This case is about a killing in Turkey.

**V.**     This Court lacks jurisdiction (or should decline to exercise it) over Plaintiffs' non-federal claims.  Regardless, Plaintiffs fail to state any claims under either Turkish or D.C. law.

DAWN fails to state a claim for intentional interference with contractual relations. Turkey recognizes no such claim.  D.C. does not permit recovery for the wrongful death of another through a common law tort claim; the only civil remedy available for a death is the wrongful-death statute, which DAWN cannot invoke.  Plaintiffs also fail to allege, except in conclusory form, that the Crown Prince knew of or intended to interfere with DAWN's contract.

Cengiz fails to state a claim for wrongful death, both because she is not the appropriate plaintiff to bring such an action and because any claim for wrongful death is barred by a two-year statute of limitations.  She also cannot recover for intentional infliction of emotional distress, loss of consortium, or loss of society.  Like DAWN's tortious-interference claim, those claims are not recognized by Turkish law, are barred by D.C.'s rule against common law recovery for a death, and in any event are not properly pleaded in the Complaint.

## SUMMARY OF RELEVANT ALLEGATIONS

Jamal Khashoggi, a Saudi citizen, was a journalist and commentator whose writing and advocacy focused on politics in Saudi Arabia and the Arab world.  Compl. ¶¶ 46-47, 54, 59, 80.  For most of his career, Khashoggi lived in Saudi Arabia.  *Id.* ¶¶ 46-50.  In late 2016 or 2017, Khashoggi moved to the United States, where he began writing a column on Middle Eastern affairs in the *Washington Post.*  *Id.* ¶¶ 51-52, 54.  On June 1, 2018, Khashoggi and Plaintiff DAWN executed an agreement for Khashoggi to serve as DAWN's Executive Director.  *Id.* ¶ 63.

Defendants are the Crown Prince, 24 other named Saudi citizens (mostly government officials), and four unnamed Defendants (each a Saudi citizen or government employee).  *Id.* ¶¶ 8-35.  The Crown Prince is the second highest-ranking official in Saudi Arabia.  He is the son of King Salman and heir to the throne.  *Id.* ¶ 8.  Plaintiffs allege that Defendants believed that Khashoggi's advocacy was "contrary to their pecuniary and other interests and posed an existential threat to [the Crown Prince's] plans to secure power as an autocrat."  *Id.* ¶ 80.  They also make various allegations of attempts by Saudi government officials to prevent Khashoggi from criticizing the Saudi government.  *Id.* ¶¶ 47-51, 58.  Most of those alleged attempts occurred before the Crown Prince assumed his current position.

Plaintiff Cengiz is a Turkish citizen and resident who met Khashoggi on May 6, 2018, and began a romantic relationship with him on or around July 10, 2018.  *Id.* ¶¶ 87-88.  Until she filed this lawsuit, Cengiz identified herself publicly as Khashoggi's "fiancée" at the time of his death.[1]  She now alleges that she is Khashoggi's "widow," *id.* ¶ 6, having allegedly married him "in the

---

[1] *See*, *e.g.*, Hatice Cengiz, *We Have Been Deprived of Jamal Khashoggi's Voice.  But His Silence Says It All*, Wash. Post (Oct. 1, 2020) (referring to Khashoggi as "my fiance"); https://www.youtube.com/watch?v=F_byDEAZLEc (4:20) (interview from Swedish television show in January 2020 in which Cengiz stated that she told a Saudi consular official on the day of Khashoggi's death:  "I'm fiancée of Jamal").

Islamic tradition" in Turkey on September 16, 2018, *id.* ¶¶ 6, 98.  Cengiz acknowledges that Turkey does not recognize her alleged religious marriage to Khashoggi.  The marriage bureau in Istanbul denied civil recognition because Khashoggi had no Turkish certificate of marriage eligibility, as required under Turkish law for a foreigner to marry a Turkish citizen.  *Id.* ¶ 99.

Plaintiffs allege that Khashoggi asked officials at Saudi Arabia's Embassy in Washington, D.C. for a certificate of marriage eligibility, but they advised him that only the Saudi consulate in Istanbul could issue such a certificate.  *Id.* ¶ 90.  Plaintiffs allege that this advice from Saudi officials was a "ruse" to "lure" Khashoggi outside the United States.  *Id.*  Plaintiffs allege that the then-Saudi Ambassador to the United States, His Royal Highness Prince Khalid bin Salman bin Abdulaziz Al Saud ("Prince Khalid"), told Khashoggi in a telephone call that he should obtain the certificate at the Saudi consulate in Istanbul and gave him assurances that it would be safe to do so. *Id.* ¶ 91.  Plaintiffs further state that "[r]eports indicate" the Ambassador gave the assurances "at the direction" of the Crown Prince.  *Id.*

On October 2, 2018, Khashoggi entered the Saudi consulate in Istanbul to obtain a Turkish certificate of marriage eligibility, while Cengiz waited outside.  *Id.* ¶ 119.  Inside the consulate, Khashoggi was murdered.  *Id.* ¶ 1.  Plaintiffs allege that some named Defendants participated directly in Khashoggi's killing, while others participated in efforts in Istanbul to plan or cover up the killing.  *See id.* ¶¶ 12-32.  They do not name the Crown Prince in either group, but allege that he "ordered the murder of Mr. Khashoggi."  *Id.* ¶ 8.  Because of the public scrutiny this case has drawn, it is important to state that the Crown Prince denies that allegation as a matter of fact.  Nevertheless, none of the arguments for dismissal requires the Court to decide whether that allegation is true or false.

## SUMMARY OF SUPPORTING FACTUAL DECLARATIONS

In support of the Crown Prince's challenges to subject-matter and personal jurisdiction, and to show matters subject to judicial notice, he submits the following declarations.[2]

Raed Ibrahem Alhabdan is the Head of the Citizens' Affairs Section at the Embassy in Washington, D.C.  He has reviewed records showing that Khashoggi visited the Embassy five times from September 2017 to March 2018.  *See* Alhabdan Decl. ¶¶ 3-8.  During those visits, Khashoggi obtained powers of attorney for his son concerning property and legal proceedings in Saudi Arabia.  *Id.* ¶¶ 4-8.  After March 2018, Embassy records show no further visits or requests from Khashoggi.  *Id.* ¶ 9.  Also, contrary to Plaintiffs' allegations, the Embassy cannot help a Saudi citizen with a certificate of eligibility to marry a Turkish citizen.  *Id.* ¶¶ 10-12.  It could assist only a Saudi citizen wishing to marry a United States citizen.  *Id.* ¶ 12.

Prince Khalid was Ambassador to the United States from April 2017 through February 2019.  *See* Prince Khalid Decl. ¶ 1.  Plaintiffs allege that the Crown Prince directed Prince Khalid to assure Khashoggi it would be safe to go to the Saudi Consulate in Istanbul, and that Prince Khalid did so in August 2018.  Prince Khalid denies these allegations.  *Id.* ¶ 4.  He did not speak with Khashoggi in August 2018 at all.  *Id.*  He never told Khashoggi to go to Istanbul or assured Khashoggi it would be safe.  *Id.*  Nor did the Crown Prince give Prince Khalid any other direction about Khashoggi.  *Id.* ¶ 5.

Salah Khashoggi is Khashoggi's eldest son and executor.  *See* S. Khashoggi Decl. ¶¶ 2-3.  On November 15, 2018, in a "Deed of Inheritance Division," the Riyadh Personal Status Court recognized Khashoggi's heirs as his children:  Salah Khashoggi and his siblings.  *Id.* ¶¶ 4-5 & Ex. 1; Declaration of Gregory G. Rapawy Ex. A (translation).  Cengiz is not among those heirs.

---

[2] The Crown Prince is also submitting expert declarations on Turkish and Saudi law and from counsel attaching a certified translation and certain documents subject to judicial notice.

## STANDARD OF REVIEW

"Plaintiff[s] bear[ ] the burden of establishing personal jurisdiction, and must allege specific facts on which personal jurisdiction can be based; [they] cannot rely on conclusory allegations." *Marsoun v. United States*, 525 F. Supp. 2d 206, 211 (D.D.C. 2007) (Bates, J.) (citing *Mwani v. bin Laden*, 417 F.3d 1, 7 (D.C. Cir. 2005)).  The Court "need not treat all of [their] allegations as true," but "'may receive and weigh affidavits and other relevant matter to assist in determining the jurisdictional facts.'" *Id.* (quoting *United States v. Philip Morris Inc.*, 116 F. Supp. 2d 116, 120 n.4 (D.D.C. 2000)).  If a defendant submits affidavits refuting jurisdiction, "'the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'" *Sieverding v. American Bar Ass'n*, 439 F. Supp. 2d 111, 119 n.5 (D.D.C. 2006) (quoting *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002)).

Plaintiffs also "bear[ ] the burden of establishing . . . subject-matter jurisdiction." *Zaidi v. United States Sent'g Comm'n*, 115 F. Supp. 3d 80, 83 (D.D.C. 2015) (Bates, J.).  For this purpose, the Court "accept[s] as true [their] factual allegations," but "give[s] [those] factual allegations closer scrutiny than under a Rule 12(b)(6) motion to dismiss." *Id.*  Again, the Court is "not limited to the allegations contained in the complaint, but rather may consider extra-pleading materials." *Id.*

A motion to dismiss for failure to state a claim tests whether "a complaint . . . contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are insufficient to withstand such a motion. *Id.*

**ARGUMENT**

**I.     This Court Lacks Personal Jurisdiction over the Crown Prince**

This case seeks compensation for the death of Jamal Khashoggi, a Saudi citizen, which occurred in Istanbul, Turkey.  Compl. ¶ 1.  The Defendants alleged to have caused Khashoggi's death are all Saudi citizens residing outside the United States.  *Id.* ¶¶ 8-35.  Due process does not allow this Court to exercise personal jurisdiction over the Crown Prince.

Plaintiffs fail to establish personal jurisdiction based on assertions that Defendants prevented Khashoggi from obtaining a certificate of marriage eligibility in the United States to force him to travel to Istanbul; and that the Crown Prince directed Saudi Arabia's former Ambassador Prince Khalid to assure Khashoggi that it would be safe to do so.  *Id.* ¶¶ 38, 90-91. The Complaint does not even attempt to attribute the denial of a certificate to the Crown Prince personally; there is no evidence that any such denial actually occurred; and Turkish law in fact did require Khashoggi to obtain his certificate outside the United States.  The further allegation that Prince Khalid acted at the Crown Prince's "direction" in purportedly giving Khashoggi assurances of his safety is conclusory and untrue.  Prince Khalid denies under oath that he gave any such assurances or received any direction from the Crown Prince to do so.

Plaintiffs also fail to establish personal jurisdiction by asserting that Khashoggi was a resident of the United States and that his advocacy took place in the United States.  That theory runs up against the U.S. Supreme Court's holding that "the plaintiff cannot be the only link between the defendant and the forum"; such a link must come instead from the "defendant's conduct."  *Walden v. Fiore*, 571 U.S. 277, 285 (2014).  Plaintiffs can neither plead nor prove that their suit arises from any conduct of the Crown Prince with a link to the United States.

### A.   Plaintiffs Fail To Show Personal Jurisdiction over the Crown Prince Based on Khashoggi's Alleged Interactions with Saudi Embassy Officials

"'[D]ue process requires'" that a "defendant must 'have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."'" *Livnat v. Palestinian Auth.*, 851 F.3d 45, 48 (D.C. Cir. 2017) (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).  Under Federal Rule of Civil Procedure 4(k)(2), *see* Compl. ¶ 39, the forum is the United States as a whole.  *See Livnat*, 851 F.3d at 55.  That rule applies only to "claim[s] that arise[] under federal law," Fed. R. Civ. P. 4(k)(2), which here include only the TVPA and ATS claims asserted by Plaintiff Cengiz.

For a forum "to exercise specific jurisdiction, 'the *suit*' must 'aris[e] out of or relat[e] to the defendant's contacts with the *forum*.'"  *Bristol-Myers Squibb Co. v. Superior Ct. of California*, 137 S. Ct. 1773, 1780 (2017) (quoting *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014)) (brackets in original).  A plaintiff must show "a strong 'relationship among the defendant, the forum, and the litigation'" as "the 'essential foundation' of specific jurisdiction."  *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1028 (2021) (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)).  Contacts of the plaintiff with the forum or of the defendant with forum residents are not enough.  *See Walden*, 571 U.S. at 284-85.[3]

### 1.   Plaintiffs' Allegations That Embassy Officials Conspired To Deny Khashoggi a Certificate Do Not Support Jurisdiction

The Complaint alleges that, in August 2018, Khashoggi contacted unnamed officials at the Saudi Embassy to ask about a "certificate of marriage eligibility."  Compl. ¶ 90.  It alleges

---

[3] The Complaint does not and could not suggest general jurisdiction over the Crown Prince.  General jurisdiction can be based on "'only a limited set of affiliations with a forum,' all analogous to an individual's domicile."  *Livnat*, 851 F.3d at 56 (quoting *Daimler*, 571 U.S. at 137).  The Crown Prince lives and works in Saudi Arabia.  *See* Compl. ¶ 8.

that certification is "a service routinely provided by the Embassy"; that "Defendants, working through officials at the Embassy, instructed Mr. Khashoggi that he would have to apply for the document at the Saudi Consulate in Istanbul"; and that those "instructions were a ruse to lure Mr. Khashoggi" outside the United States. *Id.* Plaintiffs rely heavily on this alleged "ruse" for their personal-jurisdiction theory. *See id.* ¶¶ 4, 38. It will not bear the weight they place on it.

### a.   Plaintiffs' Conspiracy Allegations Are Legally Insufficient

Plaintiffs do not allege, even in conclusory form, that the Crown Prince personally told any Embassy official – directly or indirectly – to deny Khashoggi a certificate. They attribute the denial to "Defendants and their co-conspirators," Compl. ¶ 4; to "Defendants" collectively, *id.* ¶ 38; and to "Defendants, working through officials at the Embassy," *id.* ¶ 90. Those allegations impermissibly "aggregate factual allegations concerning multiple defendants in order to demonstrate personal jurisdiction over an[] individual defendant." *D'Onofrio v. SFX Sports Grp., Inc.*, 534 F. Supp. 2d 86, 90 (D.D.C. 2008) (Bates, J.) (citing *Rush v. Savchuk*, 444 U.S. 320, 331-32 (1980)). They fall short for that reason alone.

Plaintiffs' conspiracy allegations are also too conclusory to support jurisdiction. As the court of appeals explained in *First Chicago International v. United Exchange Co.*, 836 F.2d 1375 (D.C. Cir. 1988), "[i]t is settled . . . that the 'bare allegation' of conspiracy or agency is insufficient to establish personal jurisdiction." *Id.* at 1378-79 (quoting *McLaughlin v. McPhail*, 707 F.2d 800, 806 (4th Cir. 1983) (per curiam)); *see Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020, 1031 (D.C. Cir. 1997) ("'[B]ald speculation' or a 'conclusionary statement' that individuals are co-conspirators is insufficient to establish personal jurisdiction under a conspiracy theory."). Here, the Complaint fails "to plead with sufficient particularity any overt acts" in the United States "in furtherance of the [alleged] conspiracy." *Id.*

Plaintiffs' conspiracy allegations also fail because they are proceeding under Rule 4(k)(2), which does not authorize jurisdiction based on alleged conspiracy.  *See Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096, at *5 n.8 (D.D.C. Mar. 19, 2019) (Bates, J.) ("[A]s far as the Court is aware, no court to have considered the question has permitted the assertion of conspiracy jurisdiction under Rule 4(k)(2)."); *see also In re Aluminum Warehousing Antitrust Litig.*, 90 F. Supp. 3d 219, 227 (S.D.N.Y. 2015) (explaining that expanding Rule 4(k)(2) to include "assertion of participation in a conspiracy generally" as "a standalone basis for jurisdiction" would "potentially expand jurisdiction beyond that which Congress intended").  That is another basis for rejecting jurisdiction based on Plaintiffs' theory that Defendants collectively conspired with unnamed Embassy officials.

