# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HATICE CENGIZ, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:20-cv-03009 |
| MOHAMMED BIN SALMAN, *et al.*, | |
| *Defendants*. | |

## <u>OPPOSITION TO DEFENDANTS' MOTION TO DISMISS</u>

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

FACTUAL BACKGROUND ........................................................................................2

ARGUMENT ...............................................................................................................6

I.     THIS COURT HAS PERSONAL JURISDICTION. .........................................6

     A.     This Court has personal jurisdiction over MBS because the suit arises out of and relates to his contacts with the United States...................................6

          1.     By instructing KBS to deceive Khashoggi, MBS purposefully directed his activities to the United States. ...................................6

          2.     MBS's declarations do not undermine Plaintiffs' prima facie case..........11

          3.     At a minimum, jurisdictional discovery is necessary. ...............................15

     B.     This Court has personal jurisdiction over MBS because his actions were aimed at the United States.......................................................................18

          1.     By targeting Khashoggi's speech in the United States, MBS subjected himself to the jurisdiction of American courts. .........................18

     C.     Exercising jurisdiction would be consistent with notions of fair play and substantial justice. ......................................................................................23

     D.     The Court has pendent jurisdiction over the state-law claims. ..............................24

     E.     The Court has personal jurisdiction over Al-Qahtani and Al-Assiri. ...................25

II.     MBS IS NOT PROTECTED BY HEAD-OF-STATE IMMUNITY. ..............................27

III.     DEFENDANTS ARE NOT PROTECTED BY THE ACT OF STATE DOCTRINE. ...............................................................................................................32

IV.     THIS SUIT SHOULD NOT BE DISMISSED BASED ON SAUDI ARABIA'S SOVEREIGN IMMUNITY. .......................................................................................37

V.     CENGIZ STATES A TVPA CLAIM. .............................................................................42

     A.     Cengiz is a "person who may be a claimant in an action for wrongful death." .........................................................................................................43

          1.     Turkish law applies. ..........................................................................43

          2.     Under Turkish law, Cengiz may sue for wrongful death...........................46

               a.     Under Turkish law, Cengiz is eligible to bring a wrongful death action seeking compensation for her emotional injury. ...............................................................................46

   b. Under Turkish law, Cengiz is eligible to bring an action for pecuniary damages. ........................................................................48

 B. MBS has not adequately proven non-exhaustion ...................................50

 C. The TVPA permits secondary liability. ...............................................55

 D. Cengiz adequately pleads a TVPA claim against Al-Qahtani and Al-Assiri .........57

VI. CENGIZ STATES AN ATS CLAIM. .................................................................59

VII. DAWN STATES A TORTIOUS-INTERFERENCE CLAIM. .......................................62

 1. D.C. law applies to DAWN's tortious-interference claim. ........................62

 2. DAWN's claim is not barred by *Cole*. ....................................................63

 3. DAWN's allegations are sufficiently specific to state a claim. .................65

VIII. CENGIZ HAS STATED COMMON-LAW CLAIMS. ...............................................69

CONCLUSION ........................................................................................................70

# TABLE OF AUTHORITIES*

CASES

*Agudas Chasidei Chabad of United States v. Russian Federation*, 528 F.3d 934
(D.C. Cir. 2008) ...........................................................................................................35

*Aldossari ex rel. Aldossari v. Ripp*, No. 20-3187, __ F. Supp. 3d __, 2021 WL
1819699 (E.D. Pa. May 6, 2021), *appeal docketed*, No. 21-2080 (3d Cir. June
9, 2021) .......................................................................................................................29

*American Oversight v. United States Department of Veterans Affairs*, 498 F. Supp.
3d 145 (D.D.C. 2020) .................................................................................................13

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140 (2d Cir. 2011).....................10

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) .......................................32

*Banneker Ventures, LLC v. Graham*, 798 F.3d 1119 (D.C. Cir. 2015) ..................64, 65

*Beech Aircraft Corp. v. Rainey*, 488 U.S. 153 (1988) ...................................................8

*Boniface v. Viliena*, 338 F. Supp. 3d 50 (D. Mass. 2018)........................................39, 51

*Bortell v. Eli Lilly & Co.*, 406 F. Supp. 2d 1 (D.D.C. 2005) .......................................16

* *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 (1985).......................................10, 23

*Cabello v. Fernandez-Larios*, 402 F.3d 1148 (11th Cir. 2005) ..............................56, 57

* *Calder v. Jones*, 465 U.S. 783 (1984)......................................................................18

*Casey v. McDonald's Corp.*, 880 F.3d 564 (D.C. Cir. 2018) ......................................45

*Central Bank of Denver N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164
(1994) ......................................................................................................................56-57

*In re Chiquita Brands International, Inc. Alien Tort Statute & Shareholder
Derivative Litigation*, 190 F. Supp. 3d 1100 (S.D. Fla. 2016)................................51

*Cole, Raywid & Braverman v. Quadrangle Development Corp.*, 444 A.2d 969
(D.C. 1982) ............................................................................................................63, 64

*Collett v. Socialist Peoples' Libyan Arab Jamahiriya*, 362 F. Supp. 3d 230 (D.D.C.
2005) .....................................................................................................................50, 53

---

* Authorities upon which we chiefly rely are marked with an asterisk.

*Cronin v. Adam A. Weschler & Son, Inc.*, 904 F. Supp. 2d 37 (D.D.C. 2012) ............................38

*Dammarell v. Islamic Republic of Iran*, No. Civ.A. 01-2224, 2005 WL 756090
(D.D.C. Mar. 29, 2005) ............................................................................................44, 45

*de Csepel v. Republic of Hungary*, No. 1:10-CV-01261, 2020 WL 2343405 (D.D.C.
May 11, 2020), *appeal docketed*, No. 20-7047 (D.C. Cir. June 10, 2020) ......................40, 42

* *Doe v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011), *vacated*, 527 F. App'x
7 (D.C. Cir. 2013) .........................................................................................55, 56, 57

*Doe v. Exxon Mobil Corp.*, No. 01–1357, 2015 WL 5042118 (D.D.C. July 6,
2015) ...............................................................................................................56, 60, 61

*Estate of Domingo v. Marcos*, No. C82-1055V, 1983 WL 482332 (W.D. Wash.
July 14, 1983).................................................................................................................30

*Embassy of the Federal Republic of Nigeria v. Ugwuonye*, 901 F. Supp. 2d 136
(D.D.C. 2012) ................................................................................................................46

*Enahoro v. Abubakar*, 408 F.3d 877 (7th Cir. 2005) ...................................................51

*FC Investment Group LC v. Lichtenstein*, 441 F. Supp. 2d 3 (D.D.C. 2006) ...............................10

*Fiorentine v. Sarton Puerto Rico, LLC*, 486 F. Supp. 3d 377 (D.D.C. 2020) ...................................7

*Fisher v. Great Socialist People's Libyan Arab Jamahiriya*, 541 F. Supp. 2d 46
(D.D.C. 2008) ................................................................................................................43

*Flemmings v. District of Columbia*, 719 A.2d 963 (D.C. 1998)....................................................70

*Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020)........................................44

*Ford Motor Co. v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017
(2021)............................................................................................................................26

*Gensetix, Inc. v. Board of Regents of University of Texas System*, 966 F.3d 1316
(Fed. Cir. 2020)......................................................................................................40, 42

*Gonzalez-Vera v. Kissinger*, No. 02–02240, 2004 WL 5584378 (D.D.C. Sept. 17,
2004), *aff'd*, 449 F.3d 1260 (D.C. Cir. 2006) .........................................................57

*In re Grand Jury Investigation*, 916 F.3d 1047 (D.C. Cir. 2019)................................................57

*GTE New Media Services Inc. v. Bellsouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000)....................15

* *Hassen v. Nahyan*, No. CV 09-01106, 2010 WL 9538408 (C.D. Cal. Sept. 17,
2010) .....................................................................................................................20, 29

*Hourani v. Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015) ...........................................................34, 35, 36

*IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95 (D.D.C. 2018)............................................24

*Jara v. Nunez*, No. 6:13-cv-1426-ORL37, 2014 WL 12623015 (M.D. Fla. June 30, 2014) .................................................................................................................................43

*Jean v. Dorelien*, 431 F.3d 776 (11th Cir. 2005) ........................................................................51

*Jimenez v. Aristeguieta*, 311 F.2d 547 (5th Cir. 1962) ...............................................................33

*Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995)...........................................................................33

*Kareem v. Haspel*, 986 F.3d 859 (D.C. Cir. 2021) ......................................................................65

*Kashef v. BNP Paribas S.A.*, 925 F.3d 53 (2d Cir. 2019) .......................................................32, 33

*Kilroy v. Windsor*, No. 78-291, 1978 U.S. Dist. LEXIS 20419 (N.D. Ohio Dec. 7, 1978) .................................................................................................................................30

*Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108 (2013).........................................................59, 60

*Estate of Klieman ex rel. Kesner v. Palestinian Authority*, 923 F.3d 1115 (D.C. Cir. 2019), *summarily vacated*, 140 S. Ct. 2713 (2020), *reinstated in part*, 820 F. App'x 11 (D.C. Cir. Aug. 18, 2020) .....................................................................21, 22

*Kline v. Kaneko*, 535 N.Y.S.2d 303 (N.Y. Sup. Ct. 1988), *aff'd*, 546 N.Y.S.2d 506 (App. Div. 1989) .................................................................................................................30

*In re Korean Air Lines Disaster of September 1, 1983*, 932 F.2d 1475 (D.C. Cir. 1991) ...................................................................................................................................8

*Letelier v. Republic of Chile*, 488 F. Supp. 665 (D.D.C. 1980)...................................................35

*Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 156 (2020) ..................................................................................................................................27

*Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201 (2d Cir. 2016) ...................................61, 62

*Livnat v. Palestinian Authority*, 851 F.3d 45 (D.C. Cir. 2017)...........................................7, 10, 21

*Lizarbe v. Rondon*, 642 F. Supp. 2d 473 (D. Md. 2009), *aff'd in part*, 402 F. App'x 834 (4th Cir. 2010).................................................................................................51, 52, 53, 54

*MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894 (6th Cir. 2017) ........................................21

*Mamani v. Berzain*, 21 F. Supp. 3d 1353 (S.D. Fla. 2014), *aff'd in part*, 825 F.3d 1304 (11th Cir. 2016)........................................................................................................53, 54

*Manoharan v. Rajapaksa*, 711 F.3d 178 (D.C. Cir. 2013) ...........................................................28

*Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990) ......................................................................48

*Moattar v. Foxhall Surgical Associates*, 694 A.2d 435 (D.C. 1997)..........................................64

*Mohamad v. Palestinian Authority*, 566 U.S. 449 (2012) ..........................................................57

* *Mwani v. Bin Laden*, 417 F.3d 1 (D.C. Cir. 2005).......................................7, 8, 11, 20, 22, 24

*Mwani v. bin Laden*, 947 F. Supp. 2d 1 (D.D.C. 2013) ..............................................................61

*Nader v. Democratic National Committee*, 567 F.3d 692 (D.C. Cir. 2009) ................................67

*In re Nahyan*, 485 F. App'x 859 (9th Cir. 2012) .......................................................................20

*Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461 (D.C. Cir. 2017)....................................39, 41

*Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021) ................................................................60, 61

*Nnaka v. Federal Republic of Nigeria*, 238 F. Supp. 3d 17 (D.D.C. 2017), *aff'd*,
        756 F. App'x 16 (D.C. Cir. 2019)......................................................................................34

*Nyambael v. AlliedBarton Security Services, LLC*, 153 F. Supp. 3d 309 (D.D.C.
        2016), *on reconsideration*, 344 F. Supp. 3d 183 (D.D.C. 2018) ....................................67, 68

*Ofisi v. Al Shamal Islamic Bank*, No. 15-2010, 2019 WL 1255096 (D.D.C. Mar. 19,
        2019) ...............................................................................................................................15

*Oveissi v. Islamic Republic of Iran*, 573 F.3d 835 (D.C. Cir. 2009) ..........................................44

*Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008) .............................................38, 40, 42

*Runyon v. District of Columbia*, 463 F.2d 1319 (D.C. Cir. 1972)..............................................48

*Samantar v. Yousuf*, 560 U.S. 305 (2010)................................................................................28

*Shatsky v. Palestine Liberation Organization*, 955 F.3d 1016 (D.C. Cir. 2020)..........................22

*Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190 (D.D.C. 2014) ....................................................31

*Texas Trading & Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300 (2d
        Cir. 1981), *overruled by Frontera Resources Azerbaijan Corp. v. State Oil Co.
        of Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009)............................................................30

*TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1 (D.D.C. 2013), *aff'd*, No. 14-
        7036, 2015 WL 3653187 (D.C. Cir. June 9, 2015)..................................................................38

*United States ex rel. Cimino v. International Business Machines Corp.*, 3 F.4th 412 (D.C. Cir. 2021) ...................................................................................................66

*United States v. Sum of $70,990,605*, 234 F. Supp. 3d 212 (D.D.C. 2017)....................................34

*United States v. Sum of $70,990,605*, 4 F. Supp. 3d 189 (D.D.C. 2014).......................................37

*Urquhart-Bradley v. Mobley*, 964 F.3d 36 (D.C. Cir. 2020) ...........................................................8

*Vann v. United States Department of Interior*, 701 F.3d 927 (D.C. Cir. 2012)............................40

*Villoldo v. Castro Ruz*, 821 F.3d 196 (1st Cir. 2016) ....................................................................35

\* *W.S. Kirkpatrick & Co., Inc. v. Environmental Tectonics Corp., International*, 493 U.S. 400 (1990)..............................................................................................32, 36, 37

*Walden v. Fiore*, 571 U.S. 277 (2014).....................................................................................20, 21

*Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801 (E.D. Va. 2007) ...............................................10

*Warfaa v. Ali*, 33 F. Supp. 3d 653 (E.D. Va. 2014), *aff'd*, 811 F.3d 653 (4th Cir. 2016) ................................................................................................................................33

*Weil v. Seltzer*, 873 F.2d 1453 (D.C. Cir. 1989) ...........................................................................45

*Whitt v. American Property Construction, P.C.*, 157 A.3d 196 (D.C. 2017) .........................65, 68

*Wiwa v. Royal Dutch Petroleum Co.*, No. 96 CIV. 8386, 2002 WL 319887 (S.D.N.Y. Feb. 28, 2002) .........................................................................................55

*Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012) ......................................................................28

*Xuncax v. Gramajo*, 886 F. Supp. 162 (D. Mass. 1995).................................................................53

**STATUTES**

28 U.S.C. § 1350.......................................................................................................................33, 59

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73..........33, 39, 42, 50, 55

D.C. Code § 16-2701 .......................................................................................................................46

Md. Code Ann. Cts. & Jud. Pro. § 3-904(d) ..................................................................................47

Va. Code Ann. § 8.01-52 .................................................................................................................47

**LEGISLATIVE MATERIALS**

S. Rep. No. 102-249 (1991).......................................................................................................51, 55

OTHER AUTHORITIES

32 C.F.R. § 1703.4 ............................................................................................16

32 C.F.R. § 1905.4 ............................................................................................16

*Apex Global Management Ltd. v. Fi Call Ltd.*, [2013] EWHC 587 (Ch) ..............................30, 31

*Black's Law Dictionary* (11th ed. 2019) ..................................................................47

Fed. R. Civ. P. 4(k)(2) .......................................................................................6

Fed. R. Civ. P. 19(a)(1)(B) ..................................................................................38

Fed. R. Civ. P. 19(b) .........................................................................................38

Fed. R. Civ. P. 19(b)(1) .....................................................................................39

Fed. R. Civ. P. 19(b)(2) .....................................................................................41

Fed. R. Civ. P. 19(b)(3) .....................................................................................41

Fed. R. Civ. P. 19(b)(4) .....................................................................................42

Fed. R. Evid. 803(8) ...........................................................................................8

Shane Harris et al., *CIA concludes Saudi crown prince ordered Jamal Khashoggi's assassination*, Wash. Post (Nov. 16, 2018), https://www.washingtonpost.com/ world/national-security/cia-concludes-saudi-crown-prince-ordered-jamal-khashoggis-assassination/2018/11/16/98c89fe6-e9b2-11e8-a939-9469f1166f9d_story.html ...................................................................................9

Human Rights Council, *Annex to the Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions: Investigation into the unlawful death of Mr. Jamal Khashoggi* (June 19, 2019), https://www.ohchr.org/ EN/HRBodies/HRC/RegularSessions/Session41/Documents/A_HRC_ 41_CRP.1.docx ...................................................................................................7

* Office of the Director of National Intelligence, *Assessing the Saudi Government's Role in the Killing of Jamal Khashoggi* (Feb. 11, 2021), https://www.dni.gov/ files/ODNI/documents/assessments/Assessment-Saudi-Gov-Role-in-JK-Death -20210226v2.pdf ...........................................................................8, 54, 58, 59

*Restatement (Second) of Foreign Relations Law* § 66 (1965) ....................................27

*Restatement (Second) of Torts* § 766 (1979) ......................................................64

Saudi Gazette, *Turkey welcomes Khashoggi murder case trial in Saudi Arabia*, https://saudigazette.com.sa/article/606028 ......................................................54-55

Suggestion of Immunity, *Al Fassi v. King Fahd Bin Abdulaziz*, No. 03-3841 (C.D. Cal Aug. 4, 2003), ECF No. 49....................................................................................28

Suggestion of Immunity, *Alicog v. Kingdom of Saudi Arabia*, No. H-93-4169 (S.D. Tex. May 23, 1994), ECF No. 23 .............................................................................28

Superior Court of the District of Columbia, Order by Chief Judge Josey-Herring (amended July 14, 2021), https://www.dccourts.gov/sites/default/files/2021-07/amended_general_order_july_2021.pdf ...................................................... 69-70

*Prosecutor v. Perisic*, Case No. IT–04–81–T Judgment (Feb. 28, 2013).....................................55

U.K. State Immunity Act of 1978, ch. 33, pt. III, § 20(1) ...........................................30

U.K. State Immunity Act of 1978, ch. 33, pt. I, §§ 1-11 ...........................................30

U.S. Dep't of State, *2020 Country Reports on Human Rights Practices: Saudi Arabia* (Mar. 30, 2021), https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/saudi-arabia....................................................................28

*White House to communicate with Saudi King instead of crown prince as US reassesses relationship*, https://www.cnn.com/2021/02/16/politics/white-house-saudi-arabia/index.html ................................................................. 28-29

Jamal Khashoggi, a journalist living in the United States, was murdered in 2018 inside the Saudi Consulate in Istanbul, Turkey at the behest of Mohammed bin Salman, the Crown Prince of Saudi Arabia ("MBS").  Khashoggi's murder was the culmination of weeks of planning on the part of MBS and his co-conspirators.  The purpose of the murder was to silence Khashoggi and to halt his advocacy in the United States for democratic reform in the Arab world.

There is little doubt that MBS was behind the murder.  The U.S. Office of the Director of National Intelligence recently declassified a report concluding that MBS approved the operation to capture or kill Khashoggi, a conclusion also reached by the United Nations Special Rapporteur. Plaintiffs Hatice Cengiz—Khashoggi's widow—and Democracy for the Arab World Now, Inc. ("DAWN")—Khashoggi's advocacy organization—now seek redress for this brazen crime.

