# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| HATICE CENGIZ, *et al.*, | |
| *Plaintiffs*, | |
| v. | Civil Action No. 1:20-cv-03009 (JDB) |
| MOHAMMED BIN SALMAN, *et al.*, | |
| *Defendants*. | |

## DEFENDANT MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD'S REPLY IN SUPPORT OF MOTION TO DISMISS

Michael K. Kellogg (DC 372049)
Gregory G. Rapawy (DC 493973)
Andrew C. Shen (DC 500071)
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Attorneys for Defendant*
*Mohammed bin Salman bin Abdulaziz Al Saud*

November 9, 2021

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................. iii

INTRODUCTION ................................................................................................................. 1

ARGUMENT ........................................................................................................................ 1

I.      This Court Lacks Personal Jurisdiction Over the Crown Prince ........................... 1

        A.      Plaintiffs Fail To Allege a *Prima Facie* Case for Jurisdiction Based
                on an Alleged Conspiracy with U.S. Embassy Officials ........................... 1

        B.      Plaintiffs Failed To Meet Their Burden To Counter the Crown
                Prince's Evidence Refuting Their Conclusory Jurisdictional
                Allegations ................................................................................................... 3

        C.      Khashoggi's Alleged Connections to the United States Do Not
                Justify Personal Jurisdiction ...................................................................... 7

        D.      Notions of Fair Play and Substantial Justice Weigh Against
                Jurisdiction .................................................................................................. 9

        E.      Jurisdictional Discovery Is Unwarranted ................................................ 10

        F.      The Court Lacks Jurisdiction Over Plaintiffs' Non-Federal Claims ...... 11

II.     Status-Based Immunity Bars Plaintiffs' Claims Against the Crown Prince ........ 12

III.    The Act of State Doctrine Requires Dismissal of Plaintiffs' Claims ................... 14

IV.     Saudi Arabia Is a Necessary Party That Is Immune from Suit ........................... 16

V.      Cengiz Fails To State a Claim Under the Torture Victims Protection Act ........... 18

        A.      Cengiz Is Not a Proper Plaintiff To Bring a TVPA Claim ...................... 18

                1.      Cengiz Is Not a "Person Who May Be a Claimant in an
                        Action for Wrongful Death," Even Under Turkish Law ............. 19

                2.      To the Extent Turkish Law Conflicts with the Law of
                        Virginia, D.C., or Saudi Arabia, Turkish Law Does
                        Not Apply.................................................................................... 21

        B.      Cengiz Has Failed To Exhaust Remedies in Turkey ............................... 22

VI.     Cengiz Fails To Establish Jurisdiction Under the Alien Tort Statute .................. 25

VII.    The Court Should Dismiss Plaintiffs' Non-Federal Claims ...............................................27

      A.    DAWN Fails To State a Claim for Tortious Interference with
Contract.........................................................................................................................27

      B.    Cengiz Fails To State Any Non-Federal Claims.....................................................29

CONCLUSION.........................................................................................................................30

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

Page

CASES

*Aircrash Disaster Near Roselawn, Ind. on Oct. 31, 1994, In re*, 948 F. Supp. 747
(N.D. Ill. 1996)..................................................................................................22

*Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935 (E.D. Va.),
*appeal dismissed*, 775 F. App'x 758 (4th Cir. 2019), *cert. denied*,
141 S. Ct. 2850 (2021)......................................................................................14

*Aldossari ex rel. Aldossari v. Ripp*, 2021 WL 1819699 (E.D. Pa. May 6, 2021),
*appeal pending*, No. 21-2080 (3d Cir.)..............................................................12

*American Oversight v. U.S. Dep't of Veterans Affs.*, 498 F. Supp. 3d 145
(D.D.C. 2020) ......................................................................................................6

*Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140 (2d Cir. 2011) ......................2

*Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980 (D.C. Cir. 2014) .................................29-30

\* *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ......................................................................29

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064 (9th Cir. 2017) .....................9

*Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124 (9th Cir. 2010)............9

*Calder v. Jones*, 465 U.S. 783 (1984)............................................................................7

\* *Cole, Raywid & Braverman v. Quadrangle Dev. Corp.*, 444 A.2d 969 (D.C. 1982) .............27, 28

*Collett v. Socialist Peoples' Libyan Arab Jamahiriya*, 362 F. Supp. 2d 230
(D.D.C. 2005) ....................................................................................................23

*Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019 (W.D. Wash. 2005), *aff'd*,
503 F.3d 974 (9th Cir. 2007) ............................................................................25

*Dammarell v. Islamic Republic of Iran*, 2005 WL 756090 (D.D.C. Mar. 29, 2005),
*recon. granted in part*, 370 F. Supp. 2d 218 (D.D.C. 2005).......................21, 22

*de Csepel v. Republic of Hungary*, --- F. Supp. 3d ---, 2020 WL 2343405
(D.D.C. May 11, 2020), *interlocutory appeal pending*, No. 20-7047
(D.C. Cir.) ..........................................................................................................18

*Doe v. Exxon Mobil Corp.*, 2015 WL 5042118 (D.D.C. July 6, 2015) ........................25

---

[*] Authorities principally relied upon are marked with an asterisk.

*Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 116 (D.D.C. 2008) ....................................28

*Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021)..................................................10

*Escarria-Montano v. United States*, 797 F. Supp. 2d 21 (D.D.C. 2011) ......................................23

*Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115 (D.C. Cir. 2019),
    *cert. granted, vacated, and remanded*, 140 S. Ct. 2713 (2020)......................................... 8-9

*Ex parte Young*, 209 U.S. 123 (1908)................................................................................18

*Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.*, 638 F. Supp. 2d 1
    (D.D.C. 2009) ..........................................................................................................10

\* *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087 (D.C. Cir. 2008)...................................10, 11

*Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323 (D.D.C. 2020)......................................21

*Gensetix, Inc. v. Board of Regents of Univ. of Texas Sys.*, 966 F.3d 1316
    (Fed. Cir. 2020)......................................................................................................18

*Grand Jury Proceedings, Doe No. 700, In re*, 817 F.2d 1108 (4th Cir. 1987)............................13

*Hassen v. Nahyan*, 2010 WL 9538408 (C.D. Cal. Sept. 17, 2010) ................................................9

*Hoffman v. State Regulatory Registry, LLC*, 2021 WL 2592960 (D.D.C. June 24,
    2021) ......................................................................................................................10

\* *Hourani v. Mirtchev*, 796 F.3d 1 (D.C. Cir. 2015)..................................................................15, 16

*Jaramillo v. Naranjo*, 2021 WL 4427455 (S.D. Fla. Sept. 27, 2021)..........................................22

*Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997) ....................2

*Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994) ................................................28

\* *Lewis v. Mutond*, 918 F.3d 142 (D.C. Cir. 2019), *cert. denied*, 141 S. Ct. 156
    (2020)..............................................................................................................12, 13

*Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201 (2d Cir. 2016)........................................26

*MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894 (6th Cir. 2017) ..........................................8

*Marsoun v. United States*, 525 F. Supp. 2d 206 (D.D.C. 2007) ...................................................1

*McKesson Corp. v. Islamic Republic of Iran*, 672 F.3d 1066 (D.C. Cir. 2012) ............................16

*McManus v. District of Columbia*, 530 F. Supp. 2d 46 (D.D.C. 2007) ........................................30

*Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264 (11th Cir. 2002) ...................................3, 4

*Miles v. Apex Marine Corp.*, 498 U.S. 19 (1990) ..........................................................21

*Moattar v. Foxhall Surgical Assocs.*, 694 A.2d 435 (D.C. 1997)...................................28

*Mushikiwabo v. Barayagwiza*, 1996 WL 164496 (S.D.N.Y. Apr. 9, 1996) ....................22

*Mwani v. bin Laden*:

    417 F.3d 1 (D.C. Cir. 2005)...........................................................................8

    947 F. Supp. 2d 1 (D.D.C. 2013) ...............................................................26

*Naegele v. Albers*, 355 F. Supp. 2d 129 (D.D.C. 2005).................................................3

\* *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931 (2021) ...................................................25, 26

*Nnaka v. Federal Republic of Nigeria*, 238 F. Supp. 3d 17 (D.D.C. 2017), *aff'd*,
    756 F. App'x 16 (D.C. Cir. 2019)...........................................................15, 16

*Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096 (D.D.C. Mar. 19, 2019) .............10

*Oveissi v. Islamic Republic of Iran*, 573 F.3d 835 (D.C. Cir. 2009) ............................21

*Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981).......................................................25

*Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773 (7th Cir. 2003).......................3, 6

\* *Republic of Philippines v. Pimentel*, 553 U.S. 851 (2008)................................16, 17, 18

*RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325 (2016).......................................25

*Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073 (C.D. Cal. 1999) .......................................9

*Seminole Tribe of Florida v. Florida*, 517 U.S. 44 (1996). ..........................................18

*Sieverding v. American Bar Ass'n*, 439 F. Supp. 2d 111 (D.D.C. 2006)......................3, 4

*Simon v. Republic of Hungary*, 911 F.3d 1172 (D.C. Cir. 2018), *vacated and
    remanded*, 141 S. Ct. 691 (2021)..............................................................23

*Singh v. District of Columbia*, 55 F. Supp. 3d 55 (D.D.C. 2014) .................................30

*Thompson v. DEA*, 492 F.3d 428 (D.C. Cir. 2007)......................................................24

\* *TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1 (D.D.C. 2013), *aff'd*,
    2015 WL 3653187 (D.C. Cir. June 9, 2015)..............................................16, 17

*Todd v. Panjaitan*, 1994 WL 827111 (D. Mass. Oct. 26, 1994)....................................................22

*Triple Up Ltd. v. Youku Tudou Inc.*, 2018 WL 4440459 (D.C. Cir. July 17, 2018) .....................10

*Two Shields v. Wilkinson*, 790 F.3d 791 (8th Cir. 2015) .............................................................17

*United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488 (D.C. Cir. 2004)......................23

*Vann v. U.S. Dep't of Interior*, 701 F.3d 927 (D.C. Cir. 2012) ..............................................17, 18

