# EXHIBIT A

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HATICE CENGIZ, *et al.*,<br><br>    *Plaintiffs*,<br><br>        v.<br><br>MOHAMMED BIN SALMAN, *et al.*,<br><br>    *Defendants*. | Civil Action No. 1:20-cv-03009 |

**DECLARATION OF GÜNEŞ MURAT TEZCÜR**

I, Güneş Murat Tezcür, hereby declare as follows:

1.  My name is Güneş Murat Tezcür. I am a Professor and the Director of the School of Politics, Security, and International Affairs at the University of Central Florida (USF) and the Jalal Talabani Endowed Chair and Director of the Kurdish Political Studies Program at UCF. I also serve as the Chair of the Religion and Politics Section of the American Political Science Association.

2.  I was born in Turkey and completed my undergraduate degree at Boğaziçi University Istanbul, the top higher education institution in Turkey. I received my Ph.D. from the Department of Political Science at the University of Michigan, one of the leading programs in the nation, in 2005.

3.  I have published extensively in leading scholarly outlets on a wide range of topics ranging from judicial politics to democratization to political violence, with a focus on Turkish, Iranian, and Kurdish human geography. My more than two dozen articles have appeared in journals

1

such as *American Political Science Review*, *Comparative Politics*, *Conflict Management and Peace Science*, *Development and Change*, *Journal of Peace Research*, *Journal for the Scientific Study of Religion*, *Law & Society Review, Perspectives on Politics*, *Politics and Gender*, *Politics of Religion*, and *Third World Quarterly*. Those articles include "Judicial Activism in Perilous Times: The Case of Turkey"; "Activism in Turkish Foreign Policy: Balancing European & Regional Interests"; and "The Effectiveness of Harnessing Human Rights: The Struggle over the Ilisu Dam in Turkey."

4. I recently edited *The Oxford Handbook of Turkish Politics* (Oxford University Press, 2022), a field-defining volume offering state-of-the-art reviews of the scholarship on Turkish politics. The *Handbook*, which contains 35 articles, includes original and engaging contributions from some of the most influential social scientists studying Turkey. I authored a chapter of the *Handbook* titled "The Study of Politics in Turkey: New Horizons and Perennial Pitfalls."

5. My writing has been published in research reports and encyclopedias as well. I authored, for example, "Historical and Contemporary Trends in the Turkish Political Party System" in the London School of Economics and Political Science publication *The AKP And Turkish Foreign Policy in the Middle East*; "Turkey" in the *Encyclopedia of Islam and the Muslim World*; and "Turkey's Middle East Policy in the Wake of the Arab Uprisings" in the *National Strategy Forum Review*.

6. I am regularly invited to speak about Turkish politics at prominent institutions around the world and have given many such presentations.

7. I was engaged by Jenner & Block LLP to provide an affidavit on the state of the Turkish judicial system as it pertains to the case of *Hatice Cengiz, et al. v. Mohammed bin Salman, et*

2

*al.* Having considered the matter, and based on the documents furnished to me by Jenner & Block LLP, my views are as follows.

### A.        The Turkish Political Context and System

8.   The Justice and Development Party (*Adalet ve Kalkınma Partisi* - AKP) was founded in August 2001 during one of the worst economic crises of modern Turkish history. Led by Recep Tayyip Erdoğan, a politician advocating a greater role of Islam in sociopolitical life, the AKP came to power in the snap parliamentary elections in November 2002. In the face of stiff opposition from the military establishment and high judiciary, the AKP initially pursued a conciliatory agenda and initiated a series of liberal reforms aiming to bolster Turkey's membership prospects in the European Union.[1]

9.   As the AKP gradually consolidated its power and emerged victorious from the parliamentary elections in 2011 and 2015, it became increasingly more authoritarian. After a power struggle involving coup allegations and arrests of high-ranking military officers and bureaucrats, as well as prominent public personalities known for their secular political convictions, the AKP diminished the political autonomy of the military and established stronger control over the state bureaucracy including the judiciary.[2]

10. A coup attempt on July 15, 2016, was a watershed in the AKP's rule. A group of disgruntled military officers aimed to topple the AKP government in a highly disorganized fashion. Given

---

[1]  Ergun Özbudun, *Democratization Reforms in Turkey, 1993–2004*, 8 Turkish Stud. 179 (2007); Güneş Murat Tezcür, *Muslim Reformers in Iran and Turkey: The Paradox of Moderation* (2010).

[2]  A sprawling series of trials targeting opponents of the AKP and characterized by procedural violations and empirical inconsistencies resulted in a series of convictions by 2013.

the lack of cooperation from most military units and resistance of ordinary citizens on the streets, the attempt failed miserably. More than 240 people lost their lives. The government declared Fetullah Gülen, a preacher based in Pennsylvania since 1999, as the mastermind of the attempt.[3] Gülen is the leader of a globalized Islamic network, which has combined educational and civil society activism with clandestine police and judicial operations. The Gülen network used to be an erstwhile ally of the AKP government in its power struggle against the military and high judiciary until their fallout starting in late 2013.

11. After the coup attempt in 2016, the AKP declared a state of emergency and used the coup attempt as a pretext to stifle all forms of dissent. The establishment of emergency rule allowed the government to rule by decree, bypassing legislative and judicial oversight. Consequently, political liberties and civil rights suffered major setbacks.[4] The government issued a series of decrees that dismissed tens of thousands of civil servants, including teachers and university faculty, and it banned more than a thousand civil society associations and hundreds of media institutions, including TV stations, newspapers, magazines, and publishers. Meanwhile, tens of thousands of individuals, including public intellectuals and journalists, were arrested for alleged participation in and support for the coup attempt. According to the Committee to

---

[3] Erdağ Göknar, *The AKP's Rhetoric of Rule in Turkey: Political Melodramas of Conspiracy from "Ergenekon" to "Mastermind"*, *in The Oxford Handbook of Turkish Politics* 711 (Güneş Murat Tezcür ed., 2020).

