## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**HATICE CENGIZ, et al.,**

    **Plaintiffs,**

    **v.**

**MOHAMMED BIN SALMAN, et al.,**

    **Defendants.**

**Civil Action No. 20-3009 (JDB)**

### MEMORANDUM OPINION

Jamal Khashoggi was a Saudi Arabia-born journalist who dedicated his career to "advocating for democratization and greater human rights observance in the Arab world." Compl. [ECF No. 1] ¶¶ 45–46. He was tortured, murdered, and dismembered by Saudi Arabian nationals on October 2, 2018 in the Saudi Consulate ("Consulate") in Istanbul, Turkey. Id. ¶ 1; see also U.N. Human Rights Council, Annex to the Report of the Special Rapporteur on Extrajudicial, Summary or Arbitrary Executions: Investigation into the Unlawful Death of Mr. Jamal Khashoggi, ¶¶ 94–96, U.N. Doc. A/HRC/41/CRP.1 (June 19, 2019). His brutal murder, plaintiffs allege, was ordered by Mohammed bin Salman, the Crown Prince of Saudi Arabia, and carried out by his accomplices. Compl. ¶ 2.

While Khashoggi was tortured and murdered, plaintiff Hatice Cengiz, Khashoggi's fiancé, waited outside the Consulate for more than 12 hours "in a desperate and tormented state" for Khashoggi to leave the Consulate with the papers they needed to civilly marry in Turkey. Compl. ¶¶ 101, 114, 119, 136–38. Cengiz, along with plaintiff Democracy for the Arab World Now, Inc. ("DAWN"), the advocacy organization of which Khashoggi served as Executive Director, brought

this action against 25 named Saudi nationals and four John Does alleging that they planned and executed Khashoggi's murder.  See id. ¶¶ 1, 6–35.[1]

Only three defendants have entered an appearance: Mohammed bin Salman, the Crown Prince of Saudi Arabia; and Saud al-Qahtani and Ahmed al-Assiri, both high-ranking Saudi officials at the time of Khashoggi's murder.  See Notice of Appearance [ECF No. 11] (counsel for al-Qahtani and al-Assiri); Notice of Appearance [ECF No. 14] (counsel for bin Salman).  All three defendants have moved to dismiss plaintiffs' claims against them.  See Def. Mohammed bin Salman bin Abdulaziz Al Saud's Mot. to Dismiss [ECF No. 21] ("Bin Salman Mot."); Mot. of Saud al-Qahtani and Ahmed al-Assiri to Dismiss the Compl. Against Them [ECF No. 22] ("Al-Qahtani & Al-Assiri Mot.").

Plaintiffs allege that bin Salman ordered Khashoggi's "ruthless torture and murder," Compl. ¶ 2, and that it was planned and carried out by his accomplices, including al-Qahtani and al-Assiri.  The United States has reached the same conclusion: that the "horrific" killing was approved by bin Salman himself.[2]  Even defendants acknowledge that Khashoggi was murdered in the Saudi Consulate, and that the murder was carried out by Saudi nationals.  See Bin Salman Mot. at 1.  Hence, there is a strong argument that plaintiffs' claims against bin Salman and the other defendants are meritorious.  However, the Court cannot resolve that issue at this time.  The

---

[1] The suit includes claims for extrajudicial killing under the Alien Tort Statute and Torture Victim Protection Act, and a number of state law claims.  Compl. ¶¶ 163–218.

[2] In the suggestion of immunity filed by the United States in this case, the government described Khashoggi's killing as "horrific" and noted that the Office of the Director of National Intelligence ("ODNI") declassified its conclusions on the murder.  Suggestion of Immunity by the United States [ECF No. 53] ("Suggestion of Immunity"). ODNI concluded that "Saudi Arabia's Crown Prince Muhammed bin Salman approved [the] operation in Istanbul, Turkey to capture or kill Saudi journalist Jamal Khashoggi."  Office of the Director of National Intelligence, Assessing the Saudi Government's Role in the Killing of Jamal Khashoggi 2 (Feb. 11, 2021); see also Shane Harris et al., CIA Concludes Saudi Crown Prince Ordered Jamal Khashoggi's Assassination, Wash. Post (Nov. 16, 2018), https://www.washingtonpost.com/world/national-security/cia-concludes-saudi-crown-prince-ordered-jamal-khashoggis-assassination/2018/11/16/98c89fe6-e9b2-11e8-a939-9469f1166f9d_story.html (reporting that a call to Khashoggi directing him to go to the Consulate was made "at [bin Salman's] direction") (hereinafter, "CIA Conclusions Article").

Court has a responsibility to decide preliminary issues, such as jurisdiction, before the merits—however strong the merits may be.  Specifically, in light of the Statement of Interest filed by the United States and the absence of any basis to assert personal jurisdiction over defendants al-Qahtani and al-Assiri, the Court concludes that the case must be dismissed at this time.

### Factual Background[3]

Jamal Khashoggi was born in Saudi Arabia and spent many years working as a journalist and advocate in the Arab world, including for the Kingdom of Saudi Arabia at times.  Compl. ¶¶ 45–49.  However, his "work, advocacy, and efforts to promote democracy and objective journalism in the Arab world often met harsh opposition from officials and political leaders of the region, as well as their supporters."  Id. ¶ 47.  During this time, Saudi officials threatened Khashoggi and ordered him to stop posting, writing, and speaking out against Saudi Arabia and affiliated causes.  Id. ¶¶ 50–51.  In one instance, following tweets Khashoggi posted that were critical of then-President Elect Donald Trump, al-Qahtani told Khashoggi that he was "not allowed to tweet, not allowed to write, not allowed to talk."  Id. ¶ 50.

"Having lost his freedom to write, speak, and publish freely" in the Arab world, Khashoggi moved to Washington, D.C., where he "developed strong ties to think tanks, journalists, and academics," including speaking at nonprofits and writing a column for the Washington Post.  Compl. ¶¶ 52–54.  Specifically, he used his platform as a Washington Post columnist to "challenge[] the Kingdom and the ruling royal family" to implement civil society reforms and criticize "the media and civil society crackdowns initiated" by bin Salman.  Id. ¶ 54.  In 2018, Khashoggi helped establish DAWN and began serving as the organization's Executive Director

---

[3] The facts set forth in this section are taken from plaintiffs' complaint.  Some of these facts—particularly pertaining to Khashoggi's attempts to obtain a marriage certificate in the United States and bin Salman's involvement in Khashoggi's murder—are disputed by defendants in a series of declarations.  Those disputes, and the weight the Court assigns the contested facts, will be noted where relevant.

"with the intention of utilizing DAWN as a platform from which to advocate for democracy and to promote human rights in the Arab world."  Id. ¶¶ 59–63.