### b.     The Evidence Contradicts Plaintiffs' Allegations

Even if Plaintiffs' allegations concerning the denial of a certificate were properly pleaded (which they are not), countervailing evidence shows that no such denial took place.  The Embassy's records show that Khashoggi's last visit there was in March 2018, and there is no record of him visiting or making any request after that date.  *See* Alhabdan Decl. ¶¶ 8-9.

Further, if some Embassy official had told Khashoggi he could not get the certificate he needed in the United States, that statement would not have been a "ruse."  The Embassy indeed could not have issued a certificate Turkish authorities would accept.  *Id.* ¶ 11.[4]  As Professor Ozan Varol, an expert on Turkish law, explains, Khashoggi needed a certificate from a Saudi diplomatic or consular mission in Turkey, verified by Turkish provincial or national authorities;

---

[4] The Complaint quotes a web page from the Embassy stating that the Embassy assists in "'carrying out the steps required for . . . Saudi citizens wishing to marry . . . foreigners.'" Compl. ¶ 90 & n.49 (ellipses in original).  That page neither states nor implies that the Embassy can supply a certificate acceptable in any country other than the United States.  *See* Alhabdan Decl. ¶ 12 & Ex. 1 (full translation).  The Embassy's role is to assist with documents needed for a Saudi citizen to marry a U.S. citizen in the United States or Saudi Arabia.  *See id.* ¶ 12.

or from a Saudi government office in Saudi Arabia, verified by the Turkish Embassy in Riyadh. Varol Decl. ¶¶ 18-25.

The shortcomings in Plaintiffs' "ruse" allegations reinforce one another.  The lack of any record that Khashoggi asked the Embassy for a certificate makes sense, because the Embassy could not give Khashoggi the certificate he allegedly wanted.  Nor is there basis to speculate that anyone (much less the Crown Prince) directed Embassy officials to make alleged false statements to Khashoggi, both because the evidence shows no such statements were made and because, even if made, such statements would have been true, not false.

### 2.      Plaintiffs' Allegations That Prince Khalid Gave Khashoggi Assurances About His Safety Do Not Support Jurisdiction

The Complaint also alleges that, "[w]hile in the United States, Mr. Khashoggi made a phone call to then Saudi Ambassador [Prince] Khalid," who "reiterated that Mr. Khashoggi should go to the Saudi Consulate in Istanbul to retrieve the documents" he needed.  Compl. ¶ 91. It alleges that Prince Khalid "gave Mr. Khashoggi assurances that it would be safe to do so" and that "[r]eports indicate that [Prince] Khalid . . . made these assurances at the direction of" the Crown Prince.  *Id.*; *see also id.* ¶¶ 38, 69.  Like the allegations that the denial of the certificate was a "ruse," those allegations are insufficient on their face and contrary to evidence.

### a.      Plaintiffs' Allegation That Prince Khalid Acted at the Crown Prince's Direction Is Legally Insufficient

The Complaint's allegation that Prince Khalid acted at the direction of the Crown Prince is a "'bare allegation' of . . . agency," *First Chicago*, 836 F.2d at 1378-79, that cannot establish personal jurisdiction.  A mere allegation that one person directed another to take an action states a legal conclusion that, without supporting facts, should not be assumed true on a motion to dismiss.  *See*, *e.g.*, *Carruth v. Bentley*, 942 F.3d 1047, 1056 (11th Cir. 2019) (finding allegation that one defendant "act[ed] at the direction of" another to be "wholly conclusory" and "strikingly

similar to [the allegations] the Supreme Court disregarded in . . . *Iqbal*").[5]  Here, the Complaint alleges no facts that could support even a *prima facie* case that the Crown Prince personally directed Prince Khalid to give the alleged assurances.

The "[r]eport[ ]" to which paragraph 91 refers, cited in a footnote, does not change that result.  It is a newspaper article stating that, in a call "intercepted by U.S. intelligence," Prince "Khalid told Khashoggi . . . that he should go to the Saudi Consulate in Istanbul to retrieve the documents and gave him assurances that it would be safe to do so."[6]  It adds that, "according to . . . people familiar with the call," Prince Khalid "made the call at [the] . . . direction" of his "brother," that is, the Crown Prince.  *Id.*  The article does not identify the "people familiar with the call" or explain how they reached the asserted conclusion.[7]  It cannot save the Complaint's deficient allegations.  *See Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (per curiam) (rejecting "a single conclusory statement from an anonymous source" in a newspaper article as insufficient to plead standing); *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007) (refusing to allow plaintiffs "to fill gaps in their factual allegations by reference to unnamed or anonymous sources in a newspaper article").

### b.   The Evidence Shows That Prince Khalid Neither Gave the Alleged Assurances nor Received Direction To Do So

Prince Khalid denies Plaintiffs' allegations that he gave assurances to Khashoggi about

---

[5] *See also Blantz v. California Dep't of Corr. & Rehab.*, 727 F.3d 917, 927 (9th Cir. 2013) (rejecting allegations that a defendant "'directed' the other defendants to take . . . actions" as "conclusory" and "insufficient on their own to defeat a motion to dismiss"); *Bertuglia v. City of New York*, 839 F. Supp. 2d 703, 720-21 (S.D.N.Y. 2012) (describing "'at [the] direction'" allegations as "conclusory," "formulaic," and "not entitled to the assumption of truth").

[6] Shane Harris et al., *CIA Concludes Saudi Crown Prince Ordered Jamal Khashoggi's Assassination*, Wash. Post (Nov. 16, 2018), https://wapo.st/3cfZ9r8.

[7] The article also quotes a spokeswoman for the Embassy stating that "the ambassador and Khashoggi never discussed 'anything related to going to Turkey.'"  *Id.*

Khashoggi's personal safety in Istanbul.  He "never communicated with Mr. Khashoggi about his marriage certificate, or about the Saudi Consulate in Istanbul"; "never instructed Mr. Khashoggi to visit the Saudi Consulate in Istanbul, nor . . . g[a]ve him assurances that it would be safe to do so"; and "had no contact whatsoever with Mr. Khashoggi after March of 2018." Prince Khalid Decl. ¶ 4.  Further, *"*[t]he Crown Prince never directed [Prince Khalid] to give Mr. Khashoggi assurances that it would be safe for him to visit the Saudi Consulate in Istanbul," or indeed "gave [him] any directions whatsoever relating to Mr. Khashoggi." *Id.* ¶ 5.

Prince Khalid's sworn denial outweighs Plaintiffs' conclusory assertions.  It also outweighs the newspaper article on which they rely, which is not evidence.  *See*, *e.g.*, *Atkins v. Fischer*, 232 F.R.D. 116, 132 (D.D.C. 2005) ("[C]ourts within this Circuit have consistently barred newspaper articles from introduction as evidence due to the fact that they constitute inadmissible hearsay.").[8]  The Court should therefore reject the phone-call allegations.

### B.   Plaintiffs Fail To Show Personal Jurisdiction over the Crown Prince Based on Khashoggi's Own Contacts with the United States

#### 1.   Allegedly Causing Harm to a U.S. Resident on Foreign Soil Is Not a Jurisdictional Contact with the United States

The "'relationship among the defendant, the forum, and the litigation'" that supports personal jurisdiction "must arise out of contacts that the 'defendant *himself*' creates with the forum."  *Walden*, 571 U.S. at 284 (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 775 (1984), and *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (emphasis in *Burger King*).  The "'minimum contacts' analysis looks to the defendant's contacts with the forum State itself, not the defendant's contacts with persons who reside there."  *Id.* at 285.  Khashoggi's

---

[8] *See also In re Investment Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 623 (S.D.N.Y. 2017) (rejecting "vague" statements about "people familiar with" alleged events as "provid[ing] no basis . . . to evaluate . . . reliability") (internal quotation marks omitted).

residence and work in the United States, *see*, *e.g.*, Compl. ¶¶ 52-62, do not make contacts with him into contacts with the United States.

Applying *Walden* and other Supreme Court cases, the D.C. Circuit has rejected personal jurisdiction over foreign defendants for claims arising from alleged attacks on foreign soil against American citizens or American residents.  *See*, *e.g.*, *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1037 (D.C. Cir. 2020) (claims by victims of attacks by Palestinian governmental organizations against American citizens in the West Bank); *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1124-25 (D.C. Cir. 2019) (same), *cert. granted, vacated, and remanded*, 140 S. Ct. 2713 (2020); *Livnat*, 851 F.3d at 56-58 (same); *see also Doe 1 v. Buratai*, 792 F. App'x 6, 9-10 (D.C. Cir. 2019) (per curiam) (claims by Nigerian citizens of alleged attacks by Nigerian officials in Nigeria).  Those cases foreclose any attempt to establish personal jurisdiction based on the death of Khashoggi, a Saudi citizen, in Istanbul.

## 2.     Plaintiffs Fail To Allege That Defendants' Conduct Was Aimed at the United States or That the Brunt of the Harm Was Felt Here

Plaintiffs assert that Khashoggi's killing was conduct "aimed and directed at the United States" because its "intended and actual effect" was "to silence [his] political advocacy in the United States."  Compl. ¶¶ 41-42.  That invokes what is sometimes called the "effects test" of *Calder v. Jones*, 465 U.S. 783 (1984), a defamation case where "California [wa]s the focal point both of the [allegedly defamatory] story and of the harm suffered."  *Id.* at 789.  As *Walden* explained, the crux of *Calder* was that "the reputational injury . . . would not have occurred but for the fact that the defendants wrote an article for publication in California that was read by a large number of California citizens."  571 U.S. at 287-88; *see Klieman*, 923 F.3d at 1125 ("In glossing *Calder*'s 'effects test,' the *Walden* Court stressed defendants' intentional contacts with the forum.").  For two reasons, the facts here fall short under *Calder* and *Walden*.

15

*First*, Plaintiffs' own allegations undermine any suggestion that Defendants' alleged conduct was aimed at the United States.  The Complaint alleges that "officials and political leaders," including "Saudi officials" and at least one Defendant, sought to limit Khashoggi's speech even before he left Saudi Arabia.  Compl. ¶¶ 47-51.  It also alleges that Defendants pursued other Saudi citizens in Saudi Arabia and Canada, *see id.* ¶¶ 69, 75-76, and it relies on sources that refer to alleged incidents in Jordan, Kuwait, Morocco, and the United Arab Emirates.[9]  Without conceding that these allegations are true or sufficiently pleaded, they are inconsistent with any contention that the United States was critical to the alleged conduct.

That jurisdictional defect is not cured by assertions that "the objective of the murder was . . . to halt Khashoggi's advocacy in the United States" and to "prevent him from continuing in the United States his advocacy," *id.* ¶¶ 2, 41; or that his "advocacy . . . was especially threatening to Defendants precisely because it occurred in the United States," *id.* ¶ 42 (emphasis omitted); *see also id.* ¶¶ 38, 73, 169.  Those allegations resemble those in *Livnat*, where an attack in the West Bank allegedly was part of a "'general practice of using terrorism to influence United States public opinion and policy' and was 'intended, through intimidation and coercion, to influence the . . . United States government's policies.'"  851 F.3d at 57.  The D.C. Circuit rejected those allegations as "conclusory" because they "merely state[d] the plaintiffs' theory of specific jurisdiction" and were not supported by "specific facts."  *Id.* at 57-58.  So too here.

*Second*, aiming alone is not enough.  To assert personal jurisdiction under *Calder*, Plaintiffs must also show that the "brunt of the harm . . . was suffered" in the forum.  465 U.S. at 788-89; *see Walden*, 571 U.S. at 287-88.  They fail to do so here.  For their federal claims – the

---

[9] *See, e.g.*, Mark Mazzetti & Ben Hubbard, *It Wasn't Just Khashoggi:  A Prince's Brutal Drive to Crush Dissent*, N.Y. Times (Mar. 17, 2019), https://www.nytimes.com/2019/03/17/ world/middleeast/khashoggi-crown-prince-saudi.html, *cited in* Compl. ¶ 69 n.32.

only ones relevant to Rule 4(k)(2) – the brunt of the harm was Khashoggi's death and related physical and mental suffering, Compl. ¶¶ 167, 170, 177-178, which occurred in Turkey. Cengiz's own suffering and any financial losses, *id.* ¶¶ 171, 180-181, also occurred in Turkey, the location of the apartment she alleges Khashoggi purchased for her, *id.* ¶¶ 93, 166.[10]  There is no colorable contention that the brunt of the harm occurred in the United States.

   *Klieman* is instructive.  Like *Livnat*, that case dealt with a killing in the West Bank.  The victim was an American citizen; the plaintiffs were her estate, survivors, and heirs.  *See* 923 F.3d at 1118.  "[T]he planning, carrying out, and occurrence of [the] killing all took place in the West Bank."  *Id.* at 1125.  Her survivors in the United States felt "emotional suffering," as was "(perhaps) foreseen by the attackers."  *Id.*  Nevertheless, the D.C. Circuit explained, "[t]he *Walden* Court rejected" such suffering "as the relevant 'effect.'"  *Id.*  Khashoggi's killing likewise took place outside the United States.  Apart from the Embassy allegations (which are conclusory and unsupported, *see supra* Part I.A), Cengiz alleges no "planning" or "carrying out" in the United States.  She does not even allege, as the *Klieman* plaintiffs did, emotional suffering in the United States.  Her case for jurisdiction is thus weaker than the one rejected in *Klieman*.[11]

### C.   Exercising Jurisdiction over the Crown Prince Would Offend Notions of Fair Play and Substantial Justice

   Jurisdiction is also inappropriate over the Crown Prince because the exercise of jurisdiction would not comport with fair play and substantial justice.  *See Mwani*, 417 F.3d at 14.

---

   [10] The allegation that Khashoggi and Cengiz intended to reside primarily in the United States, *see* Compl. ¶¶ 95, 169, is irrelevant.  Because even present "contacts between the plaintiff . . . and the forum," *Walden*, 571 U.S. at 284, are not enough, planned future ones cannot be.

   [11] The Supreme Court vacated *Klieman* and remanded "in light of the Promoting Security and Justice for Victims of Terrorism Act of 2019, Pub. L. No. 116-94, div. J, tit. IX, § 903, 133 Stat. 3082."  140 S. Ct. 2713 (2020).  That statute concerns Palestinian governmental defendants, *see* 133 Stat. 3082-85, and does not affect the court of appeals' reasoning.

In this analysis, courts consider "'the burden on the defendant, the interests of the forum State, the plaintiff's interest in obtaining relief in the forum State, and the interests of other sovereigns in resolving the dispute.'" *IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 115-16 (D.D.C. 2018) (quoting *Daimler*, 571 U.S. at 145 (Sotomayor, J., concurring in the judgment)).  All those factors weigh against exercising jurisdiction here and present a "'compelling case'" that jurisdiction is "'unreasonable.'"  *Id.* at 116 (quoting *Mwani*, 417 F.3d at 14).