MBS and two of his co-conspirators, Saud Al-Qahtani and Ahmed Al-Assiri, now move to dismiss.  They contend that the Court lacks personal jurisdiction over them.  They are wrong. Defendants lured a U.S. resident outside of the United States in order to prevent him from writing critically in the United States about MBS's human rights abuses, and to prevent him from advocating in the United States for a change in U.S. policy with respect to its support for MBS. They can, and should, be held accountable in an American court.

Defendants also assert that they are immune from suit under several legal theories.  But no immunity doctrine protects Defendants from being held accountable for their flagrant murder.

Contrary to Defendants' claim, both Cengiz and DAWN have stated legally cognizable claims.  The Torture Victims Protection Act was designed for cases like this one, in which foreign officials orchestrate extrajudicial killings.  Cengiz has a cause of action under that statute, as well as under the Alien Tort Statute and Turkish common law.  DAWN, for its part, has properly alleged a claim for tortious interference with contract.  The Court should allow this action to proceed.

## FACTUAL BACKGROUND

Khashoggi was a prominent journalist with a commitment to promote and expand democratization and greater human rights observance in the Arab world.  Compl. ¶ 46.  This work met harsh opposition from political leaders in the region, including in Saudi Arabia.  Compl. ¶¶ 47-48, 50.  As a result of his advocacy, including critical public comments about then- President-Elect Donald Trump in 2016, Khashoggi was banned from speaking freely in Saudi Arabia.  Compl. ¶¶ 50-52.  To continue his work, he had to leave his family and live in self-imposed exile in Washington D.C.  Compl. ¶¶ 50-52.  He developed ties to think tanks, journalists, and academics, began writing for the *Washington Post*, and maintained an active presence on Twitter.  Compl. ¶¶ 53-56, 66.  This work was painful to Defendants, particularly MBS, because it threatened Defendants' economic and political interests in the United States.  Compl. ¶ 42.

MBS kept close tabs on Khashoggi and his U.S. activities:  In October 2017, Mr. Khashoggi received a call from Saud Al-Qahtani, MBS' loyal lieutenant.  Compl. ¶ 57.  Al-Qahtani urged Khashoggi to continue to write positive things about MBS.  Compl. ¶ 57.  The call achieved its purpose—to remind Khashoggi that MBS was monitoring his work.  Compl. ¶ 57.  It did not, however, deter Khashoggi from his advocacy.  Instead, Khashoggi took on a leading role in the newly formed DAWN organization, which had a mission of promoting democracy and human rights in the Arab world.  Compl. ¶ 59.  In late 2017 and early 2018, Khashoggi met regularly with the other co-founders of DAWN.  Compl. ¶ 59.  In spring 2018, he directed them to rent office suites and signed an agreement to serve as DAWN's Executive Director.  Compl. ¶¶ 62-63.

In June 2018, an operator working on behalf of the Saudi government hacked the cell phone of Khashoggi's close associate, Omar Abdulaziz.  Compl. ¶¶ 79-80.  At that point (if not earlier), MBS learned of Khashoggi's work with DAWN.  Compl. ¶¶ 79-80.  Defendants therefore redoubled their efforts, which had begun earlier that year, to lure Khashoggi back to Saudi Arabia.

2

Compl. ¶¶ 81, 83.   Both Al-Qahtani and Khalid bin Salman ("KBS")—the former Saudi Ambassador to the United States and MBS' brother—conveyed to Khashoggi that he should return to Saudi Arabia and that it would be safe for him to do so.  Compl. ¶ 81.

These efforts made use of the Saudi Embassy in Washington D.C.  In late 2017 or early 2018, Khashoggi's passport went missing.  Compl. ¶ 82.  Khashoggi was therefore forced to go to the Saudi Embassy to obtain a replacement.  Compl. ¶ 82.  When Khashoggi arrived at the Embassy on this visit, he was brought up to see KBS.  Compl. ¶ 82.  KBS asked whether Khashoggi had considered an earlier offer to run a think tank on behalf of the Saudi government and informed Khashoggi that $5 million had been allocated to the project.  Compl. ¶ 82.  These and other enticements did not work to lure Khashoggi to Saudi Arabia—he understood them as mere ruses to allow the Saudi government to jail, kill, or otherwise silence him.  Compl. ¶¶ 83-84.

Defendants found their opportunity in the summer of 2018.  Khashoggi and Cengiz had met and wanted to marry in Turkey, Cengiz's home.  Compl. ¶ 89.  To do so, Mr. Khashoggi needed a certificate from Saudi Arabia stating that he was not already married.  Compl. ¶ 89.  The Saudi Embassy in Washington, DC provides this service, so in August 2018 Mr. Khashoggi contacted the Saudi Embassy to obtain this certificate.  Compl. ¶ 90 (citing *Saudi Nationals*, The Embassy of the Kingdom of Saudi Arabia, https://www.saudiembassy.net/saudi-nationals).  But the Embassy staff instructed Mr. Khashoggi that he would have to acquire it at the Saudi Consulate in Istanbul.  Compl. ¶¶ 90-91.  Mr. Khashoggi spoke to KBS about the matter, and sought assurances that it would be safe for him to go to the Saudi Consulate in Istanbul.  Compl. ¶ 91.  At the direction of MBS, KBS told Mr. Khashoggi that he should go to the Saudi Consulate in Istanbul to get the document, and assured him that it would be safe to do so.  Compl. ¶ 91.

This was a ploy to lure Khashoggi to a vulnerable location and it reflected a strategy suggested by MBS himself.  According to CIA findings, MBS stated in late summer 2018 that if they could not lure Khashoggi back to Saudi Arabia, they "could possibly lure him outside Saudi Arabia and make arrangements."  Compl. ¶ 85.

On September 9, 2018, Khashoggi traveled to Istanbul to finalize the conditions of his marriage to Cengiz with her father and brother.  He agreed to provide Cengiz with a stipend on a regular basis, which he began immediately.  Compl. ¶¶ 92-94, 96.  In addition, he agreed to purchase an apartment for Cengiz and himself in Istanbul, planning that they would principally reside in the United States but spend time in Istanbul over some summers.  Compl. ¶¶ 93-95.

On September 16, 2018, Khashoggi and Cengiz were married in the Islamic tradition. Compl. ¶ 98.  But Khashoggi still needed the certificate to complete their civil marriage.  Compl. ¶ 99.  On September 28, 2018, Khashoggi and Cengiz went to the Saudi Consulate in Istanbul— unannounced.  Compl. ¶ 100.  Cengiz waited outside.  Compl. ¶ 100.  The Saudi officials in the Consulate were surprised to see Khashoggi, but treated him cordially.  Compl. ¶ 101.  Defendant Ekrem Sultan told him the certificate would take time to prepare.  Compl. ¶ 101.  Khashoggi said that he would be traveling in the coming days but that he would return on October 2, 2018.  Compl. ¶ 101.  Sultan stated that the certificate would be ready then.  Compl. ¶ 101.

Immediately, Mr. Khashoggi's plans to return were communicated to Riyadh.  Compl. ¶ 102.  Concrete plans to murder Mr. Khashoggi and dispose of his body when he returned on October 2 began immediately.  Compl. ¶¶ 102-103.

The assassination and disposal team arrived in Istanbul the morning of October 2, 2021. Compl. ¶¶ 102-110.  Mr. Khashoggi returned to Istanbul that same morning. Compl. ¶ 113.  He called the Saudi Consulate to ensure that the certificate was ready, and they confirmed that it was.

4

Compl. ¶¶ 113-114.  Khashoggi and Cengiz arrived at the Consulate around 1 P.M., by which point all non-Saudi staff had been ordered to leave the Consulate.  Compl. ¶¶ 114-115.  Cengiz again waited outside.  Compl. ¶ 119.  Once inside, Khashoggi was invited upstairs to the Consul General's office.  Compl. ¶ 120.  He was then tortured, murdered, and dismembered.  Compl. ¶¶ 127-132.  Cengiz waited for him outside the Consulate until 2 A.M.  Compl. ¶ 138.  For the next two and a half weeks, Defendants covered up Khashoggi's murder and their involvement, only admitting that Khashoggi had died in the Consulate on October 18, 2018.  Compl. ¶¶ 140, 146.  Even then, they claimed it was the result of a fistfight—or, in later days, "a rogue operation"—before acknowledging on October 25, 2018 that it was a premeditated murder. Compl. ¶¶ 146-148.

Al-Qahtani and Al-Assiri played an active role in the planning and execution of the conspiracy to murder Khashoggi.  Al-Assiri, the Deputy Director of the Saudi General Intelligence Presidency and a Saudi Major General, planned and organized the assassination and disposal team that traveled to Turkey.  Compl. ¶¶ 11, 104.  And Al-Qahtani—who was considered MBS' "enforcer" and had long monitored and attempted to interfere with Mr. Khashoggi's speech and activities in the United States—participated as well, calling into the murder by video call and demanding that the murderers "[b]ring [him] the head of the dog."  Compl. ¶¶ 10, 50, 57, 81, 131.

Cengiz and DAWN suffered devastating harm as a result of Mr. Khashoggi's murder. Cengiz suffered severe mental anguish and the loss of Mr. Khashoggi's society, among other harms.  Compl. ¶ 157.  DAWN lost its leader, whose skills and experience would have played a major role in helping the organization achieve its advocacy mission.  Compl. ¶¶ 63-64, 158-159. Plaintiffs therefore bring this action to vindicate their rights in the only forum in which their remedies are not woefully inadequate.  Compl. ¶¶ 160-162.

**ARGUMENT**

**I.   THIS COURT HAS PERSONAL JURISDICTION.**

This Court has personal jurisdiction over all three defendants who have moved to dismiss.

With respect to Defendant MBS, the Court has jurisdiction for two independent reasons. First, this suit arises out of and relates to MBS's contacts with the United States.  MBS set the plot in motion by instructing his brother, KBS—the Saudi Ambassador to the United States, who was in the United States—to assure Khashoggi that he could safely travel to Istanbul.  *See* Part I.A. Second, MBS's actions were specifically aimed at silencing Khashoggi's speech in the United States.  *See* Part I.B.  Moreover, exercising jurisdiction over MBS would be consistent with principles of fair play and substantial justice. *See* Part I.C.  The Court also has pendent jurisdiction over Plaintiffs' state-law claims.  *See* Part I.D.  Finally, and for similar reasons, the Court has jurisdiction over Al-Qahtani and Al-Assiri.  *See* Part I.E.

**A.   This Court has personal jurisdiction over MBS because the suit arises out of and relates to his contacts with the United States.**

The Court has personal jurisdiction over MBS because MBS instructed his brother KBS, who was in the United States, to deceive Khashoggi into going to Istanbul.

1.   <u>By instructing KBS to deceive Khashoggi, MBS purposefully directed his activities to the United States.</u>

The complaint alleges that the Court has jurisdiction over MBS under Federal Rule of Civil Procedure 4(k)(2).  Compl. ¶ 39.  To establish jurisdiction, Plaintiffs must show that "exercising jurisdiction is consistent with the United States Constitution and laws."  Fed. R. Civ. P. 4(k)(2).[1] "Whether the exercise of jurisdiction is 'consistent with the Constitution' . . . depends on whether a defendant has sufficient contacts with the United States as a whole to justify the exercise of

---

[1] MBS does not dispute that he "is not subject to jurisdiction in any state's courts of general jurisdiction," as required to establish jurisdiction under Rule 4(k)(2).

personal jurisdiction under the Due Process Clause of the Fifth Amendment." *Mwani v. Bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005). That standard is satisfied when the defendant "has purposefully directed his activities at residents of the forum, and the litigation results from alleged injuries that arise out of or relate to those activities." *Id.* at 12 (quotation marks and citations omitted).

"[T]he plaintiff bears the burden of establishing a factual basis for asserting personal jurisdiction over a defendant." *Fiorentine v. Sarton Puerto Rico, LLC*, 486 F. Supp. 3d 377, 381 (D.D.C. 2020). "At the pleading stage, the plaintiff 'can satisfy that burden with a prima facie showing.'" *Id.* (quoting *Mwani*, 17 F.3d at 7). "To make such a showing, the plaintiff is not required to adduce evidence that meets the standards of admissibility reserved for summary judgment and trial; but rather, the plaintiff may rest her arguments on the pleadings, bolstered by such affidavits and other written materials as she can otherwise obtain." *Id.* (quotation marks omitted). "When deciding personal jurisdiction without an evidentiary hearing," "the court must resolve factual disputes in favor of the plaintiff, but it need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts." *Livnat v. Palestinian Authority*, 851 F.3d 45, 57 (D.C. Cir. 2017) (quotation marks and citations omitted).

Plaintiffs have made a prima facie showing of personal jurisdiction. The complaint alleges that "MBS ordered the murder of Mr. Khashoggi." Compl. ¶ 8. The CIA reached this conclusion "with high degree of confidence and on the basis of multiple sources of intelligence." Compl. ¶ 152. Similarly, the United Nations Special Rapporteur issued a report[2] concluding that "every expert consulted finds it inconceivable that an operation of this scale could be implemented

---

[2] Compl. ¶ 14 & n.7, ¶ 10 & n.1; *see* Human Rights Council, *Annex to the Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions: Investigation into the unlawful death of Mr. Jamal Khashoggi* (June 19, 2019), https://www.ohchr.org/EN/HRBodies/HRC/RegularSessions/Session41/Documents/A_HRC_41_CRP.1.docx.

without the Crown Prince being aware, at a minimum, that some sort of mission of a criminal

nature, directed at Mr. Khashoggi, was being launched."   Compl. ¶ 150.   Notably, after the

complaint was filed, the Office of the Director of National Intelligence (ODNI) declassified a

report lending powerful support to Plaintiffs' allegations.[3]   The ODNI "assess[ed] that Saudi

Arabia's Crown Prince Muhammad bin Salman approved an operation in Istanbul, Turkey to

capture or kill Saudi journalist Jamal Khashoggi."[4]

These allegations, standing alone, are sufficient to establish the reasonable inference that

MBS targeted the United States.   These are not bare "conspiracy allegations."   MBS Mot. 11.

Plaintiffs do not allege that MBS merely *participated* in a conspiracy in which some co-conspirator

had ties to the United States.   Rather, Plaintiffs allege that MBS *ordered* the murder.   At the motion

to dismiss stage, the Court must draw "all reasonable inferences in favor of the plaintiff."

*Urquhart-Bradley v. Mobley*, 964 F.3d 36, 40 n.2 (D.C. Cir. 2020).   If MBS ordered the murder,

and the murder was effectuated by luring Khashoggi outside of the United States, the reasonable

inference is that MBS ordered his co-conspirators to lure Khashoggi out of the United States.

---

[3] Office of the Director of National Intelligence, *Assessing the Saudi Government's Role in the Killing of Jamal Khashoggi* (Feb. 11, 2021), https://www.dni.gov/files/ODNI/documents/ assessments/Assessment-Saudi-Gov-Role-in-JK-Death-20210226v2.pdf ("ODNI Report").

[4] Defendants may assert a hearsay objection to these reports.   But for purposes of establishing a prima facie case of personal jurisdiction, Plaintiffs are entitled to rely on inadmissible, including hearsay, evidence.   *See Mwani*, 417 F.3d at 12 (finding, after the district court rejected plaintiff's jurisdictional evidence on hearsay grounds, that "the district court's emphasis on satisfying strict evidentiary standards at this stage of the litigation was incorrect").   Even if the Rules of Evidence apply, both the Special Rapporteur report and the ODNI report may be admissible under the public-records exception to the hearsay rule.   Fed. R. Evid. 803(8); *see Beech Aircraft Corp. v. Rainey*, 488 U.S. 153, 175 (1988) (conclusions and opinions in public investigatory reports fall within public records exception to hearsay rule).   The Special Rapporteur is affiliated with an international body rather than the federal government, but her report may still be an admissible public record. *In re Korean Air Lines Disaster of Sept. 1, 1983*, 932 F.2d 1475, 1483 (D.C. Cir. 1991) (affirming district court's determination that report by Secretary General of the International Civil Aviation Organization was admissible evidence under *Beech*).

But if Plaintiffs were required to submit specific allegations regarding *how* MBS targeted the United States, they have satisfied that requirement.  The complaint alleges that "[a]ccording to the CIA's findings, two months prior to Khashoggi's murder, Defendant MBS said that if he could not lure Khashoggi back to Saudi Arabia on his own, 'We could possibly lure him outside Saudi Arabia and make arrangements.'"  Compl. ¶ 85.

MBS and the other Defendants did just that.  "Defendants ensured that the Saudi Embassy in Washington, D.C. would not provide Mr. Khashoggi with a necessary document so that he would be forced to seek the document in Istanbul."  Compl. ¶ 40.  "Defendant MBS . . . instructed the Saudi Ambassador to the United States, who was in the United States, to assure Mr. Khashoggi that it would be safe for Mr. Khashoggi to retrieve the document he needed at the Saudi Consulate in Istanbul."  Compl. ¶ 38.  "The Ambassador did so, setting in motion the chain of events that led to Mr. Khashoggi's murder in the Consulate in Istanbul."  Compl. ¶ 38; *see also* Compl. ¶ 69 (stating that KBS, "at MBS's direction," "urged Khashoggi to go to the Saudi Consulate in Istanbul and assured him it would be safe to do so."); Compl. ¶ 91 (similar).

The complaint cites a Washington Post article reporting that "the CIA has concluded that Mohammed bin Salman ordered the assassination of journalist Jamal Khashoggi in Istanbul."[5]  The article explains that "the CIA examined multiple sources of intelligence, including a phone call that the prince's brother Khalid bin Salman, the Saudi ambassador to the United States, had with Khashoggi."  *Id.*  "Khalid told Khashoggi . . . that he should go to the Saudi Consulate in Istanbul to retrieve the documents and gave him assurances that it would be safe to do so."  *Id.*

---

[5] Compl. ¶¶ 69, 85, 91; *see* Shane Harris et al., *CIA concludes Saudi crown prince ordered Jamal Khashoggi's assassination*, Wash. Post (Nov. 16, 2018), https://www.washingtonpost.com/world/national-security/cia-concludes-saudi-crown-prince-ordered-jamal-khashoggis-assassination/2018/11/16/98c89fe6-e9b2-11e8-a939-9469f1166f9d_story.html.

Contrary to MBS's claim, these are not generic "conspiracy allegations" or "legal conclusion[s]." MBS Mot. 10-13. Rather, Plaintiffs have made specific factual allegations regarding actions that MBS personally took in order to lure Khashoggi out of the United States. MBS complains that the Washington Post article is insufficiently detailed, MBS Mot. 13, but at the motion to dismiss stage, the Court must "resolve factual disputes in favor of the plaintiff." *Livnat*, 851 F.3d at 57. Although "[c]onclusory statements or a bare allegation of conspiracy or agency do not satisfy this burden," *id.* (quotation marks omitted), here Plaintiffs have pleaded specific allegations of MBS's wrongdoing. Hence, the Court must accept these allegations as true.

The case law cited by MBS, MBS Mot. 13, does not suggest that the Court may disregard these well-pleaded allegations. Instead, it holds that courts can refuse to credit allegations inconsistent with surrounding facts, *see Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (per curiam), or allegations that do not appear in the complaint at all. *Walker v. S.W.I.F.T. SCRL*, 517 F. Supp. 2d 801, 806 (E.D. Va. 2007).