\* *Walden v. Fiore*, 571 U.S. 277 (2014) ..............................................................................7, 8, 9

*WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129 (2018) ........................................26

*Whitt v. American Prop. Constr., P.C.*, 157 A.3d 196 (D.C. 2017) ............................................29

*World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154
    (D.C. Cir. 2002) ........................................................................................................14

*Yousuf v. Samantar*, 699 F.3d 763 (4th Cir. 2012) ....................................................................13

*Zaidi v. United States Sent'g Comm'n*, 115 F. Supp. 3d 80 (D.D.C. 2015) .................................26

INTERNATIONAL CASES

*Apex Global Mgmt. Ltd. v. Fi Call Ltd.*, [2013] EWHC 587 (Ch) .................................................13

STATUTES AND RULES

\* Alien Tort Statute, 28 U.S.C. § 1350 ..................................................................................25, 26

Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*......................................................................23

Foreign Sovereign Immunities Act of 1976, Pub. L. No. 94-583, 90 Stat. 2891
    (codified as amended at, *inter alia*, 28 U.S.C. §§ 1602-1611)  ........................................16

\* Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992),
    *reprinted in* 28 U.S.C. § 1350 note .................................................................18, 19, 20,
                                                                                       21, 22, 23, 25, 29

    § 2(a)(2), 106 Stat. 73 .................................................................................................18, 21

    § 2(b), 106 Stat. 73.......................................................................................................22, 23

28 U.S.C. § 1367(c)(3)....................................................................................................27

Wrongful Death Act, D.C. Code § 16-2701 *et seq.* ....................................................27

Diplomatic Privileges Act of 1964, c. 81, § 2 & Sched. 1 (U.K.) ..............................14

State Immunity Act of 1978, c. 33 (U.K.) ................................................................14

    Pt. I:

        § 5 ......................................................................................................14

        § 20 ....................................................................................................14

Fed. R. Civ. P.:

    Rule 4(k)(2) ...........................................................................................1

    Rule 8 ................................................................................................1, 3

    Rule 12(b)(6) ..........................................................................................1

    Rule 19 ...........................................................................................16, 17

    Rule 19(b) .............................................................................................17

    Rule 44.1 ..............................................................................................24


LEGISLATIVE MATERIALS

S. Rep. No. 102-249 (1991) .....................................................................................23


ADMINISTRATIVE MATERIALS

U.S. Dep't of State, *U.S. Relations With Saudi Arabia* (Dec. 15, 2020),
    https://www.state.gov/u-s-relations-with-saudi-arabia/ ....................................9


OTHER MATERIALS

Br. for the United States as Amicus Curiae, *Mutond v. Lewis*, No. 19-185
    (U.S. May 26, 2020), 2020 WL 2866592 ..........................................................13

Shane Harris et al., *CIA Concludes Saudi Crown Prince Ordered Jamal
    Khashoggi's Assassination*, Wash. Post (Nov. 16, 2018),
    https://wapo.st/3cfZ9r8 .......................................................................................2

Andrew Jay McClurg, *It's a Wonderful Life:  The Case for Hedonic Damages in Wrongful Death Cases*, 66 Notre Dame L. Rev. 57 (1990)................................................20

Order by Chief Judge Josey-Herring, D.C. Super. Ct. (amended July 14, 2021).........................29

Restatement (Second) of Foreign Relations Law of the United States (1965).............................13

T. A. Smedley, *Some Order Out of Chaos in Wrongful Death Law*, 37 Vand. L. Rev. 273 (1984) ...........................................................................................20

Standing Order No. 20-9 (D.D.C. Mar. 16, 2020) .........................................................29

Standing Order No 20-19 (D.D.C. Apr. 2, 2020) .........................................................29

## INTRODUCTION

Plaintiffs Cengiz and DAWN ask this Court to assign responsibility for the death of

Jamal Khashoggi.  That work is for the courts of Saudi Arabia, which have already completed

a criminal prosecution, and for the courts of Turkey, where a criminal prosecution remains

underway.  This Court has neither the subject-matter nor the personal jurisdiction it would need

to decide the action that Plaintiffs seek to bring.  Nor can any of their claims survive threshold

scrutiny under Rules 8 and 12(b)(6).  Their counterarguments are inventive and impassioned,

but not sound bases for the exercise of federal judicial power.  This case should be dismissed.

## ARGUMENT

**I.    This Court Lacks Personal Jurisdiction Over the Crown Prince**

**A.    Plaintiffs Fail To Allege a *Prima Facie* Case for Jurisdiction Based on an Alleged Conspiracy with U.S. Embassy Officials**

Plaintiffs contend that this Court has personal jurisdiction over the Crown Prince under

Rule 4(k)(2) because they allege that he conspired with officials at the Saudi Embassy in

Washington, D.C. (the "Embassy") to lure Jamal Khashoggi to Istanbul.  That is doubly incorrect.

*First*, as the Crown Prince showed, Rule 4(k)(2) does not authorize jurisdiction based on

a foreign defendant's alleged conspiracy with individuals acting in the United States.  Crown

Prince Motion To Dismiss ("Mot.") 11.  Plaintiffs do not respond to and thus concede this point.

*Second*, Plaintiffs' allegations of conspiracy are also conclusory and therefore insufficient

to state a *prima facie* case for personal jurisdiction.  *See Marsoun v. United States*, 525 F. Supp.

2d 206, 211 (D.D.C. 2007) (Bates, J.) ("Plaintiff . . . must allege specific facts on which personal

jurisdiction can be based; he cannot rely on conclusory allegations.").  Plaintiffs allege that

Khashoggi attempted to obtain a Turkish marriage certificate at the Embassy in August 2018,

but unspecified Embassy officials directed him to obtain the certificate at the Saudi Consulate in

Istanbul.  Compl. ¶ 90.  Plaintiffs also allege that the Ambassador, Prince Khalid, told Khashoggi

that it would be safe to travel to the Saudi Consulate in Istanbul to obtain the certificate.  *Id.* ¶ 91.

But Plaintiffs point to no factual allegations that the unspecified Embassy officials who

allegedly met with Khashoggi conspired with the Crown Prince.  They rely instead on the

conclusory allegation that " 'Defendants ensured that the Saudi Embassy in Washington, D.C.

would not provide Mr. Khashoggi with' " a marriage certificate.  Opp. 9 (quoting Compl. ¶ 40).

As for Prince Khalid, Plaintiffs cite (at 9) the conclusory allegation that he acted "at [the Crown

Prince's] direction."  Compl. ¶ 69.  Plaintiffs also redouble (at 9) their misplaced reliance on a

*Washington Post* article stating that Prince Khalid called Khashoggi "at [the Crown Prince's]

direction."[1]  As the Crown Prince showed (at 13) and Plaintiffs do not dispute, the article's

statement is itself conclusory and relies on anonymous sources.  Such "bald speculation or a

conclusory statement that individuals are co-conspirators is insufficient to establish personal

jurisdiction under a conspiracy theory."  *Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,

115 F.3d 1020, 1031 (D.C. Cir. 1997) (brackets and internal quotations marks omitted).[2]

Plaintiffs cannot overcome those deficiencies with their circular argument (at 8) that,

"*[i]f* [the Crown Prince] ordered the murder, and" – with another implied *if* – "the murder was

effectuated by luring Khashoggi outside of the United States, the reasonable inference is that [the

Crown Prince] ordered his co-conspirators to lure Khashoggi out of the United States."

---

[1] Shane Harris et al., *CIA Concludes Saudi Crown Prince Ordered Jamal Khashoggi's Assassination*, Wash. Post (Nov. 16, 2018), https://wapo.st/3cfZ9r8.

[2] *Amidax Trading Group v. S.W.I.F.T. SCRL*, 671 F.3d 140, 147 (2d Cir. 2011) (per curiam), rejected jurisdiction based on a statement in a news article from an anonymous source. Plaintiffs attempt (at 10) to distinguish *Amidax* on the basis that the source's statements were "inconsistent with surrounding facts," meaning a government official's denial of the source's allegations.  But the same is true here.  Prince Khalid has denied that he called Khashoggi at the Crown Prince's direction.  *See* Alaoudh Decl. Exs. A, B; Prince Khalid Decl. ¶¶ 4-5.

(Emphasis added.)  Assuming the truth of Plaintiffs' conclusory assertions is not how courts apply Rule 8.

### B.    Plaintiffs Failed To Meet Their Burden To Counter the Crown Prince's Evidence Refuting Their Conclusory Jurisdictional Allegations

Even if Plaintiffs' Complaint alleged a *prima facie* basis for personal jurisdiction, which it does not, that would be insufficient because the Crown Prince has submitted factual evidence refuting Plaintiffs' conclusory jurisdictional allegations.  Because the Crown Prince's evidence "raise[d] issues to defeat jurisdiction, 'the burden . . . shift[ed] back to the plaintiff[s] to produce evidence supporting jurisdiction.'"  *Sieverding v. American Bar Ass'n*, 439 F. Supp. 2d 111, 119 n.5 (D.D.C. 2006) (quoting *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002)); *accord Naegele v. Albers*, 355 F. Supp. 2d 129, 136 n.3 (D.D.C. 2005); *Purdue Rsch. Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782-83 (7th Cir. 2003) ("[O]nce the defendant has submitted affidavits or other evidence in opposition to the exercise of jurisdiction, the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction.").

The Crown Prince's evidence refutes Plaintiffs' "luring" theory.  A review of Embassy records did not show any visit by Khashoggi in August 2018, when Cengiz alleges that Embassy officials advised him to go to Turkey to obtain his marriage certificate.  *See* Alhabdan Decl. ¶¶ 3-9.  The Embassy does not provide Turkish marriage certificates.  *See id.* ¶ 11.  Indeed, under Turkish law, the Embassy could not provide a Turkish marriage certificate that Turkish legal authorities would accept as valid.  *See* Varol Decl. ¶ 22.  Khashoggi never discussed with Prince Khalid his need for a Turkish marriage certificate or visiting the Saudi Consulate in Istanbul, and Prince Khalid never assured Khashoggi that it would be safe to go there.  *See* Prince Khalid Decl. ¶¶ 2-4.  And the Crown Prince never directed Prince Khalid to give assurances to Khashoggi that

it would be safe for him to visit the Saudi Consulate and never gave him any other direction regarding Khashoggi. *See id.* ¶ 5.