[4] Human Rights Watch, *A Blank Check: Turkey's Post-Coup Suspension of Safeguards Against Torture* (Oct. 25, 2016), https://www.hrw.org/report/2016/10/25/blank-check/turkeys-post-coup-suspension-safeguards-against-torture.

Protect Journalists (CPJ), Turkey became the "world's worst jailer of journalists" by the end of 2018.[5]

12. Turkey has a history of multiparty electoral competition going back to 1950, longer than many other countries in the world. Despite regular military interventions, most notoriously in 1980, the parliamentarism proved resilient, sustaining an undiminishable element of pluralism in Turkish politics. Yet the introduction of a presidential system in 2017 greatly aggravated the power of the executive at the expense of legislative and judicial branches.[6] The AKP government formed a strategic alliance with the ultranationalist Nationalistic Action Party (*Milliyetçi Hareket Partisi* - MHP) and garnered enough parliamentary votes for 18 constitutional amendments that modified around 50 constitutional provisions and repealed 21 articles. The Venice Commission, an advisory board of the Council of Europe and composed of constitutional law experts, wrote that 'the proposed constitutional amendments would introduce in Turkey a presidential regime which lacks the necessary checks and balances required to safeguard against becoming an authoritarian one.'[7] Nonetheless, the amendments were approved in a highly controversial referendum, which was conducted under the state of emergency, on April 16, 2017. The campaigning for the referendum took place under highly

---

[5] Elana Beiser, *Hundreds of Journalists Jailed Globally Becomes the New Normal*, Comm. to Protect Journalists (Dec. 13, 2018), https://cpj.org/reports/2018/12/journalists-jailed-imprisoned-turkey-china-egypt-saudi-arabia.php.

[6] Patrick Kingsley, *Videos Fuel Charges of Fraud in Erdogan's Win in Turkey Referendum*, N.Y. Times (Apr. 18, 2017), https://www.nytimes.com/2017/04/18/world/europe/turkey-referendum-is-haunted-by-allegations-of-voter-fraud.html.

[7] European Commission for Democracy through Law (Venice Commission), *Turkey - Opinion on the amendments to the Constitution adopted by the Grand National Assembly on 21 January 2017 and to be submitted to a National Referendum on 16 April 2017*, Opinion No. 875/2017 at 29, ¶ 130 (adopted by the Venice Commission at its 110th Plenary Session, Venice, 10-11 March 2017), http://www.venice.coe.int/webforms/documents/?pdf=CDL-AD(2017)005-e.

restrictive and repressive circumstances. The Organization for Security and Co-operation in Europe (OSCE) noted that "the referendum did not live up to Council of Europe standards."[8] Under this constitutional system, Recep Tayyip Erdoğan won the presidency and his party AKP received a plurality of the votes in elections that took place in June 2018.

13. According to Varieties of Democracy (V-Dem) Project, one of the most authoritative cross-national datasets providing a rich array of measures about democratic achievements across the globe, Turkey's liberal democracy index score increased from 0.45 in 2001 to 0.53 in 2004 before experiencing a precipitous decline in the subsequent years.[9] It reached a low of 0.11 in 2019, where the minimum possible score is 0 and the maximum possible is 1.[10] The Freedom House, an influential think tank ranking countries globally according to their level of democracy as either "free," "partly free," or "not free," classified Turkey as a "not free" country for the first time in its 2018 report—the same ranking as countries such as Egypt, Iran, China, Eritrea, and Sudan.[11] Consistent with these rankings, the conventional scholarly assessment is that Turkey has evolved into a "competitive authoritarian regime."[12] In such a

---

[8] For the OSCE press release about the Turkish referendum, *see* Press Release, Organization for Security and Co-operation in Europe (OSCE), *Lack of Equal Opportunities, One-Sided Media Coverage and Limitations on Fundamental Freedoms Created Unlevel Playing Field in Turkey's Constitutional Referendum, International Observers Say* (Apr. 17, 2017), http://www.osce.org/odihr/elections/turkey/311726.

[9] V-Dem, *Variable Graph*, https://www.v-dem.net/data_analysis/VariableGraph/ (last visited Oct. 6, 2022).

[10] *Id*.

[11] Freedom House, *Countries and Territories*, https://freedomhouse.org/countries/freedom-world/scores (last visited Oct. 6, 2022).

[12] Berk Esen & Sebnem Gumuscu, *Rising Competitive Authoritarianism in Turkey*, 37 Third World Q. 1581 (2016).

regime, all core features of democracy, including the selection of executives and legislatures via free and fair elections, judicial independence, and political rights and civil liberties, are regularly violated.[13]

14. The deterioration of Turkish democracy has been accompanied by a steady decay of institutional governance. According to Transparency International's Corruption Perceptions Index (CPI), which ranges between 0 (most corrupt) and 100 (least corrupt), Turkey's score declined from 49 in 2012 to 38 in 2021. In 2012, Turkey was ranked 54 among 176 countries; in 2021, its rank became 96 among 180 countries.[14] According to the World Bank's Worldwide Governance Indicators, Turkey's percentile rank in the "rule of law" measure declined from 54.5 in 2012 to 36.5 in 2021.[15] In light of these dynamics, an overwhelming majority of Turkish citizens express lack of trust in judicial institutions.[16]

---

[13] Steven Levitsky & Lucan A. Way, *Competitive Authoritarianism: Hybrid Regimes After the Cold War* (2010).

[14] Transparency International, *Corruption Perceptions Index*, https://www.transparency.org/en/cpi/2021 (last visited Oct. 6, 2022).