Despite his move to the United States, bin Salman and those working on his behalf continued to target Khashoggi in an attempt to silence him.  See Compl. ¶ 73; see also id. ¶ 57 (describing a call al-Qahtani placed to Khashoggi "to remind Khashoggi that Defendant MBS was closely monitoring his writings").  They tried to convince Khashoggi to travel or move back to Saudi Arabia and assured him it would be safe to do so.  See, e.g., id. ¶ 81 ("Defendant al-Qahtani contacted Mr. Khashoggi, offering him a job and requesting that Khashoggi return to the Kingdom.").  "Khashoggi explained to friends and loved ones that these ruses were nothing more than attempts to bring him back to the Kingdom so as to jail, kill, or otherwise silence him."  Id. ¶ 84.

Khashoggi met Cengiz in May 2018 in Istanbul.  Compl. ¶ 87.  In the subsequent months, the two spoke frequently, and they "began their courtship in earnest" in July 2018.  Id. ¶¶ 87–88.  A month later, Khashoggi traveled to Turkey, where the two "decided they would marry and began their engagement."  Id. ¶ 89.  Cengiz informed Khashoggi that "Turkey would require a certificate of marriage eligibility from the Kingdom [of Saudi Arabia] to recognize a civil marriage."  Id.  After returning to the United States, Khashoggi contacted the Embassy of the Kingdom of Saudi Arabia in Washington, D.C. to obtain the required certificate.  Id. ¶ 90.

"[R]ecognizing an opportunity to abduct Mr. Khashoggi, Defendants, working through officials at the Embassy, instructed Mr. Khashoggi that he would have to apply for the document at the Saudi Consulate in Istanbul.  These instructions were a ruse to lure Mr. Khashoggi to a location where Defendants could carry out an operation to kidnap, torture and murder him."

Compl. ¶ 90.  Khashoggi called Khalid bin Salman,[4] Mohammed bin Salman's brother who was then serving as the Saudi Ambassador to the United States, seeking "assurances that it would be safe for him to visit the Saudi Consulate in Istanbul."  Id.  ¶ 91.  Khalid bin Salman—reportedly at the direction of Mohammed bin Salman—assured Khashoggi that it would be safe to do so.  Id.[5]

Khashoggi arranged to visit the Consulate in Istanbul on October 2, 2018.  Compl. ¶ 102. His plan to visit the Consulate  was "communicated to certain Defendants in Riyadh," who began planning the murder.  Id. ¶¶ 102–04.  A number of the defendants traveled to Istanbul from Saudi Arabia in the early morning of October 2, 2018 "to carry out the abduction, torture, and killing" of Khashoggi.  Id. ¶ 110.

The complaint describes the gory events of October 2 in great detail, not all of which will be repeated here.  Briefly, before Khashoggi arrived at the Consulate, two of the defendants "coldly discussed the logistics of how the Defendants would remove Mr. Khashoggi's dismembered body parts from the Consulate," and described in detail the difficulties of dismembering him.  Compl. ¶ 117.  Khashoggi arrived at the Consulate shortly afterwards and met with the defendants present. Id. ¶¶ 118–20.  He appeared to be aware of his impending horror, asking, "How could this happen in an embassy?"  Id. ¶ 125.  Recordings from the Consulate captured sounds of a struggle, along with a number of "horrifying statements," including "Push here; don't remove your hand; push it," accompanied by sounds of "movement, heavy panting, and plastic sheets."  Id. ¶ 128.  While not present, al-Qahtani "called into the torture session via a visual media call," at one point asking those in the room to "[b]ring [him] the head of the dog."  Id. ¶ 131.  All this time, Cengiz was

---

[4] This opinion refers to Khalid bin Salman by his full name, and refers to Mohammed bin Salman either by his full name or as "bin Salman."

[5] Khalid bin Salman submitted a declaration denying that his brother gave him any such direction or that he spoke with Khashoggi during the relevant time period or about the Saudi Consulate in Turkey.  See Decl. of His Royal Highness Prince Khalid bin Salman bin Abdulaziz Al Saud in Supp. of Defs.' Mot. to Dismiss [ECF No. 21-2] ("Khalid bin Salman Decl.") ¶¶ 3–5.

outside waiting, "becoming increasingly anguished and enduring unimaginable distress." Id. ¶ 136.  She contacted authorities and asked two consular officials exiting the Consulate "about Mr. Khashoggi's whereabouts"; they told her he had left the Consulate.  Id. ¶¶ 136–37.

In the weeks that followed, the perpetrators attempted to cover up the murder by denying involvement, destroying evidence, and waging a "misinformation campaign" to divert blame. Compl. ¶¶ 140–44.  On October 18, Saudi Arabia's "chief prosecutor appeared on state television and admitted that Mr. Khashoggi had been killed in the Consulate—purportedly after a fistfight." Id. ¶ 146.  Days later, the Saudi Foreign Minister characterized Khashoggi's death as the "result of a rogue operation," and later the Saudi Attorney General acknowledged that it was "a planned, pre-mediated murder." Id. ¶¶ 147–48.  U.N. and U.S. intelligence agencies opened probes into the killing, and both concluded that bin Salman must have known about the operation; with the U.S. finding that bin Salman "ordered Mr. Khashoggi's assassination." Id. ¶¶ 149–52.  The U.S. Treasury Department sanctioned several Saudi nationals in response, including al-Qahtani, whom the Treasury Department concluded "was part of the planning and execution of the operation that led to the killing of Mr. Khashoggi." Id. ¶ 154.

Cengiz and DAWN brought the present lawsuit against defendants in October 2020.  In June 2021, bin Salman, al-Qahtani, and al-Assiri each moved to dismiss the claims against them for various reasons, chief among them that bin Salman is immune from suit and that the Court lacks personal jurisdiction over all three defendants.  See generally Bin Salman Mot.; Al-Qahtani & Al-Assiri Mot.

## Analysis

### I.   Claims Against Mohammed bin Salman

Plaintiffs have named Mohammed bin Salman as a defendant in this case and allege that he "ordered the murder of Mr. Khashoggi."  Compl. ¶ 8.  At the time of Khashoggi's death and

the filing of this lawsuit, bin Salman was the Crown Prince of Saudi Arabia and, he claims, widely viewed as Saudi Arabia's "acting head of state" despite his formal titles of just Deputy Prime Minister and Minister of Defense.  See Bin Salman Mot. at 21–22.  In his motion to dismiss, bin Salman argued that his status in the government entitled him to head-of-state immunity.  See id. at 20–23.

Under customary international law, foreign heads of state, heads of government, and foreign ministers are traditionally entitled to status-based immunity from civil suit in other countries while they remain in office.  Restatement (Second) of the Foreign Relations Law of the United States § 66 (Am. L. Inst. 1965); see also Samantar v. Yousuf, 560 U.S. 305, 321 n.15 (2010) (noting the Restatement's application of absolute immunity "to the head of state, head of government, or foreign minister" but "express[ing] no view on whether Restatement § 66 correctly sets out the scope of the common-law immunity applicable to current or former foreign officials"). In most instances, the Executive Branch makes the immunity determination and expresses its conclusion through a "suggestion of immunity" filed in the civil case, which the district court defers to and then dismisses the case.  See, e.g., Miango v. Democratic Republic of Congo, Civ. A. No. 15-1265 (ABJ), 2019 WL 2191806, at *2 (D.D.C. Jan. 19, 2019).