*First*, the burden on the Crown Prince would be "severe" if he were required "to submit [this] dispute . . . to a foreign nation's judicial system."  *Asahi Metal Indus. Co. v. Superior Ct. of California*, 480 U.S. 102, 114 (1987) (teaching that "[t]he unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight").

*Second*, the interests of the forum – the United States – are less than those of other sovereigns.  Cengiz, the only Plaintiff who brings federal claims, is neither a U.S. citizen nor a U.S. resident.  Khashoggi, although a U.S. resident at the time of his death, was a Saudi citizen. The alleged conduct giving rise to the claim occurred in Saudi Arabia and Turkey.  The allegations of conduct in the United States are conclusory, unsupported by evidence, and outweighed by more important events elsewhere.

*Third*, Cengiz has no special interest in obtaining relief in the United States.  The logical places for her to sue would be her home jurisdiction of Turkey, which has already initiated a criminal prosecution for Khashoggi's killing, *see* Compl. ¶ 161; or in Saudi Arabia, which has already convicted eight defendants of Khashoggi's murder, *see id.* ¶ 162.

*Fourth*, both Turkey, where Khashoggi was killed, and Saudi Arabia, where he was a citizen, have stronger connections to this suit than the United States.  The Crown Prince also resides in Saudi Arabia, where he is a high-ranking official.  The relevant relationships all began

there.  In addition, Turkish law likely governs Cengiz's non-statutory claims.  *See infra* Part V.C.

Accordingly, asserting jurisdiction over the Crown Prince would violate due process, and the Court should dismiss the claims against him.  *See Asahi*, 480 U.S. at 115 (emphasizing that courts should be "unwilling[ ] to find the serious burdens on an alien defendant outweighed by minimal interests on the part of the plaintiff or the forum State").

### D.     Plaintiffs Fail To Show Pendent Personal Jurisdiction over Plaintiffs' Non-Statutory Claims Against the Crown Prince

Rule 4(k)(2) covers only federal claims.  Plaintiffs need another basis for personal jurisdiction over their non-federal claims.  They do not invoke D.C.'s long-arm statute.  *See* Compl. ¶¶ 39-43.  Instead, they rely on "[p]endent personal jurisdiction," which applies where

> a court possesses personal jurisdiction over a defendant for one claim, lacks an independent basis for personal jurisdiction over the defendant for another claim that arises out of the same nucleus of operative fact, and then, because it possesses personal jurisdiction over the first claim, asserts personal jurisdiction over the second claim.

*United States v. Botefuhr*, 309 F.3d 1263, 1272 (10th Cir. 2002); *accord Oetiker v. Jurid Werke, G.m.b.H.*, 556 F.2d 1, 4-5 (D.C. Cir. 1977).  Once a court dismisses the "anchor claim" – in this case, Plaintiffs' federal TVPA and ATS claims – it lacks pendent personal jurisdiction over the other claims.  *See Botefuhr*, 309 F.3d at 1274.[12]  Accordingly, the Court should dismiss Plaintiffs' non-statutory claims against the Crown Prince for lack of personal jurisdiction both because Plaintiffs fail to establish personal jurisdiction over the Crown Prince for any federal claim and because (as set forth in Parts III and IV) their federal claims fail for other reasons.

---

[12] *See also D'Addario v. Geller*, 264 F. Supp. 2d 367, 387-88 (E.D. Va. 2003) (explaining that, if "the federal claim(s) [are] dismissed against a defendant, the state claims against that defendant . . . also have to be dismissed, unless another basis for asserting personal jurisdiction exists"); *Olin Corp. v. Fisons PLC*, 47 F. Supp. 2d 151, 155 (D. Mass. 1999) (same).

II.   **Plaintiffs' Claims Are Barred by Foreign Official Immunity, by the Act of State Doctrine, and for Failure To Join an Indispensable Party**

A.   **The Crown Prince Is Entitled to Head-of-State Immunity**

Foreign official immunity from suit is governed by federal common law.  *See Samantar v. Yousuf*, 560 U.S. 305, 325 (2010).  One form is "status-based" immunity, *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 156 (2020), which includes head-of-state immunity, *see Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190, 193 (D.D.C. 2014).  A judicial determination of immunity may rely either on a "'suggestion of immunity' from the [U.S.] State Department" or on a court's determination that "all the requisites for foreign-official immunity exist." *Lewis*, 918 F.3d at 145-46 (emphasis omitted).[13]

"'Under customary international law, head of state immunity encompasses the immunity of not only the heads of state but also of other "holders of high-ranking office in a State" such as "the Head of Government and Minister of Foreign Affairs."'"  *Yousuf v. Samantar*, 699 F.3d 763, 769 n.2 (4th Cir. 2012) (quoting Lewis S. Yelin, *Head of State Immunity as Sole Executive Lawmaking*, 44 Vand. J. Transnat'l L. 911, 921 n.42 (2011)).  Immunity also protects the head of state's immediate family, including a child who is the head's designated successor.[14]

The Crown Prince is the son of, and designated successor to, the King of Saudi Arabia.

---

[13] Saudi Arabia, through its current Ambassador, has asked the State Department to suggest immunity in *Aljabri v. Al Saud*, No. 1:20-cv-02146 (D.D.C.) (filed Aug. 6, 2020).  The request in *Aljabri* seeks a determination that the Crown Prince is entitled to head-of-state immunity.  Should the State Department act on this request, Saudi Arabia will advise this Court.

[14] *See Kilroy v. Windsor*, 1978 U.S. Dist. LEXIS 20419, at *3 (N.D. Ohio Dec. 7, 1978) (dismissing a lawsuit against the Prince of Wales; observing that, when a defendant is "the Heir Apparent to the throne of the possibly offended nation, the foreign policy ramifications are extraordinary"); *see also Kline v. Kaneko*, 535 N.Y.S.2d 303, 304 (Sup. Ct., N.Y. Cty., 1988) (wife of the President of Mexico), *aff'd sub nom. Kline v. Cordero De La Madrid*, 154 A.D.2d 959 (N.Y. App. Div. 1989); *Estate of Domingo v. Marcos*, 1983 WL 482332 (W.D. Wash. July 14, 1983) (wife of the President of the Philippines).

He therefore has immunity not only from his immediate familial relationship to the King, but also from his own "high-ranking office," *Yousuf*, 699 F.3d at 769 n.2 (citation omitted), as set out in Saudi Arabia's Basic Law of Governance (the "Basic Law").[15]  Under the Basic Law, the Crown Prince is the only individual with the prerogative to exercise sovereign power alongside or on behalf of the King.  *See* Basic Law art. 65 ("The King may delegate some powers of authority to the Crown Prince by Royal Decree.").  Moreover, "[s]hould the King happen to travel abroad, he shall issue a Royal Decree to deputize the Crown Prince to manage the affairs of state and look after the interests of the people."  *Id.* art. 66.[16]  As "Acting King," the Crown Prince himself has issued a number of Royal Decrees, including one appointing Saudi Arabia's current Ambassador to the United States.[17]

Upon the King's death, "the Crown Prince shall assume the Royal powers until a pledge of allegiance (bay'a) is given," at which point the Crown Prince would formally become the King.  *Id.* art. 5.  The Crown Prince currently occupies numerous high-ranking positions in Saudi Arabia's government, serving as its Deputy Prime Minister, Minister of Defense, Chairman of its Council for Economic and Development Affairs, and Chairman of its Council of Political and Security Affairs.[18]  He thus exercises day-to-day control over critical sectors of that government.

---

[15] An English-language version of the Basic Law is available on the Embassy's website. *See* Basic Law of Governance, https://www.saudiembassy.net/basic-law-governance.

[16] *See*, *e.g.*, Royal Order A/352, issued 1441/05/18 AH (01/13/2020 AD) (instructing the Crown Prince "to manage state affairs, and to look after the interests of the people during [the King's] travel outside the Kingdom"); Royal Order A/226, issued 1440/06/18 AH (02/23/2019 AD) (same); Royal Order A/313, issued 1438/11/01 AH (07/24/2017 AD) (same).

[17] Royal Order A/229, issued 1440/06/18 AH (02/23/2019 AD).

[18] *See* Rapawy Decl. Ex. B (press release on Royal Orders "[s]electing Prince Mohammed bin Salman bin Abdulaziz Al Saud as Crown Prince, appointing him as Deputy Premier, and continuing as Minister of Defense"); *id.* Ex. C (press release on Royal Decree "appointing Prince Mohammed bin Salman bin Abdulaziz Al Saud as the Minister of Defense");

The Crown Prince has engaged directly with the U.S. government's most senior officials, including President Trump[19] and his Secretaries of State.[20]  President Biden has not met the Crown Prince personally, but has described him as an "acting head of state" in public remarks.[21] Other federal agencies have also recognized that the Crown Prince, although second to the King, can properly be described as a "chief of state" and "head of government" when discussing Saudi Arabia.[22]  The leaders of other countries have received him as a visiting head of state.[23]

The practice of other states confirms that the position of Crown Prince of Saudi Arabia is entitled to status-based immunity.  In *Apex Global Management Ltd. v. Fi Call Ltd.*, [2013]

---

*id.* Ex. D (Royal Order A/292, appointing the Crown Prince as Chairman of the Council of Political and Security Affairs).

[19] *See, e.g., Remarks by President Trump and Crown Prince Mohammad Bin Salman of the Kingdom of Saudi Arabia Before Working Breakfast | Osaka, Japan*, The White House (June 28, 2019), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-crown-prince-mohammad-bin-salman-kingdom-saudi-arabia-working-breakfast-osaka-japan/.

[20] *See, e.g.*, Readout, *Secretary Pompeo's Call with Saudi Crown Prince Mohammed bin Salman Al Saud*, Office of the Spokesperson, U.S. Dep't of State (Mar. 25, 2020), https://2017-2021.state.gov/secretary-pompeos-call-with-saudi-crown-prince-mohammed-bin-salman-al-saud-4/index.html; *Remarks With Saudi Arabian Crown Prince Mohammed bin Salman al-Saud*, U.S. Dep't of State (July 12, 2017), https://2017-2021.state.gov/remarks-with-saudi-arabian-crown-prince-mohammed-bin-salman-al-saud/index.html.

[21] *Transcript:  ABC News' George Stephanopoulous Interviews President Joe Biden, ABC News* (Mar. 17, 2021), https://abcnews.go.com/Politics/transcript-abc-news-george-stephanopoulos-interviews-president-joe/story?id=76509669.

[22] *See* Central Intelligence Agency, *The World Factbook:  Saudi Arabia* (identifying both the King and the Crown Prince as Saudi Arabia's "chief of state" and "head of government"), https://www.cia.gov/the-world-factbook/countries/saudi-arabia/ (last visited May 25, 2021).

[23] *See* Press Release, *Readout of PM's Call with Mohammed bin Salman:  2 September 2020*, Prime Minister's Office, 10 Downing Street (Sept. 2, 2020), https://www.gov.uk/government/news/readout-of-pms-call-with-mohammed-bin-salman-2-september-2020; *Saudi Crown Prince Mohammed bin Salman Arrives in Pakistan*, Al Jazeera (Feb. 17, 2019), https://www.aljazeera.com/news/2019/02/saudi-crown-prince-mohammed-bin-salman-arrives-pakistan-190217061720354.html; Kim Willsher, *French President and Saudi Crown Prince Vow Partnerships on Syria and Economic Issues*, L.A. Times (Apr. 10, 2018), https://www.latimes.com/world/europe/la-fg-france-saudi-arabia-20180410-story.html.

EWHC 587 (Ch), the High Court of Justice of England and Wales observed that, under

"customary international law," an "heir to the throne . . . undertaking the offices of state on

behalf of the sovereign or head of State" would be entitled to "immunity" from suit.  *Id.* ¶ 107.[24]

*Apex Global* held that two other members of Saudi Arabia's royal family were not entitled to

status-based immunity, but indicated that it would have reached a different result for the Crown

Prince at the time, who "can officially exercise power in Saudi Arabia alongside or on behalf of

the King" under the "Basic Law."  *Id.* ¶ 122.  English courts have also extended immunity to

Israel's Defense Minister and China's Minister for Commerce and International Trade – each

less senior in their governments than is the Crown Prince in Saudi Arabia.[25]

### B.    The Act of State Doctrine Bars Plaintiffs' Claims

The act of state doctrine provides an additional reason why this Court should not hear

Plaintiffs' claims.  Under that doctrine, American courts refrain "from inquiring into the validity

of the public acts a recognized foreign sovereign power committed within its own territory."

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964).  In applying the doctrine,

courts ask whether " 'the relief sought or the defense interposed would [require] a court in the

United States to declare invalid the official act of a foreign sovereign performed within its own

territory.' "  *McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012)

---

[24] *Apex Global* was interpreting the United Kingdom's State Immunity Act, but explained that the Act was "intended to reflect the common law and customary international law position." [2013] EWHC 587, ¶ 107.  Federal courts have looked to the Act, and judicial interpretations of it, as indicative of international law.  *See, e.g.*, *Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 310 (2d Cir. 1981), *overruled on other grounds by Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009).

[25] *See Application for Arrest Warrant Against General Shaul Mofaz* (Bow St. Mag. Ct. Feb. 12, 2004) (Eng.) (Pratt, Dist. J.), *reprinted in Current Developments:  Public International Law*, 53 Int'l & Comp. L.Q. 769, 771-73 (July 2004); *Re Bo Xilai* (Bow St. Mag. Ct. Nov. 8, 2005) (Eng.) (Workman, Sr. Dist. J.), *available at Weixum v. Xilai*, No. 1:04-cv-00649-RJL, ECF No. 16-7 (D.D.C. July 24, 2006).

(quoting *W.S. Kirkpatrick & Co. v. Environmental Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990)) (alteration in original).  By barring such declarations, the act of state doctrine "promote[s] 'international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations.' "  *Hourani v. Mirtchev*, 796 F.3d 1, 16 (D.C. Cir. 2015) (quoting *Kirkpatrick*, 493 U.S. at 408).  To be an official act of a foreign sovereign "within its own territory," *Banco Nacional*, 376 U.S. at 401, it is enough that the act "is rooted, in all relevant respects, within foreign sovereign territory," *Hourani*, 796 F.3d at 13.

        To be clear, the murder of Jamal Khashoggi in Istanbul was no act of state.  Khashoggi's death was a crime that Saudi Arabia has prosecuted in its own courts under its own laws.  But the allegations against the Crown Prince in this case go beyond that death.  As set forth in Part I, Plaintiffs' theory of personal jurisdiction over the Crown Prince relies on allegations that the Crown Prince directed Embassy employees generally and Prince Khalid specifically to "lure" Khashoggi to Istanbul by denying him a certificate in Washington, D.C. and by giving him assurances about his personal safety.  Those allegations are conclusory and untrue; but, if taken as true, they describe acts of the Saudi state rooted within its own territory.  Accordingly, this Court should not proceed with a case that challenges their validity.