To be sure, the complaint does not allege that MBS physically entered the United States to effectuate the plot. But jurisdiction "may not be avoided merely because the defendant did not *physically* enter the forum State." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 476 (1985). "[I]t is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.*; *see, e.g.*, *FC Inv. Grp. LC v. Lichtenstein*, 441 F. Supp. 2d 3, 8-9 (D.D.C. 2006) (finding personal jurisdiction based on telephone calls to D.C.). Here, MBS personally instructed KBS, who was located in the United States, to deceive a resident of the United States into leaving the country. Therefore, he targeted the United States, even if he did not cross the U.S. border.

Indeed, even without such personal contact between the defendant and the United States, a court may exercise jurisdiction over murderers who commit their crimes abroad in order to target U.S. interests.  In *Mwani*, the D.C. Circuit held that an American court had personal jurisdiction to hear a lawsuit arising from a truck bomb that exploded outside the American embassy in Kenya. 417 F.3d at 4.  Although the illegal act took place in Kenya, it was orchestrated "to cause pain and sow terror in the embassy's home country, the United States."  *Id.* at 13.  Here, like in *Mwani*, the illegal act was orchestrated in order to target the United States.  The murderers' goal was to silence Khashoggi's advocacy through DAWN and his writings in the Washington Post, so as to prevent Khashoggi from influencing voters and legislators.  Indeed, MBS's connection to the United States was stronger than in *Mwani*—he personally communicated with an official located in the United States in order to perpetrate the crime.

   2.   MBS's declarations do not undermine Plaintiffs' prima facie case.

MBS makes a series of factual objections to Plaintiffs' personal jurisdiction allegations. These factual contentions do not undermine Plaintiffs' prima facie case.

MBS asserts that as a matter of Turkish law, the Saudi Embassy was unable to issue Khashoggi a certificate.  Hence, according to MBS, Khashoggi had no choice but to travel to Turkey.  MBS Mot. 11-12.  This assertion is both irrelevant and wrong.

It is irrelevant because Plaintiffs do not merely allege that Khashoggi received inaccurate advice as to whether he had to go to Turkey.  Rather, Plaintiffs allege that MBS directed KBS to assure Khashoggi that he would be *safe* at the Saudi consulate in Turkey.  Compl. ¶¶ 38, 69, 91. These assurances of safety induced Khashoggi to go to the Saudi consulate in Turkey, leading to his murder.  These assurances were deceptive regardless of which embassy or consulate had the authority to issue the certificate.

In any event, MBS's statement is wrong.  As the complaint points out, the website of the Saudi Embassy to the United States advises that the Embassy assists Saudi nationals in "carrying out the steps required for . . . Saudi citizens wishing to marry . . . foreigners."  Compl. ¶ 90.[6]

MBS relies on the declaration of his Turkish law expert, Ozan Varol, stating that Khashoggi was legally required to travel to Saudi Arabia or Turkey.  *See* MBS Mot. 11.  But Varol's declaration is incorrect.  Plaintiffs have submitted a declaration by a Turkish law expert, Abdullah Orçun Çetinkaya, which explains that Turkish law provides a mechanism to obtain a certificate through diplomatic channels that would not have required Khashoggi to travel to Turkey.  Çetinkaya Decl. ¶¶ 47-52.  Varol cites several documents purporting to state otherwise, Varol Decl. ¶¶ 5-6 & n.1, but these documents are informal guidance documents that do not purport to recount Turkish law on marriage certificates.  Çetinkaya Decl. ¶¶ 51-52.

MBS also denies the core accusations of Plaintiffs' claims, and uses that denial as a basis to argue against personal jurisdiction.  Specifically, Plaintiffs allege that Khashoggi contacted the Saudi Embassy in August 2018, and was told he needed to travel to Turkey to obtain a certificate of marriage eligibility.  Compl. ¶ 90.  Plaintiffs further allege that KBS, at MBS's direction, assured Khashoggi of safety if he went to the Saudi consulate in Turkey.  Compl. ¶ 91.  In response, MBS attaches a declaration of a Saudi Embassy official, Alhabdan, denying that Khashoggi visited or made requests from the Embassy after March 13, 2018.  Alhabdan Decl. ¶ 9.  MBS also attaches a declaration from KBS, who denies that he gave assurances to Khashoggi and asserts that MBS "never gave me any directions whatsoever relating to Mr. Khashoggi."  KBS Decl. ¶ 5.

---

[6] MBS relies on the declaration by a Saudi Embassy official, Raed Alhabdan, who says that the Saudi Embassy assists its nationals seeking to marry *United States* citizens.  Alhabdan Decl. ¶ 12. Alhabdan does not explain how his declaration can be reconciled with the official website.

If personal jurisdiction depends on the veracity of these declarations, the Court should deny the motion to dismiss and defer resolution of the factual dispute until trial. "A factual challenge to the jurisdictional allegations of a complaint . . . is subject to a significant limitation." *American Oversight v. United States Department of Veterans Affairs*, 498 F. Supp. 3d 145, 153 (D.D.C. 2020). "As the D.C. Circuit has admonished, although a district court 'may rule on disputed jurisdictional facts at any time, if they are inextricably intertwined with the merits of the case it should usually defer its jurisdictional decision until the merits are heard.'" *Id.* (quoting *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 198 (D.C. Cir. 1992)). "This proviso to the usual rule ensures that, where jurisdictional defenses and the merits of a dispute overlap, the jurisdictional defense is not used—in the absence of special considerations—to short-circuit the factual development and adjudicative process to which a plaintiff is generally entitled." *Id.*

That proviso applies here. Plaintiffs accuse MBS of orchestrating a plot to murder Khashoggi by directing Embassy officials to deceive him into traveling to Turkey. MBS's declarants insist that this never happened. This dispute goes to the very heart of the case and should not be resolved at the outset.

In any event, there are strong reasons to doubt the veracity of MBS's declarations. KBS is MBS's brother and part of the same tyrannical regime. As a participant in the plot, he has an obvious incentive to lie. Alhabdan is an Embassy official whose job and personal security depends on his obedience to MBS and the Saudi government. Moreover, Saudi government officials have repeatedly lied about Khashoggi's murder and covered it up. Initially, MBS falsely claimed that Khashoggi left the Embassy. Compl. ¶ 140. Next, the co-conspirators destroyed evidence. Compl. ¶ 144. The Saudi Ministry of Foreign Affairs and the Kingdom's chief prosecutor then falsely attributed the murder to a "fistfight." Compl. ¶ 146. Afterwards, the Foreign Minister falsely

attributed the death to a "rogue operation."  Compl.  ¶ 147.  Given these prevarications, the Court

should not trust declarations by Saudi officials that MBS himself solicited.

Moreover, KBS's declaration conflicts with his own statements on Twitter.  Following

Khashoggi's murder, KBS stated that he had no contact with Khashoggi after October 26, 2017.

Fourth Declaration of Abdullah Alaoudh ("Alaoudh Decl."), Exs. A and B.  Yet in this Court, he

attests that he continued to communicate with Khashoggi until March 2018.  KBS Decl. ¶¶ 2-3.

Alhabdan's declaration is also unreliable.  Alhabdan does not have any personal

knowledge.  He began working at the Embassy in November 2020—long after the events in

question—and his declaration is based on his review of unspecified "records."  Alhabdan Decl. ¶¶

2-3.  Those "records" are inaccurate.  Alhabdan attests that Khashoggi did not visit the Saudi

Embassy between October 2, 2017, and December 8, 2017.  *Id.* ¶¶ 5-6.  Yet, Plaintiffs have

submitted the declaration of John Doe, who attests that on November 2017, he accompanied

Khashoggi to the Saudi Embassy and personally observed Khashoggi entering the Embassy for an

approximately 30-minute meeting.  Declaration of John Doe ¶¶ 6-7 ("Doe Decl.").  Doe's

observations demonstrate that the "records" reviewed by Alhabdan are incomplete and do not

account for all of Khashoggi's interactions with the Embassy.

Plaintiffs have also submitted the declaration of Alaoudh, which explains why Alhabdan's

declaration does not undermine Plaintiffs' case.  Alaoudh explains that the Saudi Embassy logs

only formal interactions with the Embassy, such as requests for powers of attorney.  Alaoudh Decl.

¶¶ 8-9.  By contrast, when Khashoggi contacted the Embassy in August 2018 regarding the

certificate of marriage eligibility, he was told that he could *not* apply for it within the United States.

*Id.* ¶ 10.  Because Khashoggi followed this advice and did not apply for the certificate at the

Embassy, the Embassy would not have logged this interaction. *Id.* Alaoudh also explains that Embassy records could easily have been covered up. *Id.* ¶ 11.

Notably, the questionable declarations of KBS and Alhabdan are the sole factual support for MBS's denials. They do not overcome Plaintiffs' prima facie showing of personal jurisdiction.

3.   <u>At a minimum, jurisdictional discovery is necessary.</u>

For the foregoing reasons, the Court should hold that Plaintiffs have made a prima facie showing of personal jurisdiction, and should permit the parties to proceed to merits discovery. But if the Court concludes that Plaintiffs have made an insufficient showing of personal jurisdiction, and also elects to resolve the parties' factual disputes at the motion to dismiss stage, then the Court should afford Plaintiffs the opportunity for jurisdictional discovery.

"[I]f a party demonstrates that it can supplement its jurisdictional allegations through discovery, then jurisdictional discovery is justified." *GTE New Media Servs. Inc. v. Bellsouth Corp.*, 199 F.3d 1343, 1351 (D.C. Cir. 2000). This "standard for permitting jurisdictional discovery is quite liberal, and such discovery is permissible even when plaintiffs have not made out a *prima facie* case of jurisdiction." *Ofisi v. Al Shamal Islamic Bank*, No. 15-2010, 2019 WL 1255096, at *8 (D.D.C. Mar. 19, 2019) (internal quotation marks omitted). "[P]laintiffs must have at least a good faith belief that such discovery will enable it to show that the court has personal jurisdiction over the defendant." *Id.* (internal quotation marks omitted).

That standard is satisfied here. Plaintiffs have attached, as exhibits, proposed discovery requests that will supplement their jurisdictional allegations. First, Plaintiffs will seek to test the assertions in the KBS and Alhabdan declarations. Plaintiffs will seek to depose KBS and obtain his relevant documents. *See* Declaration of Keith Harper ¶ 8 ("Harper Decl."); *see also* Harper Decl., Ex. F. Likewise, Plaintiffs will seek to depose Alhabdan and obtain the "records" referred

to in his declaration, as well as information as to their reliability and admissibility.  Harper Decl. ¶ 9 & Ex. G.  Plaintiffs will also seek to determine whether there exist other records, such as videotapes, establishing that Khashoggi entered the Embassy that day.  *Id.*  If those third parties seek to quash those subpoenas or they are otherwise unenforceable, then Plaintiffs would seek to strike those un-cross-examined declarations as impermissible hearsay.  *See Bortell v. Eli Lilly & Co.*, 406 F. Supp. 2d 1, 8-11 (D.D.C. 2005) (refusing to consider sworn affidavits in connection with summary judgment motion because affiants were unavailable to testify at trial).

Second, Plaintiffs will seek party discovery from the three defendants who have filed motions to dismiss.  Harper Decl. ¶¶ 3-7 & Exs. A-E.  This discovery is intended to corroborate the allegations that the defendants deceptively lured Khashoggi out of the United States and murdered him in order to end his writings and advocacy in the United States.

Third, Plaintiffs also intend to seek discovery from the federal government via a *Touhy* request.  *See* Harper Decl. ¶ 10 & Ex. H; 32 C.F.R. § 1703.4 (outlining procedures for seeking discovery from ODNI); 32 C.F.R. § 1905.4 (same, for CIA).  Some of the requested information may be deemed classified, and Plaintiffs are prepared to proceed with this litigation regardless of how the ODNI and CIA respond to the *Touhy* request.  That said, Plaintiffs have a good-faith basis for their view that the *Touhy* request will yield relevant evidence.  As noted above, the ODNI has declassified its conclusions regarding Khashoggi's murder.  It may be willing to provide additional information in response to discovery requests.  Moreover, that additional information may be relevant because, as explained above, the Washington Post reported that the CIA examined KBS's call with Khashoggi, in which KBS told Khashoggi that he should go to the Saudi consulate in Istanbul and that he would be safe there.  *Supra*, at 9.  Hence, the U.S. government may be able to provide information corroborating the allegations in the complaint.

Fourth, Plaintiffs intend to seek discovery from Uber that would corroborate John Doe's declaration that Khashoggi went to the Saudi Embassy in November 2017. *See* Harper Decl., Ex. J; *see also* Harper Decl., Ex. I, p. 18.

Fifth, Plaintiffs intend to seek discovery from Omar Abdulaziz, Khashoggi's close colleague who was in regular contact with Khashoggi and whose phone was hacked by Saudi officials. Compl. ¶¶ 75-80. Plaintiffs interviewed Abdulaziz prior to filing the complaint, but Abdulaziz has not voluntarily submitted a declaration. *See* Harper Decl., Ex. I, pp. 15-18 (Declaration of Kaiser Gill). Based on the interview, Plaintiffs have a good-faith basis to believe that Abdulaziz can corroborate Plaintiffs' allegations regarding Khashoggi's interactions with the Saudi Embassy. *Id.* Because Abdulaziz is a resident of Quebec, Canada, Plaintiffs have separately submitted an application for a Letter of Request to the Quebec Superior Court seeking to compel limited discovery. *See* Harper Decl., Ex. I.

Abdulaziz also has discoverable information relevant to the merits of this case. For instance, the complaint alleges that Abdulaziz's cell phone was hacked by Defendants, thus allowing Defendants to learn about Khashoggi's relationship with DAWN. Compl. ¶¶ 77-80, 186-188. Abdulaziz's testimony and documents would allow him to confirm these allegations.

If the Court bifurcates jurisdictional and merits discovery, the risk would arise that Plaintiffs would need to serve two document and deposition subpoenas on Abdulaziz—one on jurisdiction, one on the merits—thus increasing the burden on Abdulaziz, the parties, and the courts. To avoid that prospect, Plaintiffs' proposed Letter of Request requests that the Canadian court compel a single deposition addressing both jurisdiction and the merits. Plaintiffs' proposed document requests also address both jurisdiction and the merits. If the Court believes that this request is overbroad at this time, Plaintiffs would replace their current proposed Letter of Request

17

with a new proposed Letter of Request addressing jurisdiction only, with the intent to request a second Letter of Request if the case reaches merits discovery.

### B. This Court has personal jurisdiction over MBS because his actions were aimed at the United States.

The Court has jurisdiction over MBS for a second and independent reason. Regardless of whether MBS personally communicated with his brother KBS, his actions were aimed at stopping Khashoggi's advocacy in the United States. Those allegations establish personal jurisdiction under *Calder v. Jones*, 465 U.S. 783 (1984).

> 1. By targeting Khashoggi's speech in the United States, MBS subjected himself to the jurisdiction of American courts.

In *Calder*, the plaintiff, a California resident, brought suit in a California court claiming she had been libeled by an article written by Florida residents. *Id.* at 784-85. The Court held that the California court had jurisdiction. It reasoned that the "allegedly libelous story concerned the California activities of a California resident." *Id.* at 788. Further, "[t]he article was drawn from California sources, and the brunt of the harm . . . was suffered in California." *Id.* at 788-89. Because "California is the focal point both of the story and the harm suffered," personal jurisdiction was proper "based on the 'effects' of their Florida conduct in California." *Id.* at 789. The Court emphasized that the defendant committed "intentional, and allegedly tortious, actions," which "were expressly aimed at California." *Id.*

The Court has jurisdiction under *Calder*. As in *Calder*, MBS committed "intentional, and allegedly tortious, actions," which "were expressly aimed" at the United States. *Id.* The purpose of the plot was to silence Khashoggi's speech within the United States, prevent Khashoggi from exposing MBS's abuses to the American public, and prevent him from persuading American legislators to withdraw their support of MBS. As the complaint explains: "Defendants undertook

wrongful conduct in the United States, the intended and actual effect of which, was to silence Khashoggi's political advocacy in the United States – advocacy that was especially threatening to Defendants precisely because it occurred *in the United States* and so touched Defendants' economic and political interests there."   Compl. ¶ 42.   Defendants also sought to curtail Khashoggi's speech *about* the United States: "[I]n 2016, Saudi officials banned Mr. Khashoggi from writing in newspapers, appearing on television, and speaking at conferences after Mr. Khashoggi made statements critical of then-United States President-Elect Donald Trump during a presentation at a Washington, D.C.-based think-tank on November 10, 2016."  Compl. ¶ 50.

Indeed, the complaint alleges that MBS perpetrated the murder in order to halt Khashoggi's speech, within the United States, *about MBS*.  Khashoggi wrote a column in the Washington Post about "media and civil society crackdowns initiated by Defendant MBS."   Compl. ¶ 54. "Defendants targeted Mr. Khashoggi and sought to put an end to his ability to carry out his work on behalf of DAWN and otherwise silence his criticism and pro-democracy activities . . . Mr. Khashoggi was one of the individuals who had been targeted by Defendant MBS."  Compl. ¶ 73.

Under *Calder*, these allegations are sufficient to establish jurisdiction.  In *Calder*, the defendant's aim was to affect the marketplace of ideas in California by propagating false information there.  Hence, California courts had jurisdiction, even though the article was written in Florida.  Here, MBS's aim was to affect the marketplace of ideas in the United States by murdering a United States resident to halt his speech—including speech about MBS—taking place in the United States.  That connection to the United States is enough to establish jurisdiction.

Similarly, in *Mwani*, the D.C. Circuit held that the defendant's intent "to cause pain and sow terror in the embassy's home country, the United States," was sufficient to establish

19

jurisdiction, even though the crime was in Kenya.  417 F.3d at 13.  Here, too, where MBS's intent was to influence American voters and legislators, a United States court has jurisdiction.

*Hassen v. Nahyan*, No. CV 09-01106, 2010 WL 9538408 (C.D. Cal. Sept. 17, 2010), is also closely on point.  In *Hassen*, a naturalized U.S. citizen traveled to the United Arab Emirates to pursue business activities.  *Id.* at *2.  While there, he was abducted.  *Id.*  He sued several defendants, including the UAE's Crown Prince.  The court concluded that it had personal jurisdiction under *Calder*'s "effects" test.  *Id.* at *7.  It observed that the plaintiff was a U.S. resident and that the defendants had sent him warnings while he was in the United States.  *Id.* at *9.  Further, "his abduction served to harm American companies by impeding their ability to garner business contracts in the UAE."  *Id.* at *10.  Finally, the defendants "abducted him in part because they suspected that he worked for the CIA and wanted to acquire United States government secrets."  *Id.*  The Ninth Circuit denied mandamus relief, citing *Mwani*.  *In re Nahyan*, 485 F. App'x 859, 861 (9th Cir. 2012).  Nearly all of the facts that led the *Hassen* court to find jurisdiction are present in this case as well.  Khashoggi was a U.S. resident; MBS targeted him while he was in the United States; and his murder served to harm DAWN's activities in the United States and Khashoggi's own speech in the United States.