The Crown Prince's evidence "'shift[ed]'" the "'burden'" back to Plaintiffs "'to produce evidence supporting jurisdiction.'" *Sieverding*, 439 F. Supp. 2d at 119 n.5 (quoting *Meier*, 288 F.3d at 1269). Plaintiffs have failed to do so. The factual disputes they raise are immaterial.

Plaintiffs submit a John Doe Declaration stating that Khashoggi visited the Embassy "on November 17, 20, 21, or 22 of 2017" to sign divorce paperwork, Doe Decl. ¶ 6, a visit not listed in the Alhabdan Declaration. Whether Khashoggi visited the Embassy in November 2017 is immaterial to Plaintiffs' jurisdictional theory. November 2017 was months before Khashoggi even met Cengiz on May 6, 2018. *See* Compl. ¶ 87. Plaintiffs do not contend that the alleged November 2017 visit to the Embassy had anything to do with a Turkish marriage certificate or allegedly luring Khashoggi to Istanbul in August 2018. *See id.* ¶ 90.

The Alaoudh Declaration similarly asserts that "the Saudi Embassy does not keep a record of every visit to the Embassy," but instead only "a record of formal requests or other events." Alaoudh Decl. ¶ 8. This statement does not meet Plaintiffs' burden to submit factual evidence supporting jurisdiction because it does not support Plaintiffs' allegation that Khashoggi visited the Embassy in August 2018.

Plaintiffs fail to cast doubt on Prince Khalid's credibility (at 14) by citing two prior Twitter posts by Prince Khalid (attached as exhibits to the Alaoudh Declaration). In those tweets, Prince Khalid stated that the last message he sent to Khashoggi was on October 26, 2017. *See* Alaoudh Decl. Exs. A, B. Plaintiffs suggest that these tweets conflict with Prince Khalid's statement in his declaration that "[b]etween September 2017 and March 2018 Mr. Khashoggi and I exchanged a handful of WhatsApp messages." Prince Khalid Decl. ¶ 2. As Prince Khalid explains in a declaration submitted with this reply, both statements are true: his last message to

Khashoggi was on October 26, 2017, and Khashoggi's last message to him (the end of their

"exchange[]") was in March 2018.  Prince Khalid Supp. Decl. ¶ 4.  In any event, the purported

dispute is immaterial.  Communications from October 2017 to March 2018 do not support

Plaintiffs' contention that Prince Khalid directed Khashoggi to go to Istanbul to obtain his

certificate to marry Cengiz in August 2018.  Compl. ¶ 91.  Nor do Plaintiffs contend that any

communications Khashoggi sent from October 2017 to March 2018 were about the Turkish

marriage certificate.  Again, at that time, Khashoggi and Cengiz had not even met.  *Id.* ¶ 87.

The declaration of Abdullah Orçun Çetinkaya on Turkish law likewise raises no material

disputes.  Çetinkaya does not dispute the opinion of the Crown Prince's expert, Ozan Varol, that

"Turkish law does not permit a non-citizen to obtain the certificate from his country's embassy

or consulate in a country other than Turkey, such as the United States."  Varol Decl. ¶ 22.  That

makes it undisputed that the Embassy could not have issued Khashoggi a legally valid Turkish

marriage certificate.  Çetinkaya also does not dispute Varol's assertion that a Saudi citizen can

obtain a Turkish marriage certificate through a Saudi consular facility in Turkey.  *See id.* ¶ 21;

Çetinkaya Decl. ¶ 50.  That makes it undisputed that, if the Embassy had advised Khashoggi that

it could not provide him with a Turkish marriage certificate but that he could obtain it at the Saudi

Consulate in Istanbul, that advice would have been accurate.

Çetinkaya further states that there is an "exceptional[]" alternative way to obtain a

marriage certificate directly from Turkish authorities.  Çetinkaya Decl. ¶ 50.  As Varol responds,

the Turkish Regulation on Marriage permits a foreigner to obtain a marriage certificate from

Turkish authorities only when it is "not possible" to obtain the certificate from authorities in his

home country; the regulation does not define the phrase "not possible."  Varol Supp. Decl. ¶ 6.

It is at best speculative whether Khashoggi would have qualified for this exception, and there

is no allegation or evidence that the Embassy officials believed he did.  Cengiz herself knew

of no applicable exception at the time:  she "told Mr. Khashoggi that Turkey would require a certificate of marriage eligibility from the Kingdom."  Compl. ¶ 89.  In any event, Çetinkaya's declaration does not support the theory that such certificates were "routinely provided by the Embassy" so that the denial must have been a "ruse."  *Id*. ¶ 90.

Plaintiffs also have no evidence to dispute Alhabdan's statement that the Embassy does not routinely provide Turkish marriage certificates, and in fact has never done so.  Alhabdan Decl. ¶ 11.  They merely point to the page on the Saudi Embassy website cited in the Complaint, "advis[ing] that the Embassy assists Saudi nationals in 'carrying out the steps required for . . . Saudi citizens wishing to marry . . . foreigners.' "  Opp. 12 (quoting Compl. ¶ 90) (ellipses in Compl.).  That page neither states nor implies that the Embassy can provide a legally valid eligibility marriage certificate for any country, much less for Turkey in particular.

In sum, the Crown Prince has refuted Plaintiffs' allegations that Saudi officials in the United States "lured" Khashoggi to the Saudi Consulate in Istanbul as part of a conspiracy with the Crown Prince.  Plaintiffs have failed to satisfy their burden, in light of the Crown Prince's factual showing, to "go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction."  *Purdue Rsch. Found.*, 338 F.3d at 783.  Nor have Plaintiffs raised any material factual disputes with the Crown Prince's evidence.  The Court should accordingly dismiss the Complaint for lack of personal jurisdiction.[3]

---

[3] The Court should reject Plaintiffs' suggestion (at 13) to "defer resolution of the factual dispute" regarding personal jurisdiction until after trial.  *American Oversight v. U.S. Department of Veterans Affairs*, 498 F. Supp. 3d 145 (D.D.C. 2020), on which Plaintiffs rely, reasoned that a court could defer resolution of "disputed jurisdictional facts" that "are inextricably intertwined with the merits of the case."  *Id.* at 153.  But, here, there are no "disputed jurisdictional facts" because Plaintiffs' evidence raises only immaterial disputes.

### C.    Khashoggi's Alleged Connections to the United States Do Not Justify Personal Jurisdiction

Plaintiffs are incorrect to argue (at 18) that they can sue in the United States because the killing of Khashoggi in Turkey allegedly had "effects" in the United States based on Khashoggi's contacts with the United States.  Plaintiffs rely on *Calder v. Jones*, 465 U.S. 783 (1984), which held that a California resident could bring a libel lawsuit in California against Florida journalists who wrote and edited an article about her that was circulated widely in California.  The Supreme Court recently clarified that *Calder*'s holding "was largely a function of the nature of the libel tort."  *Walden v. Fiore*, 571 U.S. 277, 287 (2014).

> [B]ecause publication to third persons is a necessary element of libel, the defendants' intentional tort actually occurred in California.  In this way, the "effects" caused by the defendants' article—*i.e.*, the injury to the plaintiff's reputation in the estimation of the California public—connected the defendants' conduct to *California,* not just to a plaintiff who lived there.

*Id.* at 288 (citations omitted).  *Calder*, as clarified by *Walden*, thus does not stand for the proposition that a tort committed outside the forum gives rise to jurisdiction in the forum if it has some "effects" there.  Rather, jurisdiction exists in a forum when a defendant commits a tort in the forum by intentionally injuring someone in that forum.

By contrast, injuring a forum resident outside the forum does not give rise to jurisdiction, even if the defendant allegedly knows that his actions will cause harm in the forum.  In *Walden*, a police officer in Georgia allegedly wrongly seized money in Georgia from Nevada residents boarding a flight to Nevada.  571 U.S. at 280-81.  The Ninth Circuit held that jurisdiction existed in Nevada because the defendant knowingly harmed Nevada residents, "caus[ing] them 'foreseeable harm' in Nevada."  *Id.* at 282.  But the Supreme Court reversed, holding that the court of appeals' analysis "improperly attribute[d] a plaintiff's forum connections to the defendant and makes those connections 'decisive' in the jurisdictional analysis," *id.* at 289; that "mere

injury to a forum resident is not a sufficient connection to the forum," *id.* at 290; and that "it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him," *id.* at 285. Plaintiffs' argument (at 18-19) that jurisdiction exists because the Crown Prince's alleged tort against a United States resident caused foreseeable injury in the United States is the same theory *Walden* rejected.[4]

Plaintiffs also rely (at 19-20) on *Mwani v. bin Laden*, 417 F.3d 1 (D.C. Cir. 2005), but that case does not help them. *Mwani* upheld a default judgment based on personal jurisdiction over Osama bin Laden and Al Qaeda in connection with their attack on the U.S. embassy in Kenya, which was intended to and did kill many Americans. *Id.* at 13. That attack was part of Al Qaeda's broader conspiracy to terrorize the United States, including many attacks on U.S. soil, such as the 1993 World Trade Center bombing and the September 11, 2001 terrorist attacks. *Id.* at 13-14. The unique American status of the embassy, and the context of the embassy attack in a broader conspiracy against the United States, provided the necessary jurisdictional contacts. Khashoggi was not an American citizen, and Plaintiffs' allegations that Khashoggi was killed at a Saudi Consulate in Turkey does not create a relationship with the United States in the way that Al Qaeda's bombing of a U.S. diplomatic facility did.[5] Nor do Plaintiffs even assert, much less

---

[4] Plaintiffs try to distinguish *Walden* by citing *MAG IAS Holdings, Inc. v. Schmückle*, 854 F.3d 894 (6th Cir. 2017), but that case supports the Crown Prince. It rejected the argument "that 'causing consequences' in Michigan is still sufficient" to establish personal jurisdiction there, and held that the plaintiff "must show that [the defendant] had some level of contact with the state." *Id.* at 901. The court found personal jurisdiction because the defendant was CEO of a Michigan-based business and took multiple trips to Michigan in the course of running that business. *Id.* at 901-02. No similar contacts are alleged here.