[15] The World Bank, *DataBank: Worldwide Governance Indicators*, https://databank.worldbank.org/source/worldwide-governance-indicators# (last visited Oct. 17, 2022). The World Bank's "[r]ule of Law captures perceptions of the extent to which agents have confidence in and abide by the rules of society, and in particular the quality of contract enforcement, property rights, the police, and the courts, as well as the likelihood of crime and violence. Percentile rank indicates the country's rank among all countries covered by the aggregate indicator, with 0 corresponding to lowest rank, and 100 to highest rank." The World Bank, *Metadata Glossary: Rule of Law: Percentile Rank*, https://databank.worldbank.org/metadataglossary/worldwide-governance-indicators/series/RL.PER.RNK (last visited Oct. 17, 2022).

[16] Pelin Unker, *Why Can't Bribery Be Prevented in Turkey?*, Deutsche Welle (Aug. 29, 2022), https://www.dw.com/tr/türkiyede-rüşvet-neden-önlenemiyor/a-62962087.

15.  Overall, Turkey represents a paradigmatic case of executive aggrandizement, where the rise

of elected authoritarian leaders who pursue populist platforms diminish checks-and-balances

and erode the rule of law.[17]

**B.**      **The Turkish Judicial System**

16. The formation of the AKP government in 2002 presented a direct challenge to the judicial

establishment given the party's Islamist roots. The Constitutional Court banned two of the

AKP's predecessors on grounds that those parties became focal points of anti-secular

activities.[18] In the initial AKP years, the high judiciary (the Constitutional Court – *Anayasa*

*Mahkemesi*; the Supreme Court of Appeals – *Yargıtay*; and the Council of State – *Danıştay*)

was dominated by judges who were deeply suspicious of the party's ideological goals. Their

suspicion made them aligned with the military establishment, whose self-declared mission was

to preserve national unity and the secular character of the regime.[19] At the same time, the

AKP's popularity and Turkey's accession negotiations with the European Union limited the

ability of the military-judicial establishment to push the party to the margins of politics.[20] In

---

[17] Robert R. Kaufman & Stephan Haggard, *Democratic Decline in the United States: What Can We Learn from Middle-Income Backsliding?* 17 Persps. on Pol. 417 (2019).

[18] Dicle Kogacioglu, *Progress, Unity, and Democracy: Dissolving Political Parties in Turkey*. 38 L. & Soc'y Rev. 433 (2004).

[19] Ceren Belge, *Friends of the Court: the Republican Alliance and Selective Activism of the Constitutional Court of Turkey*," 40 L. & Soc'y Rev. 653 (2006).

[20] Güneş Murat Tezcür, *Judicial Activism in Perilous Times: the Turkish Case*, 43 L. & Soc'y Rev. 305 (2009).

2008, the Constitutional Court ruled that the AKP became a focal point of anti-secular activities, but the decision lacked the supermajority required to ban the party outright.[21]

17. By 2010, the AKP, aided by the Gülen network, started to gain the upper hand in its power struggle with the military-judiciary establishment. A watershed was the 2010 constitutional amendments, which changed the procedures regulating the appointment and promotion of judges. While the amendments were initially supported by Turkish liberals on grounds that they would end the military and judicial tutelage in Turkish politics, their long-term legacy has been to enable the rise of elected authoritarian governance.[22] The composition of the Constitutional Court and the High Council of Judges and Prosecutors (*Hâkimler ve Savcılar Yüksek Kurulu* - HSYK), which acts as the body overseeing the affairs of judges and prosecutors, was also changed significantly. As a consequence of these changes, judges and prosecutors aligned with the AKP and the Gülen network increased their clout in the judiciary. The AKP established greater dominance over the judiciary with the purging of real or purported Gülenist judges and prosecutors in the aftermath of the 2016 coup attempt.[23]

18. In this context, the constitutional amendments of 2017 that institutionalized a presidential system and emasculated the legislative branch further deepened the authoritarian order and

---

[21] Robert Tait, *Turkey's Governing Party Avoids Being Shut Down for Anti-Secularism*, The Guardian (July 30, 2008), https://www.theguardian.com/world/2008/jul/30/turkey.nato1.

[22] Ozan O. Varol, *Stealth Authoritarianism*, 100 Iowa L. Rev. 1673 (2015).

[23] From July 2016 to June 2019, more than 4,000 judges were purged. This resulted in severe weakening of the judiciary's professionalism and capacity. *See* Carlotta Gall, *Erdogan's Purges Leave Turkey's Justice System Reeling*, N.Y. Times (June 21, 2019), https://www.nytimes.com/2019/06/21/world/asia/erdogan-turkey-courts-judiciary-justice.html.

weakened institutional checks over the executive. This new constitutional order for the judiciary has profoundly undermined the separation of powers.[24] Indeed, the President now appoints 12 of 15 members of the Constitutional Court without any parliamentary confirmation, and the remaining three members are selected by the Parliament.[25]

19. Equally importantly, the composition of the Council of Judges and Prosecutors (*Hâkimler ve Savcılar Kurulu* - HSK that replaced the erstwhile HSYK) has been completely altered. Six of its 13 members—including the Minister of Justice and the Deputy Minister—are directly appointed by the President, and the remaining seven members are selected by the parliament.[26] As long as the President's party and allies have a parliamentary majority, the President has complete control over the HSK, which also selects three-fourths of members of the Council of State (*Danıştay*) (the remaining members appointed by the President) and all members of the Court of Supreme Court of Appeals (*Yargıtay*).