On July 1, 2022, the Court invited the United States to "submit a statement of interest regarding any issue in this case, but particularly with respect to . . . the applicability of head-of-state immunity in this case." July 1, 2022 Order [ECF No. 39] at 1.  The United States indicated it may file such a statement and requested an extension of time until October 3, 2022, which the Court granted.  See Notice of Potential Participation & Unopposed Req. for Extension [ECF No. 41]; July 18, 2022 Min. Order.

Six days before the government's statement of interest was due, King Salman bin Abdulaziz Al Saud appointed bin Salman, his son, as Prime Minister of the Kingdom of Saudi

Arabia.  See Notice of Suppl. Authority [ECF No. 45] at 1.  Shortly after his appointment as Prime Minister, bin Salman notified the Court of his new position and argued that "the United States has made clear in prior cases" that "a sitting Prime Minister such as the Crown Prince enjoys immunity from the jurisdiction of U.S. courts in light of his current status as his nation's head of government."  Id. at 1–2 (cleaned up).  The United States requested an extension of time to submit a statement of interest in light of this development, see Notice by the United States & Second Req. for Extension of Time [ECF No. 44], and then on November 17, 2022, filed a statement of interest informing the Court that bin Salman was entitled to head-of-state immunity based on his current position as Prime Minister, see Suggestion of Immunity at 1.

> The United States' Suggestion of Immunity stressed that:
>
> The United States Government has expressed grave concerns regarding Jamal Khashoggi's horrific killing and has raised these concerns publicly and with the most senior levels of the Saudi government.  It has also imposed financial sanctions and visa restrictions as a result of, and related to, Mr. Khashoggi's killing, and has sought to promote transparency through the release of the intelligence community assessment of the Saudi government's role in the incident.

Suggestion of Immunity ¶ 2 (footnote omitted).  However, the United States concluded that "the doctrine of head-of-state immunity is well-established in customary international law and has been consistently recognized in longstanding Executive Branch practice as a status-based determination that does not reflect a judgment on the underlying conduct at issue in the litigation."  Id.  And, the United States argued, "this determination is controlling and is not subject to judicial review."  Id. ¶ 1.

Plaintiffs vigorously disagree.  See Resp. to Notice of Suppl. Authority [ECF No. 51]; Resp. to Suggestion of Immunity [ECF No. 55].  They make two primary claims in opposition: (1) an analysis of the Saudi Arabian government structure suggests that the Saudi Prime Minister is not in fact the head of government, and thus King Salman remains both the head of state and the head of government; and (2) the "unusual timing and circumstances" of the decree suggest the

appointment of Mohammed bin Salman as Prime Minister is an "attempt to manipulate the Court's jurisdiction," which the Court should not credit.  Resp. to Notice of Suppl. Authority at 2; see Resp. to Suggestion of Immunity at 2–9.

As to their first argument, plaintiffs appear to concede that the Executive Branch's determination that bin Salman is the head of government is controlling for purposes of the immunity analysis.  See Resp. to Suggestion of Immunity at 2 (noting that however "unfounded" the determination may be, plaintiffs "acknowledge the Executive Branch's authority to decide whether to recognize MBS as Saudi Arabia's head of government").[6]

Plaintiffs instead dedicate most of their response to the government's Suggestion of Immunity to the argument that the Court need not accept the Executive Branch's determination that a head of state is entitled to immunity under these circumstances.  As described above, bin Salman was appointed Prime Minister just days before the United States' deadline to take a position on his immunity status.  The government positions he held prior to his appointment as Prime Minister were not historically recognized as the "head of state" for immunity purposes, and "there is no suggestion that the Executive has yet extended this immunity to . . . [the] positions that the Crown Prince [held]."  Aldossari on behalf of Aldossari v. Ripp, 537 F. Supp. 3d 828, 852 (E.D. Pa. 2021), vacated and remanded on other grounds, 49 F.4th 236 (3d Cir. 2022).[7]  Beyond the suspicious timing, plaintiffs note two other anomalies in the Royal Order appointing bin Salman Prime Minister: his appointment was "an unexplained and unprecedented 'exception' to the Basic Law of Governance," under which the King is the Prime Minister; and King Salman

---

[6] The Court also notes that plaintiffs' complaint describes King Salman as the "head of the Kingdom's government" because he (at that time) "serve[d] as the Prime Minister."  Compl. ¶ 8.

[7] Bin Salman made similar arguments in Aldossari as in his initial motion to dismiss here—that his role as Crown Prince, his government positions, and his recognized status as "acting head of state" entitled him to immunity.  See Bin Salman Mot. at 20–23; Aldossari, 537 F. Supp. 3d at 852.  The Aldossari court expressed skepticism that bin Salman would be entitled to immunity in those roles.  537 F. Supp. 3d at 852.

"continue[d] to chair the sessions of the Council of Ministers."  Resp. to Suggestion of Immunity at 6.  A contextualized look at the Royal Order thus suggests that it was not motivated by a desire for bin Salman to be the head of government, but instead to shield him from potential liability in this case.  See, e.g., Stephanie Kirchgaessner, Mohammed bin Salman Named Prime Minister Ahead of Khashoggi Lawsuit, Guardian (Sept. 27, 2022, 6:19 PM), https://amp.theguardian.com/world/2022/sep/27/mohammed-bin-salman-named-prime-minister-ahead-of-khashoggi-lawsuit ("[T]he timing of the decision was seen by critics of the Saudi government as almost certainly linked to a looming court-ordered deadline [the following] week.").  Plaintiffs' argument, then, proceeds in two steps: first, they argue that the Court is not bound by the Executive Branch's immunity determination, see Resp. to Suggestion of Immunity at 3–5; and second, they urge the Court to consider "principles of customary international law" in an independent analysis of the immunity issue, which caution against finding bin Salman immune, see id. at 5–8.[8]  For the reasons set forth below, the Court concludes that even if it is not strictly bound by the Executive Branch's determination, it is nonetheless appropriate to defer to the Executive Branch's decision in this instance.

Plaintiffs contend that this Court has authority to reject the Executive Branch's immunity determination.  Historically, when the State Department filed a suggestion of immunity, "the district court surrendered its jurisdiction."  Manoharan v. Rajapaksa, 711 F.3d 178, 179 (D.C. Cir. 2013) (quoting Samantar, 560 U.S. at 312).  But, as plaintiffs note, courts may entertain some challenges to the application of common-law immunity—including  head-of-state immunity—in certain cases.  For example, in Manoharan, the D.C. Circuit considered whether the Torture Victim

---

[8] For example, one reason for immunity is to "promote international comity."  Resp. to Suggestion of Immunity at 8.  Foreign nations should give "the respect to the laws, policies and interests of others that it would have others give to its own in the same or similar circumstances."  Id. (quoting Usoyan v. Republic of Turkey, 6 F. 4th 31, 48 (D.C. Cir. 2021)).  Plaintiffs argue that the United States would never find itself in a similar situation to Saudi Arabia, where an executive is declared the head of government arguably for purposes of eluding foreign litigation.