        *Hourani* explains how the act of state doctrine applies to the speech and conduct of a diplomatic mission.  Two Kazakh nationals (the Houranis) brought defamation claims against a D.C.-based individual and his D.C.-based business.  The Houranis alleged that the Kazakh Embassy in Washington, D.C., at the behest of the daughter of the President of Kazakhstan, published " 'anti-Hourani content' " on its website with the " 'active support' " of the Kazakh Ambassador; "that the Ambassador was in the thick of the . . . conspiracy against them"; and that a "critical step" in the alleged conspiracy to defame them "was perpetrated by the official speech

of the Kazakh government." 796 F.3d at 12. The D.C. Circuit held that these allegations "trigger[ed]" the act of state doctrine, barring the Houranis' claims. *Id.*

The court explained that, to recover on their defamation claims, the Houranis would have to "persuade a factfinder that . . . official foreign government statements published on a foreign sovereign's own communication platform were themselves *defamatory*, and thus invalid." *Id.* at 15. Those claims and any potential defense "could not be adjudicated without a court having to inquire into the legal validity or tortiousness of the Kazakh government's activities and official government communications." *Id.* The court of appeals found irrelevant the Houranis' decision not to name Kazakhstan's Ambassador, Embassy, or government as defendants because the act of state doctrine "turns on what must be adjudicated," not on the identity of the parties. *Id.* It also rejected the Houranis' argument that the alleged defamation occurred at the Kazakh Embassy in Washington, D.C., holding that the official conduct of Kazakh diplomats stationed at that mission was "rooted, in all relevant respects," within Kazakhstan. *Id.* at 13.

The same principles apply here. Like the Houranis, Plaintiffs claim injury from a conspiracy involving allegedly false statements by the Saudi Ambassador to the United States (assurances that Khashoggi would be safe) and by other Embassy officials (statements that Khashoggi had to go to Istanbul for a certificate), as well as allegedly wrongful official conduct (withholding the certificate). Compl. ¶¶ 90-91. Like the Houranis, Plaintiffs further assert that the supposedly false speech and supposedly wrongful acts were directed by the most senior levels of the Saudi government. *See id.* Further, just as the Houranis claimed that the Kazakh Embassy's involvement was a "critical step" in the conspiracy against them, *Hourani*, 796 F.3d at 12, Plaintiffs here allege that the Saudi Embassy's actions were "[k]ey steps in Defendants' conspiracy" that "laid the groundwork for Mr. Khashoggi's murder," Compl. ¶ 40; *see also id.* ¶ 4. The Complaint thus amounts to a request "to inquire into the legal validity or tortiousness"

of Saudi Arabia's "government[ ] activities and official government communications," *Hourani*, 796 F.3d at 15 – specifically, representations of the Ambassador and Embassy officials about the requirements for obtaining a government-issued marriage certificate.

Also instructive is *Nnaka v. Federal Republic of Nigeria*, 238 F. Supp. 3d 17 (D.D.C. 2017) (Bates, J.), *aff'd*, 756 F. App'x 16 (D.C. Cir. 2019) (per curiam), which applied *Hourani* to a dispute involving a letter sent by the Attorney General of Nigeria.  The letter withdrew any authority the plaintiff (Nnaka) might have possessed to pursue recoveries of Nigerian government assets.  *Id.* at 24.  Nnaka claimed the letter was (among other things) a breach of contract, a misrepresentation, and defamatory.  *Id.* at 33.  This Court concluded that Nigeria had sent the letter in its "distinctly sovereign capacity" and declined to hear claims that would require it "to declare [the letter] to be illegal under one label or another" or to "impugn[ ] the legality" of the letter.  *Id.* at 32-33.[26]  Plaintiffs' claims here similarly ask this Court to declare unlawful official speech and conduct of Saudi Arabian officials relating to obtaining an official certificate.

Further, the alleged speech and conduct of the Ambassador and Embassy officials were "'by nature distinctly sovereign'" because they could not "'be undertaken by a private official or entity.'"  *Id.* at 32 (quoting *McKesson*, 672 F.3d at 1073).  Plaintiffs allege that Khashoggi's request for a certificate sought a "service routinely provided by the Embassy . . . to Saudi nationals."  Compl. ¶ 90.  Services of this kind are part of the consular function.[27]  Consular

---

[26] *Nnaka* observed that the letter was "an official communication from the Nigerian government to the U.S. government."  238 F. Supp. 3d at 32-33.  Quoting *Hourani*, however, the Court explained that, "even when it is not directed solely to another government, official speech that gives 'voice to the foreign government speaking from within its own territory' may constitute an act of state."  *Id.* at 32 (quoting 768 F.3d at 13-14).

[27] *See* Vienna Convention on Consular Relations arts. 5(e), 5(f) (defining "[c]onsular functions" to include "helping and assisting nationals . . . of the sending State" and "acting as notary and civil registrar and in capacities of a similar kind, and performing certain functions of

services are not provided by private entities, and courts have recognized them as governmental.[28]

Similarly, if Prince Khalid had made the alleged assurances to Khashoggi about the conduct of Saudi officials in Istanbul, he necessarily would have been speaking on behalf of his government.  *See Hourani*, 796 F.3d at 13 (explaining that an "Ambassador is not just any government functionary, but instead is an official whose defining purpose is to speak for the Kazakh government sitting within its own territory"); *see also* Vienna Convention on Diplomatic Relations art. 3(1) (listing the first "function[ ] of a diplomatic mission" as "[r]epresenting the sending State in the receiving State").  Assurances about the conduct of Saudi consular officials in Istanbul would matter only if given on behalf of the Saudi Arabian government.

In sum, Plaintiffs ask this Court to rule that the official statements and conduct of Saudi Arabia's Ambassador and Embassy personnel were a "ruse," Compl. ¶¶ 4, 90, were "false pretenses," *id.* ¶ 91, and were "part" – indeed, a "key" part – of an "unlawful conspiracy," *id.* ¶¶ 4, 40, 44, 169, aimed at Khashoggi's death.  Those allegations are central to Plaintiffs' attempt to assert personal jurisdiction over the Crown Prince (as set forth in Part I) and important to their case on the merits.  The ruling Plaintiffs seek is no different in principle from the allegation in *Hourani* that the Kazakh Embassy's statements were part of a conspiracy against the Houranis or the claim in *Nnaka* that the Nigerian Attorney General's letter was fraudulent and defamatory.  The Court should dismiss Plaintiffs' claims under the act of state doctrine.

---

an administrative nature"); *see also id.* art. 70(1) (discussing "the exercise of consular functions by a diplomatic mission").

[28] *See, e.g.*, *Wood ex rel. United States v. American Inst. in Taiwan*, 286 F.3d 526, 531 (D.C. Cir. 2002) (describing "consular services" as "governmental-type activities"); *Livnat v. Palestinian Auth.*, 82 F. Supp. 3d 19, 30 (D.D.C. 2015) (describing "consular services" as "governmental services"), *aff'd*, 851 F.3d 45 (D.C. Cir. 2017).

**C.     Saudi Arabia Is an Indispensable Party That Cannot Be Joined Because It Is Immune from Suit**

The Complaint should also be dismissed because it is impossible to join a required sovereign party under Rule 19 of the Federal Rules of Civil Procedure.  That party is Saudi Arabia, whose sovereign interests this lawsuit implicates.  But Saudi Arabia cannot be joined to this action because it is immune from suit under the Foreign Sovereign Immunities Act of 1976 ("FSIA").[29]  Saudi Arabia's absence requires dismissal under Rule 19(b) as construed in *Republic of Philippines v. Pimentel*, 553 U.S. 851, 867 (2008).

**1.     Saudi Arabia Is a Required Party Under Rule 19(a)**

Saudi Arabia is a required party to this action.  Joinder of a party is required if that party "claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest."  Fed. R. Civ. P. 19(a)(1)(B)(i).  An "interest" within the meaning of the Rule can include a sovereign interest as well as a contractual or proprietary one.  *See*, *e.g.*, *Two Shields v. Wilkinson*, 790 F.3d 791, 797 (8th Cir. 2015) (holding that United States was a required party because of its "interest in the administration, enforcement, and interpretation of its laws and regulations").[30]  As the Eighth Circuit put it in *Two Shields*, a government has a protected interest "in actions which 'indirectly attack' its administrative decisions."  790 F.3d at 796 (quoting *Boles v. Greeneville Hous. Auth.*, 468 F.2d 476, 479 (6th Cir. 1972)).

---

[29] Pub. L. No. 94-583, 90 Stat. 2891 (codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611).

[30] *See also Hood ex rel. Mississippi v. City of Memphis*, 570 F.3d 625, 631 (5th Cir. 2009) (State of Tennessee was a required party because Mississippi and Tennessee had "competing sovereign interests" in the "allocat[ion] . . . [of] interstate water resources"); *Kescoli v. Babbitt*, 101 F.3d 1304, 1310 (9th Cir. 1996) (recognizing a Rule 19(a) interest of Indian tribes in leases "by virtue of their sovereign capacity" to "determine[] what is in their best interests").

This case is not merely an indirect attack on the actions of Saudi Arabia's government – it is a direct one. The Complaint centers on the death of a high-profile Saudi Arabian national in a Saudi Arabian consular facility at the hands of Saudi Arabian government employees. Plaintiffs allege that Khashoggi's murder garnered international attention and "worldwide outrage," Compl. ¶ 139, leading to a formal "human rights inquiry" by a United Nations Special Rapporteur, *id.* ¶ 149. Several countries, including the United States, have relied on that report to take actions against Saudi Arabia or against individual Saudi Arabian nationals. Germany suspended weapons sales to Saudi Arabia., *id.* ¶ 177, and numerous Saudi Arabian nationals became targets of sanctions, *id.* ¶¶ 153, 177, 180. As a result of its own investigation into Khashoggi's murder, Saudi Arabia prosecuted and secured convictions against a number of individuals for their roles in the killing. *E.g.*, *id.* ¶ 29 n.8. A major premise of this suit is that those prosecutions were inadequate and that it is "inconceivable" that Saudi Arabia's justice system – including its King, who Plaintiffs name personally as a source of unfairness – would "permit fair proceedings" against the Crown Prince. *Id.* ¶ 162.

Plaintiffs thus ask this Court to sit in judgment of Saudi Arabia's government, including its most senior officials, its former Ambassador and Embassy personnel, and its justice system. Plaintiffs' counsel has described this and a similar case as efforts "to 'live up to the responsibilities that private litigants and lawyers have to address egregious conduct by authoritarian regimes.'"[31] All this threatens Saudi Arabia's sovereign interests in "us[ing] its own courts for a dispute if it has a right to do so," recognized in *Pimentel* as a matter of "comity"

---

[31] Spencer S. Hsu, *Saudi crown prince girds for legal battle in a changing Washington over human rights allegations*, Wash. Post (Nov. 2, 2020), https://www.washingtonpost.com/local/legal-issues/saudi-crown-prince-lawsuits/2020/11/02/ca23820a-1a06-11eb-aeec-b93bcc29a01b_story.html.

and "dignity," 553 U.S. at 866; in "its relations with the United States," *Torres v. Southern Peru Copper Corp.*, 113 F.3d 540, 542 (5th Cir. 1997), a longstanding ally with a crucial security relationship; and in "the exercise of sovereign power over individuals . . . within [its] jurisdiction" through the "enforce[ment] [of its] . . . criminal" laws, *Alfred L. Snapp & Son, Inc. v. Puerto Rico ex rel. Barez*, 458 U.S. 592, 601 (1982).  Those interests cannot properly be protected in Saudi Arabia's absence.

*TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1 (D.D.C. 2013), *aff'd*, 2015 WL 3653187 (D.C. Cir. June 9, 2015) (per curiam), illustrates the point.  That case involved an assortment of tort claims arising from its unsuccessful attempt to win a contract with the Ghanaian government to reconstruct the sewer system in Accra, Ghana.  *See id.* at 4-6.  Those claims asked the U.S. court to "examin[e] . . . the reasons for, and propriety of, a foreign sovereign's decision to award a contract for a construction project in a foreign state."  *Id.* at 12.  "Such an examination," the court explained, "is prohibited by *Pimentel*."  *Id.*  Specifically, "Ghana . . . ha[s] a legitimate interest in 'events of . . . political significance for the Republic and its people,'" *id.* at 13 (quoting *Pimentel*, 553 U.S. at 866) (second ellipsis in original), including a major domestic infrastructure project.  Allegations that a "major Ghanaian official" engaged in "corrupt practices" were also "matters of substantial domestic and political significance," so "[r]esolving" them fell "squarely within the types of interests held by the Ghana Defendants that could be compromised by adjudication of this suit in the United States."  *Id.*

Plaintiffs' allegations here touch on a foreign sovereign's affairs far more seriously than the corruption allegations in *TJGEM*.  There, the most senior official accused of misconduct was "akin to an appointed Mayor," *id.* at 4; here, it is the Crown Prince.  There, the alleged misconduct was "a $10 million bribe," *id.* at 5; here, it is an alleged "campaign to silence

dissenters" over years, Compl. ¶ 69, allegedly leading to a murder.  There, the foreign

sovereign's interest arose from an attempt to "'alleviate [a] flooding problem,'" *TJGEM*, 26 F.

Supp. 3d at 13 (quoting plaintiff's pleading); here, Saudi Arabia's interests at stake include its

diplomatic relations with the United States, key to its national security and to broader regional

stability.  "[R]esolution of this matter in this Court" would pose a "significant risk of

implicating, and possibly injuring," Saudi Arabia's "interests" as a "sovereign entit[y]."  *Id.*

### 2.      Saudi Arabia Is Immune from Suit

Saudi Arabia cannot be joined as a party to this action because it is immune from suit.

*See Kickapoo Tribe of Indians of Kickapoo Reservation in Kansas v. Babbitt*, 43 F.3d 1491, 1495

(D.C. Cir. 1995) ("*Kickapoo II*") ("One reason joinder may be infeasible is that the absent party

enjoys sovereign immunity.").  As a foreign sovereign, Saudi Arabia "is presumptively immune

from the jurisdiction of United States courts" under the FSIA.  *Saudi Arabia v. Nelson*, 507 U.S.

349, 355 (1993).  "[U]nless a specified [FSIA] exception applies, a federal court lacks subject-

matter jurisdiction over a claim against a foreign state."  *Id.*

This case does not come close to any FSIA exception.  The FSIA exceptions that cover

tortious harm to an individual are the non-commercial-tort exception, 28 U.S.C. § 1605(a)(5),

under which "'the entire tort' – including not only the injury but also the act precipitating that

injury – must occur in the United States," *Jerez v. Republic of Cuba*, 775 F.3d 419, 424 (D.C.

Cir. 2014); the exception for designated state sponsors of terrorism, *see* 28 U.S.C. § 1605A, a

designation that does not apply and has never applied to Saudi Arabia; and the exception for

terrorist acts involving "physical injury to person or property or death *occurring in the United*

*States*," *id.* § 1605B(b) (emphasis added).  Plaintiffs do not and cannot allege facts that would

support any of these exceptions.

### 3.       Because Saudi Arabia Cannot Be Joined, This Case Should Be Dismissed

Because Saudi Arabia is "a required-entity sovereign [that] is not amenable to suit," this "case may not proceed." *Pimentel*, 553 U.S. at 867.  *Pimentel*, which controls here, involved an interpleader action to determine the rightful owner of money stolen by the former President of the Philippines.  A "class . . . of some 9,539 . . . human rights victims" sought to recover damages for their injuries from assets in a brokerage account in New York.  *Id.* at 857.  The Republic of the Philippines, together with one of its agencies, contended that the former President's assets were forfeited and sought to recover them in its own courts.  *Id.* at 858-59. The sovereign entities were immune from suit and could not be joined to the interpleader.  *Id.* at 860-61.  The Supreme Court held as a matter of law that the case should be dismissed in light of "the absent entities' assertion of sovereign immunity."  *Id.* at 864.