*Walden v. Fiore*, 571 U.S. 277 (2014), on which MBS relies, is not to the contrary.  In *Walden*, the Supreme Court held that a Nevada court could not exercise personal jurisdiction over a defendant "on the basis that he knew his allegedly tortious conduct in Georgia would delay the return of funds to plaintiffs with connections to Nevada."  *Id.* at 279.  The Court reasoned that "the plaintiff cannot be the only link between the defendant and the forum. Rather, it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him."  *Id.* at 285.  The Court distinguished *Calder* on the ground that "the

reputation-based effects of the alleged libel connected the defendants to California, not just to the plaintiff." *Id.* at 287 (internal quotation marks omitted).

"*Walden* simply holds that an out-of-state injury to a forum resident, standing alone, cannot constitute purposeful availment." *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894, 901 (6th Cir. 2017). Here, however, Plaintiffs do not merely allege that MBS inflicted an out-of-state injury on a plaintiff who happened to reside within the United States. Plaintiffs allege that (1) MBS's purpose was to silence Khashoggi's speech within the United States and prevent him from influence American voters and legislators; (2) which in some cases was speech *about* the United States; (3) which was harmful *because* it affected MBS's interests in the United States. Those facts vastly differ from the tort in *Walden*, which simply happened to be against a Nevada resident but had no other connection to Nevada.

MBS also relies on cases from this Court rejecting personal jurisdiction over foreign defendants for claims arising from alleged attacks on foreign soil against American citizens or American residents. But in each case cited by MBS, there was no connection between the attack and the United States other than the fact that one of the victims happened to be an American. In *Livnat v. Palestinian Authority*, 851 F.3d 45 (D.C. Cir. 2017), for instance, the American plaintiffs were injured at an attack at Joseph's Tomb in Israel, and sued the Palestinian Authority. To show jurisdiction, the plaintiff "presented a declaration from a professor asserting that the Palestinian Authority encourages terrorism against Jews and Israelis in order to influence U.S. policy in the Palestinian Authority's favor." *Id.* at 57. The court held that the declaration "establishes no link between that practice and the Joseph's Tomb attack. Indeed, the declaration does not even mention the attack." *Id.* Likewise, in *Estate of Klieman ex rel. Kesner v. Palestinian Auth.*, 923 F.3d 1115 (D.C. Cir. 2019), *summarily vacated*, 140 S. Ct. 2713 (2020), *reinstated in part*, 820 F. App'x 11

(D.C. Cir. Aug. 18, 2020), the court held that an American court lacked jurisdiction because "[e]ven if some terrorist acts carried out in Israel or the West Bank were used by defendants to influence U.S. policy, nothing in the record indicates that *this* attack fills that bill." *Id.* at 1124; *see also Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1037 (D.C. Cir. 2020) (following *Livnat* and *Klieman*). In this case, by contrast, the attack *was* conducted to influence U.S. policy.

MBS lodges two arguments against jurisdiction under *Calder*. First, MBS notes that Saudi Arabia has also targeted journalists in other countries. MBS Mot. 16. While true, this assertion does not undermine Plaintiffs' allegations that *this* murder targeted the United States. A defendant cannot evade jurisdiction in the United States merely because it commits other torts elsewhere.

Second, MBS claims that to establish personal jurisdiction under *Calder*, Plaintiffs must establish that the "brunt of the harm" was suffered in the United States. MBS Mot. 16-17. That misstates the law. In *Mwani*, the brunt of the harm was felt in Kenya, where hundreds of people died. Still, the defendants could not escape American jurisdiction. 417 F.3d at 13 ("The fact that injured Kenyans, not injured Americans, are the plaintiffs in this case does not deny the court personal jurisdiction over the defendants" (citing *Calder*, 465 U.S. at 788)).

In any event, in this case, the brunt of the harm was felt in the United States. All of Plaintiff DAWN's harm was felt in the United States. DAWN is incorporated in the United States. Compl. ¶¶ 7, 41, 169. DAWN's mission is to engage in advocacy within the United States in order to change U.S. policy toward the Middle East and catalyze change in the Arab world. Compl. ¶¶ 59, 169. DAWN's tortious-interference claim alleges that MBS prevented Khashoggi from performing his contract within the United States. Compl. ¶¶ 185-189. Cengiz also experienced harm in the United States. Although Cengiz was a Turkish resident at the time of the murder, "Mr. Khashoggi and Plaintiff Cengiz agreed that after they married they would principally reside in the

United States and return to their flat in Turkey over some summers."  Compl. ¶ 95.  Hence, Cengiz was deprived of the companionship she would have experienced within the United States.  The effects of MBS's murder on the United States are sufficient to establish personal jurisdiction.

### C. Exercising jurisdiction would be consistent with notions of fair play and substantial justice.

MBS contends that even if he has minimum contacts with the United States, exercising jurisdiction would conflict with principles of fair play and substantial justice.  MBS Mot. 17-19. The Court should reject this contention.

"Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with fair play and substantial justice." *Burger King*, 471 U.S. at 476 (internal quotation marks omitted).  But "where a defendant who purposefully has directed his activities at forum residents seeks to defeat jurisdiction, he must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *Id.* at 477.

Here, MBS has not shown a "compelling case" that jurisdiction would be unreasonable. MBS first complains of the "severe" burdens associated with submitting himself to the American judicial system.  MBS Mot. 18.  However, MBS is a sophisticated litigant with nearly unlimited resources and skilled counsel.  Further, he is no stranger to the United States.  *See* Compl. ¶ 17 (noting that MBS met with President Trump at the White House in 2017).  He is fully capable of defending his interests.  Moreover, other doctrines exist to protect foreign officials from the burdens of foreign litigation, such as head of state immunity and the act of state doctrine.  As noted below, however, those doctrines do not apply here, in part because the State Department has declined to file a suggestion of immunity.  Where those doctrines do not apply, the Court should

not confer broader protections on foreign officials through the back door of the "fair play and substantial justice" component of personal jurisdiction.

MBS also states that the case should be litigated in Turkey or Saudi Arabia because neither Cengiz nor Khashoggi were U.S. citizens and the murder occurred in Turkey. *See* MBS Mot. 18-19. But the United States has a strong interest in this case. Plaintiff DAWN is an American entity; Khashoggi was an American resident; the crime was perpetrated by instructing a Saudi official on U.S. soil to deceive Khashoggi into leaving the United States; and the crime's purpose was to stop Khashoggi's advocacy in the U.S. and impact U.S. policy. Although Turkey and Saudi Arabia have a strong interest in this crime as well, that is insufficient to foreclose personal jurisdiction. As the court explained in *Mwani*, "the defendants purposefully directed their activities at forum residents, and the fact that the plaintiffs are Kenyans who were injured in the process is not a consideration that would render the assertion of American jurisdiction incompatible with substantial justice." 417 F.3d at 14; *see also IMAPizza, LLC v. At Pizza Ltd.*, 334 F. Supp. 3d 95, 115 (D.D.C. 2018) ("[T]he fact that the main events underlying the claim occurred abroad does not diminish Defendants' contacts with this forum.").

### D.  The Court has pendent jurisdiction over the state-law claims.

MBS appears to concede that if the Court exercises jurisdiction under Rule 4(k)(2) over Plaintiffs' federal claims, it may also exercise pendent jurisdiction over Plaintiffs' state-law claims. MBS Mot. 19. MBS contends, however, that if the Court dismisses the federal claims, then Rule 4(k)(2) would no longer furnish a basis to exercise jurisdiction for the state-law claims. In the event the Court dismisses the federal claims with prejudice, but concludes that Plaintiffs can withstand a motion to dismiss on their state-claims, Plaintiffs would seek the opportunity to amend their complaint to address personal jurisdiction over the state-law claims.

**E.  The Court has personal jurisdiction over Al-Qahtani and Al-Assiri.**

Defendants Al-Qahtani and Al-Assiri also contest personal jurisdiction, largely incorporating Defendant MBS's arguments by reference.  Al-Qahtani Mot. 5-12.  The Court has jurisdiction over those defendants for the same reasons that it has jurisdiction over MBS.

First, the Court has jurisdiction over both defendants because they targeted the United States.  The complaint alleges that Al-Qahtani "served as a trusted adviser to MBS and was considered his 'enforcer.'"  Compl. ¶ 10.  He "acted as a co-conspirator in the murder of Jamal Khashoggi."  *Id.*  While Khashoggi was being tortured in Istanbul, Al-Qahtani "called into the torture session via a visual media call," demanding that the other murderers "[b]ring me the head of the dog."  Compl. ¶ 131.  Al-Assiri was the "Deputy Director of the Saudi General Intelligence Presidency" and "a Saudi Major General."  Compl. ¶ 11.  "[A]t the behest of Defendant MBS," Al-Assiri "planned and organized the team in Riyadh that ultimately travelled to Turkey to murder Jamal Khashoggi."  *Id.*; *see also* Compl. ¶ 104 (Al-Assiri "delivered his orders and mission plan for the murder").  Given that MBS orchestrated the murder by luring Khashoggi out of the United States, and Al-Qahtani and Al-Assiri played central roles in the murder, it is reasonable to infer that Al-Qahtani and Al-Assiri participated in luring Khashoggi out of the United States.

Moreover, with respect to Al-Qahtani, the complaint alleges other specific allegations of his contacts to the United States.  While Khashoggi was in the United States, Al-Qahtani targeted him and his speech in several ways:

- In 2016, after Khashoggi criticized Donald Trump, Al-Qahtani told him that he was "not allowed to tweet, not allowed to write, not allowed to talk."  Compl. ¶ 50.

- In 2017, Al-Qahtani contacted Khashoggi to remind him that MBS was closely monitoring his writings.  Compl. ¶ 57.

- In 2017 or early 2018, Al-Qahtani contacted Khashoggi while he was in the United States and tried to lure him back to Saudi Arabia.  Compl. ¶ 81.

Although none of these events was the but-for cause of Khashoggi's death, the Supreme Court has recently held that a plaintiff need not proffer "proof that the plaintiff's claim came about because of the defendant's in-state conduct."  *Ford Motor Co. v. Mont. Eighth Judicial Dist. Ct.*, 141 S. Ct. 1017, 1026 (2021).  Instead, personal jurisdiction requires that the suit "arise out of *or relate to* the defendant's contacts with the forum."  *Id.* (quotation marks omitted).  "The first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing."  *Id.*

Here, Al-Qahtani's contacts relate to the litigation: In his capacity as MBS's enforcer, Al-Qahtani silenced Khashoggi's speech, informed him that MBS was monitoring him, and attempted to lure him out of the United States.  Meanwhile, Khashoggi's murder—in which Al-Qahtani was closely involved—involved luring him out of the United States in order to silence his speech.  Hence, there is a close relationship between Al-Qahtani's communications with the United States and the tort.  Under *Ford*, that relationship establishes personal jurisdiction.

This Court also has jurisdiction under *Calder*'s "effects" test.  As explained above, the effect of the murder was to silence Khashoggi's speech within the United States.  Hence, Khashoggi's murderers can be held to account in the United States.  This argument establishes personal jurisdiction over all of Khashoggi's murderers, including Al-Qahtani and Al-Assiri.

If the Court concludes that the allegations in the complaint are insufficient to establish personal jurisdiction over Al-Qahtani and Al-Assiri, the Court should permit jurisdictional discovery.  *Supra*, at 15-17.  Plaintiffs' discovery requests contain requests for information regarding Al-Qahtani and Al-Assiri, designed to establish their precise role in the plot, including

26

their role in directing KBS to lure Khashoggi to Turkey.  *See* Harper Decl. ¶¶ 4-7 & Ex. B-E.
Plaintiffs expect the evidence garnered from those requests to show that those defendants, like
MBS, targeted the United States.

## II.   MBS IS NOT PROTECTED BY HEAD-OF-STATE IMMUNITY.

Defendant MBS contends he is protected by the doctrine of head-of-state immunity
because he is the Crown Prince.  Defendants Al-Qahtani and Al-Assiri do not invoke this doctrine.

MBS is incorrect.  Because MBS is not Saudi Arabia's head of state, he cannot claim the
protection of head-of-state immunity.

"The doctrine of common law foreign immunity distinguishes between two types of
immunity: status-based and conduct-based immunity."  *Lewis v. Mutond*, 918 F.3d 142, 145 (D.C.
Cir. 2019), *cert. denied*, 141 S. Ct. 156 (2020).  "Status-based immunity is reserved for diplomats
and heads of state and attaches regardless of the substance of the claim."  *Id.* (internal quotation
marks omitted).  "Conduct-based immunity is afforded to 'any public minister, official, or agent
of the state with respect to acts performed in his official capacity if the effect of exercising
jurisdiction would be to enforce a rule of law against the state.'"  *Id.* (quoting *Restatement (Second)
of Foreign Relations Law* § 66(f) (1965)) (alterations omitted).  In this case, MBS asserts status-
based immunity based only on his alleged status as Saudi head of state.

Under Section 66 of the Restatement, on which the D.C. Circuit relied in *Lewis*, the sole
officials entitled to status-based immunity are the head of state, head of government, and foreign
minister (and people designated by them as members of their official parties).  *Restatement
(Second) of Foreign Relations Law* § 66(b), (d), (e) (1965).  Any other foreign official seeking
immunity must prove the prerequisite for conduct-based immunity in Section 66(f), *i.e.*, that "the
effect of exercising jurisdiction would be to enforce a rule of law against the state."  *Id.* § 66(f);

*see also Samantar v. Yousuf*, 560 U.S. 305, 320-21 & n.15 (2010) (stating that under Restatement, only "head of state, head of government, or foreign minister" is exempt from proving requirements for conduct-based immunity).

Here, MBS claims he is entitled to head-of-state immunity.  MBS notes that he serves important roles in Saudi Arabia and is the heir to the crown.  MBS Mot. 20-22.  However, he cannot claim head-of-state immunity because he is not head of state.  King Salman bin Abdulaziz Al Saud is head of state, not MBS.  *See* U.S. Dep't of State, *2020 Country Reports on Human Rights Practices: Saudi Arabia* 1 (Mar. 30, 2021), https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/saudi-arabia.

Significantly, although MBS notes that he has requested a State Department suggestion of immunity, MBS Mot. 20, the State Department has not suggested that MBS is immune.  When the State Department suggests that a foreign official is entitled to status-based immunity, that determination is entitled to absolute deference from courts.  *See Manoharan v. Rajapaksa*, 711 F.3d 178, 180 (D.C. Cir. 2013).  This reflects the principle that "head-of-state immunity involves a formal act of recognition, that is a quintessentially executive function for which absolute deference is proper."  *Yousuf v. Samantar*, 699 F.3d 763, 772 (4th Cir. 2012) (internal quotation marks omitted).  The State Department has previously suggested that the Saudi King is immune under head-of-state immunity.[7]  But the State Department has never recognized MBS as entitled to such immunity, and the Court should not do so in the first instance.[8]

---

[7] Suggestion of Immunity, *Al Fassi v. King Fahd Bin Abdulaziz*, No. 03-3841 (C.D. Cal Aug. 4, 2003), ECF No. 49; Suggestion of Immunity at 1, *Alicog v. Kingdom of Saudi Arabia*, No. H-93-4169 (S.D. Tex. May 24, 1994), ECF No. 23.

[8] Notably, the White House Press Secretary recently announced that President Biden would communicate with the King Salman, not MBS, because "[t]he President's counterpart is King Salman."  *See* White House to communicate with Saudi King instead of crown prince as US

The Court should follow *Hassen v. Nahyan*, No. CV 09–01106, 2010 WL 9538408 (C.D. Cal. Sept. 17, 2010).  In *Hassen*, Defendant Sheikh Mohamed sought status-based immunity because he was the Crown Prince of the UAE, the Ruler of Abu Dhabi, and the *de facto* head of the UAE armed forces.  *Id.* at *4, *6 n.3.  The court rejected this contention.  It explained that Sheikh Mohamed was not the head of state, head of government, or foreign minister, and there was "no legal basis to extend absolute immunity" based on his other positions in the UAE government.  *Id.* at *5-6.  The Court observed that the State Department had not requested immunity, and declined to stay the case pending a future determination by the State Department. *Id.* at *6 & n.3.  Identical reasoning supports denying immunity here.

Similarly, in *Aldossari ex rel. Aldossari v. Ripp*, No. 20-3187, __ F. Supp. 3d __, 2021 WL 1819699 (E.D. Pa. May 6. 2021), *appeal docketed*, No. 21-2080 (3d Cir. June 9, 2021), the court expressed considerable skepticism on whether MBS is entitled to status-based immunity, although it did not ultimately decide the issue.  The court observed that "[w]hether to recognize a head of state is best left to the Executive."  *Id.* at *17.  "Courts are reluctant to declare that an individual is a 'head of state' absent some indication from the political branches."  *Id.*  The court observed that the State Department had not requested immunity on the basis of MBS's status as heir apparent.  *Id.* It also stated that "no suggestion that the Executive has yet extended this immunity to a Deputy Prime Minister or Min[i]ster of Defense—positions that the Crown Prince currently holds."  *Id.*  The court ultimately declined to decide the question based on its holding that MBS was entitled to conduct-based immunity, *id.* at *17-18—an argument MBS does not advance here.

---

reassesses   relationship,   https://www.cnn.com/2021/02/16/politics/white-house-saudi-arabia/index.html.

The case law that MBS cites does not support his position.  In the three American cases cited by MBS (MBS Mot. 20 n.14), all unpublished trial-level court decisions from the 1970s and 1980s, courts deferred to State Department requests for immunity.  *Kilroy v. Windsor*, No. C 78-291, 1978 U.S. Dist. LEXIS 20419, at *1-3 (N.D. Ohio Dec. 7, 1978), involved a State Department request for *diplomatic* immunity (which MBS does not seek here).  In the other two cases, the State Department requested immunity for wives of heads of state, and the court deferred to those requests.  *Kline v. Kaneko*, 535 N.Y.S.2d 303 (N.Y. Sup. Ct. 1988), *aff'd*, 546 N.Y.S.2d 506 (App. Div. 1989); *Estate of Domingo v. Marcos*, No. C82-1055V, 1983 WL 482332 (W.D. Wash. July 14, 1983).  MBS does not cite any case in which a court granted status-based immunity *without* a request from the State Department—which is what MBS seeks here.

MBS also cites *Apex Global Management Ltd. v. Fi Call Ltd.*, [2013] EWHC 587 (Ch) ("*Apex*"), MBS Mot. 21-22.  But in that case, the court applied the U.K. State Immunities Act, which differs from U.S. law.  That Act grants immunity to a head of state's "family forming part of his household[]."  U.K. State Immunity Act of 1978, ch. 33, pt. III, § 20(1).  The portion of *Apex* cited by MBS interprets the statutory term "household."  *Apex* ¶¶ 106-107.  No analogous American statute exists, and the Restatement does not embody a similar "household" concept.[9]  Moreover, the U.K. statute at issue includes numerous carve-outs, such as for personal injury or wrongful death.  U.K. State Immunity Act of 1978, ch. 33, pt. I, §§ 1-11.  Hence, even under U.K.