[5] Since *Walden*, the D.C. Circuit has emphasized the narrowness of *Mwani*, explaining that it found jurisdiction based on an "attack[] [on] a U.S. government outpost" under circumstances showing that the defendants "manifestly sought purposefully [to] direct their terror at the United States." *Estate of Klieman v. Palestinian Auth.*, 923 F.3d 1115, 1125-26 (D.C. Cir. 2019) (last brackets in original), *cert. granted, vacated, and remanded on other grounds*, 140 S.

show, that the Crown Prince conspired to harm the United States or its citizens.  To the contrary, the Executive Branch describes Saudi Arabia as "a strong partner in security and counterterrorism efforts and in military, diplomatic, and financial cooperation," with "more than seven decades of close friendship and cooperation" with the United States.[6]  *Hassen v. Nahyan*, 2010 WL 9538408 (C.D. Cal. Sept. 17, 2010), also cited by Plaintiffs (at 20), is likewise inapposite.  *Hassen* found jurisdiction based on an abduction of an American who the defendants believed "worked for the CIA" to obtain American "state secrets."  2010 WL 9538408, at *8-10. Nothing of the kind is alleged here.[7]

### D.      Notions of Fair Play and Substantial Justice Weigh Against Jurisdiction

Plaintiffs fail meaningfully to dispute the Crown Prince's showing (at 17-19) that personal jurisdiction would offend traditional notions of fair play and substantial justice. Although Plaintiffs argue (at 23) that the Crown Prince "is a sophisticated litigant with nearly unlimited resources and skilled counsel," they cannot dispute that it would be burdensome for him and other Defendants (all of whom are Saudi) to litigate in a forum half a world away. Plaintiffs assert (at 24) that the United States "has a strong interest in this case," but they do not address the Crown Prince's showing (at 18-19) that both Saudi Arabia and Turkey have stronger

---

Ct. 2713 (2020).  Plaintiffs' allegations that the Crown Prince targeted a Saudi journalist in Turkey bear no resemblance to Al Qaeda's terror campaign against the United States.

[6] U.S. Dep't of State, *U.S. Relations With Saudi Arabia* (Dec. 15, 2020), https://www. state.gov/u-s-relations-with-saudi-arabia/; *see also Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073, 1078 (C.D. Cal. 1999) (taking judicial notice of the status of the United States' relationship with a foreign nation on the basis of a State Department press release and country guide).

[7] *Hassen* also relied heavily on cases holding that intentional targeting of a U.S. citizen abroad was sufficient.  Those cases are not good law after *Walden*, as the Ninth Circuit has recognized.  *Compare Hassen*, 2010 WL 9538408, at *9 (citing *Brayton Purcell LLP v. Recordon & Recordon*, 606 F.3d 1124 (9th Cir. 2010)), *with Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1069-70 (9th Cir. 2017) (citing *Brayton Purcell* and other cases as examples of precedent to be reconsidered "[i]n light of the Court's instructions in *Walden*").

interests.  Moreover, the purported United States interest is based largely on Plaintiffs' allegations that Saudi officials in the United States lured Khashoggi to Istanbul, which the Crown Prince has refuted.  Plaintiffs also do not address the Crown Prince's showing (at 18) that Cengiz, a Turkish citizen and resident, has no special interest in litigating in the United States.

### E.     Jurisdictional Discovery Is Unwarranted

The Court should reject Plaintiffs' request for jurisdictional discovery.  Plaintiffs have failed to raise any dispute of a material jurisdictional fact that would require resolution through discovery.  "[A] request for jurisdictional discovery cannot be based on mere conjecture or speculation."  *FC Inv. Grp. LC v. IFX Mkts., Ltd.*, 529 F.3d 1087, 1094 (D.C. Cir. 2008), *overruled on other grounds by Erwin-Simpson v. AirAsia Berhad*, 985 F.3d 883 (D.C. Cir. 2021); *accord Exponential Biotherapies, Inc. v. Houthoff Buruma N.V.*, 638 F. Supp. 2d 1, 11 (D.D.C. 2009).[8]  Where a defendant submits evidence that "unequivocally" refutes a plaintiff's jurisdictional allegations, the plaintiff may not obtain discovery based on the "mere conjecture" that the defendant's evidence might be inaccurate.  *Hoffman v. State Regulatory Registry, LLC*, 2021 WL 2592960, at *5 (D.D.C. June 24, 2021).  That is because "'[j]urisdictional discovery is not a fishing expedition.'"  *Id.* (quoting *Triple Up Ltd. v. Youku Tudou Inc.*, 2018 WL 4440459, at *3 (D.C. Cir. July 17, 2018) (per curiam)).

As shown above, Plaintiffs have submitted no factual evidence in support of their jurisdictional theory, nor have they raised any material disputes with the Crown Prince's factual evidence refuting jurisdiction.  *See supra* pp. 4-6.  Plaintiffs merely speculate (at 15) that "Embassy records could easily have been covered up" and argue (at 14), without any evidence,

---

[8] *Ofisi v. Al Shamal Islamic Bank*, 2019 WL 1255096 (D.D.C. Mar. 19, 2019), cited by Plaintiffs (at 15) to justify jurisdictional discovery, recognizes this limitation.  *See* 2019 WL 1255096, at *8 ("Mere conjecture or speculation is not enough . . . to justify such discovery.").

that "the Court should not trust" the Crown Prince's supporting declarants.  That is the type of "mere conjecture" that does not justify jurisdictional discovery.  *FC Inv. Grp.*, 529 F.3d at 1094.

The broad nature of Plaintiffs' proposed requests is further reason to deny them.  While Plaintiffs portray their requested discovery as modest and targeted, they are seeking full merits discovery in the guise of jurisdictional discovery.[9]  They also make broad requests regarding public controversies involving the Saudi royal family that have little or nothing to do with either jurisdiction or the merits of this case, underscoring that their goal is a fishing expedition.[10]

### F.      The Court Lacks Jurisdiction Over Plaintiffs' Non-Federal Claims

Plaintiffs do not dispute the Crown Prince's showing (at 19) that, if this Court properly holds that it lacks jurisdiction over Cengiz's federal claims, the sole basis for personal jurisdiction over Plaintiffs' non-federal claims asserted in the Complaint – pendent personal jurisdiction – necessarily fails.  Plaintiffs suggest (at 24) that they "would seek the opportunity to amend their complaint to address personal jurisdiction over the state-law claims," but they do not show how they could possibly do so, which would require showing that their claims have sufficient connection to the District of Columbia to satisfy due process.  Because Plaintiffs fail to satisfy the "minimum contacts" test with respect to the United States as a whole, they necessarily fail that test with respect to the District of Columbia.

---

[9] For example, Plaintiffs propose to request from the Crown Prince "Any documents or communications relating to Jamal Khashoggi between November 1, 2016 and the present," "Any communications with any Defendant relating to Jamal Khashoggi between November 1, 2016 and the present," and "Any documents or communications relating to Jamal Khashoggi's visit to the Saudi Consulate in Istanbul, Turkey on October 2, 2018."  Harper Decl. Ex. D at 5-6.  Plaintiffs also seek a deposition of the Crown Prince, of unlimited duration, that they acknowledge would be "taken for the purposes of jurisdictional discovery *and for use as evidence in this action, including to be used at trial*."  *Id.* Ex. A at 1 (emphasis added).

[10] For example, Plaintiffs propose to request from the Crown Prince "Any documents or communications relating to engagement with critics of the House of Saud" and "Any documents or communications relating to NSO Group's Pegasus spyware."  Harper Decl. Ex. D at 5-6.

## II.        Status-Based Immunity Bars Plaintiffs' Claims Against the Crown Prince

The Crown Prince is entitled to status-based immunity from any suit in U.S. court,

because he sits with the King at the apex of Saudi Arabia's government.  None of the facts set

forth in the Crown Prince's motion (at 20-21) – his place as designated successor to the King,

his exercise of sovereign power alongside or on behalf of the King, or his roles as Deputy Prime

Minister, Minister of Defense, and Chairman of the Councils for Economic and Development

Affairs and of Political and Security Affairs – is or can be disputed.  Nor can it be disputed, as

pointed out in the Crown Prince's motion (at 22), that President Biden has described the Crown

Prince as an "acting head of state" and that federal agencies have described the Crown Prince as

a "chief of state" and "head of government" of Saudi Arabia.

Plaintiffs nevertheless assert (at 28) that the Court should decline to grant status-based

immunity because the State Department has yet to act on the Crown Prince's request for a

Suggestion of Immunity in a separate case.  It is settled, however, that, when the State Department

"does not grant a suggestion of immunity, the [court] is authorized" to decide the issue

independently.  *Lewis v. Mutond*, 918 F.3d 142, 145-46 (D.C. Cir. 2019), *cert. denied*,

141 S. Ct. 156 (2020).[11]

---

[11] Plaintiffs point (at 29) to one out-of-circuit case in which a court, after concluding the Crown Prince was entitled to conduct-based immunity, "decline[d] to reach th[e] issue" of his status-based immunity.  *Aldossari ex rel. Aldossari v. Ripp*, 2021 WL 1819699, at *17 (E.D. Pa. May 6, 2021), *appeal pending*, No. 21-2080 (3d Cir.).  But the D.C. Circuit has made clear that this Court is "authorized" to address the question where the State Department is silent.  *Lewis*, 918 F.3d at 145-46.  Indeed, the court in *Aldossari* acknowledged that it "ha[d] the authority" to decide the Crown Prince's status-based immunity, but found it unnecessary to do so given its ruling that the Crown Prince had conduct-based immunity.  2021 WL 1819699, at *17.  For the same reason, Plaintiffs' attempt (at 30) to distinguish cases cited in the Crown Prince's motion (at 20 n.14) on the ground that those cases involved Suggestions of Immunity is unpersuasive.