20. The HSK, which determines the appointment, promotion, and demotion of judges and prosecutors, has taken to punishing judges who make decisions in defiance of the ruling government. One example is a judge who dissented from the 13th Istanbul Criminal Court's decision to sentence Osman Kavala, a well-known philanthropist and businessman, to life in

---

[24] Aslı Ü. Bâli, *Constitutionalism in Turkey*, in *The Oxford Handbook of Turkish Politics* 75 (Güneş Murat Tezcür ed., 2022).

[25] Anayasa Mahkemesi, *Structure: Election of Members*, https://www.anayasa.gov.tr/tr/mahkeme/yapisi/uyelerin-secimi/ (last visited Oct. 6, 2022).

[26] Board of Judges and Prosecutors, *Tasks*, https://www.hsk.gov.tr/gorevleri (last visited Oct. 6, 2022).

prison for his alleged role in organizing anti-government protests in 2013.[27] In his dissenting opinion, the judge argued for the acquittal of the defendants on grounds that the accusations lacked any empirical base and violated basic judicial principles. He was demoted to a post in a backward central Anatolian town. In contrast, prosecutors and judges who pursue cases and make decisions in accordance with the preferences of the ruling government are rewarded. For instance, a prosecutor who had Kavala re-arrested on grounds that he was a spy was appointed to the Constitutional Court by the President in 2021.[28]

21. During this period, several Turkish court cases with an international dimension took a different direction when the foreign policy priorities of President Erdoğan changed. For instance, after Turkey reached an agreement with Israel in 2016, a court dismissed charges against Israeli officials who ordered a deadly raid of a Turkish ship carrying humanitarian supplies to the

---

[27] In addition to Osman Kavala, seven other people received prison sentences of 18 years each. Ruth Michaelson & Deniz Baris Narh, *Philanthropist Sentenced to Life in Turkey in 'Travesty' Trial Over Gezi Park Protests*, The Guardian (Apr. 25, 2022), https://www.theguardian.com/world/2022/apr/25/philanthropist-sentenced-to-life-in-turkey-in-travesty-trial-over-gezi-park-protests. These protests, which erupted in reaction to police brutality and the government's attempts to convert one of the last remaining green spaces in the center of Istanbul to a shopping mall, were the largest mass mobilization during the AKP era. *See* Ayhan Kaya, *Citizenship and Protest Behavior in Turkey*, *in The Oxford Handbook of Turkish Politics* 607 (Güneş Murat Tezcür ed., 2022). While they were peaceful and emerged largely spontaneously, President Erdoğan and his supporters characterized them as an attempt to overthrow the elected government by force and accused protests as being part of a malicious foreign conspiracy. In particular, Erdoğan accused Kavala of doing the bidding of George Soros, the famous Hungarian-American investor. In the wake of the court decision, the Council of Europe declared that Turkey "has failed to fulfill its obligations under the European Convention on Human Rights" and called for his immediate release. Council of Europe, *ECHR Judgment in the Case* Kavala v. Turkiye*: Joint Statement By the Council of Europe Leaders* (July 11, 2022), https://www.coe.int/en/web/portal/-/echr-judgment-in-the-case-kavala-v-turkiye-joint-statement-by-the-council-of-europe-leaders.

[28] As expected, the Constitutional Court decided against the appeal of three defendants during the Gezi protests case in August 2022. *Court Finds Application of Three Gezi Detainees 'Inadmissible'*, Gazete duvaR (Aug. 26, 2022), https://www.gazeteduvar.com.tr/aym-uc-gezi-tutuklusunun-basvurusunu-kabul-edilemez-buldu-haber-1578797.

Gaza strip.[29] A Turkish-German journalist who was arrested on espionage charges in 2017 was released a year later after the intervention by German Chancellor Merkel.[30] An American pastor who was arrested after the failed coup attempt in 2016 on charges of espionage among other things was released in October 2018 after intense pressure by the Trump administration.[31]

22. Another indicator of the personification of political power in Turkey is the increasing criminalization of criticisms of Erdoğan. According to Article 299 of the Turkish Penal Code, which became effective in October 2004, a person who "insults" the President could be punished with a prison sentence ranging between a year and four years. If the "crime" is committed publicly, the sentence is increased by one-sixth.[32] In 2006, the number of individuals who were put on trial under Article 299 was 24; in 2007, it was 20. During the presidency of Abdullah Gül from 2007 to 2014, a leading member of the AKP, it was 706.[33] This pattern dramatically changed after Erdoğan was elected president in 2014: from 2015 to 2020, 35,397 individuals were put on trial and 12,841 individuals were found guilty under

---

[29] *Turkish Court Dismisses Mavi Marmara Case After Deal With Israel*, Daily Sabah (Dec. 9, 2016), https://www.dailysabah.com/diplomacy/2016/12/09/turkish-court-dismisses-mavi-marmara-case-after-deal-with-israel.

[30] *German Die Welt Reporter Deniz Yucel to Leave Turkey Jail*, BBC News (Feb. 16, 2018), https://www.bbc.com/news/world-europe-43083469.

[31] Carlotta Gall, *Turkey Frees Pastor Andrew Brunson, Easing Tensions With U.S.*, N.Y. Times (Oct. 12, 2018), https://www.nytimes.com/2018/10/12/world/europe/turkey-us-pastor-andrew-brunson.html.

[32] The Turkish Penal Code (in Turkish) is available at https://www.mevzuat.gov.tr/MevzuatMetin/1.5.5237.pdf.

[33] Eren Topuz, *Insulting the President: 128,872 Investigations, 9,556 Convictions in Six Years*, Gazete duvaR (Dec. 16, 2020), https://www.gazeteduvar.com.tr/cumhurbaskanina-hakaret-alti-yilda-128-bin-872-sorusturma-9-bin-556-mahkumiyet-haber-1507370.