Protection Act had displaced common-law head-of-state immunity such that a court retained jurisdiction over the sitting president of Sri Lanka—despite the Suggestion of Immunity filed on his behalf.  See id. at 274–75.  Plaintiffs urge this Court similarly to entertain a challenge to a head of state's entitlement to immunity based on the circumstances of his appointment under customary international law.  But even assuming the Court has authority to make such a determination—a questionable proposition, see, e.g., Doe v. State of Israel, 400 F. Supp. 2d 86, 111 (D.D.C. 2005) ("When . . . the Executive has filed a Suggestion of Immunity as to a recognized head of a foreign state, the jurisdiction of the Judicial Branch immediately ceases.")[9]—it declines to do so here.

As described above, plaintiffs first argue that the Court does not need to defer to the Executive Branch, then move to reasons why the Court, undertaking an independent analysis of customary international law, should decline to grant bin Salman immunity.[10]  But plaintiffs do not grapple with the intermediate question of whether the Court should nonetheless defer to the Executive Branch's conclusion on the issue—a question grounded in separation of powers principles, not customary international law, see Ye, 383 F.3d at 626 (noting in response to

---

[9] The clear weight of authority suggests that the Court lacks authority to review the Executive Branch's determination of immunity.  See, e.g., Spacil v. Crowe, 489 F.2d 614, 617 (5th Cir. 1974) ("For more than 160 years American courts have consistently applied the doctrine of sovereign immunity when requested to do so by the executive branch . . . with no further review of the executive's determination." (footnote omitted)); Isbrandtsen Tankers, Inc. v. President of India, 446 F.2d 1198, 1201 (2d Cir. 1971) ("[O]nce the State Department has ruled in a matter of this nature, the judiciary will not interfere."); Rich v. Naviera Vacuba, S.A., 295 F.2d 24, 26 (4th Cir. 1961) ("[The] grant of immunity issued by the Department of State should be accepted by the court without further inquiry.").

[10] This is no small ask.  Plaintiffs are unable to cite any instance, foreign or domestic, where a court declined to grant head-of-state immunity to a defendant based on the circumstances of their appointment—or based on anything other than a finding that the defendant was not in fact the head of state.  Cf. Ye v. Zemin, 383 F.3d 620, 625 (7th Cir. 2004) (finding defendant entitled to head-of-state immunity despite his perpetration of crimes violative of jus cogens norms).  Of course, this exact situation quite possibly has never arisen.  But because customary international law derives from "a general practice accepted as law," see Statute of the International Court of Justice, art. 38, June 26, 1945, 59 Stat. 1055, 1060, T.S. No. 993, it is difficult for the Court, given the long history of granting head-of-state immunity, to conclude that bin Salman is not immune under international law.  And that difficulty is compounded because the only nation to comment on this exact issue—the United States, via the Executive Branch's Suggestion of Immunity—has concluded exactly the opposite.  See TMR Energy Ltd. v. State Prop. Fund of Ukraine, 411 F.3d 296, 302 (D.C. Cir. 2005) ("[P]olitical branches have the final say about whether and how [customary international law] applies in the United States . . . ." (second alteration in original) (quoting J. Goldsmith & E. Posner, The Limits of International Law 77 (2005))).

plaintiff's customary international law arguments that the court's "first concern . . . is to ascertain the proper relationship between the Executive and Judicial Branches insofar as the immunity of foreign leaders is concerned").

Deference to the Executive Branch's foreign immunity determinations is motivated by "the caution [courts] believe appropriate of the Judicial Branch when the conduct of foreign affairs is involved." Ye, 383 F.3d at 626. As the branch of government primarily responsible for international affairs and diplomacy, the Executive Branch may be hindered or embarrassed should the judiciary second-guess its foreign immunity decisions. See, e.g., In re Muir, 254 U.S. 522, 533 (1921) (explaining that deference to the Executive Branch on foreign immunity questions "makes for better international relations, conforms to diplomatic usage in other matters, accords to the Executive Department the respect rightly due to it, and tends to promote harmony of action and uniformity of decision"); Ex parte Republic of Peru, 318 U.S. 578, 588 (1943) ("[C]ourts may not so exercise their jurisdiction, by the seizure and detention of the property of a friendly sovereign, as to embarrass the executive arm of the government in conducting foreign relations."). Thus, it is well-settled that judicial interference "in the chess game that is diplomacy"—where grants of immunity may "serve as a bargaining counter in complex diplomatic negotiations" and denials could "preclude a significant diplomatic advance"—is ill-advised. See, e.g., Spacil, 489 F.2d at 619.

These considerations are no less present when the circumstances of a head of state's appointment are suspect: the Executive Branch remains responsible for foreign affairs, including with Saudi Arabia, and a contrary decision on bin Salman's immunity by this Court would unduly interfere with those responsibilities all the same.

If the immunity determination was in front of the Court without input from the Executive Branch, the Court certainly would consider plaintiffs' arguments about whether, as a substantive

matter, bin Salman was entitled to head-of-state immunity.  But because the United States has determined that bin Salman is so entitled, "the doctrine of the separation of powers under our Constitution requires us to assume that all pertinent considerations have been taken into account by the [Executive Branch] in reaching [its] conclusion." Rich, 295 F.2d at 26; see also Doe I, 400 F. Supp. 2d at 111 (noting that plaintiff's arguments against immunity when the Executive Branch had weighed in were "entirely irrelevant" because "the filing of a Suggestion of Immunity ends the court's inquiry").

Despite the Court's uneasiness, then, with both the circumstances of bin Salman's appointment and the credible allegations of his involvement in Khashoggi's murder, the United States has informed the Court that he is immune, and bin Salman is therefore "entitled to head of state immunity . . . while he remains in office." Manoharan, 711 F.3d at 180.  Accordingly, the claims against bin Salman will be dismissed based on head-of-state immunity.[11]

## II.     Claims Against Saud al-Qahtani and Ahmed al-Assiri

Plaintiffs have also named Saud al-Qahtani and Ahmed al-Assiri as defendants in this case, alleging that they acted as co-conspirators in the murder of Khashoggi.  Compl. ¶¶ 10–11.  Al-Qahtani and al-Assiri filed a motion to dismiss incorporating many of bin Salman's arguments and raising additional ones, primarily arguing that this Court lacks personal jurisdiction over them. See Al-Qahtani & Al-Assiri Mot. at 5–12.  In response, plaintiffs assert three theories of personal jurisdiction: (1) it is "reasonable to infer" that al-Qahtani and al-Assiri "participated in luring Khashoggi out of the United States"; (2) with respect to al-Qahtani, there is a "close relationship" between his contacts with Khashoggi over the years and the murder such that the case "relate[s] to the defendant's contacts with the forum"; and (3) under Calder v. Jones, 465 U.S. 783 (1984), "the

---

[11] Given the resolution on the basis of immunity, the Court does not reach either personal jurisdiction or the other issues raised in bin Salman's motion to dismiss.

effect of the murder was to silence Khashoggi's speech within the United States," which "establishes personal jurisdiction over all of Khashoggi's murderers, including Al-Qahtani and Al-Assiri."  Opp'n to Defs.' Mot. to Dismiss [ECF No. 27] ("Opp'n") at 25–26.