*Pimentel* held that "where sovereign immunity is asserted, and the claims of the sovereign are not frivolous," and "where there is a potential for injury to the interests of the absent sovereign," then "dismissal of the action must be ordered."  *Id.* at 867.  Courts have taken *Pimentel* at its word.  *See TJGEM*, 26 F. Supp. 3d at 13 ("*Pimentel* holds unambiguously that in such a situation, where a sovereign is a required party for the purposes of Rule 19, the case must be dismissed."); *Ali v. Carnegie Inst. of Washington*, 306 F.R.D. 20, 28 (D.D.C. 2014) ("*Pimentel* stands for the proposition that where a sovereign party should be joined in an action, but cannot be owing to sovereign immunity, the entire case must be dismissed if there is the potential for the interests of the sovereign to be injured.") (citation omitted), *aff'd*, 684 F. App'x

985 (Fed. Cir. 2017) (per curiam).[32]  Accordingly, if the Court concludes (as it should) that Saudi Arabia is both required and immune, it should dismiss the case on that basis.

Were the Court to conduct case-specific balancing of the equities under Rule 19(b), the result would be the same.  Saudi Arabia's sovereign interests in using its own courts to decide disputes involving its own officials and nationals would unavoidably suffer "prejudice," Fed. R. Civ. P. 19(b)(1), from this case.  Because an attack on the legitimacy of Saudi Arabia's government is at the heart of this case, no tailoring of the judgment or relief could "lessen[] or avoid[]," Fed. R. Civ. P. 19(b)(2), that prejudice.  Nor would a judgment against the Crown Prince be "adequate," Fed. R. Civ. P. 19(b)(3), in the relevant sense of "settling the dispute as a whole," *Pimentel*, 553 U.S. at 870-71, unless Saudi Arabia were bound to enforce it.  Finally, to the extent Plaintiffs allege they have no "adequate remedy," Fed. R. Civ. P. 19(b)(4), in Saudi Arabia's courts, *see* Compl. ¶¶ 162, 173, 183, that allegation is insufficient under *Pimentel*.  *See* 553 U.S. at 872 ("Dismissal under Rule 19(b) will mean, in some instances, that plaintiffs will be left without a forum for definitive resolution of their claims.  But that result is contemplated under the doctrine of foreign sovereign immunity.").

That conclusion does not change because Plaintiffs have sued individual officials such as the Crown Prince.  The Ghanaian officials accused of wrongdoing were named as individual-capacity defendants in *TJGEM*, *see* 26 F. Supp. 3d at 13, but that did not lead the court to conclude that Ghana's interests were adequately protected.  Similarly, the Crown Prince could

---

[32] *See also Kickapoo II*, 43 F.3d at 1496 (pre-*Pimentel* case) ("[T]his court has observed that 'there is very little room for balancing of other factors' set out in Rule 19(b) where a necessary party under Rule 19(a) is immune from suit because immunity may be viewed as one of those interests 'compelling by themselves.'") (quoting *Wichita & Affiliated Tribes of Oklahoma v. Hodel*, 788 F.2d 765, 777 n.13 (D.C. Cir. 1986)).

protect his individual interests by disproving Plaintiffs' allegations about his conduct. But such a defense would not vindicate Saudi Arabia's sovereign interest in seeing its own laws enforced by its own prosecutors, in its own courts, to resolve disputes involving alleged misconduct by its own officials, directed at one of its own citizens.[33]

## III.   Cengiz Is Not the Appropriate Plaintiff and Fails To State a Claim Under the TVPA

The TVPA creates a private cause of action against an "individual who, under actual or apparent authority, or color of law, of any foreign nation," "subjects an individual to" either "torture" or "extrajudicial killing." Pub. L. No. 102-256, § 2(a), 106 Stat. 73, 73 (1992), *reprinted in* 28 U.S.C. § 1350 note. The cause of action for an "extrajudicial killing" is available only to "the [decedent's] legal representative" and "any person who may be a claimant in an action for wrongful death." *Id*. § 2(a)(2), 106 Stat. 73. The statute further provides that "[a] court shall decline to hear a [TVPA] claim . . . if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred." *Id*. § 2(b), 106 Stat. 73. On the face of the Complaint, Cengiz is not authorized to bring suit under the TVPA and has not exhausted remedies available to her in Turkey.

### A.   Cengiz Is Not an Appropriate Plaintiff Under the TVPA

Cengiz is neither Khashoggi's "legal representative" nor a "person who may be a claimant in an action for [his] wrongful death." TVPA § 2(a)(2), 106 Stat. 73. Cengiz alleges that she is Khashoggi's "widow" because she "married [him] according to the traditions of Islam

---

[33] The recent decision in *de Csepel v. Republic of Hungary*, --- F. Supp. 3d ---, 2020 WL 2343405 (D.D.C. May 11, 2020), *interlocutory appeal pending*, No. 20-7047 (D.C. Cir.), is not to the contrary. That case concluded that the Republic of Hungary was not indispensable because its interests could be adequately protected by non-immune parties. *Id.* at *15, *17. The court found that Hungary's interest in that case was limited to maintaining "possession of the artwork and [avoiding] damages," *id.* at *15, which a non-immune instrumentality could protect. It did not address, perhaps because the Hungarian entities did not raise it, Hungary's sovereign interest in deciding significant disputes in its own courts.

on September 16, 2018," *e.g.*, Compl. ¶ 194, but concedes that her alleged marriage was never

"recognize[d] [as] a civil marriage" or "confirm[ed] . . . under Turkish law," *id*. ¶ 89, and that the

Turkish "marriage bureau . . . refused to grant the civil confirmation of their marriage," *id*. ¶ 99.

She does not have the right to sue as though her marriage had been confirmed.  Any right to seek

damages for Khashoggi's death belongs to Khashoggi's eldest son Salah, his executor.

### 1.    Cengiz Is Not Khashoggi's "Legal Representative"

In the context of an action on behalf of a deceased individual, the ordinary meaning of

the phrase "legal representative" is the executor or administrator of that individual's estate.  *See*

*Briggs v. Walker*, 171 U.S. 466, 471 (1898)  ("The primary and ordinary meaning of the words

'representatives,' or 'legal representatives,' or 'personal representatives,' when there is nothing

in the context to control their meaning, is 'executors or administrators,' they being the

representatives constituted by the proper court.").  The context of the TVPA does not suggest a

broader meaning; its legislative history confirms that Congress meant "the executor or executrix

of [a] decedent's estate."  S. Rep. No. 102-249, at 7 (1991).[34]  Accordingly, "legal

representative" has its ordinary meaning.  *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560,

566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").

Cengiz does not allege that she was appointed to execute Khashoggi's estate.  The lack of

such an allegation is alone fatal to any attempt she might make to assert a TVPA claim as his

"legal representative."  Nor could she make such an allegation.  Khashoggi's eldest son, Salah,

---

[34] The Senate Report also states that the phrase could mean a "'friend' of the victim"
where the victim cannot sue personally because of "mental or physical incapacity or youthful age."
S. Rep. No. 102-249, at 7.  This language referred to an unenacted version of the bill in which a
"legal representative" was an authorized plaintiff for torture claims as well as for extrajudicial-
killing claims.  *See id.* at 2.  In the enacted version, the phrase "legal representative" appears
only with respect to extrajudicial-killing claims.  *See* TVPA § 2(a), 106 Stat. 73.

was appointed the executor of Khashoggi's estate, which was administered in the courts of Saudi Arabia. *See* S. Khashoggi Decl. ¶ 3 & Ex. 1.[35]

Cengiz also does not qualify as Khashoggi's "legal representative" under the broader definition of that term sometimes used in other contexts. In an insurance case, " 'legal representatives' is not necessarily restricted to the personal representatives of one deceased, but is sufficiently broad to cover all persons who, with respect to his property, stand in his place and represent his interests, whether transferred to them by his act or by operation of law." *Mutual Life Ins. Co. v. Armstrong*, 117 U.S. 591, 597 (1886). Under that broader meaning, "legal representative" may include a "widow and heir-at-law." *Young v. Firemen's Ins. Co. of Washington, D.C.*, 463 A.2d 675, 676-77 (D.C. 1983) (applying *Armstrong*). The TVPA is not an insurance policy. Even if read like one, it still would not authorize Cengiz to sue. She never legally married Khashoggi and is not his legal heir.

The Complaint alleges that Khashoggi and Cengiz "were married in the Islamic tradition" and that the "celebration of their marriage" occurred "in Istanbul," Compl. ¶ 98, but admits that the Turkish authorities "refused to grant . . . civil confirmation of their marriage," *id.* ¶ 99. Under the choice-of-law rules of the District of Columbia, the forum for this action,[36] the legal validity of Cengiz's religious marriage to Khashoggi in Turkey depends on Turkish law. *See McConnell*

---

[35] The Court may take notice of estate administration as a matter that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b)(2); *see United States v. Dancy*, 510 F.2d 779, 787 n.43 (D.C. Cir. 1975) (taking judicial "notice [of] the records of other litigation," though not for the truth of "the testimony presented therein"); *Shafer v. Children's Hosp. Soc'y of Los Angeles*, 265 F.2d 107, 110 (D.C. Cir. 1959) (same for "[t]he file of the Office of the Register of Wills").

[36] Courts in this District apply the choice-of-law rules of the District of Columbia "when . . . decid[ing] an issue not addressed by federal law, regardless of the source from which the cause of action is deemed to have arisen for the purpose of establishing federal jurisdiction." *A.I. Trade Fin., Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1463 (D.C. Cir. 1995).

*v. McConnell*, 99 F. Supp. 493, 494 (D.D.C. 1951) ("[t]he general and apparently universally accepted rule is that the validity of a marriage is to be determined by the law of the place of the celebration of the marriage") (citing, *e.g.*, *Rhodes v. Rhodes*, 96 F.2d 715 (D.C. Cir. 1938)).[37]

Turkish law does not recognize as valid a religious marriage that has not been civilly confirmed. *See* Varol Decl. ¶¶ 15-17. Accordingly, Cengiz's marriage was not legally valid and cannot make her Khashoggi's "legal representative" under the TVPA. His only heirs are his children. *See* S. Khashoggi Decl. Ex. 1 ("no other heirs than the mentioned persons").

### 2.   Cengiz Is Not a "Person Who May Be a Claimant in an Action for Wrongful Death"

The TVPA also grants a cause of action to "any person who may be a claimant in an action for wrongful death." As the D.C. Circuit has explained in interpreting the FSIA, "[t]he plain meaning of claimant . . . is simply someone who brings a claim for relief," and "[w]ho can be a claimant is typically defined by the substantive law under which a plaintiff states a claim." *Owens v. Republic of Sudan*, 864 F.3d 751, 805-06 (D.C. Cir. 2017), *vacated in part on other grounds and remanded sub nom. Opati v. Republic of Sudan*, 140 S. Ct. 1601 (2020). Here, the question of "who may be a claimant" under the TVPA should be resolved under state law, which governs wrongful-death actions. The legislative history of the TVPA confirms that "[c]ourts may look to state law for guidance as to which parties would be proper wrongful death claimants." H.R. Rep. No. 102-367, pt. 1, at 4 (1991). Courts in this District have done so. *See*, *e.g.*, *Fisher v. Great Socialist People's Libyan Arab Jamahiriya*, 541 F. Supp. 2d 46, 54-55

---

[37] Since *McDonnell* and *Rhodes*, the District of Columbia has adopted a balancing test for choice of law based on governmental interests and incorporating the Restatement (Second) of Conflict of Laws (1971). *See infra* pp. 43-44. That approach confirms the place-of-celebration rule because the Second Restatement recognizes that "[t]he state where the marriage was celebrated . . . is the state which will usually be primarily concerned with the question of formalities." Restatement (Second) of Conflict of Laws § 283 cmt. f.

(D.D.C. 2008) (applying this Court's choice-of-law analysis from *Dammarell v. Islamic Republic of Iran*, 2005 WL 756090, at \*19-23 (D.D.C. Mar. 29, 2005) (Bates, J.), *recon. granted in part on other grounds*, 370 F. Supp. 2d 218 (D.D.C. 2005)).[38]

Applying state law requires a D.C. choice-of-law analysis that has two steps.  *See In re APA Assessment Fee Litig.*, 766 F.3d 39, 51 (D.C. Cir. 2014).  *First*, a court "'determine[s] whether a "true conflict" exists' between the laws of the two jurisdictions—'that is, whether more than one jurisdiction has a potential interest in having its law applied and, if so, whether the law of the competing jurisdictions is different.'"  *Id.* at 51-52 (quoting *GEICO v. Fetisoff*, 958 F.2d 1137, 1141 (D.C. Cir. 1992)).  There is "no true conflict" where the laws of the potentially interested jurisdictions "'produce the same result when applied to the facts at issue.'"  *Danziger v. Ford Motor Co.*, 402 F. Supp. 2d 236, 241 (D.D.C. 2005) (quoting *Long v. Sears Roebuck & Co.*, 877 F. Supp. 8, 11 (D.D.C. 1995)).  *Second*, if a true conflict exists, courts resolve it through a "constructive blending" approach that accounts for each jurisdiction's "governmental interests" and considers "which jurisdiction has the most significant relationship to the dispute."  *District of Columbia v. Coleman*, 667 A.2d 811, 816 (D.C. 1995).  Doing so involves "examin[ing] . . . the various jurisdictional interests as applied to the various distinct issues to be adjudicated."  *Id.*

### a.   Cengiz Is Not a "Person Who May Be a Claimant in an Action for Wrongful Death" in Any Relevant Jurisdiction

The laws of four jurisdictions are potentially relevant to Cengiz's claims.  There is no "true conflict" between the laws of those jurisdictions, *GEICO*, 958 F.2d at 1141, because she is not an appropriate claimant in an action for wrongful death under the laws of any of those four.

---

[38] In *Dammarell*, this Court's choice-of-law determination did not apply directly to the TVPA claims, which the Court dismissed for other reasons.  *See* 2005 WL 756090, at \*30-31. Nevertheless, the Court's reasoning is still instructive on the state-law question of who may be a claimant for wrongful death, as *Fisher* shows.

### i.   Cengiz May Not "Be a Claimant in an Action for Wrongful Death" Under Virginia Law

Virginia has an interest in applying its laws because, based on the Complaint's allegations, Khashoggi's domicile was Virginia at the time of his death.  *See* Compl. ¶ 82 (alleging his "home" was in "Virginia"); *id.* ¶¶ 95-96 (alleging he intended "principally [to] reside" in the "United States" after marriage).  Those allegations, which we assume to be true for this motion, establish that he was only temporarily in Turkey and had "a fixed and definite intent to return and take up his home," *District of Columbia v. Murphy*, 314 U.S. 441, 456 (1941), in Virginia.  Cengiz could not bring a wrongful-death claim in Virginia, where such actions "shall be brought by and in the name of the personal representative of [the] deceased person," Va. Code § 8.01-50(C), meaning "the executor or administrator of a decedent's estate who has been qualified by a court to hold the position," *In re Woodley*, 777 S.E.2d 560, 563 (Va. 2015).