---

[9] MBS asserts that "Federal courts have looked to the Act, and judicial interpretations of it, as indicative of international law."  MBS Mot. 23 n.24.  That is a stretch.  MBS cites only one federal court decision for this proposition, a case from 1981 that merely cites the Act in a string citation in support of the sentence "At this point, there can be little doubt that international law follows the restrictive theory of sovereign immunity." *Tex. Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 310 (2d Cir. 1981), *overruled on other grounds by Frontera Res. Azerbaijan Corp. v. State Oil Co. of Azerbaijan Republic*, 582 F.3d 393 (2d Cir. 2009).  The case does not address the statute further and does not reference the statute's head of state immunity.

law, Plaintiffs could likely sue MBS for his wrongful murder of Khashoggi.  Finally, even taken on its own terms, *Apex* does not hold that MBS is entitled to head-of-state immunity.  *Apex*'s holding is that two Saudi princes were *not* entitled to immunity.  *Apex* ¶ 122.  *Apex* does state that "an adult member of a sovereign's or head of State's family exercising Royal or presidential, constitutional and representational functions *could be regarded in some circumstances* as a member of the sovereign's or head of State's household," *id.* ¶ 144, but that lukewarm dictum does not show that MBS is entitled to head-of-state immunity in this case.

There are also strong pragmatic reasons to decline MBS's invitation to find him a head of state.  "Independent resolution of whether a defendant is a head of state, . . . would lead courts into the murky waters of foreign policy, implicating complex problems that the judiciary is ill equipped to handle." *Sikhs for Justice v. Singh*, 64 F. Supp. 3d 190, 194 (D.D.C. 2014).  In particular, courts would face the difficult task of assessing the authority of officials in foreign and unfamiliar legal systems.  This case illustrates that concern.  In support of his argument that he is a "head of state," MBS relies on sources such as Saudi press releases, MBS Mot. 21 n.18; a "Readout" from Mike Pompeo's phone call with MBS, *id.* at 22 n.20; a press release from the British government, *id.* at 22 n.23; a transcript of an interview on ABC News, *id.* at 22 n.21; and even an *Al Jazeera* article concerning MBS's arrival in Pakistan, *id.* at 22 n.23.  There is no feasible way for the Court to assess the reliability and relevance of these sources as a measure of MBS's power.  Making matters worse, MBS cites no coherent dividing line to determine who is entitled to status-based immunity.  MBS does not even state which facts should be dispositive here—never articulating whether his status as heir, occasional "Acting King," occupier of other positions, or some combination of the three is enough to confer status-based immunity.  The Court should reject MBS's indeterminate test and hold that he is not entitled to head-of-state immunity.

### III.   DEFENDANTS ARE NOT PROTECTED BY THE ACT OF STATE DOCTRINE.

MBS contends that MBS's alleged act of instructing KBS to deceive Khashoggi into going to Turkey was an act of state, requiring dismissal under the act of state doctrine.  MBS Mot. 23-27; *see also* Al-Qahtani Mot. 13 (incorporating MBS's arguments by reference).

The act of state doctrine "precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory." *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964).  It applies when "the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *W.S. Kirkpatrick & Co. v. Env't Tectonics Corp., Int'l*, 493 U.S. 400, 405 (1990).

This case does not implicate the act of state doctrine for numerous reasons.

***First***, MBS's instruction to KBS was not an "official act of a foreign sovereign."  "To qualify as 'official,' an act must be imbued with some level of formality, such as authorization by the foreign sovereign through an official 'statute, decree, order, or resolution.'" *Kashef v. BNP Paribas S.A.*, 925 F.3d 53, 60-61 (2d Cir. 2019) (quoting *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 695 (1976)).  MBS does not contend that any official "statute, degree, order, or resolution" ever occurred.  Indeed, he denies Plaintiffs' allegations.  He merely argues, in the alternative, that *if* the allegations are true, *then* they must inherently have involved an official "statute, decree, order, or resolution" because they were carried out by high-level Saudi officials.

That is not how the act of state doctrine works.  If the allegations are true, they would establish an abuse of authority by MBS, which is *not* an official "statute, decree, order, or resolution" of the Saudi government.  Contrary to MBS's contention, if a foreign official abuses his authority to commit an atrocity, that act is not an act of state.  Under international law, a foreign

sovereign is not even *capable* of officially authorizing an extrajudicial killing for purposes of the act of state doctrine. *Warfaa v. Ali*, 33 F. Supp. 3d 653, 662 (E.D. Va. 2014) (extrajudicial killings "constitute *jus cogens violations* and therefore are not recognized as official sovereign acts"), *aff'd*, 811 F.3d 653 (4th Cir. 2016).

Moreover, MBS does not show that Saudi Arabia ever did authorize this extrajudicial killing. To the contrary, he affirmatively states that Khashoggi's murder was a "crime [in] Saudi Arabia." MBS Mot. 24. Foreign officials who commit atrocities in violation of local law cannot invoke the act of state doctrine. *Kashef*, 925 F.3d at 60-61 ("BNPP . . . point[s] to no statute, decree, order, resolution, or comparable evidence of sovereign authorization for any of the actions in question. On the contrary, the atrocities alleged to have occurred unquestionably violated Sudanese law."); *Kadic v. Karadzic*, 70 F.3d 232, 250 (2d Cir. 1995) ("[W]e doubt that the acts of even a state official, taken in violation of a nation's fundamental law and wholly unratified by that nation's government, could properly be characterized as an act of state."). That principle applies even when the wrongdoer is the head of state. *Jimenez v. Aristeguieta*, 311 F.2d 547, 557-58 (5th Cir. 1962) (rejecting Venezuelan dictator's invocation of act of state doctrine for "common crimes committed by the Chief of State done in violation of his position and not in pursuance of it").

Indeed, the Torture Victim Protection Act of 1991 ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73, presupposes that foreign officials can engage in extrajudicial killings without implicating the act of state doctrine. The TVPA *requires* that the defendant committed his acts "under actual or apparent authority, or color of law, of any foreign nation." TVPA, § 2(a); *see* 28 U.S.C. § 1350 note. If any such acts automatically constituted "acts of state," then all TVPA claims would be barred by the act of state doctrine. That is not the law.

Apparently recognizing these principles, MBS focuses narrowly on his instructions to KBS as constituting an act of state.  MBS Mot. 23-27.  But again, the complaint alleges that these instructions were intended to deceive Khashoggi into traveling to Turkey for purposes of facilitating his extrajudicial killing.  MBS cannot and does not argue that abusing his authority in order to orchestrate a murder somehow constitutes an official act of the Saudi sovereign.

***Second***, MBS's act was not the type of formal sovereign act that implicates the act of state doctrine.  "A foreign state acts, for example, when a military commander orders that someone be detained; when it seizes and sells, nationalizes, or appropriates property; when it requires a bank to pay tax on a transaction; or when it publishes allegedly defamatory material on an embassy website.  It does not 'act' in the relevant sense, however, when it merely declares its position on an issue that reaches beyond its borders and over which it lacks the power to dictate any actual consequences."  *United States v. Sum of $70,990,605*, 234 F. Supp. 3d 212, 242 (D.D.C. 2017) (internal citations and emphasis omitted).

Here, MBS merely declared his a position on an issue that reached beyond Saudi Arabia's borders and over which Saudi Arabia lacked the power to dictate any actual consequences.  Specifically, MBS urged KBS to tell Khashoggi that he would be safe at the Saudi consulate in Istanbul.  Hence, KBS gave informal advice to a private citizen regarding his safety in a foreign country over which Saudi Arabia had no legal authority.  MBS emphasizes that the "official speech of the . . . government on an official government platform" may implicate the act of state doctrine, *Hourani v. Mirtchev*, 796 F.3d 1, 12 (D.C. Cir. 2015); *see Nnaka v. Federal Republic of Nigeria*, 238 F. Supp. 3d 17 (D.D.C. 2017) (official letter by Nigeria's attorney general was covered by act of state doctrine), *aff'd*, 756 F. App'x 16 (D.C. Cir. 2019); MBS Br. 24-25.  But in this case the

34

speech was unofficial and appeared on no government platform, and MBS denies that it ever occurred at all.  This informal advice to a private citizen does not implicate the act of state doctrine.

*Third*, the act of state doctrine requires that the act take place in the sovereign's territory. *See Agudas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 952 (D.C. Cir. 2008).  That criterion is not satisfied here.  MBS reached outside of Saudi Arabia to lure a foreign resident from one foreign country (the United States) to a different foreign country (Turkey).

MBS emphasizes that he was physically present in Saudi Arabia at the time of his illegal act.  But that is irrelevant to the act of state doctrine.  When a government orders a murder of an American resident, it cannot absolve itself under the act of state doctrine merely because the murder was ordered within its own territory.  *Letelier v. Republic of Chile*, 488 F. Supp. 665, 674 (D.D.C. 1980) ("Although the acts allegedly undertaken directly by the Republic of Chile to obtain the death of Orlando Letelier may well have been carried out entirely within that country, that circumstance alone will not allow it to absolve itself under the act of state doctrine if the actions of its alleged agents resulted in tortious injury in this country."); *see also, e.g.*, *Villoldo v .Castro Ruz*, 821 F.3d 196, 202-04 (1st Cir. 2016) (law enacted in foreign country does not implicate act of state doctrine when it purports to regulate property in the United States).

Contrary to MBS's contention, this case is not analogous to *Hourani*.  In *Hourani*, a Kazakh official made statements that the plaintiffs had committed illegal acts in Kazakhstan, such as "import[ing] workers into Kazakhstan who were 'trained in Islamic terrorist camps.'"  796 F.3d at 11.  Those statements later "appeared on the website of the Kazakh Embassy in the United States with the active support of the Kazakh ambassador."  *Id.* (internal quotation marks omitted).  The plaintiffs sued for defamation.  The D.C. Circuit held the case barred by the act of state doctrine.  The court explained that "the Ambassador's speech formally communicated the foreign

government's official view of domestic events occurring within its own territory, involving its own nationals, and implicating its own national security." *Id.* at 14.  It concluded that "a foreign government['s] . . . official speech about its own nationals' domestic activities is the kind of distinctly sovereign act and formal governmental action concerning internal affairs that triggers the Act of State doctrine's and international comity's traditional concerns." *Id.* (internal quotation marks omitted).  Unlike *Hourani*, this case does not involve Saudi Arabia's "official speech about its own nationals' domestic activities."  Instead, MBS reached outside of Saudi Arabia in order to persuade a U.S. resident that he could travel to a different foreign country.

**Fourth**, even if MBS's action was an act of state, the act of state doctrine would still not bar this suit.  "The act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments, but merely requires that, in the process of deciding, the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid." *W.S. Kirkpatrick*, 493 U.S. at 409.  Hence, the doctrine applies only when "the relief sought or the defense interposed" would "require[] a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory." *Id.* at 405.

That condition is not satisfied here.  The actual tortious act—Khashoggi's murder—took place outside of Saudi Arabia.  MBS does not contend that act implicates the act of state doctrine.  Instead, MBS contends that the act underlying one of Plaintiffs' two theories of personal jurisdiction—that MBS requested that KBS convey a message to Khashoggi—was an act of state.

If the Court finds that it has personal jurisdiction under the *Calder* effects test, then MBS's argument is wholly irrelevant because it would not matter whether MBS ever contacted KBS. *Id.* at 406 ("Act of state issues only arise when a court *must decide* — that is, when the outcome of the case turns upon — the effect of official action by a foreign sovereign.").  Even if the sole viable

theory of personal jurisdiction turns on whether MBS contacted KBS, the act of state doctrine still would not apply.  The "relief sought" would not "require[] a court in the United States to declare invalid" any Saudi act.  *Id.* at 405.  Plaintiffs do not contend that MBS's contacting of KBS sufficed to establish MBS's liability.  Rather, Plaintiffs contend that MBS's contacting of KBS satisfied the "minimum contacts" personal jurisdiction requirement, therefore opening the door for MBS's liability for the actual murder, which took place in Turkey.  Hence, Plaintiffs are not attempting to *invalidate* MBS's call to KBS, but merely show that it *occurred*.  Such a claim does not implicate the act of state doctrine.  *See id.* at 406 ("The issue in this litigation is not whether [the alleged] acts are valid, but whether they occurred." (quotation marks omitted) (alteration in original)).

**Finally**, if the Court has any doubt as to the applicability of the act of state doctrine, the Court should defer consideration of that issue.  "[T]he party invoking the act of state doctrine bears the burden to prove its applicability."  *United States v. Sum of $70,990,605*, 4 F. Supp. 3d 189, 204 (D.D.C. 2014).  "Additionally, as a substantive rather than a jurisdictional defense, the Act of State doctrine is more appropriately raised in a motion for summary judgment than in a motion to dismiss."  *Id.* (alterations and internal quotation marks omitted).  Here, there are abundant disputed facts; indeed, MBS disputes that the alleged act of state ever occurred.  MBS's argument is not appropriately raised at the motion to dismiss stage.

## IV.   THIS SUIT SHOULD NOT BE DISMISSED BASED ON SAUDI ARABIA'S SOVEREIGN IMMUNITY.

MBS contends that Saudi Arabia is an indispensable party, and that this suit requires dismissal because Saudi Arabia is immune.  MBS Mot. 28-34; *see* Al-Qahtani Mot. 13 (incorporating argument by reference).  That argument is unpersuasive for several reasons.

Under Federal Rule of Civil Procedure 19(a)(1)(B), joinder of a party is required if the party "claims an interest relating to the subject of the action and is so situated that disposing of the

action in the person's absence may . . . as a practical matter impair or impede the person's ability to protect the interest."  If joinder is not feasible, "the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).  MBS, as the moving party, "bears the burden to demonstrate that [the] absent party is required under Rule 19."  *Cronin v. Adam A. Weschler & Son, Inc.*, 904 F. Supp. 2d 37, 41 (D.D.C. 2012).  Here, joinder of Saudi Arabia is not required, and even if it was, dismissal of this litigation would not be warranted.

First, Saudi Arabia is not a required party because it does not claim a legitimate "interest relating to the subject of the action."  Fed. R. Civ. P. 19(a)(1)(B).  The premise of MBS's argument is that Plaintiffs' lawsuit directly attacks Saudi acts of state.  That is incorrect.  Although MBS exercised his authority and purported to act under color of law, his actions were not acts of state. *See supra* at 32-36.  Instead, they are atrocities reflecting an abuse of MBS's authority.

MBS cites no authority in which a sovereign entity was held to be a required party when a suit alleged that an official of that sovereign abused his authority.  MBS primarily relies on *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008), but that case concerned assets in which the Philippine government asserted a proprietary interest, and all parties agreed that the Philippines were a required party under Rule 19(a).  *Id.* at 863-64.  Likewise, in *TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1 (D.D.C. 2013), *aff'd*, No. 14-7036, 2015 WL 3653187 (D.C. Cir. June 9, 2015), on which MBS relies, "the plaintiff [wa]s asking for an examination of the reasons for, and propriety of, a foreign sovereign's decision to award a contract for a construction project in a foreign state."  *Id.* at 12.  Thus, the plaintiff was challenging an act that, all parties agreed, was directly attributable to the foreign government.  Here, by contrast, MBS concedes that Khashoggi's murder violated Saudi law.  Hence, this suit does not implicate Saudi Arabia's sovereign interests.

MBS insists that Saudi Arabia has "sovereign interests in using its own courts for a dispute if it has a right do so." MBS Mot. 29-30 (internal quotation marks omitted). That interest does not render it a required party. Nothing in this suit is stopping Saudi Arabia from prosecuting any Saudi national in Saudi courts. At most, this litigation may have collateral effects on parallel Saudi litigation, but that is irrelevant under Rule 19(a). *Cf. Nanko Shipping, USA v. Alcoa, Inc.*, 850 F.3d 461, 465 (D.C. Cir. 2017) ("[T]he requirements of Rule 19(a) are not satisfied simply because a judgment against Defendants in this action might set a persuasive precedent in any potential future action") (quotation marks omitted). Indeed, MBS's argument would imply that federal courts can *never* hear TVPA cases. The TVPA expressly authorizes suits against foreign officials based on torturous acts committed under color of foreign law. *See* TVPA, § 2. Foreign countries invariably have an interest in prosecuting their own rogue officials. Hence, MBS's argument would imply that foreign countries are always required parties in TVPA cases, requiring invariable dismissal under Rule 19. That is not the law.

Likewise, MBS asserts that Saudi Arabia is a required party because Plaintiffs allege that the Saudi justice system is inadequate to hold MBS accountable. MBS Br. 28-29. But American courts routinely consider the adequacy of foreign tribunals—indeed, the TVPA *requires* courts to consider the adequacy of foreign remedies as a prerequisite to bringing suit in the United States. *See, e.g.*, *Boniface v. Viliena*, 338 F. Supp. 3d 50, 66-67 (D. Mass. 2018). Again, this does not make the foreign country a required party under Rule 19(a).

Even if Saudi Arabia was a required party, dismissal would not be warranted under Rule 19(b). Under Rule 19(b), courts must consider four factors in determining whether to dismiss an action. The first is "the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties." Fed. R. Civ. P. 19(b)(1). Saudi Arabia cites language

in *Pimentel* stating that "dismissal of the action must be ordered where there is a potential for injury to the interests of the absent sovereign." 553 U.S. at 867. But here, MBS has not met his burden of showing that there is a "potential for injury to the interests of the absent sovereign." *Id.*

Saudi Arabia's interests will not be prejudiced because MBS is fully able to protect Saudi Arabia's interests in this case.[10] Courts consistently decline to dismiss actions under Rule 19(b) when a non-immune party can adequately protect the immune party's interests. For example, in *de Csepel v. Republic of Hungary*, No. 10-CV-01261, 2020 WL 2343405 (D.D.C. May 11, 2020), *appeal docketed*, No. 20-7047 (D.C. Cir. June 10, 2020), the plaintiffs sued a company owned by the Hungarian government, seeking the return of stolen artworks. The company argued that Hungary, which owned the artworks, was a required party that was immune, necessitating dismissal under *Pimentel*. *Id.* at *15. The court rejected this argument, concluding that "in contrast to the sovereign in *Pimentel*, Hungary's interests are adequately protected in this case by the remaining defendants." *Id.* It found that the remaining defendants had the same interest as Hungary, "i.e., that Hungary . . . continue [its] possession of the artwork and pay no damages." *Id.*; *see also, e.g.*, *Vann v. U.S. Dep't of Interior*, 701 F.3d 927, 929–30 (D.C. Cir. 2012) ("[T]he Principal Chief can adequately represent the Cherokee Nation in this suit, meaning that the Cherokee Nation itself is not a required party for purposes of Rule 19."); *Gensetix, Inc v. Bd. of Regents of Univ. of Tex. Sys.*, 966 F.3d 1316, 1326 (Fed. Cir. 2020) (declining to apply *Pimentel* when private litigant "is fully able (and willing) to . . . protect the absent sovereign's interests").

---

[10] Courts consider adequacy of representation both under the Rule 19(a) analysis (whether an absent party's interests are "impeded") and under the Rule 19(b) analysis (whether the action can proceed "in equity and good conscience"). *See de Csepel v. Republic of Hungary*, No. 10-CV-01261, 2020 WL 2343405, at *14 (D.D.C. May 11, 2020), *appeal docketed*, No. 20-7047 (D.C. Cir. June 10, 2020). Consistent with *de Csepel* and the bulk of case law, Plaintiffs will analyze this issue under Rule 19(b).