In doing so, the Court must evaluate "'doctrine[s] of customary international law,'" *Yousuf v. Samantar*, 699 F.3d 763, 768-69 (4th Cir. 2012) (quoting *In re Grand Jury Proceedings, Doe No. 700*, 817 F.2d 1108, 1110 (4th Cir. 1987)), including the practice of other states. Contrary to Plaintiffs' assertion (at 27), status-based immunity is not limited to heads of state, heads of government, and foreign ministers.[12] "Under customary international law, head of state immunity encompasses the immunity of not only the heads of state but also of other holders of high-ranking office in a State." *Yousuf*, 699 F.3d at 769 n.2 (internal quotation marks omitted). "[T]he Head of Government and Minister of Foreign Affairs," *id.* (internal quotation marks omitted), are examples, not markers of the outer bounds of immunity.

As explained in the Crown Prince's motion (at 22-23 & n.25), the decisions of the English courts are particularly relevant to ascertaining the relevant customary international law. Those courts have recognized immunity for a Defense Minister and a Minister for Commerce and International Trade, and have stated in well-reasoned dictum that the position of Crown Prince in Saudi Arabia would be entitled to status-based immunity. *See Apex Glob. Mgmt. Ltd. v. Fi Call Ltd.*, [2013] EWHC 587 (Ch), ¶ 107.

Plaintiffs attempt (at 30-31) to distinguish *Apex Global* as based on the United Kingdom's State Immunity Act, but ignore the Crown Prince's point (at 23 n.24) that the statute incorporates

---

[12] Plaintiffs purport to derive this limitation from § 66 of the Restatement (Second) of Foreign Relations Law of the United States (1965), but the United States has explained that "[r]eliance on the Second Restatement's provisions on foreign-official immunity as a conclusive statement of current law is misplaced." Br. for the United States as Amicus Curiae at 14, *Mutond v. Lewis*, No. 19-185 (U.S. May 26, 2020), 2020 WL 2866592; *see id.* at 14-17. Although the D.C. Circuit relied on a different subsection of § 66 in *Lewis v. Mutond*, its reliance was based on the parties' shared understanding that "§ 66 accurately sets out the scope of common-law immunity for current or former officials"; the D.C. Circuit "proceed[ed] on that understanding without deciding the issue." *Lewis*, 918 F.3d at 146.

principles of customary international law.[13]  Plaintiffs also point to provisions of the State

Immunity Act that limit the immunity of a "State" in certain cases of "death or personal injury."

State Immunity Act of 1978, c. 33, pt. I, § 5.  But Plaintiffs ignore that, with respect to "sovereign

or other head of State" or to "members of his family forming part of his household," the State

Immunity Act incorporates the broader immunity available under the United Kingdom's

Diplomatic Privileges Act, *id.* § 20, which includes no similar exceptions, *see* Diplomatic

Privileges Act of 1964, c. 81, § 2 & Sched. 1.

## III.    The Act of State Doctrine Requires Dismissal of Plaintiffs' Claims

The Court should dismiss all of Plaintiffs' claims under the act of state doctrine.  To

support this Court's exercise of personal jurisdiction over the Crown Prince, Plaintiffs allege

that Saudi Arabia's then-Ambassador to the United States and other Embassy officials "lured"

Khashoggi, a Saudi national, to Istanbul by denying him a government-issued marriage certificate

from the Embassy and by giving him assurances about his personal safety in the Saudi Consulate

in Istanbul.  *See supra* Part I.B.  They ask the Court to infer that official statements and conduct of

the Ambassador and Embassy personnel were a "ruse," Compl. ¶¶ 4, 90, were "false pretenses,"

*id.* ¶ 91, and were a "key" "part" of an "unlawful conspiracy," *id.* ¶¶ 4, 40, 44, 169, designed to

result in Khashoggi's death.  But under the act of state doctrine, this Court must "deem[ ]" the

official statements and conduct of the Ambassador and Embassy personnel to be "valid."  *World*

*Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1165 (D.C. Cir. 2002).  Because

this case "could not be adjudicated without a court having to inquire into the legal validity or

---

[13] Contrary to Plaintiffs' suggestion (at 30 n.9), it is not difficult to find recent federal
court cases treating the State Immunity Act as persuasive authority about international law.  *See*,
*e.g.*, *Al Shimari v. CACI Premier Tech., Inc.*, 368 F. Supp. 3d 935, 956-57 (E.D. Va.) (Brinkema,
J.), *appeal dismissed*, 775 F. App'x 758 (4th Cir. 2019), *cert. denied*, 141 S. Ct. 2850 (2021).

tortiousness" of those alleged official and distinctly sovereign acts, *Hourani v. Mirtchev*, 796 F.3d 1, 15 (D.C. Cir. 2015), the Court should dismiss it.[14]

Plaintiffs do not address the alleged "key" conduct of Saudi Arabia's Ambassador and Embassy personnel. *See* Opp. 32-37. Instead, Plaintiffs narrowly focus on the Crown Prince's purported instruction to engage in that conduct. That allegation is conclusory and untrue. *See* Mot. 12-14. More fundamentally, Plaintiffs ignore the argument that the Crown Prince actually made. When a plaintiff accuses an ambassador and other diplomatic agents of being "in the thick" of a "conspiracy" and contends that a "critical step" in the alleged conspiracy was played by "official speech" of the sending state – such as speech of the ambassador, "whose defining purpose is to speak for the [sending state's government] sitting within its own territory" – then the act of state doctrine is "trigger[ed]." *Hourani*, 796 F.3d at 12-13.

Plaintiffs' insistence (at 34-35) that the purported communications at issue constituted "informal advice to a private citizen" does not withstand scrutiny. Those allegedly "key" communications concerned the issuance of an official certificate – which Plaintiffs say was a "service routinely provided by the Embassy . . . to Saudi nationals," Compl. ¶ 90 – as well as assurances from the Ambassador to a Saudi national about the conduct of Saudi Arabian consular officials. *Id.* ¶ 40. Such communications, had they occurred, would have been official and "'by

---

[14] Plaintiffs fail (at 35-36) to distinguish *Hourani* by arguing that "this case does not involve Saudi Arabia's 'official speech about its own nationals' domestic activities.'" This case, like *Hourani*, involves diplomatic officials' alleged speech in the course of their official duties. *See* Mot. 24-26. In any event, the *Hourani* court expressly noted that the speech at issue was simply "the *kind* of 'distinctly sovereign' act and 'formal governmental action' concerning internal affairs that triggers the Act of State doctrine's and international comity's traditional concerns." 796 F.3d at 14 (emphasis added). That holding is not limited to *Hourani*'s facts, but extends as far as its reasoning. *See*, *e.g.*, *Nnaka v. Federal Republic of Nigeria*, 238 F. Supp. 3d 17, 32 (D.D.C. 2017) (Bates, J.) (applying *Hourani* to dispute involving letter sent by Attorney General of Nigeria), *aff'd*, 756 F. App'x 16 (D.C. Cir. 2019) (per curiam).

nature distinctly sovereign.'"  *Nnaka*, 238 F. Supp. 3d at 32 (Bates, J.) (quoting *McKesson Corp.*

*v. Islamic Republic of Iran*, 672 F.3d 1066, 1073 (D.C. Cir. 2012)); *see* Mot. 26-27.

Plaintiffs also erroneously suggest (at 37) that the act of state doctrine is "not

appropriately raised at the motion to dismiss stage."  Courts properly dismiss pleadings in which

the allegations, taken as true, trigger the doctrine.  *See*, *e.g.*, *Hourani*, 796 F.3d at 5 (affirming

dismissal of complaint in part based on act of state doctrine); *Nnaka*, 238 F. Supp. 3d at 23

(dismissing complaint in part based on act of state doctrine).  That approach is appropriate here.

## IV.    Saudi Arabia Is a Necessary Party That Is Immune from Suit

The Court also should dismiss Plaintiffs' claims under Rule 19.  Plaintiffs ask this Court

to adjudicate a matter of great "significance for [Saudi Arabia] and its people," *Republic of*

*Philippines v. Pimentel*, 553 U.S. 851, 866 (2008):  The death of a high-profile Saudi Arabian

national at the hands of Saudi Arabian government employees in a Saudi Arabian consular

facility.  The adjudication of that matter in Saudi Arabia's absence poses an acute "potential for

injury" to Saudi Arabia's "interests."  *Id.* at 867.  But, as Plaintiffs do not dispute, Saudi Arabia

is entitled to foreign sovereign immunity under the Foreign Sovereign Immunities Act of 1976

("FSIA") and so cannot be made a party.  That ends this case.  *See*, *e.g.*, *id.* ("A case may not

proceed when a required-entity sovereign is not amenable to suit.").

Plaintiffs' arguments to the contrary are unpersuasive.  *First*, Plaintiffs acknowledge

(at 38) the Crown Prince's discussion of *TJGEM LLC v. Republic of Ghana*, 26 F. Supp. 3d 1

(D.D.C. 2013), *aff'd*, 2015 WL 3653187 (D.C. Cir. June 9, 2015) (per curiam), yet incorrectly

claim that the Crown Prince "cite[d] no authority in which a sovereign entity was held to be

a required party when a suit alleged that an official of that sovereign abused his authority."

*TJGEM* involved allegations that a "major Ghanaian official" engaged in "corrupt practices,"

*id.* at 13 – a quintessential example of a government official "abus[ing] his authority," Opp. 38.

16

The court held that "[r]esolving" those allegations fell "squarely within the types of interests held by the Ghana Defendants that could be compromised by adjudication of this suit in the United States," and so Ghana was a required party.  26 F. Supp. 3d at 13.