Article 299.[34] These punitive practices not only foster a climate of fear, suspicion, and self-censorship, but they also reveal the extent to which the judiciary has become amenable to the direct influence of the executive in contemporary Turkey.[35]

23. There is a consensus among scholars of Turkey regarding the steadily deteriorating conditions of the Turkish democracy and judicial system. This assessment is shared by Ozan Varol, Defendants' expert witness. Even before the coup attempt in 2016, he argued that the government instrumentalized the law to punish critical voices including independent journalists.[36] Writing in 2017, he observed, "President Recep Tayyip Erdoğan transformed Turkey into a "one-man system.""[37]

24. This consensus extends to the international community. In its most recent Progress Report published in October 2022, the European Commission expressed significant concern over "the systemic lack of independence of the judiciary and undue pressure on judges and prosecutors."[38] "The lack of objective, merit-based, standardised and pre-established criteria

---

[34] Adalet İçin Hukukçular & İnsan Haklari Komisyonu, *Recep Tayyip Erdoğanin Cumhurbaşkanliği Döneminde Türkiye'de İfade Özgürlüğü Değerlendirme Aporu* (2014-2020), https://bianet.org/system/uploads/1/files/attachments/000/003/499/original/aih_rapor.pdf?1639132320.

[35] In a particularly notorious case indicating the internationalization of this practice, the Turkish government requested criminal prosecution of a famous German satirist on grounds that he insulted Erdoğan in 2016: *Böhmermann Affair*, Wikipedia, https://en.wikipedia.org/wiki/Böhmermann _affair (last edited Oct. 2, 2022).

[36] Ozan O. Varol, *Stealth Authoritarianism*, 100 Iowa L. Rev. 1673, 1697 (2014).

[37] Ozan O. Varol, *Why Separation of Powers Doesn't Work*, https://ozanvarol.com/why-separation-of-powers-doesnt-work (last visited Oct. 6, 2022).

[38] Türkiye 2022 Report 5, European Commission (Oct. 12, 2022), available for download at https://neighbourhood-enlargement.ec.europa.eu/turkiye-report-2022_en.

for recruiting and promoting judges and prosecutors remains a source of concern."[39] It adds, "the shortcomings identified . . . relating to the minimal standards for dismissals of judges and legal safeguards regarding the transfer of judges and prosecutors remained unaddressed."[40] The State Department shares this view, explaining in is 2021 Human Rights Report that, while "[t]he law [in Turkey] provides for an independent judiciary, . . . the judiciary remained subject to influence, particularly from the executive branch. . . . The judiciary faced several problems that limited judicial independence, including intimidation and reassignment of judges[.]"[41]

25. Overall, the influence of the President over the judicial system, including appointments and promotions, has been greatly enhanced under the current constitutional system inaugurated in 2017. Judges and prosecutors who make decisions that go against the wishes of the President are disciplined; their colleagues who make decisions that align with these wishes are rewarded. Moreover, any person making critical remarks of the President is susceptible to criminal prosecution under Article 299 of the Turkish Penal Code. Under these conditions, it is extremely unlikely that Turkish courts will reach verdicts in open defiance of the Turkish

---

[39] *Id.* at 6.

[40] *Id.* at 26.

[41]   Bureau of Democracy, Human Rights, and Labor, *2021 Country Reports on Human Rights Practices: Turkey* 14, U.S. Dep't of State, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/turkey/ (last visited Oct. 12, 2022); *see also* Luca Perilli, *Judicial Independence & Access to Justice* 3, 35, Turkey Tribunal (Feb. 2021), https://tbinter net.ohchr.org/Treaties/CCPR/Shared%20Documents/TUR/INT_CCPR_ICS_TUR_44934_E.pdf (reporting that "Turkish courts have not been capable to effectively protect the fundamental rights of persons, leaving citizens under the arbitrary exercise of power by the Executive" and that "judicial independence has been demolished, since December 2013, by progressive interventions of the political majority driven by President Recep Tayyip Erdoğan, which have struck both external and internal judicial independence, fired and detained thousands of judges and prosecutors and then replaced them with political controlled ones.").

President and his party, especially in high profile cases like those regarding the murder of Jamal Khashoggi.

## C. The Khashoggi Case and the Turkish Judicial System

26. In the initial aftermath of the murder of Jamal Khashoggi, the Turkish government took an uncompromising stance and provided crucial intelligence about the details about the violent incident to foreign governments and international organizations. In a speech delivered during his party's parliamentary group meeting on October 23, 2018, President Erdoğan declared that his government will not remain silent in the face of this murder. He added, "the conscience of the humanity will be satisfied only when the individuals who gave the order [to murder Khashoggi] as well as the individuals who implemented the order will be made accountable." President Erdoğan also proposed that 18 individuals who were arrested by Saudi Arabia for their involvement in the murder would be put on trial in Istanbul.[42]

27. Two weeks later, on November 2, 2018, President Erdoğan penned an op-ed for *The Washington Post* where he complained about the lack of cooperation by the Saudi prosecutor regarding the investigation. He concluded his piece by writing, "[a]s responsible members of the international community, we must reveal the identities of the puppetmasters behind Khashoggi's killing and discover those in whom Saudi officials—still trying to cover up the

---

[42] The speech of the President is available (in Turkish) at Presidency of the Republic of Turkey, *The Murder of Jamal Khashoggi: "To Blame Such an Issue on a Few Members of the Security and Intelligence Community Will Not Satisfy Us or the International Community"*, Presidency of the Republic of Turkey (Oct. 23, 2018), https://www.tccb.gov.tr/haberler/410/99304/cemal-kasikci-cinayeti-boyle-bir-meseleyi-birkac-guvenlik-ve-istihbarat-mensubunun-uzerine-yikmak-ne-bizi-ne-de-uluslararasi-toplumu-tatmin-eder-.

murder—have placed their trust."[43] In a speech delivered in mid-December, he explicitly claimed that individuals who were part of Saudi Crown Prince Mohammed Bin Salman's close circle actively executed the murderous operation.[44]

28. The judicial process in Turkey regarding the murder of Khashoggi started in April 2020. A Criminal Court in Istanbul accepted an indictment calling for life sentences for 20 suspects who were tried in absentia. The first court session took place in July 2020.[45] A separate indictment that was completed in September 2020 demanded prison sentences for six additional suspects.