Courts may exercise either general or specific jurisdiction over a defendant.  See Ford Motor Co. v. Mont. Eighth Jud. Dist. Ct., 141 S. Ct. 1017, 1024 (2021).  Plaintiffs here do not contend that either defendant is "essentially at home" in the United States such that they are subject to general jurisdiction.  Id. (citing Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011)); see Opp'n at 25–27.  Instead, plaintiffs rely on specific jurisdiction, see Opp'n at 25–27, which requires that a plaintiff's claims "arise out of or relate to the defendant's contacts with the forum," Ford, 141 S. Ct. at 1025 (internal quotation marks omitted).

A "plaintiff must make a prima facie showing of the pertinent jurisdictional facts."  First Chicago Int'l v. United Exch. Co., 836 F.2d 1375, 1378 (D.C. Cir. 1988).  "'Conclusory statements' or a 'bare allegation of conspiracy or agency' do not satisfy [a plaintiff's] burden" to make such a showing.  Livnat v. Palestinian Auth., 851 F.3d 45, 56–57 (D.C. Cir. 2017) (quoting First Chicago Int'l, 836 F.2d at 1378–79).  "When deciding personal jurisdiction without an evidentiary hearing—as here—the court must resolve factual disputes in favor of the plaintiff, but it need not accept inferences drawn by plaintiffs if such inferences are unsupported by the facts." Id. at 57 (cleaned up).

### A.  The "Inference of Luring" Theory

Plaintiffs first argue that the Court has personal jurisdiction over both al-Qahtani and al-Assiri because it is "reasonable to infer" that they "participated in luring Khashoggi out of the United States."  Opp'n at 25.  Plaintiffs allege that the Embassy officials in Washington were instructed to inform Khashoggi that he would need to go to the Saudi Consulate in Turkey to get the required marriage certificate.  Compl. ¶ 90.  They further allege that Mohammed bin Salman

purposefully targeted the United States via a conversation he had with his brother, Ambassador Khalid bin Salman, who was in the United States at the time of the conversation.  Id. ¶ 38; Opp'n at 8–11.  In this conversation, Mohammed bin Salman allegedly directed Khalid bin Salman to give Khashoggi false assurances of his safety at the Saudi Consulate in Turkey.  Compl. ¶ 38.[12] Plaintiffs describe these two U.S.-based activities as defendants' "luring" of Khashoggi out of the United States.  See Opp'n at 25–26.

Plaintiffs argue that given the "central roles" al-Qahtani and al-Assiri played in the conspiracy, it is reasonable to infer that they participated in the U.S.-directed conduct (luring Khashoggi to Turkey).  See Opp'n at 25; Compl. ¶ 10 ("[Al-Qahtani] acted as a co-conspirator in the murder of Jamal Khashoggi and called into the killing of Mr. Khashoggi, reportedly, via Skype."); id. ¶ 11 ("Defendant Ahmed al-Assiri . . . [served] as Deputy Director of the Saudi General Intelligence Presidency and was a Saudi Major General.  On information and belief, at the behest of Defendant MBS, Defendant Assiri planned and organized the team in Riyadh that ultimately travelled to Turkey to murder Jamal Khashoggi." (footnote omitted)).

Despite plaintiffs' characterization of this as a reasonable inference, it is not.  Beginning with al-Assiri, plaintiffs allege only that he "planned and organized" the group that traveled from Riyadh to Turkey—plans that materialized after Khashoggi had spoken with the Saudi Embassy in Washington and with Khalid bin Salman.  Compl. ¶ 11; see also id. ¶ 104 (noting al-Assiri "delivered . . . orders" on September 29, after Khashoggi had already contacted the Consulate in

---

[12] As described above, bin Salman submitted a declaration from his brother, Khalid bin Salman, denying that this conversation ever happened or that Khalid bin Salman ever discussed the visit to Turkey with Khashoggi.  See Khalid bin Salman Decl. ¶¶ 4–5.  Plaintiffs supported their allegations with a Washington Post article citing the conclusion of U.S. intelligence that Mohammed bin Salman did, in fact, direct his brother to give Khashoggi false assurances of his safety in Turkey.  See CIA Conclusions Article.  These dueling factual proffers raise interesting questions about how a court should balance factual disputes related to jurisdiction at the motion to dismiss stage, and what inferences a court may or should make.  However, this Court need not answer those questions to resolve the present motion.  Thus, the Court will assume Mohammed bin Salman had a conversation with Khalid bin Salman directing him to give Khashoggi assurances of his safety in Turkey, and that it happened when Khalid bin Salman was in the United States (and Mohammed bin Salman was aware of his brother's location).

Turkey).  Al-Qahtani's interactions with Khashoggi began years before the "luring" occurred, but plaintiffs do not allege that his earlier contacts with Khashoggi included any knowledge of, or involvement in, the initial plan to lure Khashoggi to Turkey.  The first involvement plaintiffs allege al-Qahtani had with the murder plot was after Khashoggi scheduled his October 2 visit to the Consulate in Turkey, when the department run by al-Qahtani "presumably" was informed of the visit.  Id. ¶ 102.  Plaintiffs allege no facts suggesting either of these defendants had knowledge of or involvement in the conversations related to the Embassy in the U.S., which happened a month before.

Making the "inference" that one co-conspirator had knowledge of or participated in an act of the conspiracy absent any facts suggesting so would be inconsistent with the law on conspiracy jurisdiction following the Supreme Court's decision in Walden v. Fiore, 571 U.S. 277 (2014). Walden held that the exercise of personal jurisdiction must be based on suit-related connections to the forum created by the "defendant himself."  571 U.S. at 284 (emphasis in original).  "Some cases in this Circuit, predating the Supreme Court's 2014 decision in Walden v. Fiore, discussed a conspiracy theory of personal jurisdiction, and those cases required 'a prima facie showing of (1) a conspiracy (2) in which the defendant participated and (3) a coconspirator's overt act within the forum, subject to the long-arm statute and in furtherance of the conspiracy.'" Cockrum v. Donald J. Trump for President, Inc., 319 F. Supp. 3d 158, 185 (D.D.C. 2018) (collecting cases). Thus, under the pre-Walden test, any co-conspirator could be subject to a court's jurisdiction based solely on the in-forum actions of a co-conspirator.  However, that articulation of conspiracy-based personal jurisdiction is on shaky ground following the Supreme Court's admonishment that "a defendant's relationship with a plaintiff or third party, standing alone, is an insufficient basis for jurisdiction."  Walden, 571 U.S. at 286.  Hence, the existence of a conspiracy linking a defendant to a co-conspirator who may have taken in-forum acts is insufficient, alone, to establish

16

jurisdiction.  The defendant himself must have sufficient connections to a forum, and thus, "a plaintiff who seeks to establish jurisdiction over a defendant based on a co-conspirator's contacts must plead, at a minimum, that the defendant knew his co-conspirator was carrying out acts in furtherance of the conspiracy in the forum."  EIG Energy Fund XIV, L.P. v. Petróleo Brasileiro S.A., 246 F. Supp. 3d 52, 91 (D.D.C. 2017) (emphasis in original) (discussing the impact of Walden on personal jurisdiction), aff'd, 894 F.3d 339 (D.C. Cir. 2018).