### ii.   Cengiz May Not "Be a Claimant in an Action for Wrongful Death" Under Saudi Law

Saudi Arabia has an interest in applying its laws because Defendants and the decedent are or were Saudi nationals and the wrongful death occurred in a Saudi consulate.  Also, Khashoggi's estate was administered in Saudi Arabia, and Saudi Arabia has an interest in ensuring that any compensation for his death goes to his children, who are Saudi nationals and who Saudi Arabia's courts recognized as his only heirs.  *See* S. Khashoggi Decl. Ex. 1.  Cengiz could not bring a wrongful-death action in Saudi Arabia because such actions can be brought only by heirs.  *See* Alarfaj Decl. ¶ 9 & n.8.

### iii.   Cengiz May Not "Be a Claimant in an Action for Wrongful Death" Under D.C. Law

The District of Columbia has an interest in applying its laws because it is the forum Plaintiffs chose.  Plaintiffs also invoke forum law for their non-statutory claims, *see* Compl.

preamble (asserting "claims arising under . . . the laws of the District of Columbia").  In addition,

D.C. courts apply their own law as a "tie-breaker" where a balancing of interests does not

"clearly favor" one jurisdiction's law over another.  *APA Assessment Fee Litig.*, 766 F.3d at 51.

Cengiz could not bring a wrongful-death claim in D.C. because, as in Virginia, such an action

"shall be brought by and in the name of the personal representative of the deceased person," D.C.

Code § 16-2702, meaning "only . . . an officially appointed administrator or executor," *Strother*

*v. District of Columbia*, 372 A.2d 1291, 1296 n.7 (D.C. 1977).

**iv.  Cengiz May Not "Be a Claimant in an Action for Wrongful Death" Under Turkish Law**

Turkey has an interest in applying its laws to this controversy because Khashoggi died in

Turkey (although within a Saudi consulate) and because Cengiz is a Turkish national.  Cengiz

could not bring a claim in Turkey for damages suffered by Khashoggi himself because she is not

one of his heirs.  *See* Varol Decl. ¶¶ 27-28.  Nor could she bring a claim for "material and moral

compensation" based on her alleged expectation of receiving payments from Khashoggi after

their future marriage.  *See id.* ¶¶ 30-38.  Turkish law permits such actions only on a showing that

the decedent was providing the plaintiff with "regular and continuous assistance" before the

death, *id.* ¶ 31, and that the plaintiff's "quality of life" decreased because the decedent's

assistance ceased, *id.* ¶¶ 32-33.  To the extent there is any claim Cengiz might potentially bring

under Turkish law, it would not be a "wrongful death" claim under the TVPA.

Cengiz does not allege that Khashoggi gave her regular and continuous financial

assistance before his death.  She instead alleges that he "purchased an apartment" in which,

"following the confirmation of their marriage," they "planned to hold title . . . jointly," Compl.

¶ 93; that a "condition of the marriage" was that "Mr. Khashoggi *would* provide Plaintiff Cengiz

as a stipend on a regular basis," which he "began immediately," *id.* ¶ 94 (emphasis added); that,

40

"[o]n several occasions," he gave her "financial support," *id.* ¶ 96; and that they "agreed that Mr. Khashoggi *would* regularly provide funds to her . . . while they resided in the United States," *id.* (emphasis added), which was to occur in the future after their marriage, *id.* ¶ 95. Those allegations describe a future expectation of financial support, not existing regular support at the time of Khashoggi's death, and so do not state a claim under Turkish law. *See* Varol Decl. ¶¶ 36-37. Cengiz also does not allege that her standard of living dropped after Khashoggi's death, a necessary element of any claim for lost financial support under Turkish law. *Id.* ¶ 38.

Nor does it help Cengiz that she could potentially bring an action under Turkish law for "material and moral compensation" based on the emotional harm she suffered from Khashoggi's death. *Id.* ¶¶ 39-40. Assuming that Turkish law might permit such a recovery, that would not make her a "person who may be a claimant in an action for wrongful death" within the meaning of TVPA § 2(a). The traditional rule under federal and state law is that recovery in a wrongful-death action is "recovery only for pecuniary loss" and does not include nonpecuniary elements such as emotional harm. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32-33 (1990) (concluding this "pecuniary limitation on damages" was sufficiently "well established" in 1920 that "Congress must have intended to incorporate" it in a statute); *see also*, *e.g.*, *Runyon v. District of Columbia*, 463 F.2d 1319, 1322 (D.C. Cir. 1972) (observing that "[t]he parties . . . recovering" for wrongful death under D.C. law "may not be compensated for their grief"). The TVPA's reference to a "claimant in an action for wrongful death" does not include a non-heir who has a cause of action under foreign law to recover solely emotional damages.

### b.    Should the Court Find a True Conflict, It Should Apply the Laws of Virginia, of Saudi Arabia, or of D.C.

If the Court finds a conflict among the laws of potentially interested jurisdictions on the issue whether Cengiz is an eligible claimant for wrongful death, it should apply the rule

recognized by Virginia, by Saudi Arabia, and by the District of Columbia, which restrict the right to bring a claim arising from an individual's death to a representative of the decedent's heirs or to the heirs themselves.  Those jurisdictions have the strongest interests in determining who has the right to sue on Khashoggi's behalf.

As set forth above, Virginia was (based on the allegations of the Complaint) Khashoggi's domicile at the time of his death.  And, as this Court explained in *Dammarell*, "[t]he claims of a decedent's estate are 'traditionally governed by the laws of the decedent's domicile,' because such an approach 'respects the decedent's deliberate choice to make his or her home in a state and be governed by the laws of that state.' "  2005 WL 756090, at *21 (quoting *In re Aircrash Disaster Near Roselawn, Ind. on Oct. 31, 1994*, 948 F. Supp. 747, 758 (N.D. Ill. 1996)); *accord Haskins v. Midwest Air Traffic Control Serv., Inc.*, 2016 WL 3653531, at *3 (N.D. Ill. July 8, 2016) ("The decedent's domicile has a greater interest in ensuring compensation for the estate than any one beneficiary's domicile.").

Virginia requires wrongful-death actions to be brought by an estate's "executor or administrator," *Woodley*, 777 S.E.2d at 563, who acts as a "trustee for certain statutory beneficiaries," with the "object of . . . compensat[ing] these beneficiaries for their loss occasioned by the decedent's death," *Wilson v. Whittaker*, 154 S.E.2d 124, 128 (Va. 1967).  The list of statutory beneficiaries includes, among others, a "surviving spouse," "children," and "parents," Va. Code § 8.01-53(A)(i)-(iv), but not a fiancée.  If there are no statutory beneficiaries, the recovery from a wrongful-death action goes to the estate.  *See id.* § 8.01-53(A)(v).  That structure centralizes the ability to recover wrongful-death damages in a single named claimant and distributes any award in accordance with legislatively determined priorities.

Cengiz seeks to recover monetary compensation under the ATS and the TVPA for the "physical and mental pain and suffering" that Khashoggi "suffer[ed] . . . before his death." Compl. ¶¶ 170, 178.  She also seeks under her wrongful-death claim to recover monetary compensation for "loss of services and support on which she is dependent," *id.* ¶ 195, which amounts to a claim on a share of Khashoggi's anticipated future income had he not been killed. *See Miles*, 498 U.S. at 35 (explaining that "the support dependents lose . . . would have come from . . . future earnings").  But Virginia's laws give any such rights of recovery to an appointed representative acting on behalf of Khashoggi's statutory beneficiaries, including his surviving children, or alternatively to his estate.  Virginia law coincides on this point with that of Saudi Arabia, the domicile of the heirs; and of D.C., the forum.

The only relevant jurisdiction that would permit Cengiz to bring any form of action arising from Khashoggi's death is Turkey.  As set forth above, any Turkish-law remedy she may have is not a wrongful-death action.  Certainly no such remedy would permit her to recover for Khashoggi's personal suffering, as she seeks to do by means of her ATS and TVPA claims. *See* Varol Decl. ¶¶ 27-28.  Though Turkey may have an interest in seeing its national Cengiz recover her personal damages, *see Dammarell*, 2005 WL 756090, at *21, it has none in her claim that she – as opposed to Khashoggi's Saudi executor and heirs – can bring an action arising from Khashoggi's wrongful death to seek damages unavailable to her under Turkish law.

The factors set forth in § 145 of the Second Restatement, which D.C. courts also consider in a choice-of-law analysis, *see Coleman*, 667 A.2d at 816, do not aid the inquiry.  The "place where the injury occurred," Restatement (Second) of Conflict of Laws § 145(2)(a), is a Saudi consulate in Turkey – where Saudi Arabia has the greatest interest in regulating conduct, though Turkey retains its own jurisdiction.  The "place[s] where the conduct causing the injury

occurred," *id.* § 145(2)(b), include multiple jurisdictions, including Saudi Arabia and Turkey.[39] The "domicile[s], residence[s], [and] nationalit[ies] . . . of the parties," Restatement (Second) of Conflict of Laws § 145(2)(c), include Saudi Arabia, Turkey, and the United States.  And the "place where the relationship, if any, between the parties is centered," *id.* § 145(2)(d), is Saudi Arabia based on Defendants' relationship with Khashoggi.  Defendants have no relationship with the named Plaintiffs.

### B.     Cengiz Has Not Exhausted Adequate and Available Remedies in Turkey

For the reasons already given, Cengiz cannot seek relief for Khashoggi's wrongful death in any court because she is neither his widow nor his heir; and the Crown Prince is not subject to jurisdiction in any court outside Saudi Arabia, where Cengiz declares she will not go because she does not believe she could get a fair trial.  *See* Compl. ¶ 162.[40]  In the alternative, if Cengiz did have a cognizable wrongful-death claim, she would have an available and adequate remedy in the courts of Turkey, which she has failed to exhaust.

The TVPA provides that "[a] court shall decline to hear a [TVPA] claim . . . if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."  TVPA § 2(b), 106 Stat. 73, *reprinted in* 28 U.S.C. § 1350 note.  Here, the Complaint alleges that the conduct giving rise to Cengiz's claims occurred in multiple jurisdictions.  At a minimum, substantial conduct, including Khashoggi's death itself, occurred in Turkey.  Cengiz "has neither alleged nor established that [she] has ever pursued

---

[39] As set forth in Part I, the Complaint does not properly allege that any relevant conduct occurred in the United States, and the evidence is to the contrary.  In the alternative, if the Court accepts Plaintiffs' assertion that "[k]ey steps" in the alleged "conspiracy . . . occurred inside of the United States," Compl. ¶ 40, that would cut in favor of applying D.C. law.

[40] The Crown Prince disputes that the courts of Saudi Arabia are biased or unavailable, but will not argue that point in this motion.

and/or exhausted," *Harbury v. Hayden*, 444 F. Supp. 2d 19, 41 (D.D.C. 2006), *aff'd*, 522 F.3d

413 (D.C. Cir. 2008), remedies in the Turkish courts.  Indeed, she admits she has not, claiming it

would be "futile."  Compl. ¶ 160.

 "A foreign remedy is adequate even if not identical to remedies available in the United

States." *Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1025 (W.D. Wash. 2005), *aff'd*, 503

F.3d 974 (9th Cir. 2007).  "Courts usually find a foreign remedy adequate unless it 'is no remedy

at all.'" *Id*. at 1025-26 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981)).  For

example, a recovery smaller than what the plaintiff "might be able to recover in an American

court . . . does not mean the remedy is so inadequate so as to excuse exhaustion." *Rojas Mamani*

*v. Sanchez Berzain*, 636 F. Supp. 2d 1326, 1331 (S.D. Fla. 2009).  Moreover, remedies are

"available" unless "it is apparent that" pursuing them "would be futile," *Doe v. Exxon Mobil*

*Corp.*, 393 F. Supp. 2d 20, 25 (D.D.C. 2005) ("*Exxon I*"), *appeal dismissed*, 473 F.3d 345 (D.C.

Cir. 2007), or they are "unobtainable" because, *e.g.*, the "country's judicial system is corrupt or

ineffective," *Boniface v. Viliena*, 338 F. Supp. 3d 50, 65, 66 (D. Mass. 2018).

Cengiz's allegation of futility is conclusory, and the sparse facts in the Complaint do not

support it.  *See*, *e.g.*, *Scott v. United States*, 416 F. Supp. 2d 116, 118 (D.D.C. 2006) (dismissing

claims for failure to exhaust administrative remedies because "plaintiffs fail[ed] to allege any

facts that demonstrate futility").  The Complaint alleges that Turkey has brought a criminal

action against Khashoggi's killers and that any civil actions would have to "await the

determination of the material facts by the criminal courts."  Compl. ¶ 161.  It gives a past

example of a five-year delay in another case, *see id.*, but cites nothing to suggest five years is

typical or that a similar delay would likely occur here.

In the similar context of administrative exhaustion, "administrative delay c[an] meet the

futility exception only where it appears that agency inaction is in reality a statement by the

agency of its unwillingness to consider the issue." *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 106 (D.C. Cir. 1986).  Plaintiffs do not allege that the Turkish courts are unwilling to hear Cengiz's claims.[41]  With no allegation of bias or prejudice, Plaintiffs cannot establish futility merely by asserting that the ordinary operation of the Turkish courts – the same courts Cengiz, a Turkish national, would rely on in any other context – would be too slow.

Finally, it is not even clear that the Turkish courts would delay an action by Cengiz against the Crown Prince.  As Professor Varol explains, where a civil case relates to a criminal action but the civil defendant is not named as a criminal defendant, "the judge assigned to the civil case . . . ha[s] broad discretion to proceed with the civil case without awaiting the conclusion of the criminal case."  Varol Decl. ¶ 12.  Cengiz presents no reason to think that a Turkish judge would unfairly or unreasonably exercise such discretion.  She thus cannot bring a TVPA claim here without seeking relief from a Turkish forum.

## IV.    Cengiz Fails To Establish Jurisdiction Under the Alien Tort Statute

The ATS grants federal courts "jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350. The ATS itself is "in terms only jurisdictional," but reflects a legislative "underst[anding] that the district courts w[ill] recognize private causes of action for certain torts in violation of the law of nations."  *Sosa v. Alvarez-Machain*, 542 U.S. 692, 712, 724-25 (2004).  The Supreme Court has cautioned that courts should employ "a restrained conception of the[ir] discretion" in recognizing such actions, *id.*, and that "[e]ach . . . decision[ ]" about "defining a cause of action"

---

[41] To the contrary, they rely on newspaper reports indicating that Cengiz attended the proceedings and quoting praise for the Turkish prosecutions as "'a space where the victims are heard in a way they have never been heard before.'"  Matthew S. Schwartz, *Khashoggi Murder Trial Begins In Turkey*, NPR (July 3, 2020), https://www.npr.org/2020/07/03/887116557/ khashoggi-murder-trial-begins-in-turkey, *cited in* Compl. ¶ 161 n.103.

for violations of human law "carries with it significant foreign policy implications," *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108, 117 (2013).  Here, Cengiz's claim falls outside the narrowly defined ATS cause of action for an extrajudicial killing for two reasons:  because she is not the appropriate plaintiff and because her damages claim for a death in Istanbul reflects an impermissible extraterritorial application of U.S. law.