Here, MBS, Saudi Arabia's Crown Prince, is fully able to protect Saudi Arabia's interests. As stated above, MBS is a sophisticated litigant with near unlimited resources who is represented by skilled counsel. He has access to the same witnesses as Saudi Arabia: for instance, in responding to Plaintiffs' motion to dismiss, he was able to get declarations from a Saudi Embassy official and KBS, the former Saudi ambassador. MBS identifies nothing that Saudi Arabia would bring to this litigation that he would be unable to bring. *See Nanko Shipping*, 850 F.3d at 465 ("[E]vidence of Guinea's actions, views, or prerogatives can be discovered and introduced where relevant to the parties' claims and defenses even if Guinea remains a nonparty.").

MBS argues that *de Csepel* did not consider "Hungary's sovereign interest in deciding significant disputes in its own courts." MBS Mot. 34 n.33. MBS's effort to distinguish *de Csepel* is not persuasive. Even accepting that the "interest in deciding significant disputes in its own courts" is cognizable under Rule 19, the pertinent question is not whether Saudi Arabia has that interest, but whether MBS can protect Saudi Arabia's interests. He can. MBS can make, and is making, all the arguments Saudi Arabia would otherwise make about comity interests.

The remainder of the Rule 19(b) factors favor Plaintiffs. Rule 19(b)(2) requires consideration of whether "any prejudice could be lessened or avoided." Here, Saudi Arabia has not shown it would be prejudiced if MBS were to represent its interests.

Rule 19(b)(3) requires consideration of "whether a judgment rendered in the person's absence would be adequate." The answer is yes: MBS and the co-defendants are capable of paying the money judgment that Plaintiffs seek. MBS contends that the judgment would be "inadequate . . . unless Saudi Arabia were bound to enforce it," MBS Mot. 33. That is incorrect: Plaintiffs believe the judgment can be enforced against assets outside of Saudi Arabia, including in the United States. In any event, Saudi Arabia does not need to be a party to this litigation for Plaintiffs

to seek enforcement in Saudi courts.  Litigants routinely come to American courts seeking to enforce foreign judgments; that does not make the United States a required party to all of those foreign lawsuits.

Finally, Rule 19(b)(4) requires considering "whether the plaintiff would have an adequate remedy if the action were dismissed for nonjoinder."  In *Pimentel*, a parallel action on the same issue was pending in a Philippine court (the Sandiganbayan), and the Supreme Court held that a "relevant change" to the balance of equities "may occur if it appears that the Sandiganbayan cannot or will not issue its ruling within a reasonable period of time."  553 U.S. at 873.  Here, by contrast, MBS does not argue that Plaintiffs can hold MBS accountable in Saudi court.  MBS Mot. 44 n.40. MBS argues that this factor is not *dispositive* (MBS Mot. 33), but it is still *relevant*, and courts routinely distinguish *Pimentel* on this basis.  *See de Csepel*, 2020 WL 2343405, at *15 (distinguishing *Pimentel* when litigation in Hungarian court would be futile); *Gensetix*, 966 F.3d at 1326 (distinguishing *Pimentel* when there was no alternative forum).

## V.   CENGIZ STATES A TVPA CLAIM.

The TVPA provides that "[a]n individual who, under actual or apparent authority, or color of law, of any foreign nation . . . subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages . . . to any person who may be a claimant in an action for wrongful death."  TVPA, § 2.  Cengiz's allegations straightforwardly state a TVPA claim.  Defendants are "individual[s]" who, "under actual or apparent authority, or color of law," of Saudi Arabia, subjected Khashoggi to an extrajudicial killing in a Saudi consulate while he was seeking a document only the Saudi government could provide.

MBS advances two arguments for dismissal of Cengiz's TVPA claim.  First, he argues that Cengiz is not a "person who may be a claimant in an action for wrongful death."  Second, he argues

that Cengiz must exhaust Turkish remedies.  Al-Qahtani and Al-Assiri make two additional arguments: that the TVPA does not permit secondary liability, and that the allegations against them are too speculative.  All of Defendants' arguments lack merit.

### A.  Cengiz is a "person who may be a claimant in an action for wrongful death."

Turkish law governs whether Cengiz is a "person who may be a claimant in an action for wrongful death."  Under Turkish law, Cengiz qualifies as such a person.

#### 1.  Turkish law applies.

To decide whether Cengiz is a "person who may be a claimant in an action for wrongful death" under the TVPA, the Court must first decide which jurisdiction's law applies.  Turkish law applies because Cengiz is a Turkish national and the murder occurred in Turkey.

In deciding whether a person "may be a claimant in an action for wrongful death" under the TVPA, courts have generally applied state choice-of-law rules, and MBS adopts this approach as well.  MBS Br. 37-44.  In some cases, courts have concluded that the law of the "plaintiff's state of domicile" should apply.  *See Fisher v. Great Socialist People's Libyan Arab Jamahiriya*, 541 F. Supp. 2d 46, 54-55 (D.D.C. 2008).  Others have courts have applied the law of the place where the tort occurred.  *See Jara v. Nunez*, No. 6:13-cv-1426-ORL37, 2014 WL 12623015, at *4 (M.D. Fla. June 30, 2014) (applying Chilean law because "the injury occurred in Chile, the tort occurred in Chile, and the relationship of the parties was centered in Chile").  In this case, the Court need not select between these options, because they point in the same direction: Cengiz is Turkish, and the murder occurred in Turkey.  Hence, Turkish law applies.

This analysis is consistent with case law addressing the closely related choice-of-law question for extrajudicial killing claims under the FSIA.  On that issue, D.C. courts apply D.C.'s choice-of-law rules, under which courts "blend a 'governmental interests analysis' with a 'most

significant relationship' test." *Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842 (D.C. Cir. 2009).[11]  In applying these rules, courts have sometimes selected the domicile of the plaintiff and sometimes the location of the tort.  *See, e.g.*, *Dammarell v. Islamic Republic of Iran*, No. Civ.A. 01-2224, 2005 WL 756090, at *19-20 (D.D.C. Mar. 29, 2005) (stating that the "possibilities" were the domicile of the plaintiff and the law of Lebanon, where the tort occurred, before ultimately selecting the plaintiff's domicile).  But when the plaintiff's domicile and the location of the tort are the same, the law of that jurisdiction applies.  In *Oveissi*, the D.C. Circuit was faced with an extrajudicial killing case where the murder occurred in France and the plaintiff was a French domiciliary.  The court found that "the factors overwhelmingly point in the direction of France." 573 F.3d at 842.  It observed that "this is not a case in which we must choose between applying the law of the jurisdiction where the tort occurred versus that where the plaintiff was domiciled, as both are the same.  Moreover, in addition to having the most significant relationship to the assassination, France has a strong governmental interest in both deterring attacks within its sovereign borders and ensuring compensation for injuries to its domiciliaries."  *Id.*  *Oveissi* establishes that Turkish law applies because Cengiz is domiciled in Turkey and the murder occurred in Turkey.  *See also Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 372-73 (D.D.C. 2020) (applying Israeli law when plaintiffs lived in Israel and attacks occurred in Israel).

---

[11] "Under the governmental interests analysis, a court must evaluate the governmental policies underlying the applicable laws and determine which jurisdiction's policy would be most advanced by having its law applied to the facts of the case under review."  *Id.* (quotation marks and alterations omitted).  "To determine which jurisdiction has the most significant relationship," a court considers "[t]he four Restatement factors:" "(1) 'the place where the injury occurred'; (2) 'the place where the conduct causing the injury occurred'; (3) 'the domicil[e], residence, nationality, place of incorporation and place of business of the parties'; and (4) 'the place where the relationship, if any, between the parties is centered.'"  *Id.* (citation and alterations omitted).

Moreover, Turkish law applies for an additional reason.  MBS applies Turkish law for the proposition that Khashoggi was not legally married to Cengiz because Turkey requires a civil marriage certificate.  MBS Mot. 36-37.  But if the Court applies Turkish law to determine rights that Cengiz *lacks* (*i.e.*, the rights of a spouse), it should also apply Turkish law to determine the rights that Cengiz *has* (*i.e.*, the rights to sue for wrongful death).  It makes little sense to apply Turkish law for the proposition that Cengiz is a fiancée rather than a spouse, while then disregarding the portion of Turkish law providing that Cengiz can sue as a fiancée.  *Infra*, at 46-50

MBS contends that Virginia, Saudi, or D.C. law, not Turkish law, should apply.  As to Virginia law, MBS cites *Dammarell* for the proposition that "[t]he claims of a decedent's estate are traditionally governed by the laws of the decedent's domicile."  MBS Br. 42 (quoting *Dammarell*, 2005 WL 756090, at *21).  MBS's argument erroneously conflates survival suits with wrongful death suits.  In a survival suit, the plaintiff pursues a "tort cause of action that the decedent could have pursued if he or she had survived."  *Casey v. McDonald's Corp.*, 880 F.3d 564, 570 (D.C. Cir. 2018).  A "wrongful death claim, on the other hand, compensates the spouse and next of kin for their loss resulting from the decedent's death."  *Weil v. Seltzer*, 873 F.2d 1453, 1462 (D.C. Cir. 1989).  Thus, a plaintiff in a wrongful-death suit seeks her *own* damages resulting from a death.  The TVPA refers to wrongful death claims, not survival claims.  Hence, the plaintiff is not the "decedent's estate."  MBS Br. 42.  Rather, the plaintiff is Cengiz, suing in her own right.  Cengiz seeks damages for her *own* financial and emotional harm.  Compl. ¶¶ 180-181, 195.  Thus, the law of Turkey, Cengiz's domicile, applies—as *Dammarell* makes clear.  2005 WL 756090, at *21 ("[I]n the case of [suits brought by] survivors, the dominant rule is that the law of the state of

the survivor (rather than the decedent) should provide the rule of decision, on the theory that the survivor is usually the injured party in these claims.").

MBS also contends that D.C. law might apply because the suit was filed in D.C.  MBS Mot. 43-44.  But D.C.'s wrongful death statute expressly states it applies to "an injury done or happening within the limits of the District."  D.C. Code § 16-2701.  Here, the actual murder did not occur in D.C.  MBS also suggest that Saudi law might apply because the murder took place at the Saudi Embassy.  MBS Mot. 43-44.  But Turkey has the greater interest in a murder orchestrated on Turkish soil.  *See Embassy of the Federal Republic of Nigeria v. Ugwuonye*, 901 F. Supp. 2d 136, 143 & n.12 (D.D.C. 2012) (applying D.C. law to contract dispute involving Nigerian embassy and noting that the "Embassy is located in the District of Columbia").  MBS cannot reach outside of Saudi Arabia's borders and orchestrate the murder of a Turkish national on Turkish soil, and then seek to cloak himself in Saudi law.

### 2.   Under Turkish law, Cengiz may sue for wrongful death.

Cengiz qualifies as a person who may sue for wrongful death for two independent reasons. First, MBS does not dispute that Cengiz can sue under Turkish law for her emotional injuries.  A suit seeking compensation for emotional injuries caused by someone's death is a suit for wrongful death, so Cengiz may sue for wrongful death under Turkish law.  Second, contrary to MBS's contention, Cengiz could also sue for pecuniary damages under Turkish law.

#### a.   Under Turkish law, Cengiz is eligible to bring a wrongful death action seeking compensation for her emotional injury.

The complaint alleges that Khashoggi's murder caused Cengiz "severe mental pain and suffering; loss of guidance, companionship, and consortium; and loss of solatium."  Compl. ¶ 181. It is undisputed that under Turkish law, Cengiz may maintain a claim for such damages.  Plaintiffs' Turkish law expert, Çetinkaya, explains that Cengiz may bring a claim for "material and moral

compensation" to provide compensation for emotional suffering. Çetinkaya Decl. ¶¶ 70-71. MBS's expert on Turkish law, Varol, does not dispute this point. He acknowledges that an action for "material and moral compensation" seeking emotional damages is available under Turkish law. Varol Decl. ¶ 39. He also acknowledges that "[t]hose potentially eligible to claim damages for emotional suffering" are "engaged couples, cohabiting couples, close friends," so long as the plaintiff has a "very close and sincere emotional attachment" to the deceased. Varol Decl. ¶ 40.

Hence, Cengiz is a "person who may be a claimant in an action for wrongful death" under Turkish law. A "wrongful-death action" is a "lawsuit brought on behalf of a decedent's survivors for their damages resulting from a tortious injury that caused the decedent's death." *Black's Law Dictionary* (11th ed. 2019). That describes Cengiz's claim as cognized under Turkish law.

MBS responds that because nonpecuniary damages are not "traditional[ly]" available for wrongful death, it follows that Cengiz's Turkish law action is not an action for wrongful death. MBS Mot. 41. This is incorrect. State law varies on whether nonpecuniary actions are available for wrongful death. But in the states that do permit nonpecuniary damages, those damages are available in actions *for wrongful death*. There is no separate cause of action, with a different title, seeking nonpecuniary damages for someone's death. For example, D.C. does not permit nonpecuniary damages for wrongful death, but Maryland and Virginia both do. And in both states, those damages are authorized *in their wrongful death statutes*. Md. Code Ann. Cts. & Jud. Pro. § 3-904(d); Va. Code Ann. § 8.01-52. In other words, an action seeking nonpecuniary damages arising from someone's death, where it is available, *is* an action for wrongful death. Such an action is available in Turkey, so under Turkish law, Cengiz may bring an action for wrongful death.

The case law cited by MBS (MBS Br. 41) is irrelevant. One case holds that a "gloss" on a particular federal maritime statute was "well established" and hence incorporated into a different

federal maritime statute. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990). The other observes

that D.C.'s wrongful death statute permits recovery of only pecuniary damages. *Runyon v. District*

*of Columbia*, 463 F.2d 1319, 1322 (D.C. Cir. 1972). Neither speaks to the question of whether

Cengiz could bring an action for wrongful death under Turkish law.

> ### b.   Under Turkish law, Cengiz is eligible to bring an action for pecuniary damages.

Even if Cengiz were required to show that she could bring a Turkish action for pecuniary

damages arising from Khashoggi's death, she could make that showing.

The complaint alleges that "Plaintiff Cengiz was . . . financially dependent on Khashoggi."

Compl. ¶ 166. "Khashoggi purchased an apartment on September 25, 2018, for 1,252,000.00

Turkish Lira (approximately $218,000.00 USD)." Compl. ¶ 93. "The couple planned and agreed

to hold title to the apartment jointly following the legal confirmation of their marriage." *Id.* In

addition, "[o]n several occasions, Khashoggi sent funds to Plaintiff Cengiz to financially support

her." Compl. ¶ 96. "Khashoggi and Plaintiff Cengiz also agreed that Khashoggi would regularly

provide funds to Plaintiff Cengiz so that she could continue her studies and learn English while

they resided in the United States." *Id.*

Because of Khashoggi's murder, Cengiz was deprived of these benefits. As Çetinkaya

explains, Turkish law permits Cengiz to bring suit to recover her pecuniary damages. Çetinkaya

Decl. ¶¶ 55, 63, 70-71. Under Turkish law, a plaintiff may recover damages when the decedent's

death caused the loss of expected support. *Id.* ¶¶ 56-57. The expected support may be in the form

of regular payments, donations and gifts made once or twice a year, or even "contributions in life,"

such as food, clothes, or accommodations. *Id.* ¶ 58. Here, Cengiz has put forth substantial

evidence of loss of expected support. She alleges that (i) she entered into an Islamic marriage with

Khashoggi, (ii) she was engaged to enter into a civil marriage with Khashoggi, (iii) Khashoggi

provided her with money before his death and promised to continue supporting her. *Id.* ¶ 59; Compl. ¶¶ 89, 96, 98. These allegations, taken together, are sufficient to establish that Cengiz had an expectation of material support. Çetinkaya Decl. ¶¶ 53, 59-63. Because she was deprived of that support, Cengiz is entitled to damages. *Id.* ¶¶ 55, 63, 70-71.

MBS's disagreement with Cengiz is narrow. Varol (MBS's expert) acknowledges that under Turkish law, "engaged or cohabiting couples" are eligible to bring actions for "material and moral compensation" seeking pecuniary damages for a wrongful death. Varol Decl. ¶¶ 30, 34. Varol claims, however, that Cengiz was not receiving "regular and continuous assistance" before Khashoggi's death and hence could not recover in a Turkish court. *Id.* ¶¶ 35-38.

This argument fails because Varol mischaracterizes Turkish law. Çetinkaya's declaration walks through each of the Turkish cases that Varol cites and explains that not one of them requires the plaintiff to prove regular pre-death payments in order to recover damages. Çetinkaya Decl. ¶¶ 65-69. For example, in the very case that Varol cites for the purported "regular and continuous assistance" requirement, the Court of Cassation holds that "regular and continuous support does not mean support in pre-determined periods and amounts. It refers to the expectation that support would continue had the deceased been alive." *Compare* Varol Decl. ¶ 31, *with* Çetinkaya Decl. ¶ 66. Here, Cengiz had the expectation that support would continue had Khashoggi been alive. In other cases cited by Varol, the Court of Cassation either made a fact-bound determination that there was insufficient evidence to support a right to damages, or was addressing an irrelevant legislative scheme. *Compare* Varol Decl. ¶¶ 32, 34, *with* Çetinkaya Decl. ¶¶ 67, 69.

Varol also claims that Cengiz cannot recover because she cannot show a loss in her quality of life. Varol Decl. ¶¶ 33, 37-38. But as Çetinkaya makes clear, Turkish courts do not require the plaintiff to be in financial hardship or dependent on the deceased's financial support. Instead, they

merely require that the plaintiff's quality of life decreased relative to the quality of life the survivor would have enjoyed if the decedent had survived. Çetinkaya Decl. ¶ 68. This can be shown by mere intangible losses such as the loss of family visits on holidays or the loss of help with chores. *Id.* Having been deprived of the life she anticipated leading with her future husband, Cengiz easily meets that threshold. *Id.*

### B.  MBS has not adequately proven non-exhaustion.

Under Section 2(b) of the TVPA, a plaintiff must exhaust "adequate and available remedies in the place in which the conduct giving rise to the claim occurred." MBS has not met his burden of showing that there are "adequate and available remedies" in Turkey.

As a threshold matter, Cengiz disputes that an exhaustion requirement even applies. The TVPA requires exhaustion of adequate and available remedies "in the place in which the conduct giving rise to the claim occurred." TVPA § 2(b). Here, the conduct took place in two places: the United States (where Khashoggi was deceived into going to Turkey) and Turkey (where the murder occurred). Given that the United States is one "place in which the conduct giving rise to the claim occurred," the TVPA permits Cengiz to bring this suit in the United States.

Even if Turkey is the sole "place in which the conduct giving rise to the claim occurred," MBS cannot prevail on his exhaustion defense. Under the TVPA, exhaustion is an affirmative defense on which the defendant bears the burden of proof. *See Collett v. Socialist Peoples' Libyan Arab Jamahiriya*, 362 F. Supp. 2d 230, 243 (D.D.C. 2005). Hence, even when a TVPA plaintiff presents *no* arguments on exhaustion, a defendant cannot prevail on non-exhaustion grounds unless the defendant provides evidence that the foreign remedy is available and adequate. *Id.* (ruling that defendant did not prove non-exhaustion even though plaintiff presented no arguments).