*Second*, Plaintiffs incorrectly assert (at 38) that their case "does not implicate Saudi Arabia's sovereign interests."  As explained in the Crown Prince's motion (at 29-31), Plaintiffs' direct attack on the actions of Saudi Arabia's government – including its King and Crown Prince, its former Ambassador to the United States and U.S.-based Embassy personnel, and even the justice system that is overseeing the prosecution of those involved in the killing of Khashoggi – threatens Saudi Arabia's sovereign interests in the conduct of its diplomatic representatives in the United States and in "us[ing] its own courts for a dispute if it has a right to do so." *Pimentel*, 553 U.S. at 866.  Thus, "resolution of this matter in this Court" would pose a "significant risk of implicating, and possibly injuring," Saudi Arabia's "interests" as a "sovereign entit[y]," and the matter cannot be adjudicated in Saudi Arabia's absence. *TJGEM*, 26 F. Supp. 3d at 13. Plaintiffs further err (at 39) in downplaying Saudi Arabia's unique sovereign interest in defending Plaintiffs' attack on Saudi Arabia's justice system, including exercises of prosecutorial discretion.  A sovereign's cognizable Rule 19 interests include the sovereign's "interest in the administration, enforcement, and interpretation of its laws and regulations." *Two Shields v. Wilkinson*, 790 F.3d 791, 797 (8th Cir. 2015).

*Third*, although the Court need not consider Rule 19(b) factors, those factors lead to the same result:  The case cannot proceed in Saudi Arabia's absence. *See* Mot. 32-34.  Although Plaintiffs insist (at 40) that "[c]ourts consistently decline to dismiss actions" where another party can allegedly represent the interests of the immune party, the cases on which Plaintiffs rely do not support the claim that anyone other than a foreign sovereign itself can adequately protect the types of core sovereign interests implicated in this case. *Vann v. U.S. Department of Interior*,

701 F.3d 927 (D.C. Cir. 2012), involved the *Ex parte Young* doctrine, which is a "narrow exception to the Eleventh Amendment" to allow "federal jurisdiction over a suit against a state official" if certain conditions are met. *Seminole Tribe of Florida v. Florida*, 517 U.S. 44, 73, 76 (1996). That doctrine has no application in a suit against an official of a *foreign* sovereign. Similarly, *Gensetix, Inc. v. Board of Regents of University of Texas System*, 966 F.3d 1316 (Fed. Cir. 2020), over a dissent, declined to apply *Pimentel* in part because "state sovereign immunity," not "foreign sovereign immunity," was at issue. *Id.* at 1326. That reasoning is inapplicable here, where foreign sovereign immunity is at issue.

In addition to *Vann* and *Gensetix*, Plaintiffs place great emphasis on *de Csepel v. Republic of Hungary*, --- F. Supp. 3d ---, 2020 WL 2343405 (D.D.C. May 11, 2020), *interlocutory appeal pending*, No. 20-7047 (D.C. Cir.). As noted in the Crown Prince's motion (at 34 n.33), the court in *de Csepel* did not address Hungary's sovereign interest in deciding significant disputes in its own courts; instead, the court found that Hungary's interest in that case was limited to maintaining "possession of the artwork and [avoiding] damages." 2020 WL 2343405, at *15. Here, Plaintiffs' attempt to use this lawsuit in a campaign against what they call "egregious conduct by authoritarian regimes," Mot. 29 (quoting Plaintiffs' counsel), puts Saudi Arabia's sovereign interests directly at issue.

## V.     Cengiz Fails To State a Claim Under the Torture Victims Protection Act

### A.     Cengiz Is Not a Proper Plaintiff To Bring a TVPA Claim

The TVPA confers a right of action for an extrajudicial killing only to "the [decedent's] legal representative" or to "any person who may be a claimant in an action for wrongful death." Pub. L. No. 102-256, § 2(a)(2), 106 Stat. 73, 73 (1992), *reprinted in* 28 U.S.C. § 1350 note. Cengiz does not dispute the Crown Prince's showings (at 35-37) that she is not Khashoggi's legal representative; or (at 39-40) that, as an alleged fiancée, she could not bring a wrongful-

death action under the laws of Virginia, the District of Columbia, or Saudi Arabia.  Her TVPA claim depends on her assertions that she can be a claimant for Khashoggi's wrongful death under Turkish law and that Turkish law applies.  She is incorrect on both points.

### 1.    Cengiz Is Not a "Person Who May Be a Claimant in an Action for Wrongful Death," Even Under Turkish Law

Cengiz is incorrect to argue (at 48-50) that she would be eligible, under Turkish law, to bring an action for pecuniary damages arising from Khashoggi's death.  As the Crown Prince's expert Varol explained, Turkish law permits a survivor to bring a claim for pecuniary damages from another person's death only if she "had been receiving 'regular and continuous assistance' from the deceased," meaning "periodic payments," as opposed to "one-off, temporary, or irregular" support.  Varol Decl. ¶¶ 30-31.  Moreover, "the survivor's standard of living must have been maintained by the deceased in a regular and continuous manner."  *Id.* ¶ 32.  Cengiz's allegations that she had received a few payments from Khashoggi in the past and expected additional payments in the future do not meet this standard.  *Id.* ¶¶ 35-38.

In his declaration, Çetinkaya opines that Cengiz could bring a claim under Turkish law for material damages for loss of Khashoggi's support.  Çetinkaya Decl. ¶ 55.  He opines that "Turkish law requires only an objective expectation of support *after* the death" and that Cengiz would not need to "prove she received 'regular and continuous assistance' from Khashoggi *prior* to Khashoggi's death."  *Id.* ¶ 64.  He opines that Cengiz meets this standard based on her status as Khashoggi's fiancée, her alleged – but legally invalid – Islamic marriage to Khashoggi, and Khashoggi's irregular past support of Cengiz.  *Id.* ¶¶ 60-62.

Çetinkaya's analysis of Turkish law is incorrect.  As Varol explains in a supplemental declaration, "numerous recent decisions of the Court of Cassation," Turkey's highest appellate court for civil matters, "ma[k]e it clear that, in the case of engaged couples,  a regular and

continuous support relationship between the deceased and the survivor must exist <u>prior to</u> the date of death."  Varol Supp. Decl. ¶ 28; *see also id.* ¶¶ 29-33 (citing and describing Turkish case law).  The cases cited by Çetinkaya involved a father suing for a son's wrongful death.  These cases are inapposite because they "focused on the special nature of the parent-offspring relationship, noting that, given that biological relationship, it was 'apparent' that the son would have been expected to provide service and care for the father, if it were not for the son's wrongful death.  The same expectation does not attach to an unmarried couple under Turkish law."  *Id.* ¶ 34.  Recent public confirmation that Khashoggi had entered into an Islamic marriage with Hanan Elatr in June 2018, just a few months before his alleged Islamic marriage to Cengiz in September, and was still in an Islamic marriage with Elatr at the time of his death, further decreases the likelihood that a Turkish court would overlook Cengiz's unmarried status to award her financial compensation.  *See id.*

Cengiz also argues (at 46-48) that she can bring a TVPA claim because she could bring a claim under Turkish law for her emotional injuries.  But the phrase "person who may be a claimant in an action for wrongful death," as used in the TVPA, is best read to exclude someone who can bring a claim for emotional injuries, but cannot bring a claim for pecuniary harm.  At the time of the TVPA's enactment in 1991, the prevailing rule in all but a few U.S. jurisdictions limited wrongful-death damages to pecuniary damages and disallowed emotional damages.[15]  The year before the TVPA's enactment, the Supreme Court held that, in an earlier wrongful-death statute,

---

[15] *See* Andrew Jay McClurg, *It's a Wonderful Life:  The Case for Hedonic Damages in Wrongful Death Cases*, 66 Notre Dame L. Rev. 57, 59-60 (1990) (writing that "the pecuniary loss rule, followed in almost every state," "looks at the monetary value of benefits the decedent could have been expected to contribute to his survivors had he lived") (footnote omitted); T. A. Smedley, *Some Order Out of Chaos in Wrongful Death Law*, 37 Vand. L. Rev. 273, 279 (1984) ("[m]ost courts . . . still reject a plaintiff's requests for damages to compensate the surviving kin of the decedent for their sorrow, grief, mental anguish, or sense of bereavement arising from the death of their kinsman," with only "a few jurisdictions" allowing such recovery).

"Congress must have intended to incorporate the pecuniary limitation on damages" because the Court "assume[d] that Congress is aware of existing law when it passes legislation."  *Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990).  In light of the then-dominant understanding that wrongful-death claims were for pecuniary damages, there is no basis to conclude that, when Congress conferred a right of action on a "person who may be a claimant in an action for wrongful death," TVPA § 2(a)(2), 106 Stat. 73, *reprinted in* 28 U.S.C. § 1350 note, it intended to include those who could claim emotional but not pecuniary damages.

> **2.    To the Extent Turkish Law Conflicts with the Law of Virginia, D.C., or Saudi Arabia, Turkish Law Does Not Apply**

Even if Cengiz were, under Turkish law, a "person who may be a claimant in an action for wrongful death," Turkish law would not govern the analysis.  To the extent a conflict exists, Virginia law takes precedence because Khashoggi's domicile (based on the facts alleged in the Complaint) was in Virginia.  Cengiz offers no support for her supposed rule that, in an extrajudicial killing case, "when the plaintiff's domicile and the location of the tort are the same, the law of that jurisdiction applies."  Opp. 44.  In the cases she cites, the decedent's domicile, the plaintiff's domicile, and the location of the tort were *all* the same.  *See Oveissi v. Islamic Republic of Iran*, 573 F.3d 835, 842 (D.C. Cir. 2009); *Force v. Islamic Republic of Iran*, 464 F. Supp. 3d 323, 372-73 (D.D.C. 2020).  Those cases do not address which law applies where the decedent's domicile (Virginia) is different from the plaintiff's domicile (Turkey).

This Court addressed that question in *Dammarell v. Islamic Republic of Iran*, 2005 WL 756090 (D.D.C. Mar. 29, 2005), *recon. granted in part on other grounds*, 370 F. Supp. 2d 218 (D.D.C. 2005), reasoning that "[t]he claims of a decedent's estate are 'traditionally governed by the laws of the decedent's domicile,' because such an approach 'respects the decedent's deliberate choice to make his or her home in a state and be governed by the laws of that state.'"

*Id.* at *21 (quoting *In re Aircrash Disaster Near Roselawn, Ind. on Oct. 31, 1994*, 948 F. Supp.