29. This judicial process mirrored the Turkish President's foreign policy stance. At the time of Khashoggi's murder, Turkish-Saudi Arabian relations already had been deteriorating for months, following Turkey's alignment with Qatar, which was put under a blockade by countries including Saudi Arabia in June 2017.[46] Following the murder of Khashoggi and Turkey's attempts to mobilize international public opinion, Saudi Arabia imposed an informal

---

[43] Recep Tayyip Erdogan, Opinion: *Saudi Arabia Still Has Many Questions to Answer About Jamal Khashoggi's Killing*, Wash. Post (Nov. 2, 2018), https://www.washingtonpost.com/news/global-opinions/wp/2018/11/02/recep-tayyip-erdogan-saudi-arabia-still-has-many-questions-to-answer-about-jamal-khashoggis-killing/ (subscription required).

[44] *Erdogan Reveals Details About Murder*, Rûdaw (Dec. 14, 2018), https://www.rudaw.net/turkish/middleeast/turkey/141220181-amp.

[45] *The First Hearing of the Khashoggi Case in Instanbul was Held*, Deutsche Welle (July 3, 2020), https://www.dw.com/tr/istanbuldaki-kaşıkçı-davasının-ilk-duruşması-yapıldı/a-54040700.

[46] Birol Başkan, *Turkey Between Qatar and Saudi Arabia: Changing Regional and Bilateral Relations*, 16 Uluslararası İlişkiler Dergisi 85 (2019).

embargo on imports from Turkey. Trade relations between two countries reached a historical low.[47]

30. The deepening economic crisis by 2021, however, brought a recalibration of Turkey's foreign policy goals and a coordinated interest in repairing its relations with Saudi Arabia. Under these circumstances, the Turkish government made concerted efforts to attract Saudi investment in Turkey and boost Turkish exports to Saudi Arabia.

31. Transferring the Khashoggi case to Saudi Arabia was one of those efforts.[48] Indeed, after the Saudi government requested that Turkey's case against the murder suspects be transferred to Saudi Arabia, the Turkish prosecutor requested the transfer on March 31, 2022.[49] The Minister of Justice issued a statement a day later supporting the request despite the fact that there was

---

[47] Ragip Soylu, *Exports from Turkey to Saudi Arabia Plummet by 92 Percent Amid Unofficial Boycott*, Middle East Eye (Feb. 4, 2021), https://www.middleeasteye.net/news/turkey-saudi-arabia-exports-shrink-unofficial-boycott.

[48] *See, e.g.*, *Turkish Judge Relocated After Opposing Khashoggi Case Transfer to Saudi Arabia*, Middle East Monitor (June 22, 2022), https://www.middleeastmonitor.com/20220622-turkish-judge-relocated-after-opposing-khashoggi-case-transfer-to-saudi-arabia/ ("The move comes after Demir opposed the transfer of the Khashoggi case to Saudi authorities two months ago, which was a decision taken by Ankara to repair ties with Riyadh after years of a political and diplomatic rift between the two."); Bureau of Democracy, Human Rights, and Labor, *2021 Country Reports on Human Rights Practices: Saudi Arabia* 14, U.S. Dept of State, https://www.state.gov/reports/2021-country-reports-on-human-rights-practices/saudi-arabia (last visited Oct. 12, 2022) (describing Saudi Arabia's lack of judicial independence).

[49] Ali Kucukgocmen, *Turkish Prosecutor Requests Transfer of Khashoggi Trial to Saudi Arabia*, Reuters (Mar. 31, 2022), https://www.reuters.com/world/turkish-prosecutor-seeks-halt-trial-saudi-suspects-khashoggi-killing-2022-03-31.

no bilateral extradition agreement between Turkey and Saudi Arabia and a Saudi court already decided not to prosecute most of the suspects.[50]

32. On April 7, 2022, the 11th Istanbul Heavy Penal Court agreed with this request on the basis of Law 6706, a law governing international cooperation concerning judicial matters, and decided that the entire case would be transferred to Saudi Arabia.[51] The court reasoned that, since the suspects were citizens of Saudi Arabia and could not be apprehended, there was no point in pursuing the case in Turkey.[52] Accordingly, the arrest warrants were revoked and proceedings were halted on April 7, 2022.[53]

33. On appeal, the 12th Istanbul Heavy Penal Court affirmed the transfer decision in a divided ruling. Judge Nimet Demir, the chair of the Court, issued a sharply worded dissent opposing the transfer on four grounds.[54]

34. First, Judge Demir argued that the transfer decision contravenes Law 6706, which governs international cooperation concerning judicial matters. He highlighted the fact that a Saudi court already reached a decision about the suspects—a circumstance in which the law does not

---

[50] The Republic of Turkey Ministry of Justice memo sent to the 11th Istanbul Heavy Penal Court about its view regarding the transferring of the Khashoggi case to Saudi Arabia (April 1, 2022).

[51] *See* Safak Timur & Ben Hubbard, *Turkey Transfers Khashoggi Murder Trial to Saudi Arabia*, N.Y. Times (Apr. 7, 2022), https://www.nytimes.com/2022/04/07/world/middleeast/khashoggi-murder-trial-turkey-saudi-arabia.html.