Perhaps in recognition of this, plaintiffs do not argue that bin Salman's (or any other alleged co-conspirator's) in-forum actions may be imputed to al-Assiri or al-Qahtani under a pre-Walden theory.  But their proposed basis for personal jurisdiction reaches functionally the same result: it gives a court jurisdiction over all co-conspirators (or at least, all that played a "central role[]," Opp'n at 25, in the conspiracy) on the basis of one co-conspirator's in-forum actions.  To be sure, plaintiffs characterize this basis as making a reasonable inference that a defendant in fact took the in-forum action (which could satisfy Walden).  Id. at 25.  But a court cannot just assume the defendant—forum connection; the plaintiff must support it with facts.  Hence, this theory is insufficient to establish personal jurisdiction over al-Qahtani and al-Assiri here.

### B.  Al-Qahtani's Communication with Khashoggi

Plaintiffs further argue that the Court has jurisdiction over al-Qahtani based on other "specific allegations of his contacts to the United States."  Opp'n at 25.  The complaint alleges that, in response to tweets from Khashoggi critical of Donald Trump, and before Khashoggi's move to the United States, al-Qahtani told him that he was "not allowed to tweet, not allowed to write, not allowed to talk."  Compl. ¶ 50.[13]  While Khashoggi was in the United States, he had two

---

[13] Plaintiffs' opposition suggests this interaction happened while Khashoggi was in the United States.  See Opp'n at 25. However, the complaint suggests that this interaction happened before Khashoggi's "[s]elf-[i]mposed [e]xile" to the United States.  See Compl. ¶¶ 50–52 & n.19.  The Washington Post article on which the complaint relies dates this interaction to late 2016, when Khashoggi was working for a London-based newspaper, and specifically notes that the conversation happened "while Khashoggi was attending a conference in Qatar."  Souad Mekhennet &

interactions with al-Qahtani: (1) al-Qahtani contacted Khashoggi to remind him that bin Salman was monitoring his writings, id. ¶ 57, and (2) al-Qahtani contacted Khashoggi to offer him a job and request that he return to Saudi Arabia, id. ¶ 81.

To make a prima facie case of specific jurisdiction, plaintiffs must allege that the suit "arise[s] out of or relate[s] to the defendant's contacts with the forum." Ford, 141 S. Ct. at 1026 (emphasis in original) (quoting Bristol-Myers Squibb Co. v. Superior Ct. of California, 137 S. Ct. 1773, 1780 (2017)). "The first half of that standard asks about causation; but the back half, after the 'or,' contemplates that some relationships will support jurisdiction without a causal showing." Id.

In Ford, the Supreme Court upheld the exercise of personal jurisdiction over a car manufacturer in two products liability suits arising out of car accidents in Montana and Minnesota, relying on Ford's extensive activities in those states—advertising, maintaining dealerships, distributing replacement parts, etc.—even though Ford had not sold the particular cars at issue in the forum states (such that its in-forum conduct was not causally linked to the accidents at issue). See 141 S. Ct. at 1026–30. The Supreme Court rejected Ford's proposed causation-only approach to specific jurisdiction, id. at 1026, and held that, even if Ford's purposeful availment of the forum states was not a but-for cause of the accident, specific jurisdiction was proper because "Ford had systematically served a market in Montana and Minnesota for the very vehicles that the plaintiffs allege malfunctioned and injured them in those States," id. at 1028.

Relying on Ford, plaintiffs argue that there is a sufficiently "close relationship" between al-Qahtani's contacts with Khashoggi in the United States and the murder of Khashoggi such that

---

Greg Miller, Jamal Khashoggi's Final Months as an Exile in the Long Shadow of Saudi Arabia, Wash. Post (Dec. 22, 2018), https://www.washingtonpost.com/world/national-security/jamal-khashoggis-final-months-an-exile-in-the-long-shadow-of-saudi-arabia/2018/12/21/d6fc68c2-0476-11e9-b6a9-0aa5c2fcc9e4_story.html. Khashoggi moved to the United States in June 2017. Id.

the Court may exercise jurisdiction over al-Qahtani.  Opp'n at 26.  Specifically, al-Qahtani attempted to lure Khashoggi out of the United States and silence his speech; and ultimately, Khashoggi's murder was effectuated by luring him out of the United States and was done to silence his speech.  Id.

But Ford itself was clear that its rejection of a causation-only standard "does not mean anything goes."  141 S. Ct. at 1026.  "[T]he phrase 'relate to' incorporates real limits," id., which are guided by the "essential foundation" of specific jurisdiction: "a strong 'relationship among the defendant, the forum, and the litigation,'" id. at 1028 (quoting Helicopteros Nacionales de Columbia, S.A. v. Hall, 466 U.S. 408, 414 (1984)).  In defining those limits, the Ford Court emphasized the level of targeting of the forum state: "Ford urge[d] Montanans and Minnesotans to buy its vehicles" by "every means imaginable"; operated dozens of dealerships in each state; and "work[ed] hard to foster ongoing connections to its' cars' owners," including in those states. 141 S. Ct. at 1028; see also Staggs v. Smith & Wesson, Civ. A. No. 21-2535 (JEB), 2022 WL 2713277, at *3 (D.D.C. July 13, 2022) (noting that Ford requires some "requisite level of targeting").  Further, the relevant connections that Ford found between the defendant, the forum, and the litigation included plaintiffs' residence in the forum state, use of the defective product in the forum state, and injury in the forum state.  Ford, 141 S. Ct. at 1031.

Applying those limitations, the facts here regarding al-Qahtani's contacts with the United States fall far short of the requisite connection for personal jurisdiction.  His alleged targeting consisted of two phone calls to Khashoggi, who was presumably in the United States at the time— a far cry from the systematic activities Ford conducted in Montana and Minnesota.  And here the litigation itself is unmoored from the United States in a way that Ford was not: Cengiz is not a

U.S. resident, nor did the murder happen here.[14]   See Ford, 141 S. Ct. at 1030 (stating that a defendant is on "notice" that it "will be subject to jurisdiction in the State's courts when the product malfunctions there" (emphasis added and internal quotation marks omitted)).   Hence, the connections here are too infrequent and attenuated to support personal jurisdiction.

### C.   The "Effects" Theory

Under their third theory, plaintiffs assert that the "purpose of the [murder] was to silence Khashoggi's speech within the United States, prevent Khashoggi from exposing MBS's abuses to the American public, and prevent him from persuading American legislators to withdraw their support of MBS."   Opp'n at 18.   Accordingly, plaintiffs argue that the Court may exercise jurisdiction over any participant in the murder under the rule in Calder v. Jones, 465 U.S. 783 (1984), commonly called the Calder "effects" test.   See Opp'n at 18–23.