## A.    Cengiz Is Not an Appropriate Plaintiff To Bring Suit

An ATS claim seeking damages for an extrajudicial killing is a claim "based on harm to a third party."  *Beanal v. Freeport-McMoRan, Inc.*, 969 F. Supp. 362, 368 (E.D. La. 1997) (citing *Xuncax v. Gramajo*, 886 F. Supp. 162, 189 (D. Mass. 1995)), *aff'd*, 197 F.3d 161 (5th Cir. 1999).  Accordingly, the plaintiff must qualify for an exception to the principle that "the plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Warth v. Seldin*, 422 U.S. 490, 499 (1975).  Courts confronting that problem in the ATS context have resolved it by reference to the TVPA, reasoning that the TVPA is the "most analogous federal statute" from which to borrow a legal rule to determine which plaintiffs can sue for an extrajudicial killing.  *Xuncax*, 886 F. Supp. at 191; *see also Estate of Alvarez v. Johns Hopkins Univ.*, 275 F. Supp. 3d 670, 711 (D. Md. 2017) (same); *Beanal*, 969 F. Supp. at 368 (same).  As set forth in Part III.A, Cengiz is not an appropriate plaintiff under the TVPA because she is neither Khashoggi's "legal representative" nor a "person who may be a claimant in an action for [his] wrongful death."  TVPA § 2(a)(2), 106 Stat. 73.  For the same reasons, she is not an appropriate plaintiff for an ATS claim.

## B.    Cengiz's Claims Are Impermissibly Extraterritorial

Like many federal statutes, the ATS only applies domestically.  *See Kiobel*, 569 U.S. at 124.  Accordingly, it creates no cause of action unless "the conduct relevant to the statute's focus

occurred in the United States." *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2101 (2016). "[T]he conduct relevant to [a] statute's focus," *id.*, is "[t]he conduct that [the statute] regulates," *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2138 (2018); *accord Spanski Enters., Inc. v. Telewizja Polska, S.A.*, 883 F.3d 904, 914 (D.C. Cir. 2018) ("[W]e identity the 'conduct relevant to the [statute's] focus' by asking precisely what it is that the [statute] regulates.") (citation omitted).

The ATS regulates and focuses on violations of "specific, universal, and obligatory" norms of international law. *Sosa*, 542 U.S. at 732. The D.C. Circuit and other circuits have recognized ATS liability for aiding and abetting such violations. *See*, *e.g.*, *Doe v. Exxon Mobil Corp.*, 654 F.3d 11, 20 (D.C. Cir. 2011) ("*Exxon II*"), *vacated on other grounds*, 527 F. App'x 7 (D.C. Cir. 2013).[42] Courts have let plaintiffs proceed where they allege conduct that both "constitutes a violation of the law of nations or aiding and abetting such a violation" and also "sufficiently 'touches and concerns' the territory of the United States so as to displace the presumption against extraterritoriality." *Mastafa v. Chevron Corp.*, 770 F.3d 170, 186 (2d Cir. 2014); *see also Adhikari v. Kellogg Brown & Root, Inc.*, 845 F.3d 184, 197 (5th Cir. 2017) (explaining that, where the "conduct that violates international law . . . 'occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory' ") (quoting *RJR Nabisco*, 136 S. Ct. at 2101).

The violation of international law that is the subject of the case – the killing of Jamal Khashoggi – occurred in Saudi Arabia's consulate in Turkey, not in the United States.

---

[42] In two cases currently pending before the Supreme Court, the United States has asked the Court to hold "that aiding and abetting is not cognizable under the ATS." Br. for the United States as Amicus Curiae Supporting Petitioners at 8, *Nestlé USA, Inc. v. Doe I*, Nos. 19-416 & 19-453 (U.S. Sept. 8, 2020), 2020 WL 5498509. If the Court rejects such liability, Cengiz's allegations will even more clearly fail to state an ATS claim.

Khashoggi and the individuals who killed him were Saudi nationals.  The only relevant conduct

alleged in the United States consisted of instructions and assurances that Khashoggi allegedly

received at the Saudi Embassy in Washington, D.C., before his departure for Turkey.  As set

forth in Part I.A, the Embassy allegations are insufficiently pleaded and contrary to evidence.[43]

As further set forth in Part II.B, this Court should not consider claims that depend on the

Embassy allegations because doing so would require the Court to declare invalid an official act

of a foreign sovereign.  Beyond those points, the Embassy allegations do not state a claim for

aiding and abetting a tort in violation of the law of nations.

Conduct aids and abets a violation of international law only if done with "knowledge that

[it] w[ould] assist the perpetrator in the commission of the crime."  *Exxon II*, 654 F.3d at 33-34

(citation omitted).[44]  That knowledge element requires that the U.S.-based actor "actually knew"

both (1) "the intent of the principal perpetrator" and (2) that its conduct would help the principal

perpetrator commit the violation.  *Ofisi v. BNP Paribas, S.A.*, 278 F. Supp. 3d 84, 108-09

(D.D.C. 2017) (Bates, J.), *vacated in part on other grounds*, 285 F. Supp. 3d 240 (D.D.C. 2018);

---

[43] Because the ATS is a jurisdictional statute, whether an application of the ATS is impermissibly extraterritorial goes to subject-matter jurisdiction.  *See Kaplan v. Central Bank of Islamic Republic of Iran*, 896 F.3d 501, 516 (D.C. Cir. 2018) (observing that *Kiobel* "treated extraterritoriality in the ATS context as a jurisdictional matter").  Accordingly, Rule 12(b)(1) applies to the Crown Prince's motion insofar as it seeks to dismiss Cengiz's ATS claim, and this Court may consider the evidentiary materials cited in Part I for that purpose.

[44] The D.C. Circuit partially vacated *Exxon II* "in light of intervening changes in governing law regarding . . . the standard to be applied for aiding and abetting liability."  *Doe v. Exxon Mobil Corp.*, 527 F. App'x 7, 7 (D.C. Cir. 2013) (citing *Prosecutor v. Perišić*, Case No. IT-04-81-T, Judgement (Feb. 28, 2013), https://www.icty.org/x/cases/perisic/acjug/en/130228_ judgement.pdf).  *Perišić* appeared to articulate a "specific direction" element for aiding and abetting, but the International Criminal Tribunal for the former Yugoslavia later "repudiated the *Perišić* decision."  *Doe v. Exxon Mobil Corp.*, 2015 WL 5042118, at *11 (D.D.C. July 6, 2015) ("*Exxon III*").  The aiding-and-abetting standard of *Exxon II* thus "remains unchanged."  *Id.*

*see also Exxon III*, 2015 WL 5042118, at *10 ("A defendant is only liable for aiding and abetting if they know that their acts assist the commission of the principal offense.").

The Embassy allegations do not meet this requirement.  Nowhere does the Complaint allege that Embassy officials or Prince Khalid knew of the alleged plan to kill Khashoggi.  To the contrary, the very newspaper article that Plaintiffs cite for their allegation that Prince Khalid acted at the Crown Prince's direction admits that "[i]t is not clear if [Prince] Khalid knew that Khashoggi would be killed" at the time he gave the alleged assurances.  Shane Harris, Wash. Post, *supra* note 6.  Without any knowing act in the United States, the Complaint does not allege conduct that "touch[es] and concern[s] the territory of the United States . . . with sufficient force to displace the presumption against extraterritorial application."  *Kiobel*, 569 U.S. at 124-25.

## V.      Plaintiffs Have Failed To State Any Non-Federal Claims

Plaintiffs assert five claims that do not arise from federal statute:  (1) tortious interference with contract, Compl. ¶¶ 184-191; (2) wrongful death, *id.* ¶¶ 192-196; (3) intentional infliction of emotional distress, *id.* ¶¶ 197-205; (4) loss of consortium, *id.* ¶¶ 206-212; and (5) loss of society, *id.* ¶¶ 213-218.  If the Court dismisses Plaintiffs' federal claims, it should dismiss their state claims for lack of pendent personal jurisdiction, *see supra* Part I.D, or alternatively should decline to exercise supplemental jurisdiction over them under 28 U.S.C. § 1367(c)(3), as this case is in its earliest stages.  *See Mitchell v. Yates*, 402 F. Supp. 2d 222, 235 (D.D.C. 2005) (declining to exercise supplemental jurisdiction where "discovery . . . ha[d] been minimal" and "in the interests of comity" with the D.C. courts).

To the extent the Court reaches any of these claims, it should apply District of Columbia choice-of-law rules.  Under those rules, for each claim, the court first "'determine[s] whether a "true conflict" exists' between the laws of [potentially relevant] jurisdictions," *APA Assessment*

*Fee Litig.*, 766 F.3d at 51-52, and then, if necessary, resolves the conflict by looking to the "governmental interests" of each jurisdiction and examining "which jurisdiction has the most significant relationship to the dispute," *Coleman*, 667 A.2d at 816.  *See supra* Part III.A.2.

### A.      DAWN Fails To State a Claim for Tortious Interference with Contract

Either the District of Columbia or Turkey would have reasonable interests in applying its law to DAWN's claim for tortious interference with contract.  On the one hand, D.C. is DAWN's principal place of business, and the services Khashoggi was allegedly to perform for DAWN would have been carried out here.  On the other, DAWN's claim arises from the killing in Istanbul of a Saudi national and Virginia resident.  Turkey's interest in deterring such conduct and compensating its victims is stronger than D.C.'s.  Ultimately, the Court need not decide because there is no true conflict:  neither jurisdiction would recognize DAWN's cause of action.

If D.C. law applies, DAWN's claim "fail[s] to state a right of action cognizable at common law" because it "seek[s] damages for the death of another."  *Cole, Raywid & Braverman v. Quadrangle Dev. Corp.*, 444 A.2d 969, 972 (D.C. 1982).  In *Cole*, a law partnership brought tort claims for "economic losses . . . as a result of the death of [its] managing partner" from falling into an elevator shaft.  *Id.* at 970 (describing claims sounding in negligence, breach of warranty, and nuisance).  The D.C. Court of Appeals affirmed the dismissal of those claims as a matter of law, explaining:

> At common law, there existed no right of action to recover damages for the wrongful death of another. . . . This prohibition has been applied uniformly in contract as well as in tort actions.  Thus, any right to recover for the death of another exists by virtue of a statute, or not at all.

*Id.* at 971 (footnote omitted); *see also, e.g.*, *Jones v. Pledger*, 363 F.2d 986, 988 (D.C. Cir. 1966) ("At common law there was no right of action for wrongfully causing the death of another.") (citing *Baker v. Bolton*, 1 Camp. 493, 170 Eng. Rep. 1033 (1808)); *Bowen v. Pan Am. World*

*Airways, Inc.*, 474 F. Supp. 563, 565-66 (S.D.N.Y. 1979) (surveying the law and finding "no case from any jurisdiction" allowing "a cause of action in favor of employers for their injuries arising from the wrongful deaths of their employees").

The law partnership in *Cole* could not assert a statutory wrongful-death claim because it was not the "'personal representative of the deceased person'" and was not suing "for the sole benefit of '[his] spouse and the next of kin.'" 444 A.2d at 971 (quoting D.C. Code §§ 16-2701, 16-2702). Accordingly, "even though [its] complaint was couched in terms of negligence, breach of warranty, and nuisance, and reference to the wrongful death statute was omitted," the partnership was "nevertheless seeking damages for the death of another," and its claims were barred by the common law rule. *Id.* at 972. That holding controls here. Like the partnership in *Cole*, DAWN seeks to recover economic losses for an individual's death under a common law tort theory. Like the partnership in *Cole*, DAWN cannot bring a statutory wrongful-death action because it is not Khashoggi's personal representative and does not seek to benefit his spouse or next of kin. Accordingly, DAWN fails to state a claim. *See id.*

In addition, DAWN also fails to allege the required elements for intentional interference with contract. A plaintiff bringing such a claim "must allege 'four elements . . . : (1) existence of a contract; (2) knowledge of the contract; (3) intentional procurement of breach by the defendant; and (4) damages resulting from the breach.'" *Lannan Found. v. Gingold*, 300 F. Supp. 3d 1, 29 (D.D.C. 2017) (quoting *Dean v. Walker*, 876 F. Supp. 2d 10, 14 (D.D.C. 2012)). Here, DAWN fails to allege facts showing that the Crown Prince knew of Khashoggi's contract with DAWN or intended to disrupt it.

*First*, the Complaint fails adequately to allege that any Defendant knew of Khashoggi's contractual relationship with DAWN. Its attempt to do so relies on the allegation that

Defendants "learned of Mr. Khashoggi's activities with DAWN by hacking the phone of his friend and colleague Omar Abdulaziz." Compl. ¶ 74.[45]  According to the Complaint, Khashoggi and Abdulaziz had "extensive discussions" about "human rights issues" and "various projects to strengthen human rights," *id.* ¶ 77, including "Khashoggi's . . . position with . . . DAWN," *id.* ¶ 78.  If further alleges that, "[i]n June of 2018, on information and belief, an operator working on behalf of Defendants infected Mr. Abdulaziz's cell phone with Pegasus spyware." *Id.* ¶ 79. That software allegedly "allowed Defendants to access" the contents of the phone and "spy on" Abdulaziz, after which the Complaint asserts "there is no question . . . Defendants were aware or became aware of Mr. Khashoggi's contractual relationship with DAWN." *Id.* ¶¶ 79-80.

The Complaint's allegation that whoever infected Abdulaziz's phone was "working on behalf of Defendants," *id.* ¶ 79, is "no more than [a] conclusion[]" and is "not entitled to the assumption of truth," *Iqbal*, 556 U.S. at 679.  There is also no specific allegation that Khashoggi ever mentioned his employment contract with DAWN.  The only specific communication about DAWN alleged, presumably Plaintiffs' best example, is from March 2018, and the contract was not signed until June.  *Compare* Compl. ¶ 63 *with id.* ¶ 78.  Thus, Plaintiffs ask the Court to infer without specific facts that (1) the unnamed "operator," *id.* ¶ 79, who infected Abdulaziz's phone was working for Defendants; (2) at some unidentified time in or after June 2018, Khashoggi communicated with Abdulaziz about his contract with DAWN; (3) the operator accessed that particular communication; and (4) the operator communicated that information to Defendants. With so many leaps required, the assertion that "there is no question . . . Defendants were aware or became aware" of the contract, *id.* ¶ 80, is an "unreasonable inference," *Kareem v. Haspel*,

---

[45] The Complaint also asserts vaguely that "Defendants would not have had difficulty learning of Mr. Khashoggi's involvement in DAWN because Mr. Khashoggi openly discussed his activities with many members of the community." Compl. ¶ 74.  An allegation that Defendants "would not have had difficulty learning" a fact is not an allegation of knowledge.

986 F.3d 859, 868-69 (D.C. Cir. 2021), that need not be accepted on motion to dismiss.

*Second*, the Complaint lacks any basis for imputing knowledge of Khashoggi's contract to the Crown Prince personally, as needed to hold him personally liable.  The Complaint's sole reference to the Crown Prince's supposed knowledge of Khashoggi's involvement with DAWN – or even of DAWN's existence – is conclusory.  *See* Compl. ¶ 3 ("[the Crown Prince], other Defendants, and their co-conspirators discovered Mr. Khashoggi's plans to utilize DAWN as a platform to espouse democratic reform and promote human rights").  The mere allegation that the Crown Prince conspired with other Defendants is not enough to attribute to him their supposed knowledge of the contract.  *See Nyambal v. AlliedBarton Sec. Servs., LLC*, 153 F. Supp. 3d 309, 316 (D.D.C. 2016) (explaining that a plaintiff "cannot rely on [a] civil conspiracy theory to impute knowledge of [its] business relationships from [one conspirator] to [another] to state a tortious interference claim").