Further, for a defendant to establish non-exhaustion, the "burden of proof is substantial." *Jean v. Dorelien*, 431 F.3d 776, 781 (11th Cir. 2005). The Senate Report accompanying the TVPA states that courts may decline jurisdiction "only if it appears that adequate and available remedies can be *assured* where the conduct complained of occurred." S. Rep. No. 102-249, at 9 (1991) (emphasis added). Any "doubts" on whether foreign remedies were exhausted must "be resolved in favor of the plaintiffs." *Enahoro v. Abubakar*, 408 F.3d 877, 892 (7th Cir. 2005). In light of this rigorous standard, "[v]ery few cases under TVPA appear to have been dismissed based on the failure to exhaust domestic remedies defense." *Lizarbe v. Rondon*, 642 F. Supp. 2d 473, 485 (D. Md. 2009), *aff'd in part*, 402 F. App'x 834 (4th Cir. 2010).

Here, MBS contends that the complaint does not sufficiently establish that Cengiz has exhausted Turkish remedies. MBS Mot. 45-46. However, because exhaustion is an affirmative defense, MBS cannot show exhaustion merely by pointing to purported pleading deficiencies. Rather, he must provide affirmative evidence that remedies are adequate and available in Turkey.

The Court should reject MBS's exhaustion defense. First, it is premature. The sole evidence provided by MBS is Varol's declaration. But that evidence should not be considered at the motion to dismiss stage for purposes of establishing an affirmative defense. *See In re Chiquita Brands Int'l, Inc. Alien Tort Statute & S'holder Derivative Litig.*, 190 F. Supp. 3d 1100, 1114 (S.D. Fla. 2016) ("Because it is an affirmative defense, exhaustion of local remedies need not be pled in a complaint under the TVPA, a Plaintiff's alleged failure to exhaust local remedies would not deprive the court of subject matter jurisdiction, and the matter is not properly resolved by reference to extrinsic evidence at the motion to dismiss stage." (internal quotation marks omitted)); *Boniface*, 338 F. Supp. 3d at 66 (finding that court "is not able to consider" an "affidavit in evaluating the present motion to dismiss" in support of non-exhaustion defense).

Even if the Court considers Varol's declaration, it provides insufficient evidence that Turkish remedies would be adequate or available.  Varol's declaration says nothing about whether a cause of action would be available, whether the defendants would assert any immunity defenses or other threshold defenses under Turkish law, or whether a judgment would be enforceable. Instead, the declaration merely says that if Cengiz sued MBS in a Turkish court, and MBS moved for a stay pending the criminal proceedings, a court would not be *required* to grant the stay. Instead, it would have "discretion" to allow a civil case to proceed if the criminal case is in its early stages.  Varol Decl. ¶¶ 10-14.

Varol's statement falls far short of the affirmative proof courts have demanded before finding non-exhaustion.  For instance, in *Lizarbe*, the plaintiff sued a Peruvian official under the TVPA.  642 F. Supp. 2d at 477.  The Peruvian official was simultaneously being criminally prosecuted in Peru, and the plaintiff had filed a civil action in Peru in connection that criminal prosecution.  *Id.* at 483-84.  The defendant argued that the existence of this remedy, or a possible separate Peruvian civil suit, was an adequate and available remedy, thus foreclosing a TVPA suit. The court found that the defendant had proffered insufficient evidence to prove non-exhaustion. It reasoned that "[t]he record is barren of any evidence that the criminal case against him is proceeding apace or that there is any reasonably foreseeable date for its conclusion."  *Id.* at 485. Further, the defendant had not "established that the level of damages available to a *parte civil* in a criminal case in Peru is adequate—whether, for example, punitive damages are available, or, indeed, whether criminal court judges in Peru are sufficiently focused on, much less skilled in, assessing civil damages."  *Id.*  As for a possible civil suit, the court had "no basis for determining what items of damages are compensable under Peruvian law or whether a civil award . . . in Peru could begin to approach the level of the Florida District Court award, were he to be found liable."

*Id.*; *see also Mamani v. Berzain*, 21 F. Supp. 3d 1353, 1373 (S.D. Fla. 2014) (defendants did not prove exhaustion under TVPA because of insufficient evidence of whether particular plaintiffs "have the right to pursue civil actions" in Bolivian court or "whether such civil suits could result in enforceable judgments against anyone"), *aff'd in part*, 825 F.3d 1304 (11th Cir. 2016); *Collett*, 382 F. Supp. 2d at 243 (defendant's allusion to "the possibility of remedies in Lebanon" without "details or analysis concerning what those remedies would be" insufficient to establish exhaustion). Here, likewise, MBS has not proffered information about whether Cengiz could obtain an enforceable judgment in Turkey. Hence, MBS has not proved exhaustion.

Moreover, although Cengiz does not bear the burden at this juncture, there are powerful reasons to believe that Turkish remedies would *not* be adequate or available. First, a civil action in Turkey likely would be stayed, potentially for a lengthy period, in view of the pending criminal proceeding. *See* Compl. ¶ 161; Çetinkaya Decl. ¶¶ 10-28. This potentially long delay shows that a Turkish lawsuit is not an adequate remedy. *Lizarde*, 642 F. Supp. 2d at 485 (finding non-exhaustion when TVPA defendant provided no "evidence that the criminal case against him is proceeding apace or that there is any reasonably foreseeable date for its conclusion"); *Xuncax v. Gramajo*, 886 F. Supp. 162, 178 (D. Mass. 1995) (finding Guatemalan civil remedy inadequate when "criminal case had made no progress for several years" and "under Guatemalan law, a civil action cannot be brought until final judgment has been rendered in the criminal proceedings").

In response, Varol attests that Turkish courts ordinarily stay civil actions when a criminal action is proceeding against the same defendant, but that MBS is not a defendant in the Turkish prosecution. Varol Decl. ¶¶ 11-12. Al-Qahtani and Al-Assiri *are* criminal defendants in Turkey, so it is undisputed that a civil action against them *would* be stayed, potentially for years. Çetinkaya Decl. ¶ 16. Even as to MBS, who is not a criminal defendant in Turkey, Varol asserts that a

Turkish court has the "discretion" to allow the civil action to proceed.  Varol Decl. ¶ 12.  But he notably does not suggest that a Turkish court would actually exercise his discretion to allow the civil action to proceed.  To the contrary, as Çetinkaya explains, a Turkish court would likely stay the civil action against MBS to await the evidence that would emerge in the criminal case and in light of the potential naming of additional defendants.  Çetinkaya Decl. ¶ 23-25.  Hence, the prospect of indefinite delay establishes that Turkish remedies are inadequate as to all Defendants, including MBS.

Even if the stay would eventually end, Turkey would still not provide an adequate remedy. As Çetinkaya explains, if Cengiz sued MBS or his co-defendants in Turkey, Cengiz might not get a fair opportunity to prove her claims because she might be bound by the factual conclusions of the criminal court.  *Id.* ¶¶ 10, 24.  Punitive damages would be unavailable.  *Id.* ¶ 40; *Lizarde*, 642 F. Supp. 2d at 485 (finding non-exhaustion when TVPA defendant had not established whether "punitive damages are available").  A judgment would likely be unenforceable given that MBS has no known assets in Turkey.  Çetinkaya Decl. ¶ 46; *Mamani*, 21 F. Supp. 3d at 1373 (finding non-exhaustion when defendant had not shown that civil suits "could result in enforceable judgments").  Cengiz might not be able to rely on the ODNI report—indeed, the Turkish court rebuffed her effort to introduce it into the criminal case, implying she could not use it in a civil case.  Çetinkaya Decl. ¶ 39.  For these reasons, this suit should be permitted to continue in the United States.

### C.  The TVPA permits secondary liability.

Al-Qahtani and Al-Assiri (but not MBS) argue that they cannot be liable under the TVPA because they did not personally carry out the murder.  That argument lacks merit.  Contrary to their contention, the TVPA permits aiding-and-abetting and conspiracy liability.

The TVPA states that any person who "subjects an individual to extrajudicial killing" shall be liable.  TVPA, § 2(a).  The verb "subjects" does not mean that the defendant must have personally committed the murder.  Rather, a person who orchestrates or participates in an extrajudicial killing can readily be said to have "subject[ed]" the victim to that killing.  *See Wiwa v. Royal Dutch Petroleum Co.*, No. 96 CIV. 8386, 2002 WL 319887, at *15 (S.D.N.Y. Feb. 28, 2002) (the word "[s]ubjects" reaches any action that "expose[s]" someone to, or makes someone "liable or vulnerable" to, an extrajudicial killing (quotation marks omitted)).

This textual analysis finds support in the legislative history.  The Senate Judiciary Committee Report states that the TVPA permits "lawsuits against persons who ordered, abetted, or assisted in torture."  S. Rep. No. 102-249, at 8.  It explains that "a higher official need not have personally performed or ordered the abuses in order to be held liable."  *Id.* at 9.  "Under international law, responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts—anyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them."  *Id.*

*Doe v. Exxon Mobil Corp.*, 654 F.3d 11 (D.C. Cir. 2011), *vacated*, 527 F. App'x 7 (D.C. Cir. 2013),[12] confirms this interpretation.  In *Doe*, the court held that "aiding and abetting liability

---

[12] The D.C. Circuit vacated the portion of its opinion addressing aiding-and-abetting liability and remanded for further consideration in light of *Prosecutor v. Perisic,* Case No. IT–04–81–T Judgment (Feb. 28, 2013), an intervening case from the International Criminal Tribunal for the Former Yugoslavia.  On remand, the district court analyzed *Perisic* and concluded that "the

is clearly established in the law of nations and consequently such liability is available under the ATS." *Id.* at 32.  It reasoned that aiding and abetting murder, or participating in a conspiracy to murder, is itself a violation of international law.  *Id.* at 30 ("[C]riminal responsibility of those who aid and abet violations of international law has been accepted as one of the core principles of the post-World War II war crimes trials." (internal quotation marks omitted) (alteration in original)); *id.* ("The London Charter extended responsibility for crimes to accomplices participating in the formulation or execution of a common plan or conspiracy to commit any of the crimes triable by the Tribunal" (internal quotation marks omitted)).

Although the court did not expressly resolve whether the TVPA recognizes secondary liability, its reasoning strongly supports that conclusion.  First, the court characterized the TVPA as enhancing the remedy already available under the ATS.  *Id.* at 26.  Second, the court cited with approval *Cabello v. Fernandez-Larios*, 402 F.3d 1148, 1158-59 (11th Cir. 2005), while observing that *Cabello* had adopted secondary liability "in ATS and TVPA litigation."  *Doe*, 654 F.3d at 35.  Finally, and most notably, the court rejected the position that "there is no vicarious aiding and abetting liability for natural persons under the TVPA," citing the Senate Report, which "states that the statute permits 'lawsuits against persons who ordered, abetted, or assisted in torture.'"  *Id.* at 58 n.49 (quoting S. Rep. No. 102-249, at 8 (alteration omitted)).

Al-Qahtani and Al-Assiri characterize *Doe*'s statement regarding the TVPA as dicta.  Al-Qahtani Br. at 18 n.5.  But they do not offer any arguments on how their position can be reconciled with *Doe*'s reasoning on the ATS.  They rely on the general principles enunciated in *Central Bank*

_____

standard articulated by the Court of Appeals previously . . . remains unchanged."  *Doe v. Exxon Mobil Corp.*, Civ. No. 01-1357(RCL), 2015 WL 5042118, at *11 (D.D.C. July 6, 2015).

*of Denver N.A. v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), but *Doe* explains why those principles are inapplicable.  654 F.3d at 28-29.

Moreover, substantial additional authority supports Cengiz's position.  The Supreme Court has stated in dicta: "petitioners rightly note that the TVPA contemplates liability against officers who do not personally execute the torture or extrajudicial killing."  *Mohamad v. Palestinian Auth.*, 566 U.S. 449, 458 (2012); *see In re Grand Jury Investigation*, 916 F.3d 1047, 1053 (D.C. Cir. 2019) (courts should follow "carefully considered … dictum" of the Supreme Court).  Other lower courts have squarely held the same.  *See, e.g.*, *Cabello*, 402 F.3d at 1157 (recognizing both aiding-and-abetting and conspiracy liability under TVPA); *Gonzalez-Vera v. Kissinger*, No. 02–02240, 2004 WL 5584378, at *8-9 (D.D.C. Sept. 17, 2004) (recognizing aiding-and-abetting liability under TVPA), *aff'd*, 449 F.3d 1260 (D.C. Cir. 2006).  The Court should follow those authorities.

### D.  Cengiz adequately pleads a TVPA claim against Al-Qahtani and Al-Assiri.

Al-Qahtani and Al-Assiri contend that the allegations against them are excessively speculative to support liability.  Al-Qahtani Mot. 19-22.  They are incorrect.

Aiding-and-abetting liability requires that "(1) one or more of the wrongful acts that comprise the claim were committed, (2) [the defendant] substantially assisted some person or persons who personally committed or caused one or more of the wrongful acts that comprise the claim, and (3) [the defendant] knew that his actions would assist in the illegal or wrongful activity at the time he provided the assistance.  *Cabello*, 40 F.3d at 1158.  Conspiracy liability requires that "(1) two or more persons agreed to commit a wrongful act, (2) [the defendant] joined the conspiracy knowing of at least one of the goals of the conspiracy and intending to help accomplish it, and (3) one or more of the violations was committed by someone who was a member of the conspiracy and acted in furtherance of the conspiracy."  *Id.* at 1159.

According to the complaint, Al-Qahtani "served as a trusted adviser to MBS and was considered his 'enforcer.'" Compl. ¶ 10. Al-Qahtani monitored Khashoggi's U.S. activities on MBS's behalf. Compl. ¶ 57. On September 28, 2018, the Saudi department directed by Al-Qahtani was informed of Khashoggi's appearance at the Saudi consulate in Istanbul. Compl. ¶ 102. The murder took place on October 2, 2018. Compl. ¶¶ 110, 127. "Al-Qahtani called into the torture session via a visual media call. At one point he demanded that his co-Defendants 'Bring me the head of the dog.'" Compl. ¶ 131. The Department of the Treasury sanctioned Al-Qahtani because he "was part of the planning and execution of the operation that led to the killing of Mr. Khashoggi," and his subordinate "'coordinated and executed' the operation." Compl. ¶ 154. In addition, the recently declassified ODNI report states that the ODNI has "high confidence" that al-Qahtani "participated in, ordered, or [was] otherwise complicit in or responsible for the death of Jamal Khashoggi on behalf of Muhammad bin Salman." ODNI Report p. 3. Further, in the report, the ODNI states that its assessment of MBS's involvement is based on "the direct involvement of a key adviser." *Id.* at 2. That "key adviser" was al-Qahtani. The report explains that the Saudi team that arrived in Istanbul to murder Khashoggi "included officials who worked for, or were associated with," a Saudi entity led by "al-Qahtani, a close adviser of Muhammad bin Salman." *Id.* at 3. It explains that al-Qahtani "did not make decisions without the Crown Prince's approval." *Id.*

These allegations are sufficient to state an aiding-and-abetting and conspiracy claim. As to aiding-and-abetting liability, (1) an illegal murder was committed; (2) Al-Qahtani "was part of the planning and execution of the operation," and hence substantially assisted it; (3) Al-Qahtani knew his acts would assist the murder. As to conspiracy liability: (1) Al-Qahtani conspired with the murderers, as evidenced by him planning and executing the murder and calling into the torture

session; (2) Al-Qahtani conspired for purposes of murdering Khashoggi; (3) the conspiracy's purpose was to orchestrate Khashoggi's murder, so the murder furthered that purpose.

Al-Assiri was the "Deputy Director of the Saudi General Intelligence Presidency" who "planned and organized the team in Riyadh that ultimately traveled to Turkey to murder Jamal Khashoggi." Compl. ¶ 11. "On September 29, Defendant Muzaini . . . traveled to Riyadh where Defendant Assiri delivered his orders and mission plan for the murder." Compl. ¶ 104. As with Al-Qahtani, the ODNI report expresses "high confidence" that al-Assiri "participated in, ordered, or [was] otherwise complicit in or responsible for" Khashoggi's murder. ODNI Report pp. 3-4.[13]

These allegations are not conclusory: they specifically identify where (Riyadh), when (September 29), and to whom (Muzaini) Al-Assiri delivered the orders and mission plan for the murder. They, too, establish accomplice liability: by "delivering his orders and mission plan for the murder," Al-Assiri substantially assisted the murder. They also establish a conspiracy with Defendant Muzaini and the other members of the murder team that he "planned and organized."

## VI.    CENGIZ STATES AN ATS CLAIM.

The Alien Tort Statute ("ATS") provides: "The district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. A cause of action may be recognized under the Alien Tort Statute "only for alleged violations of international law norms that are specific, universal, and obligatory." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 117 (2013) (internal quotation marks omitted). Here, it is undisputed that there are "specific, universal, and obligatory" international law norms against extrajudicial murder.

---

[13] Al-Assiri is identified in the ODNI report as "Ahmed Zayed Asiri."

MBS nonetheless argues that Cengiz's ATS claim should be dismissed for two reasons. MBS Mot. 46-50; *see also* Al-Qahtani Mot. 14-16 (reiterating MBS's arguments).  First, MBS argues that standing under the TVPA and under the ATS are coextensive, and Cengiz lacks standing under the TVPA.  MBS Mot. 47.  The Court should reject this argument because, as explained above, Cengiz does have standing under the TVPA.  *Supra*, at 43-50.

Second, MBS argues that this action is impermissibly extraterritorial, relying on *Kiobel v. Royal Dutch Petroleum Co.*, 569 U.S. 108 (2013).  MBS Mot. 47-50.  Contrary to MBS's contention, Cengiz's claim presents a permissible domestic application of the ATS.

In *Kiobel*, the plaintiff filed a suit in which "all the relevant conduct took place outside the United States"—the plaintiff, defendant, and torts were all foreign.  569 U.S. at 124.  The Court held that the suit was impermissibly extraterritorial, while observing, "even where the claims touch and concern the territory of the United States, they must do so with sufficient force to displace the presumption against extraterritorial application." *Id.* at 124-25.

Following *Kiobel*, lower courts did not settle on a precise formula for determining whether the "touch and concern" test is satisfied.  A court in this District catalogued the case law and concluded: "[W]hen the American connections to a claim implicate important national interests, the federal courts may assume jurisdiction under the ATS if the presence of these interests, in combination with other factors, indicates that the claims sufficiently touch and concern the United States to displace the presumption against extraterritoriality." *Doe v. Exxon Mobil Corp.*, No. 01–1357, 2015 WL 5042118, at *8 (D.D.C. July 6, 2015).