747, 758 (N.D. Ill. 1996)). Cengiz argues (at 45) that, because she "seeks her *own* damages

resulting from [Khashoggi's] death," her claim is more like that of a survivor than that of an

estate, and the law of her own domicile should govern. But the Complaint shows – and Cengiz's

opposition does not deny – that her TVPA claim is not limited to her own damages, but seeks

recovery for Khashoggi's "severe physical and mental pain and suffering before his death."

Compl. ¶ 178. Such damages are indeed awarded in TVPA actions,[16] and they belong to

Khashoggi's estate, not to Cengiz. Further, in any verdict arising from Khashoggi's death,

the damages from his physical pain and suffering would likely predominate over Cengiz's

emotional damages. The jurisdiction with the strongest interest in determining who can seek

those damages is Virginia, Khashoggi's last domicile.

### B.      Cengiz Has Failed To Exhaust Remedies in Turkey

It is undisputed that Cengiz has not exhausted her remedies in Turkey, which is the

"place" where Khashoggi's killing "occurred." TVPA § 2(b), 106 Stat. 73, *reprinted in* 28

U.S.C. § 1350 note; *see* Compl. ¶ 1.[17] Yet the Complaint alleges no facts to show that Turkish

remedies are unavailable or inadequate; it simply asserts in conclusory form that a Turkish

action would be "futile" and that available remedies would be "woefully inadequate." *Id.* ¶ 160;

---

[16] *See*, *e.g.*, *Jaramillo v. Naranjo*, 2021 WL 4427455, *11 (S.D. Fla. Sept. 27, 2021) (awarding such damages); *Mushikiwabo v. Barayagwiza*, 1996 WL 164496 (S.D.N.Y. Apr. 9, 1996) (same); *Todd v. Panjaitan*, 1994 WL 827111 (D. Mass. Oct. 26, 1994) (same).

[17] While Cengiz "disputes" (at 50) whether the TVPA's exhaustion requirement applies where relevant conduct allegedly occurred both in the United States and in a foreign country, she cites no case holding that the exhaustion requirement's applicability depends on whether allegedly relevant conduct occurred in one "place" or several. Because Khashoggi was not killed in the United States, the United States is not "the place in which the conduct giving rise to the [TVPA] claim occurred." TVPA § 2(b), 106 Stat. 73, *reprinted in* 28 U.S.C. § 1350 note.

*see* Mot. 45.  Allegations of potential (but far from guaranteed) delay in bringing her action do not alter that conclusion.  *See* Mot. 45-46; Varol Decl. ¶¶ 12-14; Varol Supp. Decl. ¶¶ 17-24.

Cengiz errs in contending (at 50-53) that failure to exhaust is an affirmative defense.  The plain text of the TVPA states that a court "shall decline to hear" a TVPA claim "if the claimant has not exhausted adequate and available remedies in the place in which the conduct giving rise to the claim occurred."  TVPA § 2(b), 106 Stat. 73, *reprinted in* 28 U.S.C. § 1350 note.  The term "shall" makes the exhaustion provision mandatory, and the phrase "decline to hear" indicates that the court will not exercise its jurisdiction.  Combining the two makes exhaustion a prerequisite to the exercise of jurisdiction.  *See Escarria-Montano v. United States*, 797 F. Supp. 2d 21, 25 (D.D.C. 2011) (comparing the TVPA's exhaustion requirement to that of the Federal Tort Claims Act and concluding that it is jurisdictional); *see also Simon v. Republic of Hungary*, 911 F.3d 1172, 1181 (D.C. Cir. 2018) (explaining that, when "Congress wanted to require the pursuit of foreign remedies as a predicate to FSIA jurisdiction, it said so," and citing the TVPA's exhaustion requirement as a similar predicate), *vacated and remanded on other grounds*, 141 S. Ct. 691 (2021).

*Collett v. Socialist Peoples' Libyan Arab Jamahiriya*, 362 F. Supp. 2d 230 (D.D.C. 2005), on which Cengiz relies, is unpersuasive because it disregards text and relies solely on legislative history.  *See id.* at 243 (citing S. Rep. No. 102-249, at 10 (1991)).[18]  "[R]esort to legislative history is not appropriate in construing plain statutory language."  *United States ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 494 (D.C. Cir. 2004) (Roberts, J.).  It follows that a TVPA complaint should be dismissed where a plaintiff "has not shown that he has exhausted his administrative remedies."  *Escarria-Montano*, 797 F. Supp. 2d at 25.

---

[18] The out-of-circuit cases cited by Plaintiffs (at 51) likewise relied on that legislative history or relied on other cases that themselves relied on that legislative history.

In any event, "even when failure to exhaust is treated as an affirmative defense, it may be invoked in a Rule 12(b)(6) motion if the complaint somehow reveals the exhaustion defense on its face." *Thompson v. DEA*, 492 F.3d 428, 438 (D.C. Cir. 2007).  Here, the Complaint does just that, conceding that Cengiz has not exhausted the Turkish-law remedy that she claims to have and asserting that it is inadequate.  *See* Compl. ¶¶ 160-161, 183; Opp. 46-47.  Cengiz's claims of inadequacy, moreover, are based on arguments about points of Turkish law, which this Court "treat[s] as . . . question[s] of law," Fed. R. Civ. P. 44.1.  There is no reason this Court cannot or should not resolve the purely legal exhaustion question now.

Cengiz's expert Çetinkaya erroneously claims (at ¶ 17) that civil proceedings brought by Cengiz against the Crown Prince would be stayed.  His argument is that, even though the Crown Prince is not a defendant in the Turkish criminal action arising from Khashoggi's killing, the criminal action "would determine 'material facts' that would then bind the civil court."  But as Varol explains, "the evidence presented in a criminal prosecution is binding *only* for the parties who are named in the criminal prosecution" and so "findings in the Turkish criminal prosecution concerning Khashoggi would not be binding in a civil lawsuit against the Crown Prince."  Varol Supp. Decl. ¶ 18 (emphasis added).[19]  Çetinkaya also erroneously states (at ¶ 17) that a Turkish court would stay civil proceedings against the Crown Prince due to the alleged "prospect" that the Crown Prince "will be charged with a crime."  The suggestion of any such "prospect" is baseless conjecture; such charges would be "unprecedented."  Varol Supp. Decl. ¶ 21.  In any event, "[t]here is no authority under Turkish law to defer civil proceedings against a defendant in the absence of any criminal investigation or prosecution."  *Id.* ¶ 22.

---

[19] Thus, despite Çetinkaya's contrary assertion (at ¶ 39), the evidentiary rulings in the Turkish criminal action would not bind Cengiz either.

Plaintiffs' claim (at 54) that Turkey does not provide adequate remedies does not withstand even minimal scrutiny. Cengiz's own expert acknowledges that she could recover at least her "actual loss." Çetinkaya Decl. ¶ 40. That is adequate. *See Corrie v. Caterpillar, Inc.*, 403 F. Supp. 2d 1019, 1025-26 (W.D. Wash. 2005) ("Courts usually find a foreign remedy adequate unless it 'is no remedy at all.'") (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 (1981)), *aff'd*, 503 F.3d 974 (9th Cir. 2007).[20] Further, even if the Crown Prince has no assets in Turkey – and there is no well-pleaded allegation one way or another – that would not bar the execution of a Turkish judgment against the Crown Prince. *See* Varol Supp. Decl. ¶ 50.

## VI.   Cengiz Fails To Establish Jurisdiction Under the Alien Tort Statute

"[T]he ATS does not apply extraterritorially." *Nestlé USA, Inc. v. Doe*, 141 S. Ct. 1931, 1935 (2021). This Court accordingly lacks jurisdiction over an ATS claim based on a killing that took place in the Saudi Consulate in Istanbul.[21] Cengiz errs in claiming that jurisdiction is appropriate whenever "'the American connections to a claim implicate important national interests.'" Opp. 60 (quoting *Doe v. Exxon Mobil Corp.*, 2015 WL 5042118, at *8 (D.D.C. July 6, 2015)). Even if a generalized analysis of that kind might once have passed muster, it is clear after *Nestlé* that an ATS plaintiff "must establish that 'the *conduct relevant to the statute's focus* occurred in the United States.'" 141 S. Ct. at 1936 (quoting *RJR Nabisco, Inc. v. European Cmty.*, 579 U.S. 325, 337 (2016)) (emphasis added). Here, the conduct relevant to the ATS's focus is Khashoggi's extrajudicial killing. That occurred in Turkey.

---

[20] Turkey's policy against punitive damages is irrelevant. *See Corrie*, 403 F. Supp. 2d at 1025 ("A foreign remedy is adequate even if not identical to remedies . . . in the United States.").

[21] The parties agree that whether Cengiz is an appropriate plaintiff under the ATS is governed by the same inquiry as whether she is an appropriate plaintiff under the TVPA. *See* Mot. 47; Opp. 60. Her ATS claim fails for that reason as well.

Cengiz's contrary arguments fall short.  *First*, she errs in contending (at 60-61) that the Crown Prince's own actions "touch and concern" the United States because he purportedly "targeted a U.S. resident in order to prevent him from influencing U.S. voters and legislators." She cites no case exercising ATS jurisdiction on such a theory.[22]  If there were such cases, they would not be good law after *Nestlé*.  Allegations about foreign conduct "target[ing]" the United States cannot satisfy a standard that turns on where the relevant conduct occurred.

*Second*, Cengiz misplaces reliance (at 61) on the "domestic activities" of Prince Khalid, because the evidence contradicts her allegations that he advised Khashoggi to obtain a marriage certificate at the Saudi Consulate in Istanbul and assured Khashoggi that it would be safe to do so.  *See supra* pp. 3-5.  Because extraterritoriality goes to subject-matter jurisdiction under the ATS, the Court "may consider extra-pleading materials" such as Prince Khalid's declaration. *Zaidi v. United States Sent'g Comm'n*, 115 F. Supp. 3d 80, 83 (D.D.C. 2015) (Bates, J.).