[52] The Republic of Turkey 11th Istanbul Heavy Penal Court, Case 2020/120, Session 8 (April 7, 2022).

[53] *Turkish Court Dismissed Khashoggi Case Ahead of MBS Visit*, Ahval (June 25, 2022), https://ahvalnews.com/khashoggi-case/turkish-court-dismissed-khashoggi-case-ahead-mbs-visit.

[54] The Republic of Turkey 12th Istanbul Heavy Penal Court, Different Case 2022/332 (April 20, 2022).

support a transfer. He noted that Law 6706 does not support transferring the case to Saudi Arabia in any event, as its judicial system uses corporal and capital punishments.[55] Most emphatically, Judge Demir pointed out that all suspects were Saudi officials who acted on the orders of a high-ranking advisor to Crown Prince Mohammed Bin Salman. They committed a heinous crime on official orders, with full anticipation that they would enjoy immunity in Saudi Arabia—as evidenced by the suspects' failure to object to the transfer despite the availability of corporal and capital punishments in the Saudi system. Since Law 6706 aims to protect individuals whose rights would be violated in a foreign country, it would be wrong to apply it to this unique case. Consequently, the decision to transfer the case would make "suspects judges in their own trial."[56]

35. Second, Judge Demir argued that the decision to transfer the case goes against international agreements. For example, it violates the European Convention on the Transfer of Proceedings in Criminal Matters because there is no ongoing investigation in Saudi Arabia, which lacks a reliable judicial system.[57]

36. Third, in Judge Demir's view, the decision to transfer the case missed a unique opportunity to establish an international norm based on human rights and rule of law. He drew an analogy between the decision to end the trial of Saudi officials and the decision to drop charges against Israeli officials who ordered a deadly raid of a Turkish ship carrying humanitarian supplies to

---

[55] *Id.*

[56] *Id.*

[57] *Id.*

the Gaza strip in 2010. In both cases, the decision ending judicial action "was a ransom payment to repair deteriorating bilateral relations."[58]

37. Fourth, Judge Demir argued that the decision to transfer the case is an assault on public consciousness. He wrote, "the reckless and brutal murder of Jamal Khashoggi by Saudi officials is an assault against the reputation of our country as a safe space and the reputation and honor of our state. . . . It is essential that individuals responsible for this action are caught, put on trial, and punished for the restoration of public order." He concluded that the decision to transfer the case indicates lack of will and is "incompatible with societal values of justice, equality, and truthfulness."[59]

38. After issuing the dissent, Judge Demir was replaced on the Istanbul Heavy Penal Court and relocated to the city of Kahramanmaras in southeastern Turkey—a "judicial backwater."[60] As Judge Demir told the press, "I didn't ask for a relocation nor was I informed beforehand that I

---

[58] *Id.*

[59] *Id.*

[60] Colm Quinn, *Erdogan Hosts MBS in Ankara*, Foreign Policy (June 22, 2022), https://foreignpolicy.com/2022/06/22/erdogan-turkey-saudi-mohammed-bin-salman; *see also* Ragip Soylu, *Turkey: Judge Relocated After Opposing Khashoggi Case's Transfer to Saudi Arabia*, Middle East Eye (June 20, 2022), https://www.middleeasteye.net/news/turkey-saudi-arabia-khashoggi-case-judge-relocated-opposing-transfer; *Dissenting Judge in Khashoggi Trial to Quit Profession After Demotion*, Stockholm Ctr. for Freedom (June 20, 2022), https://stockholmcf.org/dissenting-judge-in-khashoggi-trial-to-quit-profession-after-demotion/.

was going to be placed somewhere else. . . . I was trying to uphold democracy, human rights and freedoms."[61] Judge Demir decided to ask for early retirement as a result.[62]

39. The Khashoggi case in Turkey was formally dismissed on June 17, 2022, by the 11th Istanbul Heavy Penal Court.[63] The Court cited the principle of "as in doubt, for the accused" (*in dubio pro reo*) to defend its decision to transfer the case to Saudi Arabia. In the court's view, there was not enough evidence to convict the suspects who were already acquitted or were not even asked to appear in a court in Saudi Arabia.

40. It is not a coincidence that President Erdoğan paid a visit to Saudi Arabia several weeks after the Istanbul court decided to end the prosecution of Saudi suspects in April 2022—his first visit to Saudi Arabia after Khashoggi's murder.[64] In return, Saudi Crown Prince Mohammed bin Salman visited Turkey and had a meeting with Erdoğan in June 2022, shortly after the case in Turkey was dismissed.[65] President Erdoğan and the Crown Prince issued a joint statement

---

[61] Ragip Soylu, *Turkey: Judge Relocated After Opposing Khashoggi Case's Transfer to Saudi Arabia*, Middle East Eye (June 20, 2022), https://www.middleeasteye.net/news/turkey-saudi-arabia-khashoggi-case-judge-relocated-opposing-transfer.

[62] *Turkish Judge Demoted for Objecting to Transfer of Khashoggi Case to Saudi Arabia*, MedyaNews (June 22, 2022), https://medyanews.net/turkish-judge-demoted-for-objecting-to-transfer-of-khashoggi-case-to-saudi-arabia/.

[63] The Republic of Turkey 11th Istanbul Heavy Penal Court, Case 2020/120, Decision 2020/190 (June 17, 2022); Ragip Soylu, *Khashoggi Murder Case Closed by Turkish Court Ahead of Saudi Crown Prince Visit*, Middle East Eye (June 24, 2022), https://www.middleeasteye.net/news/khashoggi-turkey-court-closed-murder-case-five-days-saudi-crown-prince-visit.