In Calder, the plaintiff was a California resident who brought suit in California against the author and editor of an allegedly libelous story about her in the National Enquirer.   465 U.S. at 785–86.   The Supreme Court held that, although the article was written and edited in Florida, California could exercise specific jurisdiction over the defendants because their "intentional, and allegedly tortious, actions were expressly aimed at California," such that they "must reasonably

---

[14] Although there are two plaintiffs—Cengiz and DAWN—the two federal law claims are brought by Cengiz only.   See Compl. ¶¶ 163, 174.   DAWN brings only one claim, a tortious inference claim under state law.   See id. ¶¶ 184–91.   This distinction is relevant because plaintiffs argue that personal jurisdiction is appropriate under Fed. R. Civ. P. 4(k)(2), which provides for personal jurisdiction for "a claim that arises under federal law" only.   See Compl. ¶ 39; Opp'n at 6.   Plaintiffs' complaint asserts that the Court would have personal jurisdiction over the state law claims through "pendent personal jurisdiction" because the claims share a "common nucleus of operative fact with Plaintiffs' federal claims," which could serve as anchor claims.   Compl. ¶ 43.

For the reasons discussed throughout this opinion, the Court concludes that exercising personal jurisdiction over al-Qahtani and al-Assiri would violate due process as the Court has neither general nor specific jurisdiction over them.   Plaintiffs state that if the federal claims are dismissed for lack of personal jurisdiction, they would amend the complaint to assert a basis other than Rule 4(k)(2) for personal jurisdiction for the state law claims.   Opp'n at 24.   But because the Court concludes that exercising personal jurisdiction over al-Qahtani and al-Assiri would be inconsistent with due process, there is no alternate basis that plaintiffs could rely on.   See Livnat, 851 F.3d at 47–48, 54 (finding that the outer boundaries of Rule 4(k)(2) are equivalent to those found in the due process clause of the Fifth Amendment).

anticipate being haled into court there to answer for the truth of the statements made in their article." Id. at 789–90 (internal quotation marks omitted).[15]  Relying on this language, plaintiffs argue that defendants' conduct was "expressly aimed" at the United States because its purpose was to "silence Khashoggi's speech within the United States," and "prevent [him] from persuading American legislators to withdraw their support of MBS."  Opp'n at 18.

But that argument, and the allegations it relies on in the complaint, are "conclusory" and "merely state the plaintiffs' theory of specific jurisdiction." Livnat, 851 F.3d at 57.  Plaintiffs plead no facts that "establish" that Khashoggi's murder was "expressly aimed at" the United States.[16]  Dudnikov v. Chalk & Vermilion Fine Arts, Inc., 514 F.3d 1063, 1072 (10th Cir. 2008). For example, in their opposition, plaintiffs point to Khashoggi's columns in the Washington Post about "media and civil society crackdowns initiated by Defendant MBS" and conclude that defendants therefore targeted Khashoggi to "silence his criticism and pro-democracy activities." Opp'n at 19 (quoting Compl. ¶¶ 54, 73).  But that conclusion does not necessarily follow.  And D.C. Circuit precedent counsels against drawing unsupported inferences—even if reasonable— when analyzing whether defendants intended to cause effects in the forum state. See Livnat, 851

---

[15] The Supreme Court's subsequent decision in Walden characterized Calder's holding slightly differently, noting that "[t]he strength of that connection was largely a function of the nature of the libel tort." 571 U.S. at 287. "[B]ecause publication to third persons is a necessary element of libel, the defendants' intentional tort actually occurred in California." Id. at 288 (citation omitted).  Thus, it may be that post-Walden, alleging that a tort's effects were intended to be felt in the forum state will not necessarily establish jurisdiction—the "effects" test may only be available for libel and certain other torts which, like libel, actually occur in part in the state where the effects are felt. See Est. of Klieman by & through Kesner v. Palestinian Auth., 923 F.3d 1115, 1125 (D.C. Cir. 2019), ("Unlike the tort in Calder, which had 'occurred in' the forum, the planning, carrying out, and occurrence of Klieman's killing all took place in the West Bank" (citation omitted)), cert. granted, judgment vacated, 140 S. Ct. 2713 (2020), opinion reinstated in relevant part, No. 15-7034, 2020 WL 5361653 (D.C. Cir. Aug. 18, 2020).

[16] Plaintiffs do allege facts showing that defendants were monitoring Khashoggi's speech and had taken action in the past to curtail it. See, e.g., Compl. ¶ 50 (describing how Saudi officials banned Khashoggi from "speaking publicly because of comments he made that were critical of the then-United States President-elect" during a speech in Washington); id. ¶ 57 (describing call from al-Qahtani "remind[ing] Khashoggi that Defendant MBS was closely monitoring his writings").  However, they do not connect those facts to Khashoggi's murder; nor is it obvious to infer that a government that monitors a journalist's writings would murder him.  See, e.g., CIA Conclusions Article (describing intelligence community's "lingering question" as to "why Mohammed might have decided to kill Khashoggi, who was not agitating for the crown prince's removal").  Plaintiffs must provide facts or evidence that connect "the defendant, the forum, and the litigation." Walden, 571 U.S. at 284 (emphasis added).

F.3d at 57 (declining to draw the inference that a specific attack was aimed at influencing U.S. policy despite evidence "that the Palestinian Authority encourages terrorism against Jews and Israelis in order to influence U.S. policy"); Klieman, 923 F.3d at 1123–24 (noting that although the "basic theme [of conduct targeting the United States] appears reasonable and seems to possess historical support," the jurisdiction inquiry "requires tangible allegations relating the attack that cost Esther Klieman's life to defendants' contacts with the forum"); see also Lewis v. Mutond, 568 F. Supp. 3d 47, 52 (D.D.C. 2021) (describing D.C. Circuit cases prohibiting the inference, in cases involving the torture or murder of an American citizen, that defendants were targeting the U.S.).[17]   As in Livnat and Klieman, it would certainly be "reasonable" to conclude that, because Khashoggi was a U.S.-based journalist who criticized the Saudi government, he was murdered with the intent of silencing such criticism.  Klieman, 923 F.3d at 1123.  But plaintiffs simply do not plead facts that establish that link.