*Third*, the Complaint fails to "plead . . . a 'strong showing of intent to disrupt'" DAWN's alleged contract with Khashoggi.  *Nanko Shipping, USA v. Alcoa, Inc.*, 107 F. Supp. 3d 174, 182-83 (D.D.C. 2015) (quoting *Bell v. Ivory*, 966 F. Supp. 23, 31 (D.D.C. 1997), *aff'd*, 1998 WL 388499 (D.C. Cir. May 13, 1998) (per curiam) (judgment noted at 159 F.3d 635 (table)), *rev'd on other grounds and remanded*, 850 F.3d 461 (D.C. Cir. 2017).  Mere "'general intent to interfere . . . is insufficient.'"  *Libya v. Miski*, 889 F. Supp. 2d 144, 157 (D.D.C. 2012) (quoting *Bennett Enters., Inc. v. Domino's Pizza, Inc.*, 45 F.3d 493, 499 (D.C. Cir. 1995)).  The inference that the Crown Prince even knew of DAWN's contract is already unreasonable.  The further inference that he allegedly targeted Khashoggi from a "'[m]otive or purpose to disrupt'" that contract, *Marshall v. Allison*, 908 F. Supp. 2d 186, 202 (D.D.C. 2012) (quoting *Genetic Sys. Corp. v. Abbott Labs.*, 691 F. Supp. 407, 422-23 (D.D.C. 1988)), *aff'd*, 554 F. App'x 20 (D.C. Cir. 2014) (per curiam), is doubly so.

For all these reasons, DAWN's claim does not fit within the cause of action for tortious interference with contract recognized by D.C. courts.  Plaintiffs' attempt to repurpose a business tort premised on "the recognition that economic relations are entitled to protection," William Prosser, *Handbook of the Law of Torts* § 129, at 927 (4th ed. 1971), as a measure for protecting political advocacy is creative.  But creativity is not a virtue when a federal court applies the common law.  *See Pitt v. District of Columbia*, 491 F.3d 494, 507 (D.C. Cir. 2007) ("[I]n considering common law claims, federal courts must apply existing law – [they] have no power to alter or expand the scope of D.C. tort law.").  An intentional killing, allegedly for the purpose of "silenc[ing] dissent[ ]," Compl. ¶ 69, may well give rise to civil claims by a proper plaintiff in a proper forum.  Tortious interference with contract is not among them.

If Turkish law applies, the analysis is much shorter.  "Turkish law . . . does not recognize a claim for tortious interference with contract."  Varol Decl. ¶ 46.  An interested jurisdiction's decision not to recognize a particular cause of action is as much a policy choice as its decision to recognize one.  *See APA Assessment Fee Litig.*, 766 F.3d at 53 ("[A] rule of non-liability—reflecting a legislative purpose to protect defendants from litigation—can be owed 'the same consideration in the choice-of-law process as is a rule which imposes liability.'") (quoting Restatement (Second) of Conflict of Laws § 145 cmt. c (1971)).

## B.    Cengiz Fails To State a Claim for Wrongful Death

Cengiz's claim for wrongful death would likewise fail under the law of any applicable jurisdiction.  As set forth in addressing her TVPA claim, there are at least four jurisdictions with a potential interest in the law governing a wrongful-death action:  Virginia, Saudi Arabia, the District of Columbia, and Turkey; but Cengiz is not the appropriate plaintiff to bring an action for wrongful death under the laws of any of those jurisdictions because she is neither

Khashoggi's personal representative nor among his heirs.  *See supra* Part III.A.2.  Her non-TVPA wrongful-death claim, *see* Compl. ¶¶ 192-196, fails for the same reasons.

In addition, any wrongful-death claim Cengiz could bring would be time-barred.  The District of Columbia's choice-of-law rule for statutes of limitations, which governs here, is generally to apply its own limitations period.  *See Jones v. Kirchner*, 835 F.3d 74, 81 (D.C. Cir. 2016) ("Consulting the 'D.C. choice-of-law rules, we see that they treat statutes of limitations as procedural, and therefore [ordinarily] mandate application of the District's own statute of limitations.'") (quoting *A.I. Trade*, 62 F.3d at 1458) (alteration in *Jones*); *Reeves v. Eli Lilly & Co.*, 368 F. Supp. 2d 11, 25-27 (D.D.C. 2005) (examining this "established rule").  Accordingly, regardless of which jurisdiction's law otherwise governs a claim for Khashoggi's wrongful death, D.C.'s limitations period determines that claim's timeliness.  Wrongful-death claims in D.C. must "be brought . . . within 2 years after the death of the person injured."  D.C. Code § 16-2702.  Khashoggi died on October 2, 2018, *see* Compl. ¶ 1, more than two years before Cengiz filed this lawsuit on October 20, 2020.

**C.    Cengiz Fails To State Any Additional Common Law Claims**

Cengiz attempts to plead three additional common law claims:  intentional infliction of emotional distress, loss of consortium, and loss of society.  To the extent they existed, such claims would likely be governed by Turkish law because Turkey has the strongest interest in compensating Cengiz, a Turkish national, for injuries suffered in Turkey.  But intentional infliction of emotional distress, loss of consortium, and loss of society are not recognized claims under Turkish law.  *See* Varol Decl. ¶¶ 41-44.  Accordingly, those claims should be dismissed.[46]

---

[46] As discussed in Part III.A.2.a.iv, Turkish law recognizes a claim for "material and moral compensation" arising out of the death of a person to whom the plaintiff has formed a close emotional relationship.  To the extent Cengiz intends to plead such a claim, the Crown

If D.C. law applies, Cengiz's claims are barred by the rule that an action "seeking damages for the death of another" is not "cognizable at common law." *Cole*, 444 A.2d at 972; *see supra* Part V.A. Each of her common law claims relies on Khashoggi's death and seeks damages arising from Khashoggi's death. *See* Compl. ¶¶ 200-201, 203, 209-210, 216. In the District of Columbia, "any right to recover for the death of another exists by virtue of a statute, or not at all." *Cole*, 444 A.2d at 971; *see also Joy v. Bell Helicopter Textron, Inc.*, 999 F.2d 549, 565-67 (D.C. Cir. 1993) (rejecting damages for "loss of consortium" under D.C. wrongful-death statute and noting that no such action would have been available at common law); *Ciarrocchi v. James Kane Co.*, 116 F. Supp. 848, 850 (D.D.C. 1953) ("At common law, a wife has no right of action for loss of consortium or other injury on account of the death of her husband by wrongful act."). In addition, Cengiz fails to plead elements of each common law cause of action.

### 1.      Cengiz Fails To State a Claim for Intentional Infliction of Emotional Distress

Under D.C. law, a claim of intentional infliction of emotional distress requires a plaintiff to prove "'(1) extreme and outrageous conduct on the part of the defendants, which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress.'" *Williams v. District of Columbia*, 9 A.3d 484, 493-94 (D.C. 2010) (quoting *Futrell v. Department of Labor Fed. Credit Union*, 816 A.2d 793, 808 (D.C. 2003)). To determine liability for intentional infliction of emotional distress ("IIED"), D.C. courts follow the Restatement (Second) of Torts (1965). *See Republic of Sudan v. Owens*, 194 A.3d 38, 41 (D.C. 2018) ("[T]his court has embraced the Restatement Second's approach to IIED liability.").

---

Prince relies on his arguments set forth in Parts I and II that the Court lacks personal and subject-matter jurisdiction (or should decline to exercise supplemental jurisdiction) and that the case should be dismissed under the act of state doctrine or because a necessary party cannot be joined. Alternatively, to the extent Cengiz contends that such a claim constitutes a claim for "wrongful death" (which it does not), it would be time-barred under D.C. Code § 16-2702.

Under the Second Restatement, where the conduct giving rise to liability "is directed at a third person," the defendant is liable only if he "intentionally or recklessly causes severe emotional distress (a) to a member of such person's immediate family who is present at the time, whether or not such distress results in bodily harm, or (b) to any other person who is present at the time, if such distress results in bodily harm."  Restatement (Second) of Torts § 46(2).  That rule governs Cengiz's claim for intentional infliction of emotional distress here because she asserts the claim based on conduct directed not at her, but at Khashoggi.  *See, e.g.*, Compl. ¶ 201. Applying the Second Restatement, the Complaint fails to state a claim for intentional infliction of emotional distress for two reasons.

*First*, § 46(2) provides that a claim for intentional infliction of emotional distress based on conduct "directed at a third person" lies only if the plaintiff was "present at the time" of the conduct.  Restatement (Second) of Torts § 46(2); *see Owens*, 194 A.3d at 42 (relying on § 46(2)(a) to "hold that, as a general matter, to recover for IIED, a plaintiff whose emotional distress arises from harm suffered by a member of his or her immediate family must be 'present' when the harm" is inflicted).[47]  Because Cengiz "waited outside" when Khashoggi entered the consulate on October 2, 2018, Compl. ¶ 119, she was not "present" when his killing took place. Accordingly, she cannot recover for intentional infliction of emotional distress.[48]

---

[47] In *Owens*, the D.C. Court of Appeals recognized an exception to the presence requirement, but expressly limited that exception to cases meeting the requirements of 28 U.S.C. § 1605A, the exception to foreign sovereign immunity for state sponsors of terrorism.  *See* 194 A.3d at 42-45.  As set forth in Part II.C.2, the requirements of § 1605A are not met here.

[48] *See, e.g.*, *Taylor v. Albert Einstein Med. Ctr.*, 750 A.2d 650, 652-53 (Pa. 2000) (barring IIED claim based on child's death during a medical procedure because child's mother "remained in a hospital waiting room and a hallway" while the procedure occurred); *see also Becker v. Wells Fargo Bank NA, Inc.*, 2014 WL 3891933, at *17 (E.D. Cal. Aug. 7, 2014) (rejecting IIED claim because "[t]he events plaintiff claims to have been 'present' for were not the alleged outrageous event"), *report and recommendation adopted*, 2014 WL 12773790 (E.D. Cal. Sept. 9, 2014), *aff'd*, 672 F. App'x 660 (9th Cir. 2016).

*Second*, each clause of § 46(2) imposes a requirement that Cengiz cannot meet.  She cannot state a claim under § 46(2)(a) because she was not a member of Khashoggi's "immediate family."  *See Jenco v. Islamic Republic of Iran*, 154 F. Supp. 2d 27, 36 n.8 (D.D.C. 2001) (defining "immediate family" under § 46(2) as one's "spouse, parents, siblings, and children"), *aff'd sub nom. Bettis v. Islamic Republic of Iran*, 315 F.3d 325 (D.C. Cir. 2003).  Cengiz was not Khashoggi's spouse at the time of his death, *see supra* Part III.A.1, and therefore was not a member of his immediate family.

Cengiz also cannot state a claim under § 46(2)(b) because she does not allege that her distress over Khashoggi's death "result[ed] in bodily harm" to her.  Although she alleges she has experienced "difficulty sleeping" as a result of the murder, Compl. ¶ 157, loss of sleep is not "bodily harm" as defined by the Second Restatement.  *See* Restatement (Second) of Torts § 15 (defining "[b]odily harm" as "any physical impairment of the condition of another's body, or physical pain or illness"); *see also*, *e.g.*, *Muchow v. Lindblad*, 435 N.W.2d 918, 922 (N.D. 1989) (holding that "loss of sleep and weight" was "a transitory physical phenomenon" and not "bodily harm" as required to support recovery for negligent infliction of emotional distress).

## 2.    Cengiz Fails To State a Claim for Loss of Consortium or Loss of Society

Under D.C. law, a claim for loss of consortium allows one spouse to recover damages for "affection, companionship, sexual relations, and the customary amenities of married life" caused by injury to another spouse.  *Curry v. Giant Food Co. of D.C.*, 522 A.2d 1283, 1294 (D.C. 1987).  "[C]ourts of this country have unanimously held that the existence of a lawful marital relationship at the time of the tortious conduct . . . is required before the other spouse can bring an action for loss of consortium."  *Stager v. Schneider*, 494 A.2d 1307, 1315 (D.C. 1985); *see also Gilbert v. Washington Metro. Area Trans. Auth.*, 1991 WL 221158, at *2 (D.D.C. Oct. 9,

1991) ("Even engagement at the time of injury . . . is insufficient.").  Because Cengiz was not

Khashoggi's spouse at the time of his death, she cannot recover for loss of consortium.

The Complaint also purports to allege a separate claim for "loss of society."  Compl.

¶¶ 213-218.  But "loss of consortium . . . encompasses loss of society," *Sea-Land Servs., Inc. v.

Gaudet*, 414 U.S. 573, 589 (1974), in that "[t]he term 'society'" merely refers to the

nonpecuniary "benefits each family member receives from the others' continued existence,

including love, affection, care, attention, companionship, comfort, and protection," *id.* at 585.

D.C. courts have recognized "loss of society" as a component of loss of consortium, rather than a

separate claim.  *See*, *e.g.*, *Crowley v. North Am. Telecomms. Ass'n*, 691 A.2d 1169, 1175 (D.C.

1997) (loss of consortium claim compensates "an actual loss of society incident to the marriage

result[ing] from tortious conduct of another").[49]  Accordingly, "loss of society" is not a distinct

cause of action from loss of consortium, as Plaintiffs appear to acknowledge.  *See*, *e.g.*, Compl.

¶ 211 (alleging a claim for loss of consortium based on, *inter alia*, the "loss of . . . society . . .

that [Cengiz] previously enjoyed with Mr. Khashoggi").  Accordingly, the same reasons that

Cengiz cannot recover for loss of consortium also bar her attempt to recover for loss of society.

## CONCLUSION

The Court should dismiss Plaintiffs' claims against the Crown Prince for lack of personal

jurisdiction, lack of subject-matter jurisdiction, failure to join a party, and failure to state a claim.

---

[49] *See also Miango v. Democratic Republic of Congo*, 288 F. Supp. 3d 117, 127 (D.D.C. 2018) (loss of consortium claim compensates "the loss of society . . . suffered by the marital unit") (citation omitted), *vacated on other grounds*, 2019 WL 2191806 (D.D.C. Jan. 19, 2019) & 2020 WL 3498586 (D.D.C. June 29, 2020), *appeal pending*, No. 20-5244 (D.C. Cir.); *Hitaffer v. Argonne Co.*, 183 F.2d 811, 816 (D.C. Cir. 1950) (loss of consortium claim compensates a wife's "right to the conjugal society of her husband"), *overruled in part on other grounds by Smither & Co. v. Coles*, 242 F.2d 220 (D.C. Cir. 1957).

Dated:   June 4, 2021                    Respectfully submitted,

                                         /s/ *Michael K. Kellogg*
                                         Michael K. Kellogg (DC 372049)
                                         Gregory G. Rapawy (DC 493973)
                                         Andrew C. Shen (DC 500071)
                                         KELLOGG, HANSEN, TODD, FIGEL
                                           & FREDERICK, P.L.L.C.
                                         1615 M Street, N.W., Suite 400
                                         Washington, D.C. 20036
                                         (202) 326-7900

                                         *Attorneys for Defendant*
                                         *Mohammed bin Salman bin Abdulaziz Al Saud*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 4, 2021, I electronically filed the foregoing DEFENDANT

MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD'S MOTION TO DISMISS,

using the ECF system, which sent notice of filing in this matter to all counsel of record.


*/s/ Michael K. Kellogg*
Michael K. Kellogg
*Attorney for Defendant*
*Mohammed bin Salman bin Abdulaziz Al Saud*