 After MBS's motion to dismiss was filed, the Supreme Court applied the "touch and concern" standard in *Nestle USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021).  In *Nestle*, "[n]early all the conduct that [plaintiffs] say aided and abetted forced labor . . . occurred" abroad. *Id.* at 1937.  The

plaintiffs sought to satisfy *Kiobel* based on generic allegations that the defendant made "operational decisions" in the United States. *Id.* The Court held that the action was impermissibly extraterritorial. "Because making 'operational decisions' is an activity common to most corporations, generic allegations of this sort do not draw a sufficient connection between the cause of action respondents seek—aiding and abetting forced labor overseas—and domestic conduct." *Id.* "To plead facts sufficient to support a domestic application of the ATS, plaintiffs must allege more domestic conduct than general corporate activity." *Id.*

Here, Cengiz alleges far "more domestic conduct than general corporate activity." *Id.* Rather, the "American connections" to the claim "implicate important national interests." *Doe*, 2015 WL 5042118, at *8. The complaint alleges that MBS targeted a U.S. resident in order to prevent him from influencing U.S. voters and legislators. *Supra*, at 1-3. Although the murder took place abroad, courts have permitted ATS claims based on foreign murders to proceed, so long as the murder had a sufficient connection to the United States. *See Mwani v. bin Laden*, 947 F. Supp. 2d 1, 5-6 (D.D.C. 2013) (foreign attack on U.S. embassy satisfied "touch and concern" test); *Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201, 217 (2d Cir. 2016) (defendant's banking services in the United States that facilitated foreign murder satisfied "touch and concern" test). Here, too, the case touches and concerns the U.S. even though the murder occurred in Turkey.

In response, rather than dispute that *MBS*'s actions "touch and concern" the United States, MBS focuses on the domestic activities of *KBS*. He argues that KBS may have been unaware, at the time he gave his assurances, that Khashoggi would be murdered. MBS Mot. 49-50.

However, KBS is not a defendant in this action. MBS is. Hence, it is MBS's knowledge that counts, not KBS's knowledge. More generally, courts applying the touch-and-concern test have not isolated the individual physically present in the United States, and analyzed *that* person's

61

state of mind.  Instead, court have analyzed the claims against *the defendant* and considered: (1) whether the claim "'touches and concerns' the United States," and (2) whether the claim is "for a violation of the law of nations or aiding and abetting another's violation of the law of nations." *Licci*, 834 F.3d at 217.  Here, the claim "touches and concerns" the United States because the United States has an interest in preventing foreigners from targeting U.S. residents for purposes of influencing U.S. foreign policy.  Further, MBS does not dispute that the claim is for a violation of international law.  That is enough to state an ATS claim, regardless of KBS's state of mind.

## VII.   DAWN STATES A TORTIOUS-INTERFERENCE CLAIM.

D.C. law applies to Plaintiff DAWN's claim for tortious interference with contract, and DAWN has adequately pleaded all elements of that claim under D.C. law.

### 1.   D.C. law applies to DAWN's tortious-interference claim.

As explained above, D.C. courts conduct choice-of-law analysis by blending a "governmental interests" test with a "most significant relationship" test.  *Supra*, at 43-44.  Both tests support applying D.C. law to DAWN's tortious-interference claim.

The contract at issue is Khashoggi's agreement with DAWN to serve as DAWN's Executive Director.  Compl. ¶ 63.  The agreement states that "DAWN is in the business of research and advocacy," that Khashoggi had "skills and experience useful in the business of DAWN," and that, under the agreement, Khashoggi was required to "use his best efforts to enhance and promote DAWN's business."  Compl. ¶ 64.  Defendants interfered with that agreement: they "targeted Mr. Khashoggi and sought to put an end to his ability to carry out his work on behalf of DAWN and to otherwise silence his criticism and pro-democracy activities."  Compl. ¶ 73.

At the time the contract was signed, DAWN's principal place of business was in D.C. Compl. ¶¶ 7, 41.  Khashoggi specifically directed that DAWN rent its office suites in D.C.  Compl.

¶ 62.  "Khashoggi firmly believed that in order to be an effective voice for change that it was essential he be based in Washington, D.C. as he knew it to be the center of the political world."  Compl. ¶ 95.  Reflecting DAWN's D.C. ties, the contract recites: "This Agreement and the rights of the Parties hereunder shall be governed by, interpreted, and enforced in accordance with the laws of the District of Columbia."  Ghafoor Decl. ¶ 3, Ex. A. [14]

These facts support application of D.C. law, not Turkish law.  D.C. has a strong interest in ensuring that D.C.-based entities like DAWN can engage in D.C.-based activities without interference.  Moreover, D.C. has the most significant relationship to this claim.  At the time of the contract, DAWN was based in D.C.; the contract recites that D.C. law applies; and the activities that Defendants sought to prevent would have been performed in D.C.  By contrast, Turkey has little interest in regulating contracts that have no link to Turkey.  Moreover, Turkey lacks a close relationship to the plaintiff (DAWN), the defendants (Saudi officials), or the contract at issue.[15]

### 2.  DAWN's claim is not barred by *Cole*.

MBS contends that DAWN's tortious-interference claim is barred by *Cole, Raywid & Braverman v. Quadrangle Development Corp.*, 444 A.2d 969 (D.C. 1982).  MBS Mot. 51-52; *see* Al-Qahtani Mot. 23 (incorporating MBS's arguments by reference).  MBS overreads *Cole*.  In *Cole*, a law partner died in an elevator accident.  The plaintiff law firm sued the defendant builder

---

[14] DAWN was eventually evicted for nonpayment of rent.  Ghafoor Decl. ¶ 4.  As such, DAWN's current address is in Virginia.  *Id.*  Although the complaint identifies a D.C. address for DAWN, DAWN had already been evicted by the time the complaint was filed.  *See id.*  DAWN intends to move back into offices in D.C. when it is safe to do so.  *Id.*

[15] Even if Turkish law applied, DAWN could state a claim.  Varol states that Turkey lacks a cause of action for tortious interference with contract.  Varol Decl. ¶¶ 45-46.  Turkish law would, however, permit a legal entity like DAWN to bring a claim for material and moral compensation.  Such a claim would allow it to be compensated for the reputational and monetary loss arising from Khashoggi's murder.  Çetinkaya Decl. ¶¶ 74-77.  If the Court dismisses the tortious-interference claim on the ground that Turkish law applies, DAWN would seek leave to replead.

and elevator manufacturer, alleging that their torts caused the partner's death and hence indirectly harmed the law firm. The court concluded that the law firm was, in substance, bringing a wrongful-death action that was barred because the law firm was not within the class of plaintiffs with standing under D.C.'s Wrongful Death Act. 444 A.2d at 971-72.

This case differs from *Cole*. *Cole* did not involve any allegations that the defendants had specifically targeted the law firm in order to disrupt its operations. Instead, *Cole* merely involved a wrongful death that happened to inflict a financial injury on the partner's law firm. This case, by contrast, involves allegations that MBS specifically targeted DAWN. DAWN alleges that "Mr. Khashoggi's efforts with DAWN were perceived by Defendants as contrary to their pecuniary and other interests and posed an existential threat to Defendant MBS' plans to secure power as an autocrat." Compl. ¶ 80. "Defendants thereafter resolved to stop Mr. Khashoggi from carrying out his work on behalf of DAWN, redoubled their efforts to abduct Mr. Khashoggi, and actively sought a suitable opportunity to permanently silence him." *Id.* Nothing in *Cole* prevents a plaintiff who was the specific target of a tort from vindicating its *own* rights. *See Moattar v. Foxhall Surgical Assocs.*, 694 A.2d 435, 439 (D.C. 1997) (distinguishing *Cole* in case where "the injured party seeking to recover on her own behalf damages . . . which she is entitled to pursue").

Moreover, "District of Columbia courts have adopted the Restatement's formulation of the claim of tortious interference." *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1135 (D.C. Cir. 2015). And the Restatement states, "Interference with the third party's performance may be by prevention of the performance, as by physical force." *Restatement (Second) of Torts* § 766, cmt. k (1979). Here, MBS used "physical force" to prevent Khashoggi from performing his contract with DAWN. Neither *Cole* nor the Restatement suggests that there is any exception to tortious-interference liability when the "physical force" results in the contracting party's death.

Finally, MBS's position would result in bizarre consequences.  Under D.C. law, a plaintiff can establish a tortious interference claim merely by showing that the defendant "induc[ed]" a third party not to perform a contract.  *Banneker*, 798 F.3d at 1136.  A plaintiff need not "allege inducement through egregious means, such as libel, slander, coercion, or disparagement."  *Id.* Rather, "intimidation," or even "persuasion" via "financial influence," is sufficient.  *Id.*  Hence, under MBS's theory, if MBS had induced Khashoggi to breach his contract by offering him money or intimidating him, DAWN would have a claim.  But because MBS achieved the same end by orchestrating his murder, he is immune.  That result does not make sense.

### 3.   DAWN's allegations are sufficiently specific to state a claim.

Under D.C. law, a tortious-interference claim requires: "(1) existence of a valid contractual or other business relationship; (2) the defendant's knowledge of the relationship; (3) intentional interference with that relationship by the defendant; and (4) resulting damages."  *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 202 (D.C. 2017) (quotation marks and alterations omitted). DAWN has sufficiently pleaded these allegations with regard to all defendants.

*(1) Valid contract.*  Defendants do not dispute that DAWN's contract with Khashoggi is a valid contract for purposes of a tortious-interference claim.

*(2) Knowledge of the relationship*.  The complaint alleges that "[o]n information and belief, Defendants had actual knowledge of DAWN's contractual relationship with Mr. Khashoggi by, *inter alia*, hacking Mr. Abdulaziz's cell phone."  Compl. ¶ 188.

"[P]leadings on information and belief are permitted when the necessary information lies within defendants' control."  *Kareem v. Haspel*, 986 F.3d 859, 866 (D.C. Cir. 2021) (quotation marks omitted).  Such allegations must, however, "be accompanied by a statement of the facts upon which the allegations are based."  *Id.*  Here, DAWN has met that burden.  First, the "necessary

information"—*i.e.*, Defendants' state of mind with regard to Khashoggi's contract—lies within Defendants' control. Second, the complaint alleges specific facts upon which the allegations are based. It alleges that in June 2018—after Khashoggi contracted with DAWN—"an operator working on behalf of Defendants infected" the cell phone of Omar Abdulaziz, Khashoggi's friend and colleague, with "Pegasus spyware." Compl. ¶¶ 74, 79. "The Pegasus spyware allowed Defendants to access Mr. Abdulaziz's contacts, photos, text messages, online chat logs, emails, personal files, and otherwise encrypted apps such as WhatsApp." *Id.* ¶ 79. "The software also allowed Defendants to use the microphone and camera on Mr. Abdulaziz's mobile phone to spy on his affairs." *Id.* "[A]fter hacking Mr. Abdulaziz's mobile phone, Defendants were aware or became aware of Mr. Khashoggi's contractual relationship with DAWN and his intent to use it as a platform to advocate for human rights and democratic reform in the Kingdom." *Id.* ¶ 80. These allegations plausibly show that Defendants knew about Khashoggi's agreement with DAWN.

MBS insists these allegations are insufficient because the complaint does not contain specific allegations regarding the exact information on Abdulaziz's cell phone that was conveyed to the hackers. MBS Mot. 53-54. But at the pleading stage, the court must credit not only "the facts alleged," but also "the reasonable inferences drawn from those allegations" in DAWN's favor. *See United States ex rel. Cimino v. Int'l Bus. Machs. Corp.*, 3 F.4th 412, 422 (D.C. Cir. 2021). And "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable." *Id.* (quotation marks omitted). Here, DAWN alleges that the purpose of the murder was to prevent Khashoggi from carrying out his relationship with DAWN, that Khashoggi was being monitored, and that the cell phone of Khashoggi's associate was hacked. In view of these allegations, it is hardly speculative or implausible that Defendants knew about Khashoggi's contractual relationship with DAWN.

MBS also argues that the allegations do not establish that he *personally* knew about Khashoggi's relationship with DAWN.  MBS Br. at 53.  To the contrary, the complaint alleges that MBS "discovered Mr. Khashoggi's plans to utilize DAWN as a platform to espouse democratic reform and promote human rights."  Compl. ¶ 3.  It further alleges MBS's motive for thwarting Khashoggi's activities with DAWN: "Mr. Khashoggi's efforts with DAWN . . . posed an existential threat to Defendant MBS' plans to secure power as an autocrat."  Compl. ¶ 80.  The reasonable inference from these allegations is that MBS knew about Khashoggi's relationship with DAWN.  Moreover, the complaint alleges that MBS is personally responsible for orchestrating Khashoggi's murder.  Compl. ¶ 85.  It is reasonable to infer that the person who *ordered* the murder would be aware of the *reason* for the murder, *i.e.*, Khashoggi's activities on behalf of DAWN.

Al-Qahtani and Al-Assiri, likewise, contend that the complaint includes insufficient allegations of their personal knowledge of Khashoggi's contract with DAWN.  Al-Qahtani Br. at 24.  As a threshold matter, DAWN does not bear the burden of proving that each defendant was personally aware of the contract.  Under the law of civil conspiracy, defendants can be liable for their co-conspirators' torts even if they did not personally commit all elements of the tort.  *See Nader v. Democratic Nat'l Comm.*, 567 F.3d 692, 697 (D.C. Cir. 2009) (civil conspiracy's "purpose is to spread liability for a successful tort claim to all agreeing parties regardless of whether they actually committed the tortious act").  Al-Qahtani and Al-Assiri assert (Al-Qahtani Mot. 24) that a plaintiff "cannot rely on [a] civil conspiracy to impute knowledge of [its] business relationships from [one conspirator] to [another] to state a tortious interference claim," quoting *Nyambael v. AlliedBarton Sec. Servs., LLC*, 153 F. Supp. 3d 309, 316 (D.D.C. 2016), *reconsidered on other grounds*, 344 F. Supp. 3d 183 (D.D.C. 2018).  However, they take *Nyambael* out of context.  That case held that the plaintiff could not impute knowledge from one co-conspirator to

another because the plaintiff did not sufficiently allege a tortious-interference claim against *any* co-conspirator.  *See id.* (explaining that "[i]f the underlying tort claims fails, a conspiracy claim based on such a tort also fails").  Here, if the Court holds that DAWN has stated a tortious-interference claim against any co-conspirator, then all co-conspirators may be held liable, even if they do not personally satisfy all elements of the tort.

In any event, the allegations in the complaint suffice to draw a reasonable inference that Al-Qahtani and Al-Assiri were aware of Khashoggi's relationship with DAWN.  Al-Qahtani monitored Khashoggi's U.S. activities on MBS's behalf.  Compl. ¶ 57.  The Department of the Treasury sanctioned Al-Qahtani because he "'was part of the planning and execution of the operation that led to the killing of Mr. Khashoggi.'"  Compl. ¶ 154.  Al-Assiri "planned and organized the team in Riyadh that ultimately traveled to Turkey to murder Jamal Khashoggi."  Compl. ¶ 11.  Given their central role in orchestrating Khashoggi's murder, it is plausible that they were aware of the motive for the murder, *i.e.*, Khashoggi's relationship with DAWN.

*(3) Intentional interference*.  MBS contends that the complaint does not sufficiently allege that he specifically intended to disrupt DAWN's relationship with Khashoggi.  MBS Mot. 54; *see* Al-Qahtani Mot. 24 (same).  MBS misstates D.C. law.  In *Whitt*, the D.C. Court of Appeals held that a plaintiff bringing a tortious-interference claim can prove intent for "by showing that a defendant knew that his actions were certain or substantially certain to interfere with the plaintiff's business."  157 A.3d at 203.  The plaintiff need not show "actual purpose or desire to interfere."  *Id.* at 204.  Here, it is obvious that murdering Khashoggi, the creator and executive director of DAWN, would interfere with DAWN's business.  Hence, Defendants knew that their actions were certain or substantially certain to interfere with the plaintiff's business.

*(4) Damages*.  Defendants do not dispute that DAWN incurred damages arising from Khashoggi's murder.  Compl. ¶¶ 158-159, 190.

Because DAWN has pleaded all elements of a tortious-interference claim under D.C. law, the Court should deny Defendants' motion to dismiss that claim.

## VIII.   CENGIZ HAS STATED COMMON-LAW CLAIMS.

The complaint includes claims for intentional infliction of emotional distress, loss of consortium, and loss of society.  Cengiz agrees with MBS (MBS Mot. 56) that Turkish law applies to Cengiz's claims.  The Court should therefore construe these claims as Turkish common-law claims.  As explained above, Cengiz may bring claims for her pecuniary and emotional losses under Turkish law.  *Supra*, at 46-50.

MBS largely relies on his prior arguments as a basis for dismissing these claims to the extent they arise under Turkish law.  MBS Mot. 56-57 & n.46.  He adds one additional point: that Cengiz's common-law claims are time-barred.  According to MBS, statutes of limitations are procedural, so D.C.'s statute of limitations applies to claims under Turkish substantive law.  MBS further claims that if Cengiz's Turkish-law claims are "wrongful death" claims, then they are time-barred because Khashoggi died on October 2, 2018, while the suit was filed on October 20, 2020, which is beyond the two-year limitations period in D.C.'s wrongful death statute.  MBS Mot. 56-57 & n.46 (citing D.C. Code § 16-2702).

This argument fails because Cengiz's claim is timely under D.C.'s wrongful death statute.  D.C. tolled all statutes of limitations during the COVID-19 emergency, including the period between October 2, 2020 (two years after the death) and October 20, 2020 (when the suit was filed).  *See* Superior Court of the District of Columbia, Order by Chief Judge Josey-Herring (amended July 14, 2021), https://www.dccourts.gov/sites/default/files/2021-07/amended_general

_order_july_2021.pdf (stating that in a series of orders from March 2020 to May 12, 2021, the Chief Judge ordered that "all deadlines . . . that would otherwise expire before July 15, 2021, including statutes of limitations, are suspended, tolled, and extended during the period of the current judicial emergency").  Hence, under D.C. law, the limitations period never expired.

Moreover, under D.C. law, the limitations period may be tolled for fraudulent concealment. *See Flemmings v. District of Columbia*, 719 A.2d 963, 964 (D.C. 1998).  Saudi officials denied Khashoggi's death until October 18, 2018, and then attributed it to a purported "fistfight."  Compl. ¶¶ 145-46.  It was not until October 21, 2018, that Saudi Arabia suggested that Khashoggi's death resulted from a rogue operation; and not until October 25, 2018, that Saudi Arabia acknowledged the premeditated murder.  Compl. ¶¶ 147-48.  These allegations, if true, would show that Saudi Arabia fraudulently concealed the murder from October 2 until October 21 or 25, which would render the claim timely.

## CONCLUSION

The motions to dismiss should be denied.

Dated: September 14, 2021                  Respectfully submitted,

                                           /s/ *Keith M. Harper*
                                           Keith M. Harper (D.C. Bar 451956)
                                           Adam G. Unikowsky (D.C. Bar 989053)
                                           JENNER & BLOCK LLP
                                           1099 New York Avenue NW, Suite 900
                                           Washington, D.C. 20001
                                           Telephone: (202) 639-6045

                                           Faisal Gill (D.C. Bar 497312)
                                           GILL LAW FIRM
                                           1155 F. Street NW, Suite 1050
                                           Washington D.C. 20005
                                           Telephone: (202) 570-8223

                                           *Counsel for Plaintiffs Hatice Cengiz and*
                                           *Democracy for the Arab World Now, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on September 14, 2021, a true and correct copy of the foregoing was electronically filed with the Clerk using the CM/ECF filing system, which sent notice of filing to all counsel of record.

/s/ *Keith M. Harper*
Keith M. Harper (D.C. Bar 451956)

*Counsel for Plaintiffs Hatice Cengiz and Democracy for the Arab World Now, Inc.*