*Third*, even if it had occurred, Prince Khalid's alleged advice to Khashoggi is not "conduct relevant to the statute's focus," *Nestlé*, 141 S. Ct. at 1936, which is "[t]he conduct that [the statute] regulates," *WesternGeco LLC v. ION Geophysical Corp.*, 138 S. Ct. 2129, 2138 (2018).  Cengiz does not dispute that she does not allege, even conclusorily, that Prince Khalid knew that Khashoggi would be harmed at the Saudi Consulate in Istanbul.  She is incorrect to argue (at 61-62) that Prince Khalid's state of mind is irrelevant.  If he acted without knowledge of any alleged murder plot, his alleged conduct would not have been aiding and abetting, and therefore would not have been conduct that the ATS regulates.  *See* Mot. 49-50.

---

[22] *Mwani v. bin Laden*, 947 F. Supp. 2d 1 (D.D.C. 2013), involved a foreign attack on a U.S. embassy, *see id.* at 5, which concerns the United States far more directly than an attack on a U.S. resident.  *Licci v. Lebanese Canadian Bank, SAL*, 834 F.3d 201 (2d Cir. 2016), involved banking services in the United States, *see id.* at 206-07, not alleged targeting.

**VII.    The Court Should Dismiss Plaintiffs' Non-Federal Claims**

Plaintiffs do not dispute that, if the Court dismisses Cengiz's federal claims, it should

decline supplemental jurisdiction over Plaintiffs' non-federal claims under 28 U.S.C. § 1367(c)(3).

*See* Mot. 50.  In any event, as explained below, Plaintiffs fail to state any non-federal claims.

**A.    DAWN Fails To State a Claim for Tortious Interference with Contract**

Whether the Court applies Turkish or D.C. law to DAWN's claim for tortious interference

with contract, that claim fails.  As to Turkish law, no such claim exists, *see* Varol Decl. ¶ 46,

and DAWN does not argue otherwise.[23]  As to D.C. law, DAWN's claim is foreclosed by

*Cole, Raywid & Braverman v. Quadrangle Development Corp.*, 444 A.2d 969 (D.C. 1982).

*See* Mot. 51-52.

DAWN attempts to distinguish *Cole* by arguing (at 64) that "*Cole* did not involve any

allegations that the defendants had specifically targeted the law firm in order to disrupt its

operations."  That is irrelevant to *Cole*'s holding or reasoning.  *Cole* held that the D.C. Wrongful

Death Act provides the *only* cause of action under D.C. law for the wrongful death of another.

*See* 444 A.2d at 970-71 (explaining that the trial court had been "correct" to conclude that,

"since the complaint sought damages for the death of a person, the [D.C.] Wrongful Death Act

was applicable").  That holding rested on *Cole*'s reasoning that, "[a]t common law, there existed

no right of action to recover damages for the wrongful death of another."  *Id.* at 971.  Therefore,

"any right to recover for the death of another exists by virtue of a statute, or not at all."  *Id.*

DAWN does not and cannot assert any claim under the D.C. Wrongful Death Act, and its

"common law" claim fails as a matter of law because it seeks "to recover damages for the

---

[23] DAWN briefly and incorrectly suggests (at 63 n.15) that it could bring a Turkish-law claim for material and moral compensation.  Any attempt to plead such a claim would be futile. *See* Varol Supp. Decl. ¶¶ 52-57.

wrongful death of" Khashoggi.  *Id.*  That DAWN cannot bring a common-law claim is not

"bizarre," as DAWN asserts (at 65), but rather follows from the longstanding common-law

prohibition on claims based on wrongful death as adopted by D.C.'s highest court.[24]

Moreover, even if *Cole* were not an insurmountable obstacle, DAWN's claim would still

fail, because it has not pleaded the required elements of tortious interference with contract.  As

explained in the Crown Prince's motion (at 52-55), the Complaint does not contain allegations

sufficient to show that the Crown Prince knew of Khashoggi's contract with DAWN or intended

to disrupt it.  DAWN's arguments to the contrary are unpersuasive.

As to knowledge, DAWN highlights (at 66) the unexceptional proposition that a court

should draw "*reasonable* inferences" in the non-moving party's favor at the motion-to-dismiss

stage.  *Elemary v. Philipp Holzmann A.G.*, 533 F. Supp. 2d 116, 133 (D.D.C. 2008).  However,

the inference of knowledge that DAWN asks this Court to draw – based on "unsupported,

conclusory allegations," *id.* – is anything but reasonable.  *See* Mot. 52-54.  DAWN repeats

(at 67) the assertion in the Complaint that the Crown Prince and other Defendants "discovered

Mr. Khashoggi's plans" concerning DAWN "after hacking mobile telephone(s)" of Khashoggi's

"associate(s)."  Compl. ¶ 3.  But the facts alleged in the Complaint show only that an unknown

"operator" was able to "infect[]" the phone of one of Khashoggi's associates sometime in or

around June 2018.  The further assertion that this "operator" was "working on behalf of Defendants,"

*id.* ¶ 79, much less the Crown Prince personally, is a mere "legal conclusion[] cast in the form of

[a] factual allegation[]," *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

---

[24] *Moattar v. Foxhall Surgical Associates*, 694 A.2d 435 (D.C. 1997), cited by DAWN
(at 64), is inapposite.  *Moattar* did not permit a plaintiff to assert a tort claim based on another
person's wrongful death, but rather allowed a living plaintiff to recover her own damages for
medical malpractice committed against her.

As to intent, DAWN errs in relying (at 68) on *Whitt v. American Property Construction, P.C.*, 157 A.3d 196 (D.C. 2017), which held that "a plaintiff can prove intent by showing that a defendant knew that his actions were certain or substantially certain to interfere with the plaintiff's business." *Id.* at 203.  As already shown, the assertion that the Crown Prince knew about any contract between Khashoggi and DAWN itself requires an unreasonable inference based on bare conclusions.  The further assertion that the Crown Prince must have been "certain or substantially certain" about the potential impact of his alleged conduct on a contractual relationship piles a second inference on that already-unsupported first inference.  None of this is enough to "unlock the doors of discovery."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009).

### B.   Cengiz Fails To State Any Non-Federal Claims

The Court should dismiss Cengiz's common-law claims.  Her wrongful-death claim fails for the same reasons that her TVPA claim fails.  *See* Mot. 56.  As to her claims for intentional infliction of emotional distress, loss of consortium, and loss of society, she does not dispute the Crown Prince's showing that those claims fail under D.C. law, *see* Mot. 57-60, which her Complaint invokes, *see* Compl. pmbl. (referring to "claims arising under both federal law and the laws of the District of Columbia").  To the extent Turkish law applies, her claims fare no better.  Turkish law does not recognize such claims.  *See* Mot. 56 (citing Varol Decl. ¶¶ 41-44).[25]

---

[25] Although not affirmatively arguing that the Court should treat her common-law claims as claims for "wrongful death," Cengiz disputes (at 69-70) the Crown Prince's straightforward point that such claims would be time-barred.  *See* Mot. 57 n.46.  She is incorrect.  First, she cites to an administrative order issued by the Chief Judge of the D.C. Superior Court.  *See* Opp. 69-70 (citing Order by Chief Judge Josey-Herring, D.C. Super. Ct. (amended July 14, 2021)).  That order has no application in this Court, where Cengiz chose to file.  This Court has expressly declined to toll statutes of limitations in response to the pandemic.  *See* Standing Order No. 20-9, § 7 (D.D.C. Mar. 16, 2020); Standing Order No 20-19, § 7 (D.D.C. Apr. 2, 2020).  Cengiz also errs in suggesting (at 70) that charges of fraudulent concealment could save her claims.  To toll based on fraudulent concealment, Cengiz would have to show that "the information fraudulently concealed was material to the delay" in filing suit.  *Amobi v. D.C. Dep't of Corr.*, 755 F.3d 980,

Cengiz does not argue otherwise, but instead appears to ask the Court (at 69) to construe the Complaint as asserting a Turkish civil-law claim for "material and moral compensation" – the same claim she asserts elsewhere is inadequate.  Cengiz did not assert any such claim in her Complaint; instead, she chose to plead only D.C. common-law claims for intentional infliction of emotional distress, loss of consortium, and loss of society under D.C. law, not a Turkish civil-law claim for material and moral compensation.  *See*, *e.g.*, Compl. pmbl., ¶¶ 43, 197-218 (Counts V-VII).  "It is 'axiomatic' that a party may not amend [a] complaint through an opposition brief."  *Singh v. District of Columbia*, 55 F. Supp. 3d 55, 70 (D.D.C. 2014) (quoting *McManus v. District of Columbia*, 530 F. Supp. 2d 46, 74 n.25 (D.D.C. 2007)).  In any event, the Complaint fails to state any claim for "material and moral compensation."  *See* Mot. 40-41.

## CONCLUSION

The Court should dismiss Plaintiffs' claims against the Crown Prince for lack of personal jurisdiction, lack of subject-matter jurisdiction, failure to join a party, and failure to state a claim.

Dated:    November 9, 2021                        Respectfully submitted,

/s/ *Michael K. Kellogg*
Michael K. Kellogg (DC 372049)
Gregory G. Rapawy (DC 493973)
Andrew C. Shen (DC 500071)
KELLOGG, HANSEN, TODD, FIGEL
  & FREDERICK, P.L.L.C.
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
(202) 326-7900

*Attorneys for Defendant*
*Mohammed bin Salman bin Abdulaziz Al Saud*

---

988 (D.C. Cir. 2014).  But the only period of purported concealment that Cengiz identifies (at 70) left Cengiz with more than 23 months to file suit before the running of the limitations period, and so could not have been material to her delay.  She also attributes the purported concealment to "Saudi Arabia" and unnamed "Saudi officials," not to the Crown Prince personally.

## <u>CERTIFICATE OF SERVICE</u>

I certify that on November 9, 2021, I electronically filed the foregoing DEFENDANT

MOHAMMED BIN SALMAN BIN ABDULAZIZ AL SAUD'S REPLY IN SUPPORT OF

MOTION TO DISMISS, using the ECF system, which sent notice of filing in this matter to all

counsel of record.


<u>/s/ Michael K. Kellogg</u>
Michael K. Kellogg
*Attorney for Defendant*
*Mohammed bin Salman bin Abdulaziz Al Saud*