[64] Yusuf Soykan Bal & Zafer Fatih Beyaz, *President Erdoğan's Sharing About His Visit to Saudi Arabia*, Anadolu Agency (Apr. 29, 2022), https://www.aa.com.tr/tr/gundem/cumhurbaskani-erdogandan-suudi-arabistan-ziyaretine-iliskin-paylasim/2575891.

[65] *Turkish Judge Relocated After Opposing Khashoggi Case Transfer to Saudi Arabia*, Middle East Monitor (June 22, 2022), https://www.middleeastmonitor.com/20220622-turkish-judge-

characterizing bilateral relations as "perfect" and announced the start of a "new era of cooperation" in political, economic, military, security, and cultural affairs.[66]

41. Hatice Cengiz, the fiancée of Khashoggi at the time of his murder, petitioned the Turkish Constitutional Court on May 23, 2022. She argued that the transfer of the case to Saudi Arabia is a violation of Article 17 of the Turkish Constitution and Articles 2 and 3 of the European Human Rights Convention (EHRC).[67] Her petition asked the Court to revoke the decisions of the lower courts and reinitiate the judicial process.

42. On September 8, 2022, the Istanbul Regional Court of Justice, 1st Criminal Circuit affirmed the June 17, 2022, decision dismissing "all public legal charges filed" against all defendants relating to the murder of Jamal Khashoggi, and it denied Hatice Cengiz's appeal "with

---

relocated-after-opposing-khashoggi-case-transfer-to-saudi-arabia; *Turkish Court Dismissed Khashoggi Case Ahead of MBS Visit*, Ahval (June 25, 2022), https://ahvalnews.com/khashoggi-case/turkish-court-dismissed-khashoggi-case-ahead-mbs-visit; Ragip Soylu, *Khashoggi Murder Case Closed by Turkish Court Ahead of Saudi Crown Prince Visit*, Middle East Eye (June 24, 2022), https://www.middleeasteye.net/news/khashoggi-turkey-court-closed-murder-case-five-days-saudi-crown-prince-visit.

[66] The full statement (in Turkish) is available at https://www.tccb.gov.tr/assets/dosya/2022-06-22-arabistan-ortakbildiri.pdf.

[67] Başak Akbulut, *Jamal Khashoggi's Fiancée, Hatice Cengiz, Appeals to the Constitutional Court*, Anadolu Agency (May 24, 2022), https://www.aa.com.tr/tr/cemal-kasikci/cemal-kasikcinin-nisanlisi-hatice-cengiz-anayasa-mahkemesine-basvurdu/2596588. According to Article 17 of the Turkish Constitution, nobody could be tortured or maltreated; nobody could be punished or treated in a way that violates human dignity. The full text of the Constitution is available (in Turkish) at https://www5.tbmm.gov.tr/anayasa/anayasa_2018.pdf. Articles 2 and 3 of EHRC is about "right to life" and "prohibition of torture," respectively. The full convention is available at European Court of Human Rights, Council of Europe, *European Convention on Human Rights*, https://www.echr.coe.int/documents/convention_eng.pdf.

prejudice."[68] This decision is the final step in the Turkish courts' refusal to hold the perpetrators of Jamal Khashoggi's murder accountable.

43. The denial of Hatice Cengiz's appeal is no surprise. Given the new direction of Saudi-Turkish relations, the Turkish government had no incentive to reinitiate a process that would deeply antagonize the Saudi rulers. In fact, it can be reasonably inferred that the closure of the judicial process in Turkey was a precondition for the Saudi willingness to renew bilateral relations with the Erdoğan government.

44. For the same reason, Hatice Cengiz would be unable to obtain a remedy for Khashoggi's murder by filing a civil lawsuit. Under the current constitutional order, the executive branch represented by President Erdoğan has undue influence over the judicial branch. It is not possible to talk about a separation of powers in a meaningful manner in a system where judges and prosecutors are punished and rewarded according to the preferences of the government. As noted above, the President also has significant power over the Constitutional Court. At the moment, seven out of 15 members of the Court were directly appointed by the President and three members were chosen by the parliament where the President's party and his allies have a majority.[69]

45. Given this dual pattern involving the current direction of Turkish foreign policy and the lack of judicial independence, the Constitutional Court and lower Turkish courts could not make a

---

[68] The Republic of Turkey Istanbul Regional Court of Law 1st Criminal Circuit, Decision 2022/1146.

[69] Anayasa Mahkemesi, *Vice Presidents, Members, and Retired Members*, https://www.anayasa.gov.tr/tr/baskanvekilleri-ve-uyeler/uyeler (last visited Oct. 18, 2022).

fair assessment about the Khashoggi case. Any judge who affords Ms. Cengiz due process would be subject to retaliation by the executive branch led by President Erdoğan, as the experience of Judge Demir unequivocally demonstrates. This prospect of retaliation serves as a strong deterrent from resolving a civil suit brought by Ms. Cengiz based on a neutral application of governing law. Most judges in Turkey would also be biased against Ms. Cengiz in the first place, as they have been selected because of their loyalty to the President and his party or fear direct retaliation from the executive branch.[70]

46. Consequently, Turkish courts thus cannot provide Hatice Cengiz with "adequate and available remedies" for Khashoggi's murder. Attempting to obtain such remedies in Turkish courts would be futile.

I declare under penalty of perjury that the foregoing is true and correct.

Executed October 18, 2022.

*Güneş murat tezcür*

_____

Güneş Murat Tezcür

---

[70] *See* Luca Perilli, *Judicial Independence & Access to Justice* 33 Turkey Tribunal (Feb. 2021), https://tbinternet.ohchr.org/Treaties/CCPR/Shared%20Documents/TUR/INT_CCPR_ICS_TUR_44934_E.pdf ("800 of the 900 newly appointed judges have direct links to the ruling Justice and Development Party (AKP).").