Notably, almost all of the facts that plaintiffs rely on to support this theory involve Khashoggi's connections to the United States—such as his residence here and his writing and advocacy based here.  Keeping in mind the fundamental rule that "plaintiff's contacts with the defendant and the forum state" cannot "drive the jurisdictional analysis," Walden, 571 U.S. at 289, absent evidence about the defendants' U.S.-directed contacts, see Mwani, 417 F.3d at 13 (noting plaintiffs offered "allegations and evidence" of defendant's U.S.-focused intent (emphasis added)),

---

[17] Plaintiffs rely heavily on Mwani v. bin Laden, see Opp'n at 7–8, 11, 19–20, 22, 24, where the D.C. Circuit found personal jurisdiction in a case arising out of the bombing of the U.S. Embassy in Nairobi.  417 F.3d 1, 4 (D.C. Cir. 2005).  As the D.C. Circuit later explained, in Mwani, "defendants' contacts with the United States were manifest in the very act that had precipitated the suit—a 'devastating truck bomb' outside the U.S. Embassy."  Klieman, 923 F.3d at 1125 (internal quotation marks omitted).  Further, the plaintiffs in Mwani offered specific facts showing defendants' attempts to cause harm in the United States—"plaintiffs described an ongoing conspiracy to attack the United States, with overt acts occurring within this country's borders."  Mwani, 417 F.3d at 13.  Unlike in Mwani, the facts here—the killing of a Saudi national who had been monitored by the Saudi government for years and had resided in the United States for only months—do not inherently give rise to the conclusion that defendants must have been targeting the United States; and plaintiffs have not offered any other facts showing purposeful targeting of the United States (as opposed to one resident).

the Court declines to infer a motive on behalf of defendants based primarily on facts concerning Khashoggi's U.S. contacts.[18]

The dearth of facts here is underscored by the "wholly plausible alternative explanation" for the attack suggested by plaintiff's complaint—namely, that the murder was aimed at "dynamics altogether internal to" the Saudi government.  See Klieman, 923 F.3d at 1125; see also Lewis v. Mutond, 568 F. Supp. 3d 47, 53–54 (D.D.C. 2021) (finding no jurisdiction under Calder because although defendant's statements "reference the United States," "the references appear incidental to [defendants'] goal—affecting politics in the DRC").  Plaintiffs here allege that the Saudi government's censorship of Khashoggi began before he relocated to the United States, suggesting that his residence at the time of his murder was not critical to any desire to silence him (even assuming that was the purpose).  See Compl. ¶ 47–51.  And when Khashoggi was in the United States, the complaint describes his work with DAWN as "contrary to [defendants'] pecuniary and other interests and pos[ing] an existential threat to Defendant MBS' plans to secure power as an autocrat."  Id. ¶ 80.  The sources plaintiffs cite provide further alternative explanations.  See, e.g., CIA Conclusions Article ("A theory the CIA has developed is that Mohammed believed Khashoggi was a dangerous Islamist who was too sympathetic to the Muslim Brotherhood . . . .").

---

[18] Along these lines, plaintiffs rely heavily on Hassen v. Nahyan, where a court exercised personal jurisdiction on the basis of somewhat analogous facts: a U.S. citizen was abducted in the United Arab Emirates and alleged that the purpose of his abduction was to "harm American companies by impeding their ability to garner business contracts in the UAE" and "acquire United States government secrets."  No. CV 09-01106, 2010 WL 9538408, at *10 (C.D. Cal. Sept. 17, 2010).  Hassen pre-dates Walden, and relies on an outdated statement of the law: the "effects" test can be satisfied as easily as "targeting 'a plaintiff whom the defendant knows to be a resident of the forum state.'"  Id. at *9.  That rule was rejected by Walden.  See Axiom Foods, Inc. v. Acerchem Int'l, Inc., 874 F.3d 1064, 1069–70 (9th Cir. 2017) ("In Walden, the Supreme Court rejected our conclusion that the defendants' knowledge of the plaintiffs' strong forum connections, plus the foreseeable harm the plaintiffs suffered in the forum, comprised sufficient minimum contacts." (cleaned up)).  Further, the Hassen court found jurisdiction in part based on a factual allegation that "his torturers demanded a list of CIA agents in the UAE," a fact expressly tying defendants, the torture, and the forum state together.  Hassen, 2010 WL 9538408, at *10.  As discussed, there is no such allegation in this case.  To the extent Hassen credited other, unsupported allegations, that approach cannot be squared with recent binding D.C. Circuit precedent.  See Livnat, 851 F.3d at 57.

Given the wide range of motives alleged and supported by the facts, the Court is unwilling to infer and credit the motive that simply restates plaintiffs' specific jurisdiction theory.  See Aljabri v. Saud, Civ. A. No. 20-2146 (TJK), 2022 WL 4598519, at *7 (D.D.C. Sept. 30, 2022) ("From these allegations, the Court could reasonably infer various motives on bin Salman's part related to his efforts to seize and maintain power in Saudi Arabia. But inferring that he tried to kill Aljabri specifically to impact the U.S. intelligence community is a bridge too far.")

Thus, defendants' alleged purpose in killing Khashoggi—to silence his speech about bin Salman within the United States—is neither self-evident nor inferable from the facts pled in the complaint.  Plaintiffs' Calder argument, which necessarily turns on this alleged purpose, therefore fails.

### D.  Jurisdictional Discovery

In the alternative, plaintiffs request jurisdictional discovery.  See Opp'n at 15–18.  Much of the discovery requested is irrelevant to the claims against al-Qahtani and al-Assiri given the legal deficiencies in the jurisdiction theories.  For example, further discovery as to whether Khashoggi went to the Saudi Embassy in Washington or spoke to Khalid bin Salman about his trip to Turkey would be irrelevant as those facts do not concern al-Qahtani or al-Assiri's involvement in the conspiracy or connections to the United States.

Plaintiffs do request party discovery, which theoretically could uncover further information linking al-Qahtani or al-Assiri to the United States, including information on whether defendants' intent was to have effects in the United States as relevant under Calder.  But jurisdictional discovery "is justified only if the plaintiff reasonably 'demonstrates that it can supplement its jurisdictional allegations through discovery,'" and "'[m]ere conjecture or speculation' is not enough."  Exponential Biotherapies, Inc. v. Houthoff Buruma N.V., 638 F. Supp. 2d 1, 11 (D.D.C. 2009).  Plaintiffs must provide "plausible factual support" that the discovery would yield relevant

information. <u>Toumazou v. Turkish Republic of N. Cyprus</u>, 71 F. Supp. 3d 7, 18 (D.D.C. 2014). They fail to do so here.  Instead, they simply assert that it <u>could</u> yield information, which is "based on speculative inferences the Court has already rejected."  <u>Aljabri</u>, 2022 WL 4598519, at *17. Further, plaintiffs do not explain specifically what information they would request or through which discovery mechanisms.  The request is thus "ill-defined and overly broad."  <u>See</u> <u>Cockrum v. Donald J. Trump for President, Inc.</u>, 319 F. Supp. 3d 158, 188 (D.D.C. 2018).  Finally, granting broad party discovery at this stage would "draw this Court into endless discovery disputes," <u>id.</u> at 189, which would be compounded by the nature of the discovery: documents and depositions of two high-ranking Saudi officials.  <u>See</u> <u>Aljabri</u>, 2022 WL 4598519, at *17.  Absent a clearer link between the proposed discovery and personal jurisdiction, the Court will not enter into that thicket.

*     *     *

Because plaintiffs have not adequately pled personal jurisdiction over al-Qahtani or al-Assiri or established a basis for jurisdictional discovery, the claims against al-Qahtani and al-Assiri will be dismissed.

## Conclusion

For the foregoing reasons, the Court will grant both motions to dismiss and accordingly dismiss all claims against bin Salman, al-Qahtani, and al-Assiri.  A separate Order consistent with this opinion will issue.

/s/
_____
JOHN D. BATES
United States District Judge

Dated: <u>December 6, 2